# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - -

DRUVI JAYATILAKA,    :   CIVIL ACTION
                 :
      Plaintiff,   :
                 :
                 :
   VS.             :     ORIGINAL
                 :
NATIONAL BOARD OF    :
MEDICAL EXAMINERS,   :
                 :
      Defendant.   :   NO.   CV09-2032-PA

- - -

Oral deposition of CATHERINE FARMER, Psy.D., taken at The Rittenhouse, 210 West Rittenhouse Square, Philadelphia, Pennsylvania, on Friday, December 18, 2009, beginning at approximately 10:53 a.m., before Robin Frattali, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

CATHERINE FARMER, PSY.D.

```
 1       APPEARANCES:

 2


 3       MULLIN HOARD & BROWN LLP
         BY:  VINCENT E. NOWAK, ESQUIRE
 4       Amarillo National Plaza Two
         Suite 800
 5       500 South Taylor, Lobby Box #213
         Amarillo, Texas  79101
 6       (806) 372-5050
         Counsel for Plaintiff
 7


 8
         COOLEY GODWARD KRONISH LLP
 9       BY:  GREGORY C. TENHOFF, ESQUIRE
         Five Palo Alto Square
10       4th Floor
         Palo Alto, California  94306-2155
11       (650) 843-5054
         Counsel for Defendant
12

13
         ALSO PRESENT:
14

15
         SUZANNE WILLIAMS, ESQUIRE
16

17

18

19

20

21

22

23

24
```

CATHERINE FARMER, PSY.D.

```
 1                    I N D E X

 2                      - - -

 3    WITNESS:                             PAGE

 4    CATHERINE FARMER, Psy.D.

 5    EXAMINATION

 6    By Mr. Nowak                              4

 7

 8

 9                    EXHIBITS

10

11    EXHIBIT NO.          DESCRIPTION        PAGE

12

13

14

15            (No exhibits were marked.)

16

17

18

19

20

21

22

23

24
```

**CATHERINE FARMER, PSY.D.**

```
1                        -  -  -
2                   CATHERINE FARMER, Psy.D.,
3          having been first duly sworn to tell the
4          truth, was examined and testified as
5          follows:
6                        -  -  -
7    BY MR. NOWAK:
8          Q.    Would you state your full name, please.
9          A.    Catherine Farmer.
10         Q.    And where do you work?
11         A.    National Board of Medical Examiners.
12         Q.    And what do you do at the National
13   Board?
14         A.    I am manager-disability services, ADA
15   compliance officer, testing programs.
16         Q.    What does that all mean?  Tell me what
17   you do on a day-to-day basis.
18         A.    I oversee the day-to-day operations of
19   the Office of Disability Services at the National
20   Board.
21         Q.    And what does that entail?
22         A.    We receive and review requests for test
23   accommodations.  Review and -- review requests for
24   test accommodations for USMLE, United States
```

**CATHERINE FARMER, PSY.D.**

1    Medical Licensing Examination.  I supervise a

2    number of direct reports who process those

3    requests.  I'm responsible for making decisions

4    regarding those requests.  Making sure the

5    accommodations are implemented.

6         Q.    Approximately how many requests do you

7    receive annually?

8         A.    It varies from year to year.

9         Q.    Can you ballpark it for me?

10        A.    I would estimate perhaps around 500 a

11   year.

12        Q.    And of those 500 per year, how many

13   are -- ballpark, and I'm not testing, ballpark,

14   how many are granted accommodations?

15        A.    Are granted accommodations?

16        Q.    Yes.  Yes, ma'am.

17        A.    That also would vary from year to year.

18   Gee.  I would estimate more often than not we

19   grant accommodations.

20        Q.    More than 50 percent?

21        A.    More often than not, yes.

22        Q.    What is -- if there is a typical, what

23   is the typical accommodation that's granted?

24        A.    Oh.  I don't know that there's a

CATHERINE FARMER, PSY.D.

1    typical accommodation that's granted.

2        Q.   Is extra time --

3        A.   Extra time is the most frequently

4    requested accommodation.

5        Q.   How come you denied Dr. Jayatilaka

6    extra time on his Step 2 exam?

7        A.   The review of his documentation did not

8    reveal to us that he demonstrated a substantial

9    limitation in a major life activity relative to

10   the average person.

11       Q.   What did you review to reach that

12   conclusion?

13       A.   I'm sorry.  Can you repeat that?  I

14   didn't hear.

15       Q.   Yes, ma'am.

16              What -- you said you reviewed

17   his documentation.

18       A.   Uh-huh.

19       Q.   What did you review?

20       A.   I believe he submitted a personal

21   statement, some medical records, a neuropsych eval

22   from --

23       Q.   Dushenko?

24       A.   -- Dushenko and Levine, maybe a 2008

CATHERINE FARMER, PSY.D.

1   neuropsych eval.  That's all the documents that I

2   can recall.

3        Q.   After your name you have some initials,

4   P-S-Y-D?

5        A.   Uh-huh.

6        Q.   Yes?

7        A.   Yes.

8        Q.   What does that stand for?

9        A.   Doctor of Psychology.

10       Q.   Do you have a practice of your own

11   outside of your work for the National Board?

12       A.   No.

13       Q.   Are you full-time with the Board?

14       A.   I am.

15       Q.   And the reason I ask that is I think

16   the last time we talked -- you talked to my

17   partner, John Mozola -- I don't think you were

18   full time.

19       A.   Do you remember what year that was?

20       Q.   '03?

21       A.   Correct.  I was in training.

22       Q.   Do you diagnose individuals or do you

23   consult with individuals to determine whether or

24   not they have a disability that qualifies under

CATHERINE FARMER, PSY.D.

1    the ADA?

2                        MR. TENHOFF:  Objection.

3         Compound.  Could you break that down for

4         her?

5                        - - -

6    BY MR. NOWAK:

7         Q.   Do you understand the question?

8         A.   I thought I heard a few questions.

9    Which question would you like me to answer first?

10        Q.   Do you consult with patients?

11        A.   Do I consult with patients?  No.

12        Q.   Have you ever had patients?

13        A.   Have I ever had patients of my own?

14        Q.   As a psychologist.

15        A.   Yes.

16        Q.   Okay.  Have you ever undertaken to

17   evaluate whether a patient has a disability under

18   the ADA?

19                       MR. TENHOFF:  Objection.  Vague

20        as to "evaluate."

21                       THE WITNESS:  I have in my

22        training consulted with patients.  I don't

23        recall that it was for the basis of the --

24        qualifying under the ADA.

CATHERINE FARMER, PSY.D.

1   BY MR. NOWAK:

2        Q.   Have you ever diagnosed a patient with

3   a disability?

4        A.   I have diagnosed patients with mental

5   conditions.

6        Q.   A disability?

7        A.   I don't know that I would qualify them

8   as disabilities or not.  They would be DSM

9   diagnoses.

10       Q.   Okay.  Would you agree with me, and not

11  just me, but Dr. Nussbaum and Dr. Litchford, that

12  in order to diagnose a patient with a disability,

13  you need to sit with the patient and take a

14  history?

15       A.   I would agree that a history is

16  important for making a diagnosis.

17       Q.   Well, Dr. Litchford and Dr. Nussbaum

18  said that they would not undertake to make a

19  diagnosis without actually meeting the patient and

20  taking a history.

21            Do you agree with that?

22       A.   That sounds reasonable.

23       Q.   You agree with that?

24       A.   Yes.

**CATHERINE FARMER, PSY.D.**

1      Q.    And Dr. Nussbaum and Dr. Litchford also

2   said that in addition to personally meeting with

3   the patient and taking a history, that a

4   psychologist would need to administer tests.

5                 You agree with that, correct,

6   to -- to determine whether or not the person has a

7   disability.

8      A.    Not necessarily.  I think it would

9   depend on what the individual's symptoms were,

10  whether you needed to administer a test.

11     Q.    Okay.  Tell me the situations where you

12  would not need to administer a test when

13  evaluating a client or a patient for a disability.

14     A.    Again --

15                 MR. TENHOFF:  Go ahead.

16                 THE WITNESS:  -- I think I

17           would be evaluating or a psychologist would

18           be evaluating for any number of things.

19           Again, it's usually to make a diagnosis.  A

20           diagnosis of anxiety disorders, depression,

21           they don't generally require a test.

22                       - - -

23  BY MR. NOWAK:

24     Q.    Okay.  Let's talk about learning

CATHERINE FARMER, PSY.D.

1  disabilities or a cognitive disorder not otherwise

2  specified.  Let's limit it to that.

3       A.   Okay.

4       Q.   Can you make such a diagnosis without

5  taking a history and administering tests?

6       A.   I suppose it's possible.

7       Q.   Would you do it?

8       A.   Probably not.

9       Q.   Because the best practice is to take

10  the history and administer whatever tests are

11  indicated, correct?

12       A.   Correct.  I think you just hit it,

13  based on the history.  That would lead you to the

14  next steps.

15       Q.   Sure.

16            And then another important

17  component to making a diagnosis in such an

18  individual is clinical observations, correct?

19       A.   Yes, that's -- that's very important.

20       Q.   History, testing, clinical

21  observations, those are the three pillars that are

22  most important in making a diagnosis of an

23  individual for a learning disorder, correct?

24       A.   Okay.  Yes.

**CATHERINE FARMER, PSY.D.**

1      Q.    In fact, Dr. Litchford testified that

2   you really can't say yes or no with respect to a

3   learning disability unless you personally take the

4   history, administer a test and make clinical

5   observations.

6                 And you agree with that, don't

7   you?

8                 MR. TENHOFF:   Objection.

9       Misstates his testimony.

10                THE WITNESS:   I don't know what

11      Dr. Litchford testified to.

12                     -  -  -

13   BY MR. NOWAK:

14      Q.    Well, let me ask you.

15                Can you say yes or no with

16   respect to an ADA disability, specifically a

17   cognitive disorder not otherwise specified, can

18   you say yes, this person has it, or no, this

19   person doesn't without partially taking a history,

20   administering the test and making clinical

21   observations?

22                MR. TENHOFF:   Objection, vague.

23      You mean make a clinical diagnosis?

24                THE WITNESS:   I think the best

**CATHERINE FARMER, PSY.D.**

1          you could do is review the documentation

2          that was provided and agree or disagree with

3          the conclusions of the evaluator.

4                          - - -

5    BY MR. NOWAK:

6          Q.    Dr. Nussbaum testified that it would be

7    unethical to make a diagnosis without actually

8    meeting a patient.

9                    Do you agree with her

10   testimony?

11         A.    To make a diagnosis?

12         Q.    Yes.

13         A.    Yes, I agree.

14         Q.    How can you refute a diagnosis without

15   actually meeting with the patient?

16         A.    Well, again, I think reviewing the

17   documentation that the individual provides would

18   either support the diagnosis or not.  If it

19   doesn't, you'd refute the diagnosis or at least

20   question the diagnosis.

21         Q.    And you've never met with

22   Dr. Jayatilaka, have you?

23         A.    I have not.

24         Q.    Have you asked to meet with him?

CATHERINE FARMER, PSY.D.

1      A.    Have I?

2      Q.    Asked to meet with him.

3      A.    No.

4      Q.    Have you asked him to meet with either

5    Dr. Nussbaum or Dr. Litchford?

6      A.    No.

7      Q.    Why not?

8      A.    It's our guidelines for requesting test

9    accommodations are for individuals to provide

10   documentation from their own treatment or

11   evaluators, treatment providers or evaluators, and

12   then we review that documentation.

13     Q.    But you will agree with Dr. Nussbaum

14   and Dr. Litchford that the best way to evaluate

15   whether someone has a disability that qualifies

16   under the ADA is to meet with them personally,

17   take a history, administer exams, and make

18   clinical observations, correct?

19              MR. TENHOFF:   Objection.  Vague

20         as to "evaluate."

21              THE WITNESS:   I believe that

22         would be appropriate if one was to diagnose

23         or wishing to diagnose.

24                    - - -

**CATHERINE FARMER, PSY.D.**

```
1    BY MR. NOWAK:
2         Q.   In fact, Dr. Litchford said that's the
3    gold standard; that's the way to do it.
4                   You agree with that, correct?
5         A.   If one wishes to diagnose.  If one's
6    goal is to diagnose, yes.
7         Q.   Why do you qualify that?
8         A.   I'm sorry?
9         Q.   Why do you qualify that?
10        A.   I think there's a distinction between
11   reviewing documentation to see if it supports a
12   diagnosis or a request for test accommodations on
13   the basis of disability.
14        Q.   Would you agree --
15                   MR. TENHOFF:  Wait.
16                   Have you finished your answer?
17                   THE WITNESS:  No.
18                   There's a distinction between
19             that and diagnosing someone or evaluating
20             someone for the purpose of making a
21             diagnosis.
22                        - - -
23   BY MR. NOWAK:
24        Q.   Would you agree with me that the best
```

**CATHERINE FARMER, PSY.D.**

1    person to diagnose a disability would be the

2    psychologist who is actually personally taking the

3    history, administering the test, and making

4    clinical observations?  That's the best person to

5    diagnose a disability, correct?

6         A.    That sounds like the best person, yes.

7         Q.    And the National Board has done none of

8    that with respect to Dr. Jayatilaka, correct?

9         A.    We have not diagnosed Dr. Jayatilaka,

10   correct.

11        Q.    Tell me about Step 2 CK.  What is that?

12        A.    It's an examination called a Step 2

13   Clinical Knowledge Examination.  It's one of three

14   step exams for the United States Medical Licensing

15   Examination.  It assesses clinical knowledge.

16        Q.    Tell me about how it's administered,

17   how much time is given, what breaks there are in

18   between.

19        A.    It's a computer-based multiple-choice

20   examination administered over a single day.  There

21   are nine test blocks of one hour each and 45

22   minutes of break time.

23        Q.    Just one break?

24        A.    It's used at the examinee's discretion

CATHERINE FARMER, PSY.D.

1  between test blocks.

2       Q.    I got you.

3                   So they can break up to 45

4  minutes however they choose to take it?

5       A.    That's correct.

6       Q.    Is it a mastery exam, in other words,

7  it tests your knowledge?

8       A.    It is the clinical knowledge exam, yes.

9  It's testing knowledge.

10      Q.    Is it accurate that you either know the

11  answer or you don't?

12      A.    I don't know if that's accurate or not.

13  I suppose.

14      Q.    Do you agree with that?

15      A.    It's a multiple-choice test.  You can

16  choose.  You can guess.  Hopefully, you know the

17  answer.

18      Q.    So you agree with that?

19      A.    Agree with what?

20      Q.    You either know the answer or you

21  don't.

22                   MR. TENHOFF:  Well, objection

23       to the extent it calls for speculation.

24                   Answer, if you can.

CATHERINE FARMER, PSY.D.

1              THE WITNESS:  Again, it's a

2        multiple-choice question test.  You have

3        options.  You can know the answer.  You can

4        guess at the answer.  You can know part of

5        the question -- part of the answer.

6                   - - -

7    BY MR. NOWAK:

8        Q.   Has the Board done any studies on the

9    effect of extra time on Step 2 CK?

10       A.   Not to my knowledge.

11       Q.   Are you aware of any studies with

12   respect to giving extra time on this type of exam?

13       A.   On a computer-based multiple-choice

14   examination?

15              MR. TENHOFF:  Or this

16        particular exam.

17              THE WITNESS:  On this

18        particular exam?

19                   - - -

20   BY MR. NOWAK:

21       Q.   We'll do both.

22       A.   Let me think.

23              I don't know about studies on

24   computer-based multiple-choice examinations.

CATHERINE FARMER, PSY.D.

1      Q.   Tell me about the studies you know

2  about.

3      A.   Again, I don't -- I don't know.  There

4  might be other testing agencies that have done

5  studies.

6      Q.   Are you aware of any studies that

7  evaluate whether giving extra time to a person

8  increases or decreases their score on an exam?

9      A.   I believe that there were studies done

10  by -- I'm sorry if I -- I can't spell his name,

11  Sorecci (sic), Scarpatti (sic) or Scarpatta (sic)

12  and Lu (sic), I believe, where they did a review

13  of the literature of such studies and found mixed

14  results.

15      Q.   What do you mean?

16      A.   Some studies showed that additional

17  time provided a benefit to individuals and some

18  didn't.  I'm sorry.  I don't recall the actual

19  citation.

20      Q.   That's fine.

21           Can you give me the percentage?

22  I mean --

23      A.   No.  I don't recall.

24      Q.   What would be the harm to the National

CATHERINE FARMER, PSY.D.

1    Board in giving Dr. Jayatilaka double time on Step

2    2 CK?

3        A.   Well, I think the Board is interested

4    and obligated to provide reasonable and

5    appropriate test accommodations to individuals who

6    are disabled under the ADA, and that's -- my role

7    is to -- is to do that.

8        Q.   What would be the harm to the National

9    Board in allowing Dr. Jayatilaka double time on

10   Step 2 CK?

11                  MR. TENHOFF:   Objection.  Calls

12          for speculation and lacks foundation.

13                  THE WITNESS:   Again, as I think

14          I stated --

15                       - - -

16   BY MR. NOWAK:

17       Q.   You told me what -- you told me that

18   the Board, you know, makes efforts to make

19   reasonable accommodations when it's --

20       A.   Or follow the law.

21       Q.   All right.  But that -- see, my

22   question is different.  What is the harm to the

23   National Board in allowing Dr. Jayatilaka double

24   time on Step 2 CK?

CATHERINE FARMER, PSY.D.

```
 1                    MR. TENHOFF:  Calls for
 2        speculation.  Lacks foundation.
 3                    THE WITNESS:  I don't know.
 4                        -  -  -
 5    BY MR. NOWAK:
 6         Q.    Is there any harm?
 7                    MR. TENHOFF:  Same objections.
 8                    THE WITNESS:  I don't know.
 9                        -  -  -
10    BY MR. NOWAK:
11         Q.    Dr. Farmer, you're -- I mean, you're
12    the only person I get to talk to from the National
13    Board, and I apologize for repeating myself, but
14    what harm would it be to the Board to give
15    Dr. Jayatilaka double time on Step 2 CK?
16                    MR. TENHOFF:  Objection.  Asked
17        and answered.  Lacks foundation.  Calls for
18        speculation.
19                    THE WITNESS:  I don't know.
20                        -  -  -
21                    MR. NOWAK:  Could I ask you to
22        explain your objections?
23                    MR. TENHOFF:  Sure.
24                    She's already told you what her
```

## CATHERINE FARMER, PSY.D.

1          duties are, and they don't involve
2          determining effect on tests or psychometrics
3          or anything like that.
4                    Your request for the deposition
5          was the person who made the decisions
6          whether to grant the accommodations and
7          Dr. Farmer's that person.  She's here to
8          answer those questions, but she's not the
9          person who develops the test, determines
10         whether the test -- how it would be affected
11         by extra time or not extra time.
12                    She's not a psychometrician.
13                        -  -  -
14   BY MR. NOWAK:
15         Q.   You just don't know?
16         A.   Correct.
17         Q.   How did you determine that
18   Dr. Jayatilaka would not be given the
19   accommodation of extra time on Step 2?
20         A.   Reviewing his documentation, sending it
21   out for external review, and that would have been
22   to Dr. Litchford, and based on the documentation
23   that was provided did not demonstrate that he was
24   substantially limited in a major life activity

CATHERINE FARMER, PSY.D.

1    compared to most or the average person in the

2    general population.

3         Q.   When did y'all consult with

4    Dr. Nussbaum?

5         A.   I don't recall the dates exactly, but

6    it was when we received Dr. Jayatilaka's request

7    for reconsideration, I think, through your letter.

8         Q.   Why did y'all consult with

9    Dr. Nussbaum?

10        A.   I don't recall offhand.

11             I believe that no additional

12   substantive documentation was provided other than

13   I think it was Dr. Dushenko's Affidavit that had a

14   diagnosis.  Dr. Litchford had already reviewed the

15   documentation, rendered a recommendation to us.

16   In view of the request for reconsideration, we

17   thought we would send it out to someone different.

18        Q.   How many requests for accommodations

19   have you sent to Dr. Nussbaum?

20        A.   I don't know offhand.  I can think of

21   maybe a couple this year.

22        Q.   That's this year.  I mean, over your

23   history with her.

24        A.    That's all that I can -- that's all

Page 24

CATHERINE FARMER, PSY.D.

```
1      that I can recall offhand.
2           Q.   Are you critical of the testing
3      administered by Dr. Levine?
4           A.   I'm not sure I understand what you
5      mean.  Am I critical?
6           Q.   Yeah.  Are you critical?
7           A.   Can you -- can you say more?  Can you
8      explain that?
9           Q.   Do you have a problem with the way he
10     tested Druvi?
11          A.   With the way he tested?
12          Q.   Uh-huh.
13          A.   I'm not sure that I know the way he
14     tested other than the report that he provided.
15          Q.   And that report contained the diagnosis
16     of cognitive disorder not otherwise specified,
17     correct?
18          A.   No.
19                    MR. TENHOFF:  Objection.
20     Misstates the evidence.
21                    Go ahead.
22                    THE WITNESS:  No.  No.  His
23     report didn't include any diagnosis.
24                         - - -
```

CATHERINE FARMER, PSY.D.

1    BY MR. NOWAK:

2         Q.    The Dushenko Affidavit did, though,

3    didn't it?

4         A.    After, yes, we got the --

5         Q.    And what was --

6                   MR. TENHOFF:  Wait.  Wait.

7    Let's make sure we get a clear record.

8                   Can you finish your answer,

9    Cathy.

10                  THE WITNESS:  Yeah.

11                  After we had reviewed the

12   neuropsychological evaluation and denied the

13   request, subsequent to that, we received the

14   Affidavit with the diagnosis.

15                  - - -

16   BY MR. NOWAK:

17        Q.    What was the diagnosis?

18        A.    Cognitive disorder NOS.

19        Q.    Not otherwise specified.

20                  And are you critical of that

21   diagnosis?

22        A.    Are you asking do I agree with it?

23        Q.    We'll start with that, and then you can

24   heap on your criticism after that.

CATHERINE FARMER, PSY.D.

1              MR. TENHOFF:  So the question

2      to you, Dr. Farmer, is do you agree with

3      that diagnosis.

4              THE WITNESS:  No, we don't.  I

5      don't believe -- I'm sorry.  No, I don't

6      agree with the diagnosis.

7                      - - -

8   BY MR. NOWAK:

9      Q.   Why not?

10     A.   Again, I don't think the documentation

11  that was provided in the entire record from

12  Dr. Jayatilaka supported a diagnosis of cognitive

13  disorder NOS.

14     Q.   Other than Dr. Litchford and

15  Dr. Nussbaum, who have you consulted with with

16  respect to Dr. Jayatilaka's request for

17  accommodations?

18     A.   I'm trying to think.

19              No one outside of the Board.  I

20  have staff in-house that may have reviewed it at

21  that time.

22     Q.   Who would that be?  Would it be

23  Suzanne?

24     A.   Suzanne may have certainly after --

CATHERINE FARMER, PSY.D.

1    after the fact, not when the decision was made

2    after either your reconsideration request or after

3    the suit was filed.

4         Q.   Right.

5         A.   I've had some staff turnover, so I

6    can't recall exactly if I had another psychologist

7    in the office reviewing with me.  I don't believe

8    so.

9         Q.   Step 2 CK is nine hours?

10        A.   It is.

11        Q.   Has the Board ever considered

12   increasing the amount of time?

13        A.   On Step 2 CK?

14        Q.   Yes.

15        A.   I don't know.

16        Q.   What's a passing score on Step 2 CK?

17        A.   It is a score of 75 on a two-digit

18   scale, and I don't recall exactly on the

19   three-digit scale.

20        Q.   What's a passing score on Step 1?

21        A.   A 75 on the two-digit score.

22        Q.   Why did I think it was 185?

23        A.   It could be.  There's a three-digit

24   score --

CATHERINE FARMER, PSY.D.

1          Q.    All right.   What's --

2          A.     -- and the two-digit scores.

3                         I don't recall the two

4     digit-scores.

5          Q.    Okay.   On Step 1 --

6          A.    I mean the three-digit --

7                    MR. TENHOFF:   Wait.   Hang on.

8                    You don't recall what?

9                    THE WITNESS:   I don't recall

10         the three-digit score on each Step, but 75

11         is always a passing score.

12                        - - -

13    BY MR. NOWAK:

14         Q.    Okay.   Is the Board increasing the

15    score for Step 1 next year?

16         A.    I also don't know that.

17         Q.    From 185 to 188.

18         A.    I don't know.

19         Q.    Who would know?

20         A.    It would be posted at the USMLE

21    website, if and when that's going to occur.

22         Q.    But who could I talk to that would

23    know?  A name.

24         A.    I'm trying to think.

CATHERINE FARMER, PSY.D.

```
 1                    Jerry Dillon.
 2        Q.    Is it the Board's contention that
 3   giving Druvi extra time on Step 2 CK would allow
 4   him an unfair advantage?
 5                    MR. TENHOFF:  Objection.  Calls
 6        for speculation.  Lacks foundation.
 7                    THE WITNESS:  I don't know.
 8                         - - -
 9   BY MR. NOWAK:
10        Q.    Well, who could I ask that question of?
11                    MR. TENHOFF:  If you know.
12                    THE WITNESS:  Yeah.  I don't --
13   I don't know.
14                         - - -
15   BY MR. NOWAK:
16        Q.    Are you aware of any facts that
17   allowing Druvi extra time on Step 2 CK would give
18   him an unfair advantage?
19        A.    I don't know.
20        Q.    Would you agree with me that an
21   appropriate accommodation for an individual who
22   takes double the amount of time to process the
23   written word would be double time on an exam?
24                    MR. TENHOFF:  Objection.  Lacks
```

**CATHERINE FARMER, PSY.D.**

```
 1        foundation.  Calls for speculation.  An
 2        incomplete hypothetical.
 3                 THE WITNESS:  I really couldn't
 4        determine based on a hypothetical situation.
 5                      -  -  -
 6   BY MR. NOWAK:
 7        Q.   Well, if it takes someone twice as long
 8   to read and process the written word, you must
 9   agree, Dr. Farmer, that an appropriate
10   accommodation would be double time, correct?
11        A.   I --
12                 MR. TENHOFF:  Same objections.
13                 Go ahead.
14                 THE WITNESS:  Yeah.  I couldn't
15        speculate on what --
16                      -  -  -
17   BY MR. NOWAK:
18        Q.   Why not?
19        A.   Each case is fact-specific.
20        Q.   Well, if it takes someone twice as long
21   to read and process the written word, wouldn't you
22   agree as a doctor that double time would be the
23   appropriate accommodation?
24                 MR. TENHOFF:  Same objections.
```

**CATHERINE FARMER, PSY.D.**

```
1              THE WITNESS:  I couldn't
2       speculate on what an appropriate
3       accommodation would be for a hypothetical
4       situation.
5                    - - -
6    BY MR. NOWAK:
7       Q.   Well, it's not a hypothetical.  I'm
8    talking about Druvi.
9              Let me ask you this:  If it
10   takes someone longer than most people to read and
11   process the written word, wouldn't you agree as a
12   doctor that the appropriate accommodation is to
13   give them extra time to read and process the
14   written word?
15             MR. TENHOFF:  Objection.  Lacks
16      foundation.  Calls for speculation.
17      Incomplete hypothetical.
18                   - - -
19   BY MR. NOWAK:
20      Q.   And this is a softball.  This is an
21   easy one.
22             MR. TENHOFF:  Same objections.
23             THE WITNESS:  I wouldn't
24      speculate on a hypothetical situation.
```

CATHERINE FARMER, PSY.D.

1    BY MR. NOWAK:

2         Q.    I'm asking you to.

3              MR. TENHOFF:  Well, she's a

4         fact witness, Vince.  She doesn't speculate.

5         You know better than that.

6                   - - -

7    BY MR. NOWAK:

8         Q.    If you had a kid, and your kid took

9    twice as long to read something like the Hardy

10   Boys or Nancy Drew, wouldn't you agree that an

11   appropriate accommodation is give your kid a

12   little bit of extra time to read the book?

13              MR. TENHOFF:  Same objections.

14              THE WITNESS:  Again, it's a

15        hypothetical situation.

16                   - - -

17   BY MR. NOWAK:

18        Q.    It is.  But you agree with me?

19        A.    I can't speculate on a hypothetical

20   situation what would be an appropriate

21   accommodation.

22        Q.    Do you have children?

23        A.    No.

24              MR. NOWAK:  Five-minute break.

**CATHERINE FARMER, PSY.D.**

1          We're just about done.

2                      MR. TENHOFF:  Sure.

3                      - - -

4                      (Whereupon, a discussion was

5          held off the record.)

6                      - - -

7     BY MR. NOWAK:

8          Q.   Is it the National Board's contention

9     that Dr. Jayatilaka is not qualified to be a

10    medical doctor?

11         A.   I don't know that.  Nobody's ever made

12    that statement.

13         Q.   So that's a no?

14         A.   That's a no.

15         Q.   Is the Step 2 CK exam designed to test

16    reading comprehension?

17                     MR. TENHOFF:  Objection.  Lacks

18         foundation.  Calls for speculation.

19                     THE WITNESS:  Our website

20         doesn't indicate that it's a reading

21         comprehension test, no.

22                     - - -

23    BY MR. NOWAK:

24         Q.   So that's a no?

CATHERINE FARMER, PSY.D.

1        A.    No.

2        Q.    In the last five years, if you could,

3    please, ballpark for me the number of people who

4    were granted the accommodation of extra time on

5    Step 2 CK.

6        A.    Sorry.  I have absolutely no idea how

7    many people in the last five years were granted.

8        Q.    I think you told me earlier it was more

9    than 50 percent?

10             MR. TENHOFF:   Objection.

11       Misstates her testimony.

12                      -  -  -

13   BY MR. NOWAK:

14       Q.    Is that accurate?

15       A.    I believe I -- my statement was to a

16   question about how many accommodations on average,

17   and I believe I said we granted an accommodation

18   more often than not.

19       Q.    Which would be 51 percent or better,

20   right?

21       A.    Yeah.  That would mean across all

22   steps, any kind of accommodation.

23       Q.    Do y'all have records in your office

24   that would tell me precisely how many people in

CATHERINE FARMER, PSY.D.

```
 1   the last five years applied for accommodations and
 2   how many people received accommodations?
 3        A.    That would be information we could get
 4   out of the database.
 5        Q.    If I wanted to phrase a document
 6   request, what would I need to ask of you to get
 7   that information?
 8                  MR. TENHOFF:  Objection.  Calls
 9         for speculation.
10                  THE WITNESS:  I think your
11         question would be clear.
12                     -  -  -
13   BY MR. NOWAK:
14        Q.    Tell me -- I'm going to write it down
15   right now.  What do I need to ask for?
16        A.    What did you just ask previously?
17                  MR. TENHOFF:  Objection.  Calls
18         for speculation.
19                  MR. NOWAK:  Well, actually,
20         she's talking to the court reporter now.
21         It's not speculation.
22                  THE WITNESS:  No, I was --
23                     -  -  -
24   BY MR. NOWAK:
```

CATHERINE FARMER, PSY.D.

1       Q.    I think my question is --

2       A.    I was talking to you.

3       Q.    -- was, if I were to send you a

4   document request asking you for documents that

5   would show how many requests were received by the

6   National Board for accommodations and how many

7   requests were granted, would that be sufficient to

8   get the information I'm looking for?

9       A.    For a document request?  I don't have

10  that in my head, a document request.  I'm sure we

11  could get that information.

12      Q.    So that would be a yes?  I can copy and

13  paste out of this transcript and send a document

14  request?  That's a good question?

15              MR. TENHOFF:  Well, objection,

16          to the extent this witness isn't here to

17          answer and respond to document requests.

18              But I think the question to you

19          is would you understand if you received that

20          document request what Mr. Nowak is asking

21          for?

22              THE WITNESS:  Yes.

23                   - - -

24  BY MR. NOWAK:

CATHERINE FARMER, PSY.D.

1    Q.   And would you have any objection to

2    providing me those documents?

3                   MR. TENHOFF:  Objection.

4         That's not for this witness to say.

5                   You don't need to answer that

6         question.

7                   MR. NOWAK:  Are you instructing

8         the witness not to answer?

9                   MR. TENHOFF:  Yes, to the

10        extent you don't make document requests to

11        witnesses at deposition.

12                   - - -

13   BY MR. NOWAK:

14        Q.   In the last five years, and I apologize

15   if I'm repeating myself, but in the last five

16   years, how many times has the National Board

17   granted extra time as a percentage on a Step 2 CK?

18        A.   I'm sorry.  You are repeating yourself,

19   and I don't --

20        Q.   I may be.

21        A.   I don't know that information off the

22   top of my head.

23        Q.   Would it be more than 50 percent?

24        A.   I don't know.

Page 38

**CATHERINE FARMER, PSY.D.**

1      Q.    Why do you use Dr. Litchford?

2      A.    Why do I use Dr. Litchford?

3      Q.    Why does the Board use Dr. Litchford?

4      A.    He has experience and training in areas

5      relevant to the requests for test accommodations

6      that we receive.

7      Q.    How many times has Dr. Litchford told

8      you on a given examinee that this examinee is

9      entitled to extra time?

10     A.    I don't have that information on the

11     top of my heard either.

12     Q.    Can you ballpark it?

13     A.    No.

14            MR. TENHOFF:  Just as a

15            foundational question, Vince, you keep

16            asking about the last five years.  I don't

17            know if you've established how long she's

18            been in this position.

19                    - - -

20     BY MR. NOWAK:

21     Q.    How long have you been in this

22     position?

23     A.    Since September 2006.

24     Q.    All right.  But you've been with the

CATHERINE FARMER, PSY.D.

1    Board since at least 2003, correct?

2        A.   Correct.

3        Q.   And you've been associated with

4    Litchford since at least 2003, correct?

5        A.   Associated -- I have done some work in

6    the Office of Disability Services since at least

7    2003.

8        Q.   Well, he's been a consultant since at

9    least 2003, correct?

10       A.   Yes, correct.

11       Q.   To the National Board.

12       A.   Correct.

13       Q.   And 95 percent of the time his

14   recommendation is to not allow an accommodation,

15   correct?  That was his testimony?

16       A.   I don't -- I don't know what his

17   testimony was.

18       Q.   Well, I'm telling you he said that he's

19   reviewed over 200 cases, and in only five percent

20   of those cases did he recommend an accommodation.

21              Would you disagree with that?

22              MR. TENHOFF:  Objection.  Lacks

23       foundation.  Calls for speculation.

24              THE WITNESS:  Again, I'm -- I

CATHERINE FARMER, PSY.D.

1          don't know what he testified, and I don't

2          have that information on the top of my head.

3                         - - -

4    BY MR. NOWAK:

5          Q.    Well, I'm telling you what he testified

6    to --

7          A.    Okay.

8          Q.    -- and he said he did over 200 cases

9    and only recommended accommodations in five

10   percent of those cases.

11               You have no reason to dispute

12   that testimony, do you?

13         A.    I'm saying I don't know.  I don't know

14   the answer.

15         Q.    How often has Dr. Nussbaum recommended

16   accommodations?

17         A.    Well, she did not in this case, and

18   that's the only one that I can recall.  I don't

19   recall the other cases she's done.

20         Q.    Do you remember Dr. Rush?

21         A.    An examinee, Rush?

22         Q.    Yes.

23         A.    Yes, I know of him.

24         Q.    You know that in that case she did not

SUMMIT COURT REPORTING

**CATHERINE FARMER, PSY.D.**

1      recommend an accommodation, correct?

2                          MR. TENHOFF:  If you know.

3                          THE WITNESS:  I don't know.

4                              - - -

5      BY MR. NOWAK:

6          Q.    Well, you remember there was a lawsuit

7      over Dr. Rush, right?

8          A.    I do.

9          Q.    Okay.  And you remember that it was the

10     Board's position that Dr. Rush was not entitled to

11     an accommodation, correct?

12         A.    I would presume that's why.

13         Q.    And Dr. Don Flanagan was one of your

14     outside consultants, correct?

15         A.    Again, I was not involved in the Rush

16     case.

17         Q.    You wrote a letter.

18         A.    Other than writing the letter.

19         Q.    Okay.

20         A.    I didn't make the decision.  I was

21     working part-time.

22         Q.    Who made the --

23         A.    I was working part-time, not in the

24     decision making role that I'm in now.

CATHERINE FARMER, PSY.D.

1          Q.    Okay.   Who made the decision on

2     Dr. Rush's case?

3          A.    I don't recall.

4                     What year was it?

5          Q.    '93.

6                     2003.   Sorry.

7                     MR. TENHOFF:   Again, if you

8          know.   Don't speculate.

9                     THE WITNESS:   I don't know for

10         sure.

11                         - - -

12    BY MR. NOWAK:

13         Q.    And who is the ultimate decision maker

14    in Dr. Jayatilaka's request?

15         A.    I am.

16         Q.    Tell me every reason you, on behalf of

17    the Board, refused to grant the accommodation of

18    extra time to Dr. Jayatilaka?

19                     MR. TENHOFF:   Objection.   Asked

20         and answered.

21                     You can answer again.

22                     THE WITNESS:   The documentation

23         submitted by Dr. Jayatilaka upon review, the

24         initial and subsequent reconsideration

**CATHERINE FARMER, PSY.D.**

1    request did not demonstrate that he was

2    substantially limited in a major life

3    activity as compared to the average person

4    in the general population.

5                    - - -

6    BY MR. NOWAK:

7        Q.   What documentation?

8                MR. TENHOFF:  Objection.  Asked

9    and answered.

10               You can answer again.

11               THE WITNESS:  The documentation

12   that he submitted initially.

13                    - - -

14   BY MR. NOWAK:

15       Q.   Yeah.

16       A.   I'm answering.  Medical records.

17       Q.   From who?

18       A.   I don't recall offhand.  Some

19   physicians that attended to him in -- after his --

20       Q.   All right.  So we've got --

21       A.   -- surgery.

22       Q.   -- medical records that you --

23               MR. TENHOFF:  Why don't you let

24   her finish her whole answer.

CATHERINE FARMER, PSY.D.

1          MR. NOWAK:  I'm just trying to

2      make a note.

3              - - -

4   BY MR. NOWAK:

5      Q.   We've got medical records that you

6   don't recall.  What else?

7      A.   He had a neuropsychological evaluation

8   from Dushenko and Levine.

9      Q.   What did that tell you?

10         MR. TENHOFF:  Well, wait.  Let

11     her finish the list.  You asked her for all

12     the documentation, so let her finish the

13     list, please.

14         THE WITNESS:  He had a personal

15     statement that he submitted, and I believe a

16     letter from a physician named Gorbunoff.

17         MR. TENHOFF:  Are you done?

18         THE WITNESS:  Did you ask me

19     what documentation?

20         That's the documentation I can

21     recall.

22             - - -

23   BY MR. NOWAK:

24     Q.   All right.  So we have medical records

Page 45

**CATHERINE FARMER, PSY.D.**

 1   that you do not recall, correct?

 2        A.   I don't recall the physicians in

 3   attendance.

 4        Q.   Well, tell me what you do recall about

 5   these medical records.

 6                  MR. TENHOFF:  Objection.  Best

 7        evidence.

 8                  Go ahead.

 9                  MR. NOWAK:  Well, exactly.  I

10        mean, the witness -- I'm sorry.

11                  MR. TENHOFF:  Well, you've got

12        all the records.

13                       - - -

14   BY MR. NOWAK:

15        Q.   Tell me --

16                  MR. TENHOFF:  Show them to her.

17                       - - -

18   BY MR. NOWAK:

19        Q.   Tell me about the medical records that

20   you don't recall.

21        A.   I don't recall the physicians who

22   attended to him when he had surgery in 1995, I

23   believe.  I believe they were from St. Mary's

24   Hospital.  There were operative reports.

CATHERINE FARMER, PSY.D.

1      Q.    And what did they tell you?

2      A.    That he had surgery after 1995.

3      Q.    When you initially said no to

4  Dr. Jayatilaka's request for accommodations, had

5  you consulted with anybody?

6      A.    Had I consulted with anybody?  George

7  Litchford.

8      Q.    And he testified that he spent about an

9  hour and 45 minutes before he made his first

10 recommendation to deny an accommodation.

11             Does that comport with your

12 recollection?

13     A.    I don't recall how much time he spent.

14     Q.    How long does it take to evaluate a

15 person for a disability?

16             MR. TENHOFF:  Objection.  Vague

17     as to "evaluate."

18             THE WITNESS:  I don't know.  I

19     imagine it would vary.

20                    - - -

21 BY MR. NOWAK:

22     Q.    Well, you're a Doctor of Psychology,

23 correct?

24     A.    Correct.

CATHERINE FARMER, PSY.D.

1    Q.   If I brought my 16-year-old son to you

2    and told you that he was having trouble keeping up

3    with the rest of his class, how long would you

4    spend with him to determine whether or not he had

5    a learning disability?

6              MR. TENHOFF:  Objection.  Calls

7         for speculation.  Incomplete hypothetical.

8              THE WITNESS:  I don't know.  It

9         would depend.

10                    - - -

11   BY MR. NOWAK:

12   Q.   Well, have you ever diagnosed anyone

13   with a learning disability?

14   A.   I have.

15   Q.   And generally, how long does it take to

16   visit with a person and take a history, administer

17   tests and make clinical observations?

18              It takes more than an hour and

19   45 minutes, doesn't it?

20   A.   To evaluate an individual to render a

21   diagnosis?

22   Q.   Yes.

23   A.   It could.

24   Q.   Well, it does.

CATHERINE FARMER, PSY.D.

1       A.   It could.

2       Q.   Well, would -- have you ever made a

3  diagnosis in less than two hours?

4       A.   I don't recall.

5       Q.   Well, think.

6       A.   I really don't recall.

7       Q.   Would you ever make a diagnosis in less

8  than two hours of a learning disability?

9       A.   Again, I don't know.  I can't speculate

10  on what I would or wouldn't do.  It would be based

11  on the individual who presented.

12       Q.   Sure, but you're the doctor, I'm not.

13            You agree with me that it would

14  take more than two hours to diagnose a learning

15  disability, wouldn't it?

16            MR. TENHOFF:  Objection.  Calls

17       for speculation.  Incomplete hypothetical.

18            - - -

19  BY MR. NOWAK:

20       Q.   It is a hypothetical because you're the

21  doctor.  You're the expert.

22            MR. TENHOFF:  No, she's not

23       testifying as an expert, Vince.

24            MR. NOWAK:  She's a doctor.

CATHERINE FARMER, PSY.D.

```
 1    BY MR. NOWAK:
 2         Q.   This is a softball that's really a swat
 3    out of the park.
 4              It takes more than two hours to
 5    diagnose an individual with a learning disability,
 6    doesn't it?
 7              MR. TENHOFF:  Same objections.
 8              THE WITNESS:  Again, it's a
 9         hypothetical situation.  I don't know how
10         long it would take to diagnose somebody with
11         a learning disability.
12                   - - -
13    BY MR. NOWAK:
14         Q.   I just want to make sure I have your
15    testimony clear.
16              You don't know how long it
17    would take to diagnose an individual with a
18    learning disability, correct?
19              MR. TENHOFF:  Objection.  Calls
20         for speculation.  Incomplete hypothetical.
21              THE WITNESS:  That's correct.
22                   - - -
23    BY MR. NOWAK:
24         Q.   Okay.  And along the same line, you
```

CATHERINE FARMER, PSY.D.

1    don't know how long it would take to diagnose an

2    individual with a cognitive disorder NOS, correct?

3                    MR. TENHOFF:  Same objections.

4                    THE WITNESS:  Again, I think

5         I've stated, it varies from person to

6         person.  It would depend on the

7         presentation.

8                         - - -

9    BY MR. NOWAK:

10        Q.   Is that a yes?

11        A.   It's an I don't know.

12        Q.   You just don't know how long it would

13   take?

14        A.   It varies, so I couldn't speculate as

15   to a specific number, one hour, two hours.

16        Q.   Can you diagnose someone within two

17   hours?

18        A.   I don't know.  I guess it depends on

19   what it is.

20        Q.   Could any psychologist diagnose

21   somebody within two hours of having cognitive

22   disorder NOS?

23                    MR. TENHOFF:  Objection.  Lacks

24        foundation.  Calls for speculation.

## CATHERINE FARMER, PSY.D.

1       Incomplete hypothetical.

2             THE WITNESS:  I'm sorry.  I

3       really don't know.

4             - - -

5  BY MR. NOWAK:

6       Q.   You'd have to meet with the patient,

7  correct?

8             MR. TENHOFF:  Objection.  Asked

9       and answered.

10            THE WITNESS:  The amount of

11       time it would take to diagnose would depend

12       on the presentation of the individual.

13             - - -

14  BY MR. NOWAK:

15       Q.   So that's a yes?

16       A.   That's a yes.

17           MR. NOWAK:  Pass the witness.

18           MR. TENHOFF:  Okay.  I have no

19       questions.

20             - - -

21          (Whereupon, at 11:15 a.m., the

22       witness was excused and the deposition was

23       concluded.)

24             - - -

CATHERINE FARMER, PSY.D.

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF PENNSYLVANIA   :

4                                   :       SS

5    COUNTY OF PHILADELPHIA         :

6

7

8                        I, ROBIN FRATTALI, Registered

9    Professional Reporter - Notary Public, within and

10   for the Commonwealth of Pennsylvania, do hereby

11   certify that the proceedings, evidence, and

12   objections noted are contained fully and

13   accurately in the notes taken by me of the

14   preceding deposition, and that this copy is a

15   correct transcript of the same.

16

17

18                          *Robin Frattali*

19                          _____

20                          ROBIN FRATTALI

21                          Registered Professional

22                          Reporter - Notary Public

23

24

**CATHERINE FARMER, PSY.D.**

```
1              INSTRUCTIONS TO THE WITNESS
2                    Read your deposition over carefully
3      It is your right to read your deposition and make
4      changes in form or substance.  You should assign a
5      reason in the appropriate column on the errata
6      sheet for any change made.
7                    After making any changes in form or
8      substance which have been noted on the following
9      errata sheet along with the reason for any change,
10     sign your name on the errata sheet and date it.
11                   Then sign your deposition at the
12     end of your testimony in the space provided.  You
13     are signing it subject to the changes you have
14     made in the errata sheet, which will be attached
15     to the deposition before filing.  You must sign it
16     in front of a witness.  Have the witness sign in
17     the space provided.  The witness need not be a
18     notary public.  Any competent adult may witness
19     your signature.
20                   Return the original errata sheet to
21     your counsel promptly.  Court rules require filing
22     within thirty days after you receive the
23     deposition.
24
```

**CATHERINE FARMER, PSY.D.**

1              ERRATA SHEET

2    Attach to Deposition of:  Catherine Farmer, Psy.D.
     Taken on:  December 18, 2009
3    In the matter of:  Jayatilaka vs. National Board

4    PAGE          LINE NO.          CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

**CATHERINE FARMER, PSY.D.**

```
1                    SIGNATURE PAGE

2

3                        - - -

4

5            I hereby acknowledge that I have

6    read the aforegoing transcript, dated December 18,

7    2009, and the same is a true and correct

8    transcription of the answers given by me to the

9    questions propounded, except for the changes, if

10   any, noted on the Errata Sheet.

11

12                       - - -

13

14

15

16

17   SIGNATURE:    _____

18                 Catherine Farmer, Psy.D.

19

20   WITNESSED BY:  _____

21

22

23

24
```