# Exhibit B

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

DRUVI JAYATILAKA,                    ) No. CV09-2032 PA
                                     )   (CAx)
        Plaintiff,                   )
                                     )
        vs.                          )
                                     )
NATIONAL BOARD OF MEDICAL            )
EXAMINERS,                           )
                                     )
        Defendant.                   )
_____    )

DEPOSITION OF:

        ANDREW JEREMIAH LEVINE, Ph.D.
        Wednesday, October 7, 2009
        9:04 a.m.

Reported by:
        MONICA T. VOGELBACHER
        CSR No. 6406

---

**Page 2**

1       Deposition of ANDREW JEREMIAH LEVINE, Ph.D.,
2   taken at 400 Ocean Gate, Ninth Floor, Long Beach,
3   California, beginning at 9:04 a.m. and ending at 2:13
4   p.m., on Wednesday, October 7, 2009, before MONICA T.
5   VOGELBACHER, Certified Shorthand Reporter No. 6406.
6
7   APPEARANCES:
8
9   For Plaintiff:
10
11          MULLIN HOARD & BROWN LLP
12          BY: VINCENT E. NOWAK
13          Attorney at Law
14          Amarillo National Plaza Two, Suite 800
15          500 South Taylor, Lobby Box #213
16          Amarillo, Texas  79101
17          (806) 372-5050
18
19
20
21
22
23
24
25

---

**Page 3**

1   APPEARANCES: (Continued)
2
3   For Defendant:
4
5          COOLEY GODWARD KRONISH LLP
6          BY:  GREGORY TENHOFF
7          Attorney at Law
8          Five Palo Alto Square
9          3000 El Camino Real
10          Palo Alto, California  94306
11          (650) 843-5000
12
13   Also Present:
14
15          DRUVI JAYATILAKA
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1                       INDEX
2
3   WITNESS:                     EXAMINATION
    ANDREW JEREMIAH LEVINE, Ph.D.
4
5
6          BY MR. TENHOFF              6
7
8
9              E X H I B I T S
10  DEFENDANT                          PAGE
11  Exhibit 1   Neuropsychological Evaluation      9
12  Exhibit 2   General Guidelines for all        15
                Disabilities
13
    Exhibit 3   Neuropsychology Questionnaire     24
14
    Exhibit 4   12/08/1995 handwritten notes      25
15
    Exhibit 5   3/17/08 handwritten notes         25
16
    Exhibit 6   3/24/08 handwritten notes         27
17
    Exhibit 7   MRI Brain scans                   29
18
    Exhibit 8   DSM-IV Fourth Edition             36
19
    Exhibit 9   Chadwick School records          72
20
    Exhibit 10  Franklin & Marshall Student       73
                Academic Record
21
    Exhibit 11  Universidad Autonoma De           75
                Guadalajara school records
22
23
    Exhibit 12  Chadwick School College           77
                Counseling Report
24
25  Exhibit 13  MCAT Information                  79

---

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

## Page 5

1   INDEX (Continued):
2
3        E X H I B I T S
4   DEFENDANT                          PAGE
5   Exhibit 14  5/30/08 Neuropsychological      83
                Evaluation
6
    Exhibit 15  Boston Naming Test              94
7
    Exhibit 16  MMPI-2                          129
8
    Exhibit 17  4/2/08 MCMI-III                 133
9
    Exhibit 18  12/7/06 MCMI-III                139
10
    Exhibit 19  5/8/08 CPT II                   154
11
    Exhibit 20  6/12/06 letter from Dr. Aksamit  158
12              and report
13  Exhibit 21  Levine CV                       160
14
15
16        INFORMATION REQUESTED
17              (None)
18
19
20    QUESTION INSTRUCTED NOT TO ANSWER
21              (None)
22
23
24
25

## Page 6

1        Long Beach, California; Wednesday, October 7, 2009
2              9:04 a.m. - 2:13 p.m.
3
4        ANDREW JEREMIAH LEVINE, Ph.D.,
5   having been first duly sworn, was examined and testified
6   as follows:
7
8              EXAMINATION
9   BY MR. TENHOFF:
10    Q   Dr. Levine, we met off the record. My name is
11  Greg Tenhoff. I'm one of the attorneys for the National
12  Board of Medical Examiners in a case brought by
13  Mr. Jayatilaka, who is present here today with his
14  counsel.
15        Have you ever had your deposition taken
16  previously?
17    A   No.
18    Q   Let me go through a little bit of the ground
19  rules for the deposition so you understand those.
20        The format here is that I will be asking
21  questions and you will be answering those questions. The
22  reporter, who's seated to your right, will be taking down
23  everything that is said on the record in a deposition
24  transcript.
25        At the end of the deposition, she will prepare a

## Page 7

1   transcript and provide you with a copy to make any
2   changes to it. You'll have a period of time to do that.
3   I do have to caution you that if you do make any changes,
4   I can comment on those changes at future proceedings.
5        Do you understand that?
6    A   Uh-huh.
7    Q   And what's important here, too, is that you'll
8   need to answer my questions audibly. She can't take down
9   nods of the head and uh-huhs and those kinds of things.
10   A   Okay, gotcha.
11   Q   The other thing that's a bit artificial about
12  this process is, unlike normal conversation, where there
13  are times we can talk over each other and we both
14  understand each other. Here, it's really important that
15  you allow me to finish my question before you start your
16  answer, and I'll try to do the same thing, I'll let you
17  finish your answer before I ask my next question.
18        I'll also do my best to try to ask you questions
19  that you can understand, and hopefully I'm being clear.
20  We have a bit of medical jargon here, so there may be
21  times when I get things wrong. What I'd ask you to do is
22  if I ask you a question that you don't understand, just
23  tell me you don't understand and I'll be happy to
24  rephrase it.
25        Can you do that today?

## Page 8

1    A   Yes.
2    Q   And you understand that you're testifying under
3   penalty of perjury today?
4    A   Yes.
5    Q   You understand that's the same oath that you
6   would take if you were testifying in a court of law?
7    A   I do.
8    Q   Is there any reason you can't provide your true
9   and accurate testimony here today?
10   A   No.
11   Q   Did you review any documents in preparation for
12  your testimony?
13   A   I did.
14   Q   What did you review?
15   A   The report that Dr. Dushenko and I wrote for
16  Mr. Jayatilaka and a letter that was written in response
17  to that report, and then Dr. Dushenko's letter that was
18  written in response to that letter.
19   Q   Okay. And we'll get to some of those documents
20  in a moment.
21        Were there any other documents that you reviewed
22  to refresh --
23   A   Just the raw data from my assessment.
24   Q   Okay. Did you have any discussions with anybody
25  about the substance of your testimony prior to you

2 (Pages 5 to 8)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 9

1    appearing here today?
2        A   Dr. Dushenko and I just discussed some of the
3    issues about the case.
4        Q   When did you have that discussion?
5        A   Probably two days ago.
6        Q   What did you discuss?
7        A   We just discussed the evaluation, what was done,
8    what was -- he kind of filled me in on what a deposition
9    consists of, what's going to be asked of me in general,
10   things like that.
11       Q   Okay.  Did you have any discussion with him
12   about any changes to anything that was in your initial
13   report?
14       A   No.
15       Q   All right, let's go ahead and start there.
16       MR. TENHOFF:  Can you mark this as Number 1,
17   please.
18       MR. NOWAK:  Thank you.
19       MR. TENHOFF:  Uh-huh.
20       DRUVI JAYATILAKA:  Thanks.
21       (Defendant Exhibit 1 was marked
22       for identification by the reporter.)
23   BY MR. TENHOFF:
24       Q   Dr. Levine, I've -- are you looking for
25   something there?

Page 10

1        A   Yeah, I'm just getting my paperwork together.
2        Q   Oh.  What do you have in front of you there?
3        A   This is the report.
4        Q   Okay.
5        A   This is the letter from Dr. Dushenko to
6    Dr. Farmer.  And this is an affidavit that I don't need.
7        Q   Okay.  For documents, what'll happen here is
8    that since we have subpoenaed your office and received
9    documents in response to those, we will be using
10   documents that you provided to us.  So if I have
11   questions about specific documents, I'll go ahead and
12   place that in front of you --
13       A   Okay.
14       Q   -- and allow you to take a look at that.  And
15   what I've placed before you now is Exhibit 1 to this
16   deposition, and I will represent to you that this is the
17   report that the National Board of Medical Examiners
18   received from your office.
19       And I wonder if you could take just a moment to
20   review it and tell me whether you recognize that document
21   and that is your signature on page 12.
22       A   Well, I recognize it, that's for sure.  It's
23   formatted a little differently than the report that I
24   have, but that's probably nothing -- that is my
25   signature.

Page 11

1        Q   Okay.  At the top of Exhibit 1, there's a series
2    of things about the patient and the date of birth, and
3    one says, "Referral Source:  William Hornstein, M.D."
4        A   Uh-huh.
5        Q   How is it that you first became involved with
6    providing any evaluation for Mr. Jayatilaka?
7        A   Dr. Dushenko had seen Mr. Jayatilaka first and I
8    believe came to the conclusion that he needed a
9    neuropsychological evaluation, so as the
10   neuropsychologist in the practice, he was referred to me
11   by Dr. Dushenko.
12       Q   When was the first time that you got involved
13   with Mr. Jayatilaka and the evaluation?
14       A   I believe it would have been the date 5/8/08,
15   was the first day that we had an evaluation together.
16       Q   Okay.  We'll go into that in just a moment --
17       A   Okay.
18       Q   -- because I want to ask you specifically
19   various dates and tests that were provided.
20       A   Uh-huh.
21       Q   What was your understanding as to the reason for
22   why Mr. Jayatilaka was requesting or being recommended to
23   have an evaluation?
24       A   Well, thinking back to the time, I believe
25   Dr. Dushenko had informed me that -- of his background,

Page 12

1    that he was in medical school; that he had been assaulted
2    at a certain -- I think it was in 1995, and since that
3    time was having difficulty passing his Boards, and due to
4    that reason, he was seeking evaluation to find out what
5    problems there might be that were preventing him from
6    passing.
7        Q   Okay.  Did you know Dr. Hornstein prior to this
8    time?
9        A   No, I don't think I've ever met Dr. Hornstein.
10       Q   Prior to the first time you met Mr. Jayatilaka,
11   did you have any communications with him -- with his
12   father, rather?
13       A   No.
14       Q   Did Dr. Dushenko provide you with any
15   information about Mr. Jayatilaka prior to the time that
16   you first met him in evaluation?
17       A   Yes.  He provided me with his notes, his
18   progress notes, his evaluation notes.
19       Q   Okay.  And I'll show you those in a bit, too,
20   because there seems to be some notes, I can't quite tell
21   who took those, so I'll probably be asking you about
22   those as well.
23       What, if anything, did he tell you about
24   Mr. Jayatilaka prior to the time that you first met him
25   and began your evaluation?

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 13

1    A  I couldn't tell you what he told me at the time.
2    Whatever he told me was probably -- I was -- probably
3    integrated into the report by me and by him.  We both
4    worked on the report together.
5    Q  Let me ask you, then:  Who actually drafted this
6    report, Exhibit 1?
7    A  In general, Dr. Dushenko worked on the first
8    part, which included the background information, "Reason
9    For Referral, Work History, Developmental/Medical
10   History, Personal Habits," pretty much up until the
11   "Behavioral Observations."  From there on in, it was a
12   neuropsychological evaluation, and I had written the vast
13   majority of that.
14       The end, the "Summary and Impressions," was
15   written by both of us.  Probably -- mostly me, and then
16   Dr. Dushenko went through and added whatever he thought
17   was relevant and pertinent.
18   Q  I see.
19       And the summary of the test results that are
20   shown on pages -- in the charts at the end, pages 14
21   through 16, was that developed by you as well?
22   A  That was me, yes.
23   Q  Okay.  And in terms of the neuropsychological
24   tests that were administered, were you the one who
25   administered them?

Page 14

1    A  I administered all of the neuropsychological
2    tests.
3    Q  Okay.  Let me have you refer, Dr. Levine, back
4    to the first page of Exhibit 1.  And if you'll look at
5    the very bottom of that page, and it says, quote:
6        The current referral was requested to
7        obtain neuropsychological and
8        neurobehavioral data to assist in
9        diagnosing the patient's current
10       condition to delineate cognitive and
11       behavioral strengths and challenges
12       and to specify treatment approach to
13       the extent viable, including provision
14       of assistance with meeting
15       educational/professional goals, closed
16       quote.
17       Was that your understanding of the reason for
18   the referral?
19   A  Yes.
20   Q  And did you write this particular sentence?
21   A  I did not write that sentence.
22   Q  Do you have any understanding of what the
23   "provision of assistance with meeting
24   educational/professional goals" refers to?
25   A  I believe that would refer to seeking

Page 15

1    concessions or assistance via the ADA.  So, for example,
2    extended testing time.
3    Q  Okay.  At the time that you did your
4    neuropsychological testing of Dr. Jayatilaka, were you
5    aware that he intended to seek an accommodation from the
6    National Board of Medical Examiners to take Step 2 of the
7    USMLE?
8    A  Yes.
9    Q  And how were you aware of that?
10   A  A letter was -- a form or a letter was presented
11   to me indicating what needed to be completed in the
12   evaluation in order for him to apply for that, for those
13   concessions.
14   Q  Okay.  Let's go ahead and mark that, now that
15   you've brought that up.
16       MR. TENHOFF:  Let's mark this as Exhibit 2.
17       (Defendant Exhibit 2 was marked
18        for identification by the reporter.)
19   BY MR. TENHOFF:
20   Q  All right.  The reporter's placed before you
21   what I've marked as Exhibit 2 to this deposition.  And
22   let me just give you a little background here.
23       When we subpoenaed documents from your office,
24   Dr. Levine, we received a couple of hundred pages of
25   documents.  And what we did was, as lawyers, we tend to

Page 16

1    mark documents, we try to identify where they came from.
2    And so the documents that came from Dr. Dushenko's files,
3    which I assume is the main file, are labeled at the
4    bottom right-hand corner "SD."  Do you see that?  And
5    they are labeled between 0244 and 504.
6    A  Okay.
7    Q  Okay?  So what that means to you is that the
8    document I've put in front of you, Exhibit Number 2, was
9    a document that was produced to us by Dr. Dushenko's
10   office as part of his files.  I'll try to point that out
11   to you as we go along here.
12   A  I'm a little confused, the difference between
13   Dr. Dushenko's office and my office.
14   Q  Yeah, and I was going to ask you that question
15   myself.
16       So we sent two separate subpoenas, one to
17   Dr. Dushenko and one to you, and Dr. Dushenko produced
18   the vast majority of the documents that we're going to
19   look at today.  You produced, I believe, the report, and
20   I believe it was only the May 21st, 2008 report.  And
21   that indicated to us that perhaps Dr. Dushenko's file was
22   the complete file of Mr. Jayatilaka that you had.  Is
23   that an accurate assumption?
24   A  Could you repeat that last point?
25   Q  Sure.

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 17

1    Does -- well, let me just ask you the question:
2  How do you and Dr. Dushenko keep your files?
3    A  If Dr. Dushenko was seeing a patient for
4  possible, let's say, psychotherapy, it would be kept in a
5  separate file than the neuropsychological evaluation.
6  His notes were made available to me to review before I
7  had seen Dr. -- Mr. -- or Dr. Jayatilaka.  And after
8  that, I'm not sure if they were combined into one file.
9  The administrative assistant would basically, you know,
10  make a decision on that.  So my assumption is that if you
11  requested records from Dr. Dushenko, you probably
12  received everything, including the neuropsychological
13  evaluation.
14    Q  Right, we did.  It's just I wanted to make sure
15  that if they were in that file, that you would have
16  access to them or perhaps have seen them.
17    A  I mean, all the files are accessible by
18  everybody in the practice, so if -- I'm not sure if I had
19  seen all of Dr. Dushenko's notes.  I received the notes
20  that he gave me from the file.  I'm not sure what wasn't
21  in there, but there were some notes of his that were in
22  there that were probably not included in the
23  neuropsychological folder.
24    Q  Okay.
25    A  If that makes sense.

Page 18

1    Q  Yeah.
2    Let's go -- and we'll take them one at a time as
3  we get to them, Dr. Levine.
4    A  Sure.
5    Q  Before we got a little sidetracked here, I was
6  asking you about your understanding of what
7  Dr. Jayatilaka was looking for in the referral, and you
8  mentioned that you were provided with some information
9  about what needed to be submitted.  And is Exhibit 2 the
10  information that you were provided about the
11  documentation that was needed with regard to
12  disabilities?
13    A  Yes.
14    Q  Okay.  Where did you receive that from?
15    A  I believe this -- I'm trying to remember here.
16  I think that we requested it from Dr. Jayatilaka, and it
17  was given to me through Dr. Dushenko.
18    Q  Okay.  And did you read through this document
19  prior to the time that you conducted the
20  neuropsychological evaluation?
21    A  Yes.
22    Q  Okay.  Let me refer you a couple of places here
23  in Exhibit 2.  If you'll look about -- there's a number 2
24  on the first page of Exhibit 2, where it talks about,
25  "The following characteristics are expected of all

Page 19

1  documentation."
2    The use of the term, quote, State a specific
3  diagnosis of the disability, closed quote, what did you
4  understand that to mean when you read it?
5    A  Exactly what it says, "State a specific
6  diagnosis of the disability."
7    Q  And that would be a diagnosis under the DSM-IV
8  diagnostic categories?
9    A  That's a suggestion that's made in this letter.
10  It could be under DSM, it could be ICD.  There's
11  different diagnostic physiologies.
12    Q  What diagnostic tools or mechanisms do you use
13  in your practice?
14    A  Generally, DSM-IV and ICD.  However, sometimes
15  someone's impairments don't fit within a diagnostic
16  category.
17    Q  And when you use DSM, there are a couple
18  different versions of DSM.  There's a DSM-IV and then
19  there's a DSM-IV TR.
20    Is there a particular one that you use?
21    A  The IV.
22    Q  Okay.  It goes on a little further down.  The
23  second to the last paragraph mentions, quote, Describe in
24  detail the individual's limitations due to the diagnosed
25  disability, closed quote.

Page 20

1    A  Uh-huh.
2    Q  What did you understand that to mean when you
3  read it?
4    A  I believe it's pretty clear there.  Describe
5  their functional limitations as it pertains to day-to-day
6  functioning or academic functioning, occupational
7  functioning due to the disability that's diagnosed
8  through the evaluation.
9    Q  And let me turn you back to the third page of
10  this exhibit, and this is with regard to learning
11  disorders.  Was this section of the document also
12  provided to you by Mr. Jayatilaka?
13    A  To the best of my recollection, yes.
14    Q  And did you have any understanding why you were
15  being provided with information about documentation of
16  learning disorders?
17    A  Well, documentation of a learning disorder
18  probably would qualify one under the ADA for concessions
19  in testing.  And in order to -- in order for them to
20  accept the diagnosis of that, they had some stipulations
21  and criteria here that needed to be met as far as the
22  evaluation went.
23    Q  If you'll look at the bottom of that first page,
24  it says, "Learning disorders" about three bullet points
25  out.  It says, quote:

5 (Pages 17 to 20)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 21

1    A diagnosis must be based on the
2    aggregate of test results, history and
3    level of current functioning.  It is
4    not acceptable to base a diagnosis on
5    only one or two subtests, closed
6    quote.
7        Did you understand that when you read it?
8    A  I did.
9    Q  The final sentence on that page says, quote,
10   Test must be appropriately norm for the age of the
11   patient and must be administered in a designated
12   standardized manner, closed quote.
13       Did you understand that when you read it as
14   well?
15   A  Yes.
16   Q  Okay.  And finally, I want to turn your
17   attention to the last page of Exhibit Number 2, which is
18   marked SD0294.  And right above the final paragraph it
19   says, quote:
20       Problems such as test anxiety, English
21       as a second language in and of itself,
22       slow reading without an identified
23       underlying cognitive deficit or
24       failure to achieve a desired academic
25       outcome are not learning disabilities

Page 22

1    and therefore are not covered under
2    the Americans with Disabilities Act.
3        Did you agree with that at the time you read it?
4    A  I do -- I did and I do, yes.
5    Q  Okay.  All right, let's go ahead and set that
6    one aside.
7    A  Okay.
8    Q  Let's go back to Exhibit 1, just make sure I
9    understand the testing that was conducted.
10       If you'll turn to page 5 of Exhibit 1, there's a
11   category that says "Procedures," and it lists procedures
12   on April 2nd, 2008, May 8th, 2008 and May 15th, 2008.
13       Is this, in fact, a complete summary of all the
14   procedures that were engaged by you or Dr. Dushenko with
15   regard to this evaluation?
16   A  It is.  And if I could just add, I'm seeing now
17   that the first day of all this testing was done on April
18   2nd, and that was the first time I had evaluated him.  It
19   wasn't May 8th.
20   Q  Right.
21       (Recess taken.)
22   BY MR. TENHOFF:
23   Q  And all of the tests that are listed here on
24   page 5 were administered to Mr. Jayatilaka on the dates
25   referenced there?

Page 23

1    A  Yes.
2    Q  Were there any other neuropsychological tests
3    that were administered to Mr. Jayatilaka, other than what
4    is listed here on page 5?
5    A  Not to the best of my recollection, no.  Not by
6    me.
7    Q  And since May 15th of 2008, have there been any
8    neuropsychological testing done of Dr. Jayatilaka, to
9    your knowledge?
10   A  Not to my knowledge.
11   Q  All right.  And then we're now in the area of
12   the report that I believe you read most of.
13       If you turn to page 6 through 9 --
14   A  Uh-huh.
15   Q  -- there is a series of different breakdowns
16   and -- up until we get to "Summary and Impressions."
17       Was it your goal in writing this particular
18   portion to characterize the results of the
19   neuropsychological evaluation in terms of various areas
20   of achievement and functioning?
21   A  Yes, as compared to a normative sample.
22   Q  Who actually conducted the clinical interview on
23   April 2nd, 2008?
24   A  The testing?  That would be me.
25   Q  Okay.  Let me see.

Page 24

1        MR. TENHOFF:  Go ahead and mark this as 3.
2        Just as a housekeeping matter, Vince, what I'm
3    going to try to do is keep the same sequence of exhibits
4    so we're all asking about the same ones each time.
5        (Defendant Exhibit 3 was marked
6        for identification by the reporter.)
7    BY MR. TENHOFF:
8    Q  All right, I've placed before you what I've
9    marked as Exhibit 3 to this deposition.  And again, I'll
10   note for the record it's listed on the bottom right-hand
11   corner as SD0296 to 0301, which denotes that it came in
12   response to a subpoena to your office.
13       Have you ever seen this document before?
14   A  It doesn't look familiar, but I would say I
15   probably have.  In writing the report, this is probably
16   included in Dr. Dushenko's file that I reviewed.
17   Q  Is this your writing?
18   A  This is Dr. -- well, it's not my writing.  I'm
19   assuming it's Dr. Dushenko's.
20   Q  Does it appear to be Dr. Dushenko's writing?
21   A  From what I've seen of Dr. Dushenko's writing,
22   it is Dr. Dushenko's writing.
23   Q  Okay.  We won't qualify you as a handwriting
24   expert in this case, Dr. Levine.
25       MR. TENHOFF:  Let's go ahead and mark this one

6  (Pages 21 to 24)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 25

1    as well, as Number 4, please.
2        Q   You can set that aside, Dr. Levine.  Thank you.
3        (Defendant Exhibit 4 was marked
4        for identification by the reporter.)
5    BY MR. TENHOFF:
6        Q   All right.  The reporter's placed before you
7    what I've marked as Exhibit Number 4, which is a --
8        (Interruption in proceedings.)
9    BY MR. TENHOFF:
10       Q   It's a one-page document listed as D0302, which
11   again, denotes it came from your office's files.
12       Have you ever seen this document before?
13       A   Again, it looks like any other document I've
14   seen, so I couldn't say specifically if I have, but if I
15   were to guess, I would say yes, in reviewing the notes
16   generating this report.
17       Q   Okay.  Does it appear to be Dr. Dushenko's
18   writing?
19       A   Yes.
20       Q   It's not your writing, though.
21       A   No.
22       Q   Okay.  And then let me show you the last one
23   here.  See if you recognize this one.  This'll be
24   Exhibit 5 for us.
25       (Defendant Exhibit 5 was marked

Page 26

1        for identification by the reporter.)
2    BY MR. TENHOFF:
3        Q   The reporter's placed before you what I've
4    marked as Exhibit 5 in this deposition.  Take a moment
5    and tell me whether -- and by the way, it's noted SD0306
6    to 0307 at the bottom of the right-hand corner.
7        Can you tell me whether you recognize this
8    document?
9        A   Again, it doesn't look specific to me, but I
10   probably have seen it before reviewing this file.
11       Q   Does it appear to be Dr. Dushenko's writing?
12       A   Yes.
13       Q   All right.  And this isn't your writing,
14   correct?
15       A   On Exhibit 5?
16       Q   Yes.
17       A   No.
18       Q   Did you take any notes of your clinical
19   interview with Mr. Jayatilaka?
20       A   Yes.
21       Q   Where are those notes?
22       A   In his file.
23       Q   And I don't believe those were produced to us in
24   response, but maybe we'll run across them.
25       A   Would you like to see them now?

Page 27

1        Q   If you've got them, that would be great.
2        A   Have you seen those?
3        Q   I have a different memory.  I have seen that one
4    before.
5        A   You have?
6        Q   Let me see if I can find that real quick.  Thank
7    you.  I appreciate that.
8        All right.
9        MR. TENHOFF:  What are we up to?
10       THE REPORTER:  6.
11       (Defendant Exhibit 6 was marked
12       for identification by the reporter.)
13   BY MR. TENHOFF:
14       Q   The reporter has placed before you what I've
15   marked as Exhibit 6 to this deposition.
16       Take a look and tell me whether you recognize
17   this document?
18       A   I do.
19       Q   What is it?
20       A   This would be notes taken during my evaluation
21   on, let's see, 3/24/08.
22       Q   Does that refresh your recollection as to
23   whether the interview took place before the testing began
24   on April 2nd?
25       A   Except for the discrepancy that I can't explain.

Page 28

1    It's possible I put the wrong date on the report, it's
2    possible I put the wrong date on this.
3        It appears from the notes here that -- let me
4    see -- that the testing that's indicated as being
5    completed on this document was the testing that says was
6    completed on April 2nd on the report.  So one of the
7    dates is -- was entered wrong.
8        Q   What's your best recollection, Dr. Levine, in
9    terms of when you actually conducted the clinical
10   interview?  Was it on the date that you gave him the
11   initial battery of neuropsychological tests or was it at
12   some other time?
13       A   In general, I'll do the clinical interview on
14   the date of the testing.  In the case of Dr. Jayatilaka,
15   it was probably a very minimal interview since
16   Dr. Dushenko had done quite extensive interviewing with
17   him, so it might have consisted of just confirming some
18   of the information with regards to education and
19   background.
20       Q   Okay.  And I'm going to ask you some more
21   questions about this in a little while, but let's go
22   ahead and set that aside.
23       As a result of the interview and discussion you
24   had and review of anything in Dr. Dushenko's files, did
25   you understand, prior to conducting the

7 (Pages 25 to 28)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 29

1  neuropsychological testing, that Mr. Jayatilaka had
2  suffered a depressed skull fracture in 1995?
3      A  I believe that information was made available to
4  me prior to the evaluation.
5      Q  And did you understand that he had received
6  treatment for that injury at St. Mary's Medical Center in
7  Long Beach the day after the attack occurred?
8      A  I'm not sure when I would have found out about
9  that.
10     Q  Were you aware whether he had traveled back to
11  California the day after it occurred?
12     A  I'm not sure when I would have became aware of
13  that either.
14     Q  Were you aware, prior to conducting the
15  neuropsychological tests, of the result of MRI tests that
16  have been done at various times on Mr. Jayatilaka?
17     A  It's possible, but probably not.
18         MR. TENHOFF:  We'll mark this as -- what are we
19  up to?
20         THE REPORTER:  7.
21         MR. TENHOFF:  7, thanks.
22         (Defendant Exhibit 7 was marked
23         for identification by the reporter.)
24  BY MR. TENHOFF:
25     Q  I've placed before you what I've marked as

Page 30

1  Exhibit Number 7 to this deposition, which is a series of
2  documents labeled as SD0314 through 0316, denoting they
3  came from your office's files.
4         Did you ever review -- have you ever seen these
5  documents before?
6      A  Yes, I've seen these before.
7      Q  And did you review these documents prior to the
8  time you conducted neuropsychological testing?
9      A  In all likelihood, no.  In general, I'll look at
10  MRI results after the evaluation.
11     Q  Okay.  And after the evaluation, did you review
12  these particular documents?
13     A  These look familiar to me.  I have these in my
14  files, so, yes, these were probably reviewed by me.
15     Q  Okay.  And on the first page it shows, if I'm
16  reading this correctly, that there was an MRI of the
17  brain without contrast on May 18th of 1996; is that
18  correct?
19     A  Yes.
20     Q  And that the impression at that time was a
21  negative MRI of the brain?
22     A  That's what it says here, yes.
23     Q  And what did you understand, at the time you
24  read this, a negative of the MRI of the brain to mean?
25     A  That there was no neuropathology seen.

Page 31

1      Q  And if you'll turn to the second page, this
2  appears to be the results of an MRI of the brain without
3  and with contrast on July 28th, 1997, correct?
4      A  Yes.
5      Q  And the impression is, no change since the prior
6  study dated 5/18/96, correct?
7      A  Uh-huh.
8         THE REPORTER:  "Yes"?
9         THE WITNESS:  I'm sorry.  Yes.
10  BY MR. TENHOFF:
11     Q  And so did you understand that to mean that
12  that, again, was a negative MRI of the brain?
13     A  "No abnormality is seen," would indicate to me
14  that it's a negative MRI.
15     Q  And then finally, we'll turn to the last one,
16  which is SD0316, and that appears to be an MRI of
17  June 5th, 2003; is that correct?
18     A  Yes.
19     Q  And the impression there was, "Negative
20  examination, no acute process."  What did you understand
21  that to mean when you read it?
22     A  Again, that the results of the MRI were negative
23  for neuropathological finding; that there's no new
24  processes occurring.
25     Q  There's also a note in this last one,

Page 32

1  Dr. Levine, that says, "Comparison is made to 6/5/02."
2         Are you aware of an MRI being conducted on June
3  5th of 2002?
4      A  No, I'm not.
5      Q  And were there any medical records for
6  Dr. Jayatilaka that you reviewed prior to doing your
7  neuropsychological testing?
8      A  I don't remember.  But again, generally, I
9  review medical records after my evaluation.
10     Q  And do you recall what medical records you
11  reviewed after your evaluation?
12     A  The ones in my hand.  These ones.
13     Q  Okay.  Were you aware at the time that you did
14  your neuropsychological evaluation that Mr. Jayatilaka
15  had been treated by a Dr. William Gorbunov, a
16  neurologist?
17     A  I don't recall if I was aware of that at the
18  time.
19     Q  I take it you didn't review any of
20  Dr. Gorbunov's medical records; is that right?
21     A  It's possible.  If you'll allow me to look in my
22  file.
23     Q  Sure.
24     A  If those records are in there, chances are that
25  I did review them.

8 (Pages 29 to 32)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 33

1      Q   Sure.  If you have your file, please take a
2   look --
3      A   Yeah.
4      Q   -- because I have a couple questions just to see
5   whether you reviewed things or not.
6      A   Uh-huh.
7      Q   By the way, Dr. Levine, it's not an exercise to
8   see how long you can go without a break, so if at
9   any time -- I forgot to tell you this.  If at any time
10  you need a break, please let me know, we'll go ahead and
11  do that.  We normally try to break at least every hour or
12  so for the court reporter, so if you need to take a
13  break, just let us know.
14     A   Okay.  So the medical records that are in my
15  file are from the Mayo Clinic, Dr. Allen Aksamit.
16     Q   Okay.  What other ones?
17     A   Mayo Clinic, same doctor.  And Mayo Clinic, same
18  doctor.  And this one's from St. Mary's Medical Center,
19  from Dr. Andrew Burg.  And these are just blood labs.
20     Q   Okay.  And apart from those -- we're going to
21  come back to those in just a minute.
22         Apart from those, were there any other medical
23  records that you reviewed prior to the neuropsych testing
24  or prior to the time that you finalized your report,
25  Exhibit 1?

Page 34

1      A   Again, I couldn't tell you.  It's possible that
2   there were additional ones that were in Dr. Dushenko's
3   file, but to the best of my recollection, no.
4      Q   In terms of documents that you submitted to the
5   National Board of Medical Examiners that came with your
6   signature on it, was it only Exhibit 1, which is the
7   May 21st, 2008 report?
8      A   I believe so.
9      Q   And there was, again, a subsequent affidavit
10  from Dr. Dushenko, but that was not signed by you,
11  correct?
12     A   I don't believe so.
13     Q   Were you aware that that was being submitted to
14  the National Board of Medical Examiners?
15     A   No.
16     Q   Did you have any input into that document?
17     A   Not to the best of my recollection.
18     Q   All right.  And was there any other
19  information -- again, I just want to make sure I'm clear
20  on this.
21         Any other information that you had a role in
22  submitting to the National Board of Medical Examiners on
23  behalf of Mr. Jayatilaka?
24     A   Was there -- can you repeat the question,
25  please.

Page 35

1      Q   Sure.
2          MR. TENHOFF:  Could you read that back.
3          (Record read.)
4          THE WITNESS:  Not to the best of my
5   recollection.  There was a letter that Dr. Dushenko had
6   sent on behalf of Dr. Jayatilaka, but I don't believe I
7   saw that letter before it went out.  I don't believe it
8   had my signature on it either.
9   BY MR. TENHOFF:
10     Q   And you mentioned previously, in terms of making
11  certain diagnoses, the tools you used for the DSM-IV and
12  the ICD.
13         What are you referring to when you say the ICD?
14     A   It's more -- it's used more by physicians for
15  medical diagnosis.  The DSM is also used by physicians,
16  psychiatrists, but it's generally the tool for
17  psychologists as well.  We're nonmedical doctors.
18     Q   Okay.  And, to your knowledge, was there ever
19  any diagnosis of Mr. Jayatilaka under ICD standards?
20     A   No.
21     Q   So let's go a little bit longer.
22         Dr. Levine, we can do this in one of two ways.
23  I actually have excerpts from the DSM-IV that we can use
24  and make part of the record, which may be a little easier
25  for everyone, rather than make the whole book part of the

Page 36

1   record and have to pay for that - no offense - or we can
2   look at the book.  If at any point you want to look at
3   the book, it's right in front of me here.  Feel free to
4   use it.
5          MR. TENHOFF:  So let's go ahead and mark this as
6   8.  Thank you.
7          (Defendant Exhibit 8 was marked
8          for identification by the reporter.)
9   BY MR. TENHOFF:
10     Q   And I want to spend a little time just making
11  sure that you and I have sort of our terminology
12  definitions aligned.
13         What is the DSM-IV used for?
14     A   Diagnostic purposes, generally, for psychiatric
15  disorders.
16     Q   And do you use the term "psychiatric disorders"
17  interchangeably with "mental disorders"?
18     A   Yes.  Psychological, psychiatric, mental and
19  cognitive.
20     Q   If you can turn on Exhibit 8, which again, is an
21  excerpt from the DSM-IV.  If you could turn to the third
22  page of that exhibit, which says, "Definition of Mental
23  Disorder."
24     A   Uh-huh.
25     Q   Okay.  Here, if you look towards the very last

9 (Pages 33 to 36)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 37

1  paragraph, the second sentence in that paragraph says,
2  quote, in DSM-IV:
3       ...each of the mental disorders is
4       conceptualized as a clinically
5       significant behavioral or
6       psychological syndrome or pattern that
7       occurs in an individual and that is
8       associated with present distress,
9       e.g., a painful symptom or disability,
10       i.e., impairment in one or more
11       important areas of functioning or with
12       a significantly increased risk of
13       suffering death, pain, disability, or
14       an important loss of freedom, closed
15       quote.
16  A  Uh-huh.
17  Q  And are you familiar with that definition?
18  A  Yes.
19  Q  Okay.  And so if we use the term "disability" in
20  terms of the DSM-IV, you would agree that that is, again,
21  impairment in one or more important areas of functioning,
22  correct?
23  A  Yes.
24  Q  Now, in your mind, is there a difference between
25  the term "impairment," as it is used here in the DSM-IV,

Page 38

1  and the word "deficit," from a clinical standpoint?
2  A  Not necessarily.  They are used somewhat
3  interchangeably.
4  Q  Okay.  Are you familiar with the use of the term
5  "a relative weakness"?
6  A  Yes.
7  Q  What does "a relative weakness" mean to you?
8  A  If somebody, say you, for example, is above
9  average in all skills, memory, attention, visual, spacial
10  skills, but you have just average functioning in problem
11  solving, we would say that that might represent a
12  relative deficit for you, relative to you, rather than
13  relative to a normative sample of your average
14  individual.
15  Q  I see.  Okay.
16       And would you agree with me as well that the
17  neuropsychological tests that you administered, when
18  they're properly administered, are scientifically
19  validated to identify impairments?
20  A  Well, that's a big, gray area.
21  Neuropsychological tests are in an ever-validating mode.
22  They're developed to assess something, like, for example,
23  attention, but the definition of "attention" itself is
24  something that changes.  And there's different theories
25  of what attention is and how to break it down and,

Page 39

1  therefore, how to evaluate it.  So it's an iterative
2  process of developing instruments to assess attention,
3  redefining what attention is, revalidating those
4  instruments to assess the new definition of "attention,"
5  etcetera, etcetera.
6       So, in other words, what I'm saying is, these
7  instruments aren't as scientific as an MRI.  They can't
8  look into someone's brain and say this person has a
9  deficit in this domain of attention when the domain
10  definition itself is changing.
11  Q  Right.  And in terms of being scientifically
12  validated when it comes to neuropsychological tests, how
13  would you define "scientifically validated"?
14  A  "Scientifically validated."  Well, I would say
15  it's scientifically validated if it's been studied in a
16  controlled fashion, in a controlled study, with
17  operational definitions of what it is acutatively
18  assessing and if the study were carried out in a
19  scientifically validated manner and reviewed by qualified
20  individuals.
21  Q  When it comes to neuropsychological testing,
22  would you agree that one of the purposes of validating
23  the test is to determine whether the test has some degree
24  of correlation with predicting what it is you're trying
25  to determine?

Page 40

1  A  Yes, that's what one form of validation --
2  Q  Okay.
3  A  -- what we call predictability or concurrent
4  validity.  There's other types of validity, though.
5  Q  Okay.  And of the neuropsychological tests that
6  you administered to Mr. Jayatilaka, were there any that
7  you believe were not scientifically validated?
8  A  I think that it depends what they're being used
9  for.  For example, the Trail Making Test has been used as
10  a measure of divided attention or speed of information
11  processing or basic attention or executive functioning.
12  It's been used across all these different domains or
13  constructs, if you will.
14       Now, the question arises, are these valid
15  constructs.  That's the big problem there, what's a valid
16  construct.  Once you have a construct, the other problem
17  is, okay, does this test adequately assess that
18  particular construct?
19       So what I'm saying, and the short answer to your
20  question is, one could argue that all of these tests are
21  valid.  One could also argue that all of these tests are
22  not valid, depending on how you're defining your
23  constructs and what you're using them for.
24  Q  For the purposes of providing some predictive
25  validity as to the areas of functioning that you

10  (Pages 37 to 40)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 41

1  evaluated in Mr. Jayatilaka, would you believe that the
2  tests that were administered were scientifically
3  validated for those purposes?
4      A  I believe that tests of -- I would say yes, but
5  one could argue, again, that they weren't.
6  Unfortunately, neuropsychological testing is somewhat
7  more of a gray area than physiological testing, where you
8  have a well-defined and observable physiological effect,
9  whereas we're assessing cognitive functions, which are
10  defined differently over time and those constructs
11  change.  Clinically, I think these tools are useful in
12  assessing a syndrome such as the ones defined in DSM.
13      Q  Okay.  Let me ask you -- let me make sure,
14  because we are going to go into a bit on the scores here.
15      If you could turn to page -- go back to Exhibit
16  1, if you would, Dr. Levine, and I want to take a look at
17  your charts here on the scores on the various
18  neuropsychological tests.
19      And as I understand the columns you have here,
20  the left-hand column is "Raw Score," the middle column is
21  "Scaled Score" and the right is "Percentile."
22      A  The middle column is a standardized score,
23  whether it's scaled, standard, great estimate, T score.
24      Q  Okay.
25      A  It's basically a score that falls along a normal

Page 42

1  distribution.
2      Q  Okay.  And so let's take a look, for example, on
3  the W-A-I-S.  If you'll look down --
4      A  We call it WAIS.
5      Q  WAIS.  Okay.  Thank you.  Hopefully she gets
6  that.
7      If you look under the "Standard Score," where
8  you're looking at the IQ towards the bottom, there are
9  various standard scores there.
10      Would you agree that when we're using a standard
11  score, there's a mean here of 100 and a standard
12  deviation of 15?
13      A  Uh-huh.
14      Q  Is that --
15      A  Yes.
16      Q  -- correct?
17      A  Yes.
18      Q  Okay.  And if we're using -- if we go above here
19  on the subtest for the WAIS, we actually have a mean of
20  10 and a standard deviation of 3, correct?
21      A  That's correct.
22      Q  All right.  And so, for example, on an IQ test,
23  anyway, plus or minus one standard deviation of the mean
24  represents a score range of, say, 85 to 115 as a standard
25  score, correct?

Page 43

1      A  Yes.
2      Q  And 68 percent of the general population in the
3  norm group would fall in that range, correct?
4      A  Within one standard deviation, yes.
5      Q  Thank you.
6      And so then to associate that with the
7  percentiles, plus or minus one standard deviation would
8  be associated with the 16th and the 84th percentile,
9  correct?
10      A  That's correct.
11      Q  So you would expect that the average person in
12  the population would score between the 16th percentile
13  and the 84th percentile, for example, in an administered
14  test of intelligence?
15      A  Yes, with one point that the WAIS-III manual has
16  categories based on their standard scores, and
17  neuropsychologists recognize a score above the
18  75th percentile as being above average and below the
19  25th percentile as being below average.
20      Q  Okay.
21      A  So it doesn't follow the standard deviation
22  distribution exactly.
23      Q  Well, let's -- yeah, let's go back to that in
24  just a minute.
25      A  Uh-huh.

Page 44

1      Q  When we look at the Woodcock-Johnson, the WJ,
2  here slightly below that, it has "Grade Estimate."
3      What does "Grade Estimate" refer to?
4      A  It's based on the individual's score, and it --
5  and the information available from the normative
6  population.  It says that this person is performing at
7  the equivalent to somebody from a normative population
8  who is in X grade.
9      Q  And again, this also includes on the -- the WJ
10  also includes percentiles, correct?
11      A  Yes.
12      Q  And are those percentiles also associated,
13  again, with that standard deviation from the mean?
14      A  I believe so, with the WJ-III, yes.
15      Q  All right.  Now, when we say -- so let's go up
16  to, for example, a verbal IQ score that you have here,
17  standard score of 100 and a percentile of 50.
18      In terms of percentile, what that means is that
19  an individual who has that IQ score of a hundred is said
20  to be performing as well or better than 50 percent of
21  individuals of their chronological age relative to the
22  norm?
23      A  That's fair, yes.
24      Q  Okay.  All right.
25      And when we talked about -- let's go back to

11 (Pages 41 to 44)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 45

1 this idea of average and above average.
2        As I understand it, one of the reasons for using
3 those terms is simply because it has, maybe, for the lay
4 person a little more meaning than using percentiles or
5 standard scores or means, correct?
6     A  Yes.
7     Q  All right.  And again, my understanding of the
8 average, as it's used in that term, is between 86 and 115
9 on, say, a hundred-point scale or between the 16th and
10 84th percentiles.  Would you agree with that or disagree
11 with that?
12     A  You said 86 and 115 on the standard score
13 scale --
14     Q  Do you want me to break that down for you?
15     A  -- would be equivalent to the 16th or
16 84th percentile.  It sounds right.  I'm trying to picture
17 the distribution in my head, but it's probably fairly
18 accurate.
19     Q  Okay.  And again, I'm trying to make sure we're
20 definitionally aligned here only because these words are
21 used in your report and I want to make sure I understand
22 how you're using them.
23     A  When I use "average" and "above average," I'm
24 not using the same cutoffs as you're using.
25     Q  Okay.  What are you using?

Page 46

1     A  You're using a standard deviation of 15 on a
2 standard score scale, and I'm using the information
3 provided, for example, on the WAIS-III or in the WAIS-III
4 manual, which states that an IQ score of between 90 and
5 109 would be average, whereas a score between 110 and 119
6 would be above average.
7     Q  Okay.
8     A  And 120 and 129 would be very high average,
9 etcetera, etcetera.
10     Q  All right.
11     A  It's slightly different.  And the
12 classifications, the ranges used by neuropsychologists,
13 in general, differ from that standard deviation scale
14 that you're using.  So for someone functioning under the
15 25th percentile, between the 25th and 9th percentile, I
16 believe, would be below average, and between the 75th and
17 84th percentile would be above average.
18     Q  And is that the way you're using the terms in
19 your report?
20     A  That's generally the way I use the terms in my
21 report, yes.
22     Q  And what is that based upon?
23     A  That's a very good question.  As a
24 neuropsychologist going through a neuropsychology
25 program, neuropsychology post doctorates, was the

Page 47

1 distribution that we were taught.  I'm not sure of the
2 scientific grounding for it, but that's just what's
3 generally used throughout the neuropsychology community.
4     Q  And so if perhaps you and I disagree on the
5 definition of what we're saying average or above average,
6 it may be more accurate for you and I to talk in terms of
7 percentiles, correct?
8     A  Sure.
9     Q  Okay.  And then if anyone -- and just
10 definitionally to talk about norming.
11        And again, when we're talking about percentiles,
12 the significance is really dependent upon the group upon
13 which you're comparing the person being tested, correct?
14     A  Uh-huh.  Yes.
15     Q  And that's referred to as the "norm group,"
16 correct?
17     A  Yes.
18     Q  All right.  And most of these tests that we're
19 talking about here, the WAIS and the Woodcock-Johnson,
20 the other ones, are normed on a nationally representative
21 sample of individuals in the United States, correct?
22     A  Yes.
23     Q  Okay.
24     A  Generally.  Sometimes the normative sample isn't
25 representative of the person you're evaluating, and you

Page 48

1 have to consider that in interpreting the data.
2     Q  Okay.  And test norms themselves are typically
3 an age-based norm as opposed to an educational-based
4 norm; is that right?
5     A  It depends on the test that you're using.  Some
6 stratify for age, some stratify for age and education,
7 some stratify for age, education and ethnicity, some
8 stratify for age, education, ethnicity and geographic
9 area.  So they stratify -- the more they're stratified,
10 likely, the more accurate they are, but not all tests
11 stratify, based on all these demographic factors.
12     Q  Okay.  So let me ask you maybe a harder
13 question.
14        Of all the ones that are summarized here on your
15 chart, are there any that are normed on something other
16 than chronological age, in other words, stratified in
17 some other way?
18     A  The -- generally -- let's see, I'll use age.
19 That's pretty standard.
20        The Woodcock Johnson also uses education instead
21 of age as an alternative way of interpreting it, and it's
22 up to the clinician, really, to decide which way to use
23 it.
24     Q  And the percentile --
25     A  The --

12 (Pages 45 to 48)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 49

1      Q   I'm sorry, can I just finish that one?
2      A   Sure.
3      Q   The percentiles here that you have listed on the
4   WJ percentiles, are those age- or education-based norms?
5      A   I believe these -- I didn't put it in here, and
6   I believe they're probably education based.  Let me see.
7   I may have it in here.  Just a moment.
8          This printout states that the norms are based on
9   age.  I'm not sure if those were the ones that I included
10  in here.  These might be education based.  I couldn't
11  tell.
12     Q   Okay.
13     A   Yeah.
14     Q   Are there any other percentiles that are listed
15  here on your charts, Dr. Levine, that would be norm of
16  something other than just age?
17     A   The Boston Naming Test.  There's different
18  normative sets for that.  This is another problem with
19  the field, is deciding which normative set to use, so
20  people come up with different scores based on --
21  different standard scores based on the same raw score.
22         That has normative sets that are based on age
23  and education.  I can't tell you -- I couldn't tell you
24  right now which one I based it on.
25         CPT, I believe, is based on age alone.  D-KEFS

Page 50

1   on age alone.
2      Q   And again, I'm assuming they're all age alone,
3   unless -- what I'm just looking for is any that were
4   normed differently.
5      A   Okay.
6      Q   Differently or had an additional stratification.
7   Age and education, age, education, gender.
8      A   The Wisconsin Card Sorting Test, the WCST --
9      Q   Yeah.
10     A   -- I believe that might have education in it.
11  Let me just check.  I have the printout here for that.  I
12  might not have that in here.  That may be age and
13  education.
14         The Grooved Pegboard and Finger Tapping Test are
15  ethnicity, age and education based.
16     Q   Okay.
17     A   And that's it.
18     Q   Could you, one more time, tell me below average,
19  average and above average, and then we'll take a break,
20  in terms of your percentiles, the percentiles that you
21  use.
22     A   So I use -- out of my average range is 25 to
23  75 percentile.  My low average is 9th to 24th percentile.
24     Q   And you use that as low average; is that --
25     A   Low average.

Page 51

1      Q   Okay.
2      A   My -- what's called borderline impaired would be
3   5th to 8th percentile, and impaired would be below the
4   5th percentile.  Above average would be 76th through 91.
5   And above that it's, I think, superior.
6      Q   91 and above?  Or 92 and above?
7      A   Ninety -- oh, boy.  I'm sorry.  I'm having a
8   little recollection difficulty right here myself.
9          I think what we call 92 to 95 would be very
10  high, and then above 95 would be superior.  It's somewhat
11  arbitrary.  Ask six neuropsychologists what they use and
12  there'll be some variation in there.
13         They're just categories based -- again, to
14  express, you know, how this person's functioning to the
15  lay person.  Some use somewhat more strict ranges, others
16  use more lax ranges, so...
17     Q   It sounds like the ranges that you're using,
18  there's just more gradation and there's more categories.
19     A   There's more categories, yes.
20     Q   Okay.  Why don't we go ahead and take a quick
21  break.  This is a good breaking point.
22         MR. TENHOFF:  We can go off the record.
23         (Recess taken.)
24         MR. TENHOFF:  Let's go back on the record.
25     Q   Okay, back on the record.  I'd like to start

Page 52

1   working through some of the scores you have here,
2   Dr. Levine.
3          If you could turn to page 14 of your report,
4   Exhibit Number 1.  And I'd like to first refer you to the
5   WAIS scores.
6          What is the WAIS and what does it measure?
7      A   It's the Wechsler Adult Intelligence Scale.
8   It's probably the most widely used measure of
9   intellectual functioning in adults.
10     Q   And would you agree with me that the scores that
11  Mr. Jayatilaka achieved on the WAIS and your testing were
12  in the average range, as you define it?
13     A   Yes.  His composite scores, full scale IQ,
14  verbal IQ, performance IQ, were in the average range.  As
15  I define it, his working memory index score would be
16  above average.
17     Q   And if you'll look as well on the subtest, would
18  you agree that as you define it, each of those tests
19  also -- his results also fell in the average or above
20  average range, as you define it?
21     A   Yes.  But those are somewhat less reliable than
22  the composite scores.
23     Q   The WTAR, what is that?
24     A   The Wechsler Test of Adult Reading.
25     Q   What is that used for?

13 (Pages 49 to 52)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 53

1    A  It's used in some contexts to obtain an estimate
2  of premorbid intellectual functioning.  For example,
3  someone who's obtained a head injury, we want to know,
4  well, at what level were they functioning before the head
5  injury.  This type of reading ability that the WTAR, the
6  W-T-A-R, assesses is generally considered resistant to
7  traumatic head injuries.  So in this instance, we were
8  using it as -- or I was using it, rather, as an estimate
9  of premorbid intellectual functioning.
10   Q  And when you say "premorbid" here, you're
11  referring to prior to the 1995 skull fracture?
12   A  Yes.
13   Q  Are there any guidelines in administering the
14  WTAR, as to how long after an injury, cognitive injury,
15  the WTAR should be administered?
16   A  Not that I'm aware.
17   Q  Did you think it was appropriate to use the WTAR
18  as a measure of premorbid functioning about 13 years
19  after the injury?
20   A  Yes.
21   Q  And here, the estimated IQ would have been --
22  this is -- estimated premorbid IQ was 109; is that
23  correct?
24   A  Yes.
25   Q  And that would fall within the 73rd percentile,

Page 54

1  correct?
2   A  That's right.
3   Q  All right.  And then if we look at achievement
4  testing on the WJ, the Woodcock-Johnson, can you tell me
5  what that refers to.
6   A  It's generally used as a test of academic
7  abilities, reading, writing, arithmetic skills.
8   Q  And would you agree that the scores that
9  Dr. Jayatilaka had achieved on these particular tests
10  were in the average or above average range?
11   A  Yes.
12   Q  In fact, I guess the score on writing fluency,
13  under your definition, would have been in the superior
14  range, correct?
15   A  Or very high, yes.  Very high effort, yes.
16   Q  All right.  And then we have a series of tests
17  that appear to be designed to test functionality in the
18  areas of attention and working memory.  Can you describe
19  what you're testing there?
20   A  Attention essentially refers to being able to
21  focus one's resources on a particular task.  It includes
22  divided attention, being able to divide one's resources
23  between two tests simultaneously.  Working memory is
24  generally considered the ability to manipulate
25  information online.  So, for example, if I asked you to

Page 55

1  remember a phone number, you run into the next room and
2  make a call, that would be your ability to -- attention
3  ability.  If I asked you to tell me the phone number
4  backwards, you would have to manipulate that information
5  online, and that would be considered working memory.
6   Q  And would you agree that in the attention and
7  working memory area, Dr. Jayatilaka's neuropsychological
8  test scores fell in the average or above average range
9  for each of the scores?
10   A  Yes.
11   Q  And in the language area, just tell me generally
12  what you're testing.  And we're going to come back to
13  this in more detail, but tell me generally what you're
14  testing in the language area.
15   A  Expressive and receptive language abilities.
16  Includes writing, auditory comprehension, reading
17  comprehension, confrontation naming, verbal fluency.
18   Q  I notice there's a test called D-KEFS Verbal
19  Fluency.  What does that refer to?
20   A  The D-KEFS is the Delis-Kaplan Executive
21  Function System.  Generally, it's considered a battery
22  useful in assessing frontal lobe and executive
23  functioning.  This particular subtest involves the
24  examinee coming up with as many words as they can within
25  a minute that begin either with specific letters or that

Page 56

1  belong to specific categories.
2   Q  And I do notice this is the only one that
3  appears that it was given twice, once on April 2nd, 2008
4  and once on May 8th, 2008; is that correct?
5   A  Uh-huh.
6   Q  I'm sorry?
7   A  Yes.
8   Q  Why was it given twice?
9   A  Because of his unusually low score on the
10  letters aspect of the test.  It seemed to stand out from
11  all of his other performances, which were average or
12  better.
13   Q  And in terms of the score, in terms of
14  generating your evaluation report, did you rely on the
15  April 2nd score or the May 8th score or both?
16   A  I believe they were both mentioned in the
17  report.
18   Q  Do you have an opinion as to which one is a more
19  accurate indicator of his abilities in this area?
20   A  Well, I always believe the first evaluation,
21  unless there's some sort of confounding factor, such as
22  test anxiety or illness, is a better indicator of actual
23  ability.  What happens when you administer a test for the
24  second time is something we call practice effects.  So if
25  someone's already been administered the test, they know

14 (Pages 53 to 56)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 57

1  it's -- they know what's coming, they can anticipate and
2  prepare for it, therefore, the performance can differ
3  from what they would have done the first time.
4      Q   What is your opinion as to the reason that he
5  scored higher on the second administration of that
6  particular test?
7      A   I would say due to practice effects, that he
8  knew that the test entailed, that he was familiar with
9  it, and that it enabled him to do slightly better.
10     Q   Were you familiar with any other factors which
11  would have caused a difference between his performance on
12  April 2nd and May 8th, 2008, on that subtest?
13     A   Could have had less anxiety the second time
14  around.
15     Q   Any other reasons?
16     A   Sometimes the letters used on the second testing
17  are different than the letters on the first.  Maybe he
18  just knew more words that belonged with those letters.
19  It's possible.
20     Q   Anything else?
21     A   That's all that I can think of.
22     Q   The next one is in the area of visual spacial
23  skills.  What are you measuring there?
24     A   Spacial orientation, visual construction,
25  ability to put things together based on smaller

Page 58

1  components, rearrange either two-dimensional or
2  three-dimensional objects in their mind, visual scanning.
3  That pretty much covers it.
4      Q   And would you agree that Dr. Jayatilaka's
5  scores, as a percentile, were in the average or in some
6  cases above average range?
7      A   Yes.
8      Q   And if you go below, there's two different
9  sections here on memory:  There's a memory index score
10  and then there's subtests.  It appears to be subtests.
11  Am I reading this correctly?
12     A   Yes, you are.
13     Q   All right.  What's the difference between the
14  memory index scores and the ones that are listed below
15  that?
16     A   The memory index scores are composites, which
17  are composed of the scores from the subtests.  So, for
18  example, logical memory and verbal paired associates in
19  the subtest area would be the tests that make up the
20  auditory verbal and immediate and delayed memory.
21     Q   And why is it that you've summarized the
22  subtests into the memory index scores?
23     A   Well, for the same reason that I did it with the
24  WAIS.  One likes to report all the scores.  One can pick
25  apart the different -- if there's a breakdown of

Page 59

1  memory -- well, let me back up a little bit.
2      If you look at auditory immediate memory, the
3  composite score falls in the 34th percentile, which is
4  average, so one could say he has average memory ability
5  or learning ability for this particular -- or immediate
6  memory.  But if one were to look at the subtest scores,
7  you'll see that he obtained a 63rd percentile on the
8  Verbal Paired Associates, which is average, but a 16th
9  percentile on Logical Memory I, which is below average.
10  And those two tests differ significantly in their format.
11  So one can gain some information by looking at how the
12  subtest scores break down, rather than just looking at
13  the overall composite score.
14     Q   Understood.
15     The overall composite scores, are they, do you
16  believe, more reliable in terms of making a diagnosis
17  rather than single or pairs of subtest scores?
18     A   No.  I think they're more reliable, which means
19  that over time a person will get that same score.  But as
20  far as the -- understanding the processes going on that
21  might break down in learning or perhaps the difficulty --
22  the areas of difficulty that one might have, the subtest
23  scores need to be looked at.  So, for example, logical
24  memory involves the reading of a long -- of a short story
25  and the individual has to remember all of the short

Page 60

1  story, then tell it back to the examiner, whereas with
2  the verbal paired associates, the examinee is read a
3  series of word pairs that are unrelated and has to form
4  some sort of association in their mind between the two.
5  So they do test slightly different aspects of learning.
6      Q   And would you agree with me that the memory
7  index scores that Mr. Jayatilaka received on
8  neuropsychological testing were in the average or above
9  average range?
10     A   Average, yes, and above average, yes.
11     Q   Okay.  Let's go to the next page, which is
12  executive functioning.
13     If you can tell me just generally, what is it
14  that you're measuring with the executive function tests
15  that are given?
16     A   Sure.  Well, executive functioning is one of the
17  more poorly defined areas of domains of
18  neuropsychological functioning, but in general, it has to
19  do with kind of advanced, higher order thinking, abstract
20  reasoning, conceptual thinking, being able to manage
21  one's resources adequately.
22     There's lots of different abilities that fall
23  under executive functioning.  For example, alternating
24  attention or set switching can be considered an executive
25  function.  Response inhibition can be considered an

15  (Pages 57 to 60)

ANDREW JEREMIAH LEVINE, Ph.D.     October 7, 2009

Page 61

1    executive function.  Some people consider cognitive
2    fluency or word generation, which was assessed by verbal
3    fluency in my evaluation, to fall under executive
4    functioning, and you actually see that data here.
5        Q    Okay.  And then the final one in terms -- well,
6    the last two, "Motor/Psychomotor Processing Speed," what
7    are you measuring there, or attempting to measure there?
8        A    Manual motor dexterity and fine motor speed, as
9    well as psychomotor ability.  So when one combines a
10   motor response with somewhat minor cognitive process, we
11   consider that psychomotor processes.
12       Q    And then the final one is "Emotional
13   Functioning."  What is the testing related to there?
14       A    The testing that's listed here is the Beck
15   Depression Inventory.  It's a measure of current
16   depressive symptoms.  The MM -- MCMI, I believe is what
17   they gave him, is not listed here.  That data is not
18   listed, but it was provided for you, I believe, in the
19   raw data.
20       Q    Right.  And we'll come back to that in a little
21   bit.
22            All right.  Are you familiar with the DSM-IV
23   definition of a learning disability?
24       A    Yes.
25       Q    And do you understand that to be a significant

Page 62

1    discrepancy between intellectual ability on the one hand
2    and scores on achievement testing on the other hand?
3        A    Yes.
4        Q    And let's go to page 10 of your report.  If
5    you'll look at the very last paragraph here, it says,
6    quote:
7            Diagnostically, a significant
8            discrepancy must exist between his
9            intellectual ability as measured by
10           the WAIS-III and his scores on
11           achievement testing as measured by the
12           WJ-III.  Such a discrepancy was not
13           found, closed quote.
14           Are you referring, at that point, when you say
15   "diagnostically," relative to the diagnostic standards in
16   the DSM-IV?
17       A    Yes.
18       Q    Okay.  And so you weren't -- or you didn't
19   diagnose Mr. Jayatilaka with a learning disability under
20   the DSM-IV standards, did you?
21       A    That's correct.
22       Q    And it was also your conclusion that
23   Mr. Jayatilaka is a man of average intellectual ability;
24   is that correct?
25       A    Yes.

Page 63

1        Q    Okay.  And if you could turn to that, I just
2    want to make sure -- that's on page 9.  It's right
3    underneath "Summary and Impressions."
4        A    Uh-huh.
5        Q    It says, quote, Psychometric estimates of
6    premorbid functioning indicate that Dr. Jayatilaka is a
7    man of average intellectual ability, closed quote.
8            You capitalized the word "average."  Were you
9    using that in a particular way?
10       A    You know, sometimes I just capitalize the range
11   that it falls within to kind of emphasize that and to let
12   the reader know that that's an actual category rather
13   than just, he did average.  It's actually -- when I put
14   it in capital, I'm trying to convey that it's an actual
15   category that we use.
16       Q    And that is, again, according to the definitions
17   that you and I talked about earlier in terms of your
18   scale in terms of what's average, below average and above
19   average?
20       A    It would be on both of our scales.
21       Q    Yeah.
22            And this also refers to "premorbid functioning."
23   Is it, in fact, the case that your conclusion is that
24   Mr. Jayatilaka was a man of average intellectual ability
25   before the injury in 1995?

Page 64

1        A    That would be my estimate, yeah.
2        Q    Are you familiar with the DSM-IV definition of a
3    reading disability?
4        A    Yes.
5        Q    Let's go back and take a look as long as we have
6    the excerpt.
7            Do you have Exhibit 8 in front of you there?  If
8    you'll turn, there's actually on -- it says page 50 at
9    the top.  It has the diagnostic criteria for 315.00.  And
10   again, I'm referring to Exhibit 8, for the record.
11           Are you familiar with these criteria for a
12   reading disorder?
13       A    Yes.
14       Q    And did you ever conclude that Mr. Jayatilaka
15   met the diagnostic criteria for such a reading disorder?
16       A    No, not according to the DSM.
17       Q    Would you agree that he scored, actually, very
18   high on measures of reading on the neuropsychological
19   tests?
20       A    Yes.  Average or better.
21       Q    Okay.  Well, let's go to page 6, actually, of
22   Exhibit 1, because I'm just trying to use your exact
23   words.
24       A    Uh-huh.
25       Q    All right.  It says -- and this is right under

16 (Pages 61 to 64)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 65

1   "Achievement Testing," Dr. Levine. And the second
2   sentence says, quote, He obtained very high scores on
3   measures of reading, arithmetic and mathematical
4   reasoning consistent with reported level of education,
5   closed quote.
6         And that is your opinion?
7   A   Yes.
8   Q   And --
9   A   That is actually not my -- that's based on the
10  data. It's my opinion based on the data -- my
11  interpretation of the data.
12  Q   Understood.
13        And the next sentence says, quote, Speeded
14  measures of reading, calculation and writing were also
15  within expectation, closed quote.
16        That also was your conclusion based upon the
17  data?
18  A   Yes.
19  Q   Now, the next sentence says, quote, Conversely
20  his scores of measures of auditory and reading
21  comprehension were below expectation, closed quote.
22        What do you mean when you say "below
23  expectation"?
24  A   I think it would be a similar phrase as to
25  relative deficit; that seeing how well he did on these

Page 66

1   other measures, a great equivalent above the 18th grade,
2   or college, graduate school, he did relatively poorly
3   on those -- poorly than we expected.
4   Q   So relative weakness as opposed to a deficit?
5   A   Yes.
6   Q   And are there particular -- I believe there are
7   some particular subtests when we were talking about
8   auditory and reading comprehension, that would be
9   associated with that; is that correct?
10  A   Yes.
11  Q   So let's go back to the tests here. And let's
12  go first to the WJ.
13        And there appears to be a subtest entitled
14  "Understanding Directions." What is that designed to
15  measure?
16  A   In that test, the examinee hears a series of
17  instructions and is -- and then carries out those
18  instructions. So it assesses auditory comprehension.
19  Q   Okay. And on that particular test, he was in
20  the 49th percentile, correct?
21  A   Yes.
22  Q   All right. And then the other one on the
23  Watkins-Johnson (sic) was, there's one called "Passage
24  Reading Comprehension." What is that intended to
25  measure?

Page 67

1   A   That is just as it says, reading comprehension.
2   One reads a passage and then answers a question with
3   regards to the content of that passage.
4   Q   And that was a 42 -- 42nd percentile; is that
5   correct?
6   A   Yes.
7   Q   All right. So that was also in the average
8   range.
9   A   Yes.
10  Q   All right. Are you familiar with the diagnosis
11  of a mixed expressive-receptive language disorder --
12  A   Yes.
13  Q   -- under the DSM-IV?
14  A   Yes.
15  Q   Let's go back to the DSM-IV. It should be,
16  actually, a couple of pages in. That's on -- this is,
17  again, Exhibit 8, pages 60 to 61. Do you see that?
18  A   Uh-huh. Yes.
19  Q   And are you familiar with those diagnostic
20  criteria for mixed receptive-expressive language
21  disorder?
22  A   Yes.
23  Q   And again, one of the things, as I understand
24  it, is that the first criteria here is, quote:
25        The scores obtained from a battery of

Page 68

1         standardized individually administered
2         measures of both receptive and
3         expressive language development are
4         substantially below those obtained
5         from standardized measures of
6         nonverbal intellectual capacity,
7         closed quote.
8         And do you understand what the term
9   "substantially below" in this context refers to?
10  A   Not necessarily. It's not defined here, but I
11  would generally use a 1.5 to 2 standard deviations.
12  Q   And would you agree that Mr. Jayatilaka does not
13  meet the criteria for a mixed receptive-expressive
14  language disorder?
15  A   I do.
16  Q   Was there ever a point in time where you
17  concluded that there was a DSM-IV diagnosis that was
18  applicable to Mr. Jayatilaka?
19  A   Not at the time of my evaluation of writing this
20  report.
21  Q   Did you come to that conclusion at some later
22  point?
23  A   Well, it's arguable. The DSM is not the best
24  reference guide for diagnosing cognitive and
25  neuropsychological disorders. There's better diagnostic

17 (Pages 65 to 68)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 69

1   criteria out there for diagnosing a learning disability
2   than what's in the DSM-IV, that I didn't use for this
3   particular evaluation and, in fact, probably would not
4   have applied to Dr. Jayatilaka. Based on my evaluation
5   of him, I found him to have some weaknesses in some
6   areas, but I didn't feel that he met diagnostic criteria
7   for any of the DSM-IV disorders.
8       Q   Do you understand that Dr. Dushenko, in December
9   of 2008, submitted an affidavit in which he diagnosed
10  Mr. Jayatilaka with a cognitive disorder not otherwise
11  specified?
12      A   I have become aware of that, yes.
13      Q   Do you agree with that?
14      A   It's not what I would have diagnosed, but it's
15  arguable that it could have been diagnosed.
16      Q   You don't agree with that diagnosis?
17      A   A Cognitive disorder NOS is kind of a wastebasket
18  term for somebody who doesn't meet diagnostic criteria
19  for, say, amnestic disorder or dementia or delirium or
20  any other disorders, but that they have some form of
21  impairment that limits them in some substantial way. So
22  one could argue that these deficits are limiting
23  Dr. Jayatilaka in a substantial way. At the time of my
24  evaluation, that wasn't my impression.
25      Q   Is it your impression today?

Page 70

1       A   I could be swayed probably either way. Because
2   my understanding is that Dr. Jayatilaka was doing fairly
3   well in school, fairly well in school. He wasn't a
4   stellar student, but he made it through college and he
5   made it into medical school, until he was injured in this
6   assault, and following that assault, he had some
7   tremendous difficulty -- I'm assuming he had difficulty
8   in medical school if it took him so long to take his
9   first Board and tries to take his first Board and pass
10  it. So one could attribute that to deficits incurred in
11  that assault, which, in that case, one could assign a
12  diagnosis of cognitive disorder NOS.
13      Q   Okay. Let's take a look at the -- which, by the
14  way, did you have any involvement with any submissions by
15  Mr. Jayatilaka to the NBME, where he identified DSM-IV
16  diagnoses?
17      A   I'm not sure what you mean by "any submissions"
18  by Dr. Jayatilaka.
19      Q   Okay. Were you aware that in submitting an
20  application for accommodations to the National Board of
21  Medical Examiners, Dr. Jayatilaka stated that he had a
22  reading disorder?
23      A   I'm not aware of that.
24      Q   Were you aware that in submitting information to
25  the National Board of Medical Examiners, Mr. Jayatilaka

Page 71

1   stated that he had a learning disability?
2       A   I'm not aware of that.
3       Q   And were you aware that in submitting
4   information to the National Board of Medical Examiners,
5   Mr. Jayatilaka stated that he also had the mixed
6   receptive-expressive language disorder?
7       A   No, I'm not aware of that.
8       Q   Let's go -- if you'll take a look at Exhibit
9   Number 8 here. And turn to -- there should be an excerpt
10  here, and jump all the way to page 163 for "Cognitive
11  Disorder Not Otherwise Specified."
12          Are you there with me?
13      A   Yes.
14      Q   At 294.9, do you see that?
15      A   Yes.
16      Q   All right. And again, this states, quote:
17          This category is for disorders that
18          are characterized by cognitive
19          dysfunction presumed to be due to the
20          direct physiological effect of a
21          general medical condition that do not
22          meet criteria for any of the specific
23          deliriums, dementias or amnesic
24          disorders listed in this section.
25          Now, is it your understanding based upon that

Page 72

1   criteria that for such a diagnosis, there would have to
2   be a medical -- general medical condition that actually
3   causes cognitive dysfunction?
4       A   Yes, that is my understanding.
5       Q   Okay. And so in terms of a general medical
6   condition, apart from the skull fracture in 1995, are you
7   aware of any other general medical condition of
8   Mr. Jayatilaka that could potentially be causing him
9   cognitive disfunction?
10      A   No. You know, he had sleep apnea, but that's
11  not enough to -- any criteria for cognitive disorder NOS.
12      Q   Okay. And it seems that in terms of going
13  either way on that kind of a diagnosis, it would be
14  important to you to understand the level of intellectual
15  achievement by Mr. Jayatilaka prior to the 1995 injury;
16  is that right?
17      A   Yes.
18      Q   Okay. Let me see if I can give you some
19  information on that.
20          So you were aware that Dr. Jayatilaka attended
21  high school at Chadwick School in Palos Verdes?
22      A   Yes.
23      Q   Okay.
24          MR. TENHOFF: Let's go ahead and mark this as 9.
25          (Defendant Exhibit 9 was marked

18  (Pages 69 to 72)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 73

1        for identification by the reporter.)
2   BY MR. TENHOFF:
3        Q   I've placed before you what I've marked as
4   Exhibit 9 to this deposition.
5        Have you ever seen this document before?
6        A   No.
7        Q   All right.  If you'd turn to the second page
8   here, there is shown at the bottom, right above that last
9   chart, it says "Cum GPA grades 10 through 12 of 3.13."
10       Do you see that?
11       A   I do.
12       Q   And a class rank of 33 out of 60.  Would you
13   agree that, generally speaking, that's average
14   performance in high school?
15       A   Yes.
16       Q   Are you aware of how Mr. Jayatilaka performed in
17   college?
18       A   From my recollection, he had told us that he had
19   average or better grades in high school and college.
20       Q   Okay.
21       MR. TENHOFF:  Let's mark that, please.
22       (Defendant Exhibit 10 was marked
23        for identification by the reporter.)
24   BY MR. TENHOFF:
25       Q   All right, I've placed before you what I've

Page 74

1   marked as Exhibit 10 to this deposition.
2        Will you take a moment and tell me whether you
3   recognize this document.
4        A   I have not seen this document.
5        Q   All right.  And if you'll look -- you understood
6   that Dr. Jayatilaka attended college prior to the 1995
7   injury, correct?
8        A   Yes.
9        Q   All right.  And if you'll look at the bottom
10   here, it appears that he received a bachelor of arts
11   degree in May of 1991, correct?  It's at the very bottom.
12       A   Yes.
13       Q   And that there was a cumulative grade point
14   average of 2.69.  Do you see that?
15       A   I do.
16       Q   And his final rank in the class was 318 out of
17   431.  Correct?
18       A   Yes.
19       Q   All right.  Would you consider those to be
20   average grades or slightly below average grades?
21       A   I'd say average.  Except for that F in organic
22   chemistry.
23       Q   Well, I was going to ask you about that.  There
24   seems to be that in some of the courses which appear to
25   be more science oriented or premedical, that there are a

Page 75

1   number of lower-ranking grades.  So, for example, if you
2   look -- the second entry on the left-hand side,
3   organismic biology was a C.  Go slightly down:  Organic
4   chemistry I, C; macroeconomics, C; organic chemistry II,
5   F; genetics, C.  On the right-hand side:  General
6   physiology, C; and pathology is C; and population biology
7   is C minus.
8        Would that have any impact on your opinion of
9   his academic performance prior to the injury?
10       A   Again, I'd say it's pretty average.  I mean,
11   there's other instances where he did well in organic
12   chemistry.  Later on, he had a B plus.  There's lots of
13   factors here.
14       I don't know what he was doing in college, if he
15   was taking it seriously or not.  But all of the things
16   being equal, these wouldn't be considered by me to be
17   particularly great grades.  I think they'd be average or
18   below.
19       Q   Okay.  Were you aware of his scores in medical
20   school, both before and after the injuries?
21       A   No.
22       Q   Okay.
23       MR. TENHOFF:  Let's go ahead and -- 11.
24       (Defendant Exhibit 11 was marked
25        for identification by the reporter.)

Page 76

1   BY MR. TENHOFF:
2        Q   The reporter's placed before you what I've
3   marked as Exhibit 11 to this deposition.
4        Have you ever seen this document before?
5        A   No.
6        Q   If you'll take a look, the final page of this
7   document is -- they have a listing right about in the
8   middle, it says, "Grading scale 5 to 10, minimum to
9   approve is 6."
10       Do you see that?
11       A   I do.
12       Q   All right.  And so if you take a look using that
13   sort of rating scale, how would you characterize the
14   grades he received in medical school?
15       A   Just give me a couple of moments to look at
16   this.
17       Q   Absolutely.
18       A   Well, they're pretty mixed.  Some are in 10 and
19   some are in 6.  I don't know what the average here is,
20   but it seemed like he got off to a really good start the
21   first year.
22       Q   And let me ask you, just taking a look at this -
23   I know you haven't seen this before, Dr. Levine - do you
24   see any appreciable difference in the nature of the
25   grades that were received prior to the 1995 injury and

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 77

1   after the 1995 injury?
2       A   I'm not sure exactly where the injury would have
3   occurred in this list, if it was before the first or --
4   before or after the first period of '95.  But there's not
5   really that many grades after the injury here to base any
6   conclusions on.
7       Q   In terms of an opinion or potential opinion on
8   the diagnosis of cognitive disability not otherwise
9   specified, would it be important to determine how
10  Mr. Jayatilaka performed on standardized testing prior to
11  the injury?
12      A   I'm sorry, could you repeat that.
13      Q   Sure.  I bet she can better than I can.
14      (Record read.)
15      THE WITNESS:  It would be helpful, yes.
16  BY MR. TENHOFF:
17      Q   Did you ever have a chance to see how he
18  had scored on his SATs prior to the injury?
19      A   I did not.
20      Q   Okay.
21      MR. TENHOFF:  Let's go ahead, and we're up to
22  12.
23      (Defendant Exhibit 12 was marked
24      for identification by the reporter.)
25  BY MR. TENHOFF:

Page 78

1       Q   Okay, the reporter has placed before you what
2   was marked as Exhibit 12 to this deposition.
3       Have you ever seen this document before?
4       A   No.
5       Q   Are you familiar with the grading on SAT scores?
6       A   Somewhat.
7       Q   Okay.  Do you see on the first part there,
8   there's a couple of different scores.  This does appear
9   that they have percentiles in the right-hand column.  Do
10  you see that?
11      A   Yes.
12      Q   And do you think the -- does it seem to be that
13  the percentiles for college bound seniors, national, he
14  scored at the 76, 83 and 78 percentile?
15      A   Yes.
16      Q   And the highest he scored on the verbal was a
17  76 percentile; is that right?
18      A   According to national standards, yes.
19      Q   Right.
20      And how would you -- I know you're not an expert
21  on SAT scores.  How would you characterize those scores?
22      A   Well, based on percentiles alone, I would say
23  they're above average.
24      Q   Okay.  And then let me have you take a look
25  at -- the final one I want to show you, his MCAT scores.

Page 79

1       Have you ever seen the scores on the MCAT that
2   we received by Mr. Jayatilaka?
3       A   No.
4       Q   Okay.
5       MR. TENHOFF:  Let's go ahead and mark that.
6       (Defendant Exhibit 13 was marked
7       for identification by the reporter.)
8   BY MR. TENHOFF:
9       Q   The reporter has placed before you what I've
10  marked as Exhibit 13 to this deposition.
11      Can you take a moment and tell me whether you
12  recognize this document in any way.
13      A   I do not recognize it.
14      Q   Did you take the MCAT, by the way?
15      A   I went to graduate school.  I took the GREs.
16      Q   Okay.  And it appears that there were a couple
17  of different iterations of the MCAT.  It looks like five
18  different times that it was taken.  Do you see that?
19      A   I do.
20      Q   Okay.  And the overall scores appear to be, at
21  least to me, in sort of the average range.  I think the
22  higher score was a 23 out of a possible 45 on the exam.
23  Would you agree with that?
24      A   I don't know the ranking system for this, so I
25  couldn't -- I couldn't make any conclusions based on

Page 80

1   this.
2       Q   Okay.  So if I were to tell you that a 9 on the
3   verbal reasoning test is, roughly, 55th to 77.9
4   percentile, and a 7 on physical sciences 36 to 53
5   percentile, and a 7 on the biological is 30 to 44.9
6   percentile, would that have any impact on your opinion as
7   to how he scored overall on the MCATs prior to the
8   injury?
9       A   I would say he obtained an average or better
10  score on the MCATs.
11      Q   Okay.  All right.  And were you aware that based
12  upon these MCAT scores, he was not accepted to any
13  medical schools the first year that he applied, in 1991?
14      A   Yes, but I'm also aware that schools don't base
15  admissions strictly on MCAT scores.
16      Q   In terms of a -- we can set that aside.
17      In terms of a potential diagnosis of cognitive
18  disorder not otherwise specified, would you attribute any
19  significance to the fact that the MRI reports that we
20  looked at earlier were negative and showing no brain
21  abnormality?
22      A   Well, if one were to, say, for example, assign
23  this diagnosis of cognitive disorder based on post
24  concussive syndrome, one would not necessarily expect to
25  see any changes on an MRI.

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 81

1    Q  Okay.  Did you review any medical records that
2  indicated that there was any injury to the brain as
3  opposed to a fracture to just the skull?
4    A  I don't recall, but if I didn't put anything in
5  my report mentioning specific brain injury, chances are I
6  did not review any medical records that mentioned it,
7  because that would be very relevant to my interpretation.
8    Q  Are you aware of any medical records that show
9  that there was actually a brain injury to Mr. Jayatilaka
10  as opposed to a skull injury?
11    A  None that show actual neuronal damage, tissue
12  damage itself.  Which isn't to say that a skull fracture
13  wouldn't cause imbalance of neural function.  It causes a
14  reaction of the organ, but not necessarily one that you
15  can see.  For example, a concussion, one doesn't
16  necessarily see a giant bleed in the brain or atrophy or
17  any changes on MRI.  The changes are actually more on a
18  microscopic level, but they're very real.
19        So in the case of an injury or impact to the
20  head that was strong enough to cause a fracture, I would
21  expect him to at least have a concussion and very
22  potentially post concussive symptoms.
23    Q  And again, you're not a medical doctor, right?
24    A  That's right.
25    Q  Is it possible, if you know - I know you're out

Page 82

1  of your area of expertise here - to have a skull fracture
2  without injury to the brain?
3    A  Define "injury to the brain."  I'm not really
4  sure what you mean by that.
5    Q  Injury that causes cognitive dysfunction.
6    A  Is it possible to have a skull fracture without
7  an injury that causes cognitive dysfunction.  I'd imagine
8  there are many instances where people have fractured
9  their skulls and not had any cognitive sequela from that.
10    Q  Wasn't it, in fact, your conclusion that
11  Mr. Jayatilaka had been functioning within the average
12  range of intellectual ability for some time?
13    A  Based on my premorbid estimates, yes.
14    Q  So average functioning both before and after the
15  injury, correct?
16    A  Yes.
17    Q  Were you aware of any change in the report that
18  was submitted to the NBME after the May 21st report?
19    A  I'm not aware of anything.  After I signed it,
20  it went into the file.  Although the date on the report
21  that I have is 5/30/08, so -- the date on the one you
22  gave me is 5/21/08.  I'm not sure which actual draft went
23  out.  But my signature is on the one that you have, so --
24    Q  Right.
25    A  -- very likely that's the one that went out.

Page 83

1    Q  I can represent to you that the only one that
2  the NBME received was the May 21st one, which was, in
3  fact, signed by you and Dr. Dushenko.
4    A  Which is a little odd because this part is
5  incomplete here, which is --
6    Q  It actually just is a page break.  If you go --
7  it actually starts at the top and --
8    A  Well, I understand that.  But this heading here
9  is not filled out --
10    Q  Okay.
11    A  -- this information, and in my final reports,
12  those are generally filled out, and I don't know why.
13    Q  All right.  So let's go ahead and mark this and
14  see if we can clear this up.
15        MR. TENHOFF:  That's 14.
16        (Defendant Exhibit 14 was marked
17        for identification by the reporter.)
18  BY MR. TENHOFF:
19    Q  All right.  I've put before you what I've marked
20  as Exhibit 14 to this deposition.
21        Can you take a moment and tell me whether you
22  recognize this document.
23    A  This is the one that I have in my folder here.
24    Q  Okay.
25    A  I believe.  Yeah.

Page 84

1    Q  And did you sign this one?
2    A  It's not signed on here.  It's not signed on
3  this copy.
4    Q  Okay.  Are you aware of any differences between
5  the May 21st and the May 30th reports?
6    A  I'll just quickly look over it.  Aside from the
7  missing information...
8    Q  Well, let me point you out to a couple of them,
9  because I want to ask you specifically about a couple.
10    A  Okay.
11    Q  If you'll look, first of all, on Exhibit 1 at
12  page 6.  Take a look under -- all right.
13        So first of all, take a look at Exhibit 1, and
14  under "Achievement Testing," the second full paragraph,
15  there's -- the second sentence says, quote:
16        Although his scores still fell within
17        the average range when compared to
18        individuals from his age group, it's
19        quite possible that they reflect
20        sequelae of his traumatic head injury,
21        THI, closed quote.
22        Do you see that?
23    A  Yes.
24    Q  All right.  Now, did you write that portion?
25    A  I don't recall.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 85

1    Q  Now, if you'll take a look in Exhibit Number 14,
2  and you'll look under "Achievement Testing," that
3  statement is deleted.  Do you know why that is?
4    A  That I don't know.
5    Q  Do you have any conclusion as to whether the
6  scores on the academic testing reflect sequelae of his
7  traumatic head injury or not?
8    A  Do I have any opinion of that?
9    Q  Yes, sitting here today.  I've got two reports
10  and one says it does and one says it doesn't.
11    A  It would be hard for me to make that conclusion
12  because of the site of the injury.  If there were any
13  underlying damage to the brain, it would not necessarily
14  affect the abilities which were below expectation on the
15  achievement testing.  It's conceivable.  Anything's
16  possible.  One could make the argument, but that's not a
17  conclusion I believe that I would have made.
18    Q  Okay.  Is that a conclusion that you make
19  sitting here today?
20    A  No, I wouldn't make that conclusion sitting here
21  today.
22    Q  Okay.  Another one I wanted to ask you about
23  was, if you go back -- let's take a look at, first of
24  all, on page 4 -- oh, let me -- let's go back to page 4
25  of both documents, Exhibit 14 and Exhibit 1.

Page 86

1       All right, so take a look at Exhibit 14 first,
2  which is the May 30th report.
3    A  Uh-huh.
4    Q  It says about -- right above "Personal Habits,"
5  there's about -- five lines up it says, quote, He states
6  that he notices the apnea now primarily after episodes of
7  heavy alcohol use, closed quote.
8       And then the last sentence of that paragraph
9  says, quote, While he does not call himself alcoholic, he
10  describes extended periods of heavy drinking with very
11  poor and restless sleep accompanying many drinking bouts,
12  closed quote.
13       Now, do you see that language anywhere in the
14  May 21st report?
15    A  No.
16    Q  Do you have any idea why it's in the report that
17  was -- it was not in the report submitted to the NBME,
18  but it was in the May 30th report?
19    A  This would have been a section that Dr. Dushenko
20  would have written, so I don't know why it was in one
21  version and not the other.  There could be any number of
22  reasons.  Reports can happen in various drafts.
23  Sometimes there's information that's unclear and has to
24  be clarified with a patient or a collateral source.  I'm
25  not sure why it's in one and not the other.

Page 87

1    Q  Okay.  There's one other statement here that if
2  you look at Exhibit 14, under "Personal Habits," the
3  second sentence says, quote:
4       He identifies periods of heavy alcohol
5       use as above, but feels he's able to
6       control when and how to indulge and
7       attributes much of his heavier usage
8       to cultural factors, closed quote.
9    A  Uh-huh.
10    Q  And do you see that language in Exhibit Number 1
11  that was submitted to the NBME?
12    A  No.
13    Q  And do you know why there's a difference between
14  the two?
15    A  I don't know why.
16    Q  Would it have any impact on your opinion if
17  there were incidence of heavy alcohol use by
18  Mr. Jayatilaka?
19    A  On my opinion of what?
20    Q  Of any deficits he may have or his results on
21  the neuropsychological test.
22    A  Unless he were a chronic alcohol user for many
23  years, I would not expect there to be significant impact
24  upon neurocognitive functioning.  And if there were, I
25  wouldn't expect to see it in the areas that were

Page 88

1  identified by this evaluation.
2    Q  Was there any indication of alcohol use on the
3  dates that you tested him, either the day before or
4  during the testing?
5    A  Certainly not during the testing.  I don't
6  recall if he had mentioned anything about drinking the
7  night before or the weekend before.  I don't know if
8  there's anything in my notes that indicate that.  Let me
9  see.
10       I didn't jot anything down here that would have
11  indicated there was a red flag about alcohol use on the
12  day of testing or the night before.
13    Q  Okay.  Can you turn to -- let's go back to
14  Exhibit 3, if you have that near you.
15    A  Yeah.
16    Q  Which is the Neuropsychological Questionnaire.
17       And let's turn to -- there's a page SD0299.  Do
18  you see that?
19    A  Yes.
20    Q  And at the top of that it says, "The following
21  may affect or involve brain functioning.  Please check
22  any you have had."
23       What's the purpose of this portion of the
24  questionnaire?
25    A  Just as it states, that some of these particular

22 (Pages 85 to 88)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 89

1  conditions or incidents may affect neurocognitive
2  functioning.
3      Q  And when you reviewed Dr. Dushenko's file prior
4  to doing testing, did you note the check on "been a heavy
5  drinker for an extended period of time"?
6      A  Well, first off, I'm not sure if I reviewed
7  his --
8      Q  Okay.
9      A  -- this particular document prior to testing, so
10 I can't answer that question.  And I'm not sure if I saw
11 this particular point.
12         To reiterate, the first part of the report was
13 written by Dr. Dushenko, so this would be more pertinent
14 to him and his writing the report.  Looking at it now, I
15 would not consider this amount of alcohol use to be
16 significant with regards to neurocognitive functioning.
17     Q  What do you interpret the amount of alcohol
18 consumed to be?  It's a little ambiguous.
19     A  I see that he drinks on weekends and has six
20 Jack and Cokes.  I'm assuming Friday and Saturday nights,
21 maybe two nights of the weekend.  Which, considering a
22 man of his size, I wouldn't consider to be excessive.
23 Unless he were planning on driving, of course.  But with
24 regards to actually doing some sort of brain damage or
25 having impact on neurocognitive functioning, I wouldn't

Page 90

1  expect it.
2      Q  Okay.  And you didn't write the words "a lot
3  equals binge" on the right-hand side?
4      A  No.  That's Dr. Dushenko's writing, I believe.
5      Q  Okay.  And again, is there anything about the
6  use of alcohol, or now seeing those things and the use of
7  alcohol, that would change your opinions in any way?
8      A  No.
9      Q  Okay.
10        MR. TENHOFF:  Are you ready for a break?
11        (Recess taken.)
12        MR. TENHOFF:  Let's go back on the record.
13     Q  Let's go back to Exhibit 1, which is the report
14 that was submitted.  And I'd like to go to page 9, if we
15 could.
16     A  I'm sorry, was it 1 that was submitted or 14
17 that was submitted?
18     Q  1 that was submitted, yes.
19        And if you'd go to page 9 with me there.
20     A  Okay.
21     Q  All right.  And I want to first talk about the
22 area of speech and language functioning.  And under
23 "Summary and Impressions," the third paragraph of the
24 first sentence says, quote, Language functioning was
25 characterized by deficits - I take it it's supposed to be

Page 91

1  "in" - expressive and receptive functions.
2      A  Uh-huh.
3      Q  Did you write that?
4      A  I'd imagine, yeah.  I think that this "Summary
5  and Impressions" looks very much like mine or sounds very
6  much like my language.
7      Q  Okay.  And in terms of those particular
8  functions, expressive and receptive functions, what of
9  the neuropsych tests were you relying upon to conclude
10 that there was deficits in those areas?
11     A  BNT.
12     Q  Uh-huh.
13     A  The D-KEFS verbal fluency.
14     Q  Uh-huh.
15     A  The auditory and reading comprehension subtests
16 of the Woodcock-Johnson.
17     Q  Okay.  Any others?
18     A  I believe that's it.  I'm looking through here.
19        Yeah.  Yeah, I think that's it.
20     Q  Okay.  And, I'm sorry, which one on the
21 Woodcock-Johnson are you referring to?
22     A  Passage comprehension, also called reading
23 comprehension.
24     Q  Okay.
25     A  And then the auditory comprehension would be

Page 92

1  called "Understanding Directions."
2      Q  And again, the "Understanding Directions" is
3  49 percentile, which is in the average range --
4      A  Uh-huh.
5      Q  -- correct?
6      A  That's right.
7      Q  And the passage reading comprehension, again, is
8  at the 42nd percentile, which is, again, in the average
9  range.
10     A  Right.
11     Q  Okay.
12     A  Also spelling, I believe, is probably included
13 in that conclusion.
14     Q  Okay.
15     A  Which was at the 57th percentile.
16     Q  Again, in the average range.
17     A  Yes.
18     Q  All right.  So let's take the Boston Naming
19 Test, and we've got that as a -- that was in the
20 18th percentile, correct?
21     A  Yes.
22     Q  All right.  So in your classifications, that
23 would be in the lower average range, correct?
24     A  Yes.
25     Q  All right.  And were you the one who

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 93

1   administered that test?
2       A   Yes.
3       Q   All right.  And the -- I think that one was one
4   that you referred to before that was normed both from an
5   age perspective and an educational perspective, correct?
6       A   It's possible.  I don't remember the normative
7   set I used, and that's my fault to not include that in
8   the results here.  Oftentimes neuropsychologists will put
9   the normative sample that they used to arrive at their
10  percentile.  So it may have been based on age alone, it
11  may have been based on age and education.
12      Q   Okay.  And if it was education, given
13  Dr. Jayatilaka's level of educational attainment, that, I
14  assume, would be a norm group of greater intellectual
15  ability, correct?
16      A   Yes.  The range of grades differ across
17  normative samples.  It may have been 13 to 21, it may
18  have been 16 to 21 years of education.  It may have been
19  20 to 21 years of education.  I don't recall the specific
20  stratification of it.
21      Q   And under the "Raw Score" of 52, do you have any
22  idea how that would correlate to a percentile if we only
23  used age-based numbers?
24      A   It would probably still be below average.
25      Q   You think it would still be below the

Page 94

1   25th percentile?
2       A   I believe it would be below the 25th percentile,
3   yes.
4       Q   Okay.  Let me ask you about the administration
5   of the Boston Naming Test, because there was a document
6   given to us.
7           MR. TENHOFF:  Go ahead -- what are we up to, 15?
8   Thanks.
9           (Defendant Exhibit 15 was marked
10          for identification by the reporter.)
11  BY MR. TENHOFF:
12      Q   The reporter's placed before you what I've
13  marked as Exhibit 15 to this deposition, and it's marked
14  at the bottom right-hand corner SD0480 and 0481.  Have
15  you ever seen this document -- which, by the way, denotes
16  it came from your office's files.
17          Have you ever seen this before?
18      A   Yes.
19      Q   What is it?
20      A   This is the protocol for the Boston Naming Test.
21      Q   All right.  So if you start on the second page,
22  it seems like we start on item 30, correct?
23      A   Uh-huh.
24      Q   "Yes"?
25      A   Yes.

Page 95

1       Q   All right.  So what's the protocol for this
2   test?  How do you give this test?
3       A   Well, generally, you show the examinee a
4   picture - it's more of a drawing - of a relatively common
5   object, and they then attempt to name what that object
6   is.  If they can't name it, you give them a stimulus cue.
7   So, for example, if I were showing you a picture of a
8   harmonica, I would say it's a musical instrument.  And if
9   that doesn't jog your memory, I would give you a phonemic
10  cue, which would be starts with the sound "har".
11      Q   And again -- and so the stimulus cue is what's
12  in the parentheses after the actual item, correct?
13      A   Yes.
14      Q   And the phonemic clue is the one that's the --
15  underlined at the beginning of the item, correct?
16      A   Yes.
17      Q   All right.  And the reason I'm asking you about
18  this is, I don't see any marks or notations that indicate
19  that stimulus cues were given when this test was
20  administered.
21      A   I don't mark everything I do on these.  It
22  becomes kind of -- I just have a standard way of giving
23  it.  And if it's clear to me that someone recognizes what
24  the object is, but they can't come up with the name, I'll
25  skip the stimulus cue altogether.  The reason for this is

Page 96

1   that you want to understand what the language deficit is.
2           We have a condition, for example, called
3   agnosia, where someone will look at a cup, for example,
4   and not really understand what it is at all, but if you
5   explain to them what category it falls within, they may
6   be able to come up with the word.  That's a different
7   type of deficit than having difficulty retrieving the
8   word, even though you know what the object is and you can
9   recognize it and describe what it's used for.
10      Q   And isn't that the purpose of giving a stimulus
11  clue first and a phonemic clue second, so that you can
12  identify which particular potential deficiency you're
13  dealing with?
14      A   Yes, one would give the stimulus cue first if
15  they thought that there was some kind of agnosia going
16  on.  If it's clear to me that the patient understands and
17  recognizes what the object is and is already struggling
18  with coming up with the word, then sometimes I may skip
19  the stimulus cue.
20      Q   And of the ones that were given here, do you
21  have any recollection of how many times you did skip
22  giving the stimulus cue?
23      A   I don't have any recollection of that.
24      Q   And is there anything in the Boston Naming Test
25  testing protocol that provides that you can skip the

24  (Pages 93 to 96)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 97

1    stimulus cue step?
2        A  I believe if you look into the protocol for the
3    Boston Naming Test, there's a lot of ambiguous areas,
4    such as how many seconds one can give a person to come up
5    with the stimulus cue, how many seconds they have to come
6    up once the phonemic cue is given.  So I felt in always
7    administering the BNT, there's some latitude in the
8    protocol for administering it.
9        For example, starting on item 30, I believe, is
10   fairly commonplace.  But we also have the reversal rule,
11   so if they have an error within the first, I believe
12   eight or so items, one starts to work backwards until
13   there's a basal of eight items.
14       Q  Is there a -- if you're looking at the numbers
15   here, at the bottom it says -- first of all, it's "Total
16   correct without cue," which is 52, correct?
17       A  Uh-huh.
18       Q  "Yes"?
19       A  Yes.
20       Q  Okay.  And then it's "Total correct with or
21   without stimulus cues" as 52, correct?
22       A  Yes.
23       Q  All right.  And then "Total correct with or
24   without stimulus or phonemic clues" is 57, correct?
25       A  Yes.

Page 98

1        Q  All right.  So the raw score that you reported
2    is a 52 on the report, correct?
3        A  That's right.
4        Q  All right.  So where did that come from?  Which
5    one is that?
6        A  Total correct without giving a cue -- without --
7    stimulus cue counts.  If you give a stimulus cue, that
8    also counts.  If they get it right after, say, for
9    example, it's something you drink out of, that also gets
10   counted as correct in the raw score.
11       Q  Right.  So if you had given the stimulus cues
12   and you, for instance, got one because of the stimulus
13   clue --
14       A  I would have marked that in the column.
15       Q  Right.  And then his scores would have been
16   reported on the raw score would have been higher than 52.
17       A  That's right.  No, no.
18       Q  Okay.
19       A  Oh, that's right, that's right.  Yes.
20       Q  So in giving this test, in looking at your
21   results, you can't tell which ones he would have gotten
22   correctly if he had been given a stimulus clue.
23       A  That's not necessarily true.  If somebody is
24   struggling, let's say, for example -- here's a good
25   example.  The word "accordion."  He sees the accordion

Page 99

1    and he says it's a xylophone.  Based on that answer, he
2    knows it's a musical answer, so I don't give the stimulus
3    cue, it's a musical instrument.  For stilts, if he's
4    looking at that and struggling with it, I'll say, They're
5    used to making you taller.  If it's clear to me that they
6    know what category or what type of item it is, I'll skip
7    the stimulus cue, as in, for example, number 47,
8    accordion.
9        Q  Uh-huh.
10       A  Right.
11       Q  And again, you don't know which ones you did or
12   did not skip a stimulus cue on?
13       A  Chances are if they -- it's pretty standard to
14   give all stimulus cues, again, unless for some reason
15   they indicate that they don't -- it's indicated that they
16   don't recognize -- I'm sorry, it's indicated that they
17   recognize what the item is, so, for example, 47.  So --
18   but you're right, from the absence of the checks here in
19   the center column, I can't identify specifically which
20   ones I didn't give as stimulus cues.
21       Q  Is there a difference in performance on the
22   Boston Naming Test for individuals who speak English as a
23   second language?
24       A  It's possible.  It probably depends upon the age
25   at which English became -- they started learning English.

Page 100

1        Q  Do you know whether English is a second language
2    for Dr. Jayatilaka?
3        A  I know it is his identified second language, but
4    he was born in the United States, which means he was
5    exposed to English from a very early time.
6        Q  Were you aware that Dr. Dushenko's notes
7    indicated that English was a second language beginning at
8    age five or six?
9        A  No.
10       Q  Would that make a difference to your opinion in
11   terms of -- actually, let's go back to this.
12       Can you put Exhibit 6 in front of you.
13       A  Yes.
14       Q  Okay.  Now, these were your notes, correct?
15       A  Yes.
16       Q  And on the left-hand column or towards the left
17   part of the page, towards the top, it looks like it says,
18   "English is second language starting at age 5 to 6."
19       A  Okay, I guess I was aware of it.
20       Q  Would that make a difference in terms of your
21   assessment of his performance on the Boston Naming Test,
22   as to whether there's a language function issue if
23   English was his second language?
24       A  I don't think so.  But it's definitely
25   conceivable that one could say that.  And considering his

25  (Pages 97 to 100)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 101

1    education and -- I would say probably -- it probably
2    wouldn't affect his Boston Naming performance or verbal
3    fluency. Especially considering the standardized scores
4    you've shown me from his prior tests.
5        Q   Were the results of the BNT inconsistent with
6    other tests that measured similar abilities?
7        A   I don't believe I gave him another test of
8    confrontation naming.
9        Q   And when we're talking about the Boston Naming
10   Test, the ultimate thing we're looking for is signaling
11   whether there's a verbal fluency problem; is that right?
12       A   No, it's not a test of verbal fluency, it's a
13   test of confrontation naming, semantic retrieval, being
14   able to attach a word to an object.
15       Q   And is it indicative of -- or would it be
16   indicative of problems that the individual may have with
17   the skills involved in reading and reading comprehension?
18       A   Possibly. I'm not sure of any studies that
19   actually look at the relationship between semantic
20   retrieval and reading comprehension, but it's
21   conceivable.
22       Q   But it's a verbal test, correct?
23       A   It's a verbal test, a language test, yes.
24       Q   Okay. And did you note any other
25   neuropsychological tests that were consistent with the

Page 102

1    Boston Naming Test in terms of measuring his abilities
2    that are measured on the Boston Naming Test?
3        A   I would say that the verbal fluency test is
4    consistent with it because both tests involve a search
5    for some sort of word or some sort of -- to match certain
6    criteria. In this case, it's a visual stimuli that --
7    it's visual stimuli that initiates the search for verbal
8    fluency. It's either a letter or a category that is the
9    rule for the search. So both involve kind of searching
10   one's -- searching one's brain, searching one's mind for
11   the particular answer.
12       Q   Measures of processing speed.
13       A   It involves processing speed, but it's not a
14   direct measure of processing speed. None of these tests
15   are really direct measures of anything. You have to
16   triangulate on things. So one does poorly on Boston
17   Naming Test, one also does poorly on the verbal fluency
18   test. What do those mean put together? Well, it may
19   mean that they -- this person has difficulty retrieving
20   names of things or words based on certain letters.
21       Q   All right. But you would agree with me that
22   with Dr. Jayatilaka, that his processing speed is within
23   the average range, at least as measured on the WAIS,
24   correct?
25       A   I think that his cognitive processing speed

Page 103

1    overall is fairly average, yes.
2        Q   Okay. And the other one you mentioned was the
3    D-KEFS verbal fluency test for letters, correct?
4        A   Yes.
5        Q   And that's the one that was given twice, that we
6    discussed earlier?
7        A   Both for letters and categories, yes.
8        Q   Right.
9            And under "Categories," he's clearly in the
10   average range on both administrations, correct?
11       A   Yes.
12       Q   All right. And it's just -- and there was a
13   difference from the 2nd to the 16th percentile between
14   the April 2nd, 2008 administration and the May 8th, 2008
15   administration, correct?
16       A   Yes.
17       Q   Okay.
18       A   Both improved, I think, if you look at the...
19       Q   And would you also agree with me that the WAIS
20   processing speed, which is at the 58th percentile, is
21   consistent with the IQ score, overall IQ score, which is
22   also in the 58th percentile?
23       A   Yes.
24       Q   Okay. And if you look on the Woodcock-Johnson
25   test results, the tests that are measuring reading and

Page 104

1    writing fluency don't indicate any deficits; is that
2    right?
3        A   That's right.
4        Q   So, for example, the reading fluency is at the
5    78th percentile, correct?
6        A   Uh-huh. Yes.
7        Q   And the writing fluency at well above average,
8    at the 94th percentile.
9        A   Yes.
10       Q   And those scores, for instance, the reading
11   fluency and the writing fluency, those are probably
12   better than one would expect based upon the IQ score,
13   correct?
14       A   Yes, but achievement and IQ don't necessarily
15   always -- aren't always congruent as in the case of a
16   learning disability. It can go either direction. One
17   can be better than the other.
18       Q   Okay. There was another sentence in the report
19   I wanted to ask you about, too, as long as we're on
20   language functioning, and that's on page 7 of Exhibit 1.
21       A   Yes.
22       Q   All right, the last sentence of this section,
23   "Speech and Language Functioning" --
24       A   Yes.
25       Q   -- says:

26 (Pages 101 to 104)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 105

1        "Receptive language was notable for
2    auditory and reading comprehension
3    that is below expectation considering
4    educational attainment, albeit average
5    for his age."
6        Would you agree that he does not have an
7    impairment or deficit in receptive language functioning?
8    A  Not relative to the normative sampling, yes.
9    Q  Okay.  And there are, again, measures of that in
10   the neuropsychological tests that you conducted, correct?
11   A  Yes.
12   Q  So, for example, on the Woodcock-Johnson test on
13   page 14, that would be the -- I think we mentioned this
14   before, but that would be the understanding directions
15   subtest?
16   A  Yes.
17   Q  All right.  And that was at the 49th percentile.
18   A  Yes, but the grade estimate was 10.4.  Again,
19   it's relative to his other performances.
20   Q  And then the other one is the WAIS verbal
21   comprehension index as well, which is also a measure of
22   receptive language function, correct?
23   A  Not necessarily, no.
24   Q  No?
25   A  It's a composite of various WAIS verbal

Page 106

1    subtests.
2    Q  Okay.
3    A  Including vocabulary, which is just assessing
4    someone's fund of vocabulary, not necessarily their
5    expressive -- or receptive language, anyway.
6    Similarities, which is abstract reasoning, and
7    information, which is a fund of general factual
8    knowledge.
9    Q  Less achievement and more intelligence, correct?
10   A  I think just -- yeah, the amount of information
11   one's acquired throughout their life and retained, as
12   well as conceptual thinking.  For example, how are a
13   chair and a table alike.
14   Q  Uh-huh.
15   A  Being able to understand the subordinate
16   category between different items.  It's not necessarily a
17   test of language functioning, per se.
18   Q  Right.  Okay.
19       Let's go to "Learning and Memory."  And this is
20   on your report at page 8.  And the hard part is, it's a
21   little hard to read.
22   A  Someone forgot to close the cover.
23   Q  Yeah, exactly.  And unfortunately, this is the
24   best copy I have.
25       So under "Learning and Memory," you had the

Page 107

1    statement here is -- in the last paragraph above
2    "Executive Functioning," the first sentence says, quote:
3        To summarize, Dr. Jayatilaka
4        demonstrated a high average visual
5        learning and memory.  Audit
6        inventory/verbal learning was
7        characterized by below average
8        learning of pros and above learning of
9        word lists, suggesting perhaps that
10       Dr. Jayatilaka is prone to being
11       overwhelmed when presented with too
12       much information at once, closed
13       quote.
14       And which specific subtests or tests were you
15   relying upon to come to that conclusion?
16   A  The logical memory subtests of the WMS, W-M-S,
17   III, and the list learning subtest.
18   Q  Which one is that?
19   A  The list learning.  It's on page 14, directly --
20   immediately after the logical memory.
21   Q  Oh, got it.
22       Which -- I'm sorry, which list learning are you
23   referring to?
24   A  Can I point it out to you?
25   Q  Yeah.

Page 108

1    A  Can I point it?
2    Q  Absolutely.  I got these three.
3    A  This one here, this one.
4    Q  This one here?
5    A  Yes.
6    Q  Okay.  And on those scores, the WMS-III list
7    learning immediate, those scores range in percentiles
8    from 37 to 84 percent.  What is it about those scores
9    that indicates to you that supports the conclusion that
10   he's prone to being overwhelmed when presented with too
11   much information at once?
12   A  That comes from a logical memory score, which
13   was at the 16th percentile.
14   Q  Got it.
15   A  So one -- for the logical memory, he was read a
16   story which contained a fair amount of information and
17   had to remember it.  For the list learning, he was read a
18   list of 12 words, which some would consider a lot of
19   information, but one can also use strategies in order to
20   remember those words.  Some people learn better through
21   rote, some people through contextual learning like a
22   story.
23   Q  Uh-huh.
24   A  Yeah.
25   Q  Okay.  And again, that was -- as I understand

27 (Pages 105 to 108)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 109

1   it, it was, again, the comparison between the two that
2   you have a word list learned at a high rate, an above
3   average rate --
4       A   Yes.
5       Q   -- you know, from a percentile perspective,
6   84 percent --
7       A   Yes.
8       Q   -- and you've got a learning of short stories
9   unexpectedly poor at 16 percent.
10      A   Yes.
11      Q   And can you think of any reason why there would
12  be such a disparity between the two?
13      A   Well, as mentioned in the report, again, it
14  might be because of the amount of information required in
15  the story.  It could also be that he just lost
16  concentration or focus during that particular time of
17  testing, which is why we like to administer more than one
18  test on this.
19      Q   Uh-huh.
20      A   So when I draw my conclusions, I often soften
21  them with suggesting "perhaps," terms like that, rather
22  than, in this case, making a strong conclusion, because
23  as compared to, for example, his other scores, verbal
24  paired associates, which was average, list learning,
25  which was above average, the logical memory was pretty

Page 110

1   low.  So it might be indicative of something or it might
2   just have been one of those kind of low scores which just
3   happens.  Generally everybody at some point --
4       Q   Uh-huh.
5       A   -- a large number of people at some point have a
6   neuropsychological testing.
7       Q   Well, let me ask you, maybe the bigger question,
8   then, is:  Based upon all the scores you have, are you of
9   the opinion that he has any particular deficit in the
10  learning and memory area?
11      A   I don't know if I made that conclusion.  Let's
12  see.  Well, I'm reading what I wrote here as far as that
13  goes.  Okay.
14          And your question again, please?
15      Q   Sure.
16      MR. TENHOFF:  Could you read it back to him.
17      (Record read.)
18      THE WITNESS:  I'd say that he -- based on this,
19  one could say that he learns better through, for example,
20  rote than through just having a lot of information told
21  to him at once and having to digest that information.  I
22  would say it's a weakness.  I wouldn't say that it's some
23  sort of syndromic impairment or syndromic level of
24  impairment.  I wouldn't say it's indicative of a learning
25  disability or a memory impairment per se, but --

Page 111

1   BY MR. TENHOFF:
2       Q   You would or you wouldn't?
3       A   I wouldn't.
4       Q   Okay.
5       A   But I would say that he does have difficulty in
6   this area.  Recall that the neuropsychological evaluation
7   in this case is also used for coming up with a profile of
8   strengths and weaknesses, without necessarily always
9   assigning, you know, some sort of diagnostic category.
10  This would probably be an instance of where this was an
11  area of weakness for him.  And you can -- and on page 10,
12  the second paragraph, I mention a couple of reasons why
13  this may have occurred.
14      Q   So let's go to one final area and then we
15  can take a break for lunch, which is on the "Executive
16  Functioning area," and you want to go to page 10, if you
17  could.
18          And if you look -- are you with me there?
19      A   I'm sorry.  Is this 1 or 14 we're on?
20      Q   Let's just stick with 1.
21      A   Okay.
22      Q   I think I'm done with 14 for a while.
23      A   Okay.  Page?
24      Q   10, please.
25      A   Okay.

Page 112

1       Q   Are you there with me?
2       A   I'm there.
3       Q   All right.  Thank you.
4           If you'll look right above the paragraph that
5   says, "To summarize," it talks about executive abilities,
6   and it says, quote, Executive abilities are generally
7   intact, with the exception of conceptual thinking and
8   flexibility of thought, as assessed with the WCST, closed
9   quote.
10          Is that the area of executive functioning we're
11  talking about?  Is that the same as executive abilities?
12      A   Yes.  I believe they're interchangeable.
13      Q   Okay.  And would you agree with me that,
14  generally speaking, that his scores on executive
15  functioning tests were in the average or above average
16  range, with the exception of this test?
17      A   Yes.
18      Q   All right.
19      A   Actually, there were a couple of low average
20  scores on there.
21      Q   But the basis of your opinion was the Wisconsin
22  Card Sorting Test, right?
23      A   Yes.
24      Q   All right.
25      A   But looking at it now, he did also -- well, I

28  (Pages 109 to 112)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 113

1  can't say that.  Yeah, that's based on the Wisconsin Card
2  Sorting Test, yes.
3      Q   All right.  And then this goes on, on page 10,
4  to say, quote:
5          On this test, Dr. Jayatilaka took an
6          unusually long time to figure out the
7          purpose of the test.  Once he
8          discovered the purpose of the task, he
9          quickly developed a successful
10         strategy, however, it was too late to
11         obtain a score that was outside of the
12         impaired range, closed quote.
13     A   Yes.
14     Q   What did you mean by that?
15     A   I don't know how else to say it besides the way
16 it says it there.  It's pretty clear that he -- there's a
17 catch to the test, and once you figure out what the test
18 is asking of you and you figure that out, you can do well
19 on it.  It took him a while, longer than usual, to figure
20 out what the test was asking of him.
21     Q   And once he did figure it out, his performance
22 improved?
23     A   His -- once he figured it out, he was able to
24 stick with it and not make a significant number of
25 errors.

Page 114

1      Q   Okay.
2      A   But it took a while for him to figure it out.
3      Q   And are there two different tests for the
4  Wisconsin Card Sorting Test, one which has 64 items, one
5  which has 128 items?
6      A   That's correct.
7      Q   And did you administer the 64-item test?
8      A   The computerized 64, yes.
9      Q   I'm sorry?
10     A   Yes, the computerized version of the 64.
11     Q   Okay.  And is there any professional reason why
12 you selected the 64-item test as opposed to the 128-item
13 test?
14     A   Because it's on my computer and it's infinitely
15 easier to administer.
16     Q   Is it more the general practice in your
17 community to administer a 128-item test?
18     A   That I'm not sure.  I'm not sure how many
19 neuropsychologists use the 128 versus the 64.
20     Q   Are there any guidelines in the testing
21 protocols as to which one should be used and when?
22     A   Not that I'm aware of.
23     Q   If you had administered the 128-item test, would
24 you expect that the score that he would have achieved to
25 be much higher?

Page 115

1      A   I think it would have been higher because he
2  would have had more opportunity to make up for the
3  initial poor performance.
4      Q   And the Wisconsin Card Sorting Test, does it
5  typically indicate problems in functioning with
6  over-rigidity in thinking or severation?
7      A   Yes.
8      Q   But you concluded that he actually didn't
9  demonstrate either of those problems, correct?
10     A   That's right.  If one were to just look at the
11 scores, one could make that conclusion, but having
12 administered it to him and seeing how -- why he made the
13 errors he did or why he got the scores he did, I didn't
14 come to that conclusion.
15     Q   Okay.  And the norms that you used on the
16 Wisconsin Card Sorting Test, what norms are -- did you
17 utilize on those?
18     A   They're actually built into the program, and I
19 believe they're age -- I believe they're age and
20 education stratified, but I'm not absolutely sure.
21     Q   Are those known as the Heaton norms?
22     A   Again, they're built into the program.  Bob
23 Heaton's norms, who actually developed the 64 test, I'm
24 assuming those are the ones that are used in the program.
25 I didn't actually look up any of the norms myself in the

Page 116

1  computer.  When the administration is finished, the
2  computer gives you a table of the normative data.
3      Q   And do you know whether it's normed not only for
4  age and education, but also for gender?
5      A   I don't recall if it's stratified based on
6  gender.
7      Q   Are those the only norms that are available for
8  the Wisconsin Card Sorting Test?
9      A   As far as I'm aware.
10         MR. TENHOFF:  Okay.  Let's go ahead and take a
11 break now.
12         (Recess taken.)
13         MR. TENHOFF:  Let's go ahead and go back on the
14 record.
15     Q   Dr. Levine, you understand you're still under
16 oath?
17     A   Yes.
18     Q   Okay, I wanted to finish with one final area in
19 your report that you mentioned, which was manual motor
20 ability.
21         If you could turn to Exhibit 1 and look at
22 page 10 with me, please.  And the second paragraph says,
23 quote:
24         Manual motor ability was impaired.
25         This was especially true for the left

29 (Pages 113 to 116)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 117

1    nondominant hand. These findings are
2    of uncertain significance as
3    Dr. Jayatilaka did not report
4    difficulty with manual activities and
5    his cognitive profile is not
6    indicative of right hemisphere
7    pathology, closed quote.
8        What does that last sentence mean?
9        A  Well, essentially, the findings just kind of
10   stand by themselves, without any sort of congruent
11   findings anywhere else. His -- the test that that's
12   based on -- ah, it's two tests. One is a pegboard test,
13   in which they're required to place pegs in a pegboard,
14   and the other is a -- called the finger tapping test,
15   which they press down on a -- kind of a little lever with
16   their finger as quickly as they can within ten -- in a
17   ten-second time limit. And his scores were actually
18   quite low, but they didn't really seem to correlate with
19   any other findings. They just kind of stood by
20   themselves.
21       Q  Was that motor ability or impaired motor ability
22   any basis for your recommendation that he be given double
23   the amount of time on the USMLE?
24       A  I don't think that played in. Let's see.
25       No. You know, motor tests, in general, in a

Page 118

1    neuropsychological evaluation are meant to look for
2    asymmetric findings which might be indicative of
3    pathology in one hemisphere or the other. So, for
4    instance, Dr. Jayatilaka, he had 40 some odd percentile
5    with his -- excuse me, 46 percentile with his right
6    dominant hand on the group pegboard and then an impaired
7    2nd percentile on the nondominant left hand, which is a
8    rather significant discrepancy. A discrepancy like that,
9    we'd expect some rather significant -- we'd expect some
10   sort of findings, you know, neuropathology as the basis
11   for that. But there were no other test findings or no
12   neuroimaging findings that would corroborate that.
13       Q  Well, in terms of the USMLE - again, just to be
14   clear - was that any basis for any double time
15   accommodation on the --
16       A  I don't think motor functioning necessarily in
17   this instance would be an issue with his capacity to
18   complete the test in a timely fashion.
19       Q  Right. And the reason I ask that is because if
20   you look, his Woodcock-Johnson III writing fluency scores
21   are in the 94th percentile.
22       A  Right.
23       Q  So that's actually a measure of writing fluency,
24   correct?
25       A  Right. Not necessarily the same thing. You

Page 119

1    know, putting a peg in a hole versus writing as many very
2    short sentences as you can within a time limit aren't
3    necessarily assessing the same ability, which is why
4    they're not really kind of mentioned together, I believe.
5        Q  Now, as I understand it, an injury to the right
6    side of the brain could affect motor skills on the
7    left-hand side of the body, like the left hand motor
8    skills and visa versa, correct?
9        A  That's correct, yes.
10       Q  All right. But if there were that kind of
11   neuropsychological injury, you would assume that it would
12   be, you know, consistent, in other words, if it was to
13   the right hemisphere, that those motor skills on the left
14   side would be impaired in different measures, correct?
15       A  Well, it really depends where the injury was.
16   The left hemisphere -- or, rather, the right hemisphere
17   is kind of a large place with regards to the number of
18   functions it subserves.
19       Q  Uh-huh.
20       A  So if one were to have, for example, an injury
21   towards the front of the brain on the right side, one
22   would expect motor deficits on the left.
23       Q  Okay. And the reason I ask is because the two
24   tests -- if you look on the motor/psychomotor processing
25   speed, you have two tests of the right hand, one the

Page 120

1    group pegboard, one the finger tapping test. The group
2    pegboard is showing a 46 percentile and the finger
3    tapping test is showing a 3rd percentile.
4        A  Uh-huh.
5        Q  Do you have any understanding as to why there
6    would be such a discrepancy there?
7        A  It's just odd. These discrepancies happen on a
8    neuropsychological evaluation, and one has to make a
9    decision about how clinically relevant they are. I don't
10   necessarily, based again on all the other information I
11   had, think that that was necessarily a significant
12   finding. Overall, I mean, it's curious, but it doesn't
13   seem to be supported -- it doesn't -- it just kind of
14   stands alone, I guess, is what I'm saying there.
15       Q  Does it cause you to question the integrity of
16   the test or the test procedure in terms of having results
17   that are inconsistent, at least with the right hand?
18       A  Not necessarily. You know, you give all of
19   these tests across -- we saw Dr. Jayatilaka over three
20   days. There's going to be some instances where there's
21   going to be a poor performance for -- just based on
22   becoming tired or losing concentration, and the
23   neuropsychologist has to determine whether or not that's
24   clinically relevant.
25       So sitting there in the room with him for all of

30 (Pages 117 to 120)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 121

1  those hours and observing him taking these tests, I can
2  make a judgement on whether or not I felt he was putting
3  effort into a particular test or he got distracted by a
4  siren going off outside or was lost in thought. So the
5  reason why he did poorly on a test is often left up to my
6  interpretation.
7      Q  Uh-huh. And do you have any interpretation as
8  to why he did poorly on these tests?
9      A  These, I don't think I do. I think I mentioned
10  that -- I just thought it was a curious finding. Let me
11  look at what I wrote about it. Excuse me a moment,
12  please.
13      Q  Uh-huh.
14      A  Yeah, it's curious. I mean, it could be that
15  he's, you know, a body builder and he's got slower motor
16  skills based on overusing his hands, it could be he
17  was -- lacked motivation during that test. It could be a
18  number of things. But because it stood alone and there
19  was no sort of either physiological or other cognitive
20  correlations with it, I felt it was difficult to make any
21  solid interpretation of that.
22      Q  Let me go back to one thing we did cover this
23  morning, which is the DSM-IV diagnosis of cognitive
24  disability not otherwise specified. And I went back and
25  looked at your testimony just to make sure I had it

Page 122

1  correct.
2      I believe you said at the time you wrote the
3  report, Exhibit 1, it wasn't your impression that that
4  was a diagnosis, and then I asked you about sitting here
5  today, and you said you could give way on it. The
6  reality of this process is, I only get one chance, for
7  everyone's advantage, to ask you questions before we try
8  this case next April.
9      So let me ask you: Sitting here today, have you
10  concluded that he does or does not have, or you would
11  diagnose him, with cognitive disability not otherwise
12  specified?
13      A  Well, let me give you somewhat of a long-winded
14  answer to that, because it's not a yes or no answer.
15      I, based on my understanding of the diagnosis,
16  would not have assigned that, based on the findings. I
17  feel that Dr. Jayatilaka has some weaknesses, that many
18  of them may be attributable to the brain injury or the
19  head injury from 1995. It's difficult to say, but I
20  would not assign that diagnosis.
21      Now, I am a clinician who is usually resistant
22  to assigning diagnosis, in general. I can, however,
23  understand why somebody could assign that diagnosis,
24  because it is somewhat of a vague, ill-defined diagnosis
25  and one could interpret the findings as cognitive

Page 123

1  disorder NOS if they believed that these deficits were --
2  began at the time of the head injury and are due to some
3  sort of kind of now chronic or - what's the word? -
4  persisting post-concussive symptoms.
5      Q  Okay. But to you, the difficulty you have is,
6  it's unclear to you whether the deficits that you've
7  identified have been present throughout his life or were
8  acquired as a result of the assault in 1995; isn't that
9  right?
10      A  Yes, it's hard to make that determination.
11  Again, based on the area of the injury, if there were
12  some underlying pathology that occurred just in the area
13  of impact, the findings here are -- don't corroborate
14  that, they don't -- they're not consistent with that.
15      Q  Okay. Take a look at page 11, Dr. Levine, in
16  your report here. And there's a statement, which is the
17  second full sentence there, which says, quote, It is
18  unclear if his deficits have been present throughout his
19  life or were acquired in the 1995 assault, closed quote.
20      I understand that was your opinion at the time
21  you wrote the report. Is that your opinion today?
22      A  Yes.
23      Q  On the Boston Naming Test and the other test we
24  mentioned this morning, which was the D-KEFS verbal
25  fluency for letters, are deficits that are identified by

Page 124

1  those particular tests associated with or mostly
2  associated with an injury to a particular hemisphere of
3  the brain?
4      A  I would say, in general, the left hemisphere.
5      Q  And --
6      A  Depending on -- some people have language
7  dominance on the right, but they're far and few in
8  between.
9      Q  And are you aware that the injury to plaintiff's
10  skull -- or to Mr. Jayatilaka's skull, rather, was on the
11  right side of his skull?
12      A  Yes.
13      Q  And do you know what region that was?
14      A  I believe it was in the right parietal region.
15      Q  And how would you describe the right parietal
16  region? Where is it?
17      A  It's on the right. It's towards the rear of the
18  brain or the top dorsal surface of the brain.
19      Q  And that would be different from frontal lobe --
20      A  Yes.
21      Q  -- area of the brain, correct?
22      A  It borders the frontal lobe, but it's not --
23  yeah, they're clearly demarcated.
24      Q  Okay. What was your -- let's go to one part of
25  your report here, which is at the very back, which is on

31 (Pages 121 to 124)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 125

1  recommendations and plan. Now, before we get to that,
2  let me ask you a couple of other questions about the
3  neuropsychological tests that you administered.
4        Is there any possibility that other
5  psychological factors have an effect on an individual's
6  scores on those particular tests?
7        A  Sure. Absolutely.
8        Q  What other factors would contribute to that?
9        A  Lack of sleep the night before. Anxiety. Some
10 people might make an effort to do poorly on tests to
11 portray themselves as being impaired. Sensory deficits,
12 poor hearing, poor sight. Personality factors. There
13 might be oppositional -- they might be resistant to
14 testing. They might just lack motivation. They might
15 not be taking the process seriously. Effects of
16 medications might make them drowsy or maybe too aroused
17 or hyper to focus.
18       Q  Uh-huh.
19       A  Those are the best ones I can think of now.
20       Q  Okay. And let's take personality factors.
21       And by the way, did you do any analysis of
22 whether Dr. Jayatilaka's scores on any of the neuropsych
23 tests are affected by any of these particular factors,
24 these other psychological factors?
25       A  I'm not aware of any analysis. I'm not sure

Page 126

1  what you mean by "analysis."
2        Q  Well, did you -- let me go at it another way.
3        Did you make any conclusions as to whether other
4  psychological factors could have impacted his abilities
5  or his achievements on the neuropsych test that you gave
6  to him?
7        A  I don't know. Let's see. I don't recall
8  reading anything in here in which I mention possibly --
9  we call them "confounds."
10       Q  You call it, I'm sorry?
11       A  Confounds. Confounds in the testing. I don't
12 believe I mention any in here, which in all likelihood
13 indicates that I didn't think there were any at the time.
14       In my notes, I know that it was somewhat --
15 there was somewhat of a -- his approach to the testing
16 was somewhat flippant. Is that the right word? It
17 wasn't sometimes taking it too seriously at first, but
18 then kind of rose to the challenge.
19       I believe that I also mention at some point in
20 my notes, in the report, that he was doing it at the
21 behest of his father; that he didn't really want to do it
22 himself, which isn't to say that he didn't put good
23 effort in. My impression of effort, I believe, was that
24 he did put adequate effort in across tests.
25       Q  Okay. And we'll get to that one specifically,

Page 127

1  too, because I do want to ask you about each of those --
2        A  Okay.
3        Q  -- categories.
4        A  Okay.
5        Q  And again, I'll refer you to those parts in your
6  report, too --
7        A  Sure.
8        Q  -- to the extent you mention them, that I found.
9  Let's start with sort of personality factors.
10       And you were aware at the time of the
11 neuropsychological testing that Dr. Jayatilaka had
12 contact with various mental health professionals with
13 varying results?
14       A  I'm not sure if I was aware of that at the time.
15       Q  Okay.
16       A  What those contacts were.
17       Q  Let me show you, on page 2 of the report,
18 Exhibit Number 1, second to the last paragraph, which
19 says, quote, Since the result, Dr. Jayatilaka has had
20 contact with various mental health professionals with
21 varying results, closed quote.
22       A  Okay.
23       Q  So you were aware that he had those contacts,
24 correct?
25       A  I'm not sure if I was aware of that at the time

Page 128

1  of the testing.
2        Q  But certainly as of the time of the report,
3  Exhibit 1.
4        A  Yes.
5        Q  And certainly you were aware of it at the time
6  that you were drawing conclusions from the testing that
7  you had done, correct?
8        A  I believe so. It would make sense.
9        Q  Okay.
10       A  Again, this is a part that was written by
11 Dr. Dushenko, and I'm not sure which records I had
12 reviewed in writing, you know, my part of it, just
13 primarily based on testing data.
14       Q  Did you review -- in coming up with the opinions
15 expressed in Exhibit 1, did you review any of the notes
16 or tests or diagnosis or other materials from any of the
17 mental health professionals who had treated
18 Dr. Jayatilaka prior to the time he talked to you?
19       A  I don't believe those were available to me at
20 the time. I don't have them in here.
21       Q  Okay.
22       A  Which would suggest to me I haven't seen them.
23       Q  All right. There was a reference to an MMPI.
24       Do you know what the MMPI is?
25       A  Yes.

32 (Pages 125 to 128)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 129

1    Q  What is that?
2    A  It's the Minnesota Multiphasic Personality
3  Inventory.  It's kind of the standard objective measure
4  of personality and emotional functioning.
5    Q  And were you aware that Mr. Jayatilaka had --
6  the year previous had an MMPI administered by a Dr. James
7  Pratty?
8    A  I was aware that he had been administered an
9  MMPI previously.  I'm not sure if I knew who it was by or
10  at what point it was, but I remember taking notes of
11  that.  Yeah.  He had had a previous MMPI and three MRIs,
12  according to my notes here.
13    Q  Okay.  And did you actually ever obtain a copy
14  of the MMPI?
15    A  I don't believe so.  I recall there being a
16  general lack of records for this particular case.
17    Q  Okay.  Let's go to -- what are we up to?
18    THE REPORTER:  16.
19    MR. TENHOFF:  16, thanks.
20    (Defendant Exhibit 16 was marked
21    for identification by the reporter.)
22  BY MR. TENHOFF:
23    Q  Dr. Levine, I've placed before you what I've
24  marked as Exhibit 16 to this deposition, and it is MMPI
25  results, and they are Bates labeled SD0505 to 0521.

Page 130

1  These did not come in response to a subpoena to your
2  office.  It did come in response to a subpoena to
3  Dr. Pratty's office.
4        And I just want to direct you to a couple
5  observations here, and in particular, the -- if you'll
6  look at page SD0511.
7    A  Uh-huh.
8    Q  Okay.  If you'll take a look under "Profile
9  Validity"?
10    A  Uh-huh.  Yes.
11    Q  It says, quote:
12        The client presented himself in a
13        positive light, attempting to show
14        that he has few psychological
15        problems.  This pattern suggests to me
16        to project a good image, high moral
17        values, good self-control and freedom
18        from psychological problems or human
19        weakness, closed quote.
20    A  Yes.
21    Q  And there's also a part under "Symptomatic
22  Patterns," if you can take a look there.
23    A  Yes.
24    Q  The last sentence of the first paragraph says,
25  quote:

Page 131

1        Individuals with this profile tend to
2        be somewhat self-indulgent, hedonistic
3        and manipulative in order to gratify
4        their wishes.  Client shows a lack of
5        impulse control and poor social
6        judgment at times, appearing rather
7        irresponsible, closed quote.
8        Now, in taking a look at this - and if there's
9  anything else in here you want to take a look at as well,
10  please do, because you're the expert, I'm not, on this -
11  is there anything about the MMPI findings here that would
12  lead you to believe that it could have an effect on the
13  neuropsychological tests that you administered to
14  Dr. Jayatilaka?
15    A  I would say no.  I don't see any really
16  significant problems with his validity scales here,
17  despite what the computer-generated report says.  And
18  keep in mind, this is a computer-generated report that's
19  based on the responses as compared to a clinical sample.
20  In actual psychological reports, the interpretation of
21  the computer-generated report has to be taken with
22  consideration of the clinically available -- the
23  information available about the particular patient.  So
24  one has to be very careful in interpreting this type of
25  report, which wasn't written by the psychologist or a

Page 132

1  psychiatrist who administered it, it was simply generated
2  by the computer.
3        Looking at the scales itself -- and I have to
4  admit, I'm not an MMPI expert and I rarely administer it.
5  But from what I know about it, the validity scales aren't
6  excessively elevated.  So it's a valid profile.  And the
7  statements under the "Profile Validity" section are
8  rather mild, I think, with regards to perhaps caveats as
9  far as validity goes.  The other interpretations --
10  throughout the whole thing.
11        You have to understand that these tests are
12  generally developed on clinical populations.
13    Q  Uh-huh.
14    A  So if you have a psychiatric hospital full of
15  individuals who are identified as depressed or who have
16  schizophrenia or who are considered sociopaths, they give
17  these questions to those people and they come up with
18  patterns that someone who is categorized as depressed
19  generally answers.
20    Q  Right.
21    A  And when you administer this test, which has
22  been validated on clinical or psychiatric population, to
23  someone like Dr. Jayatilaka, and their answers overlap to
24  some degree with those of unidentified clinical
25  population, you get an interpretive report like this,

33 (Pages 129 to 132)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 133

1    that says, well, their answers suggest, for example, that
2    individuals with this profile tend to be somewhat
3    self-indulgent, hedonistic, manipulative in order to
4    gratify their wishes, which is based on diagnostic
5    descriptions of those clinical groups.
6        So, again, the point I'm driving at is that this
7    is not the clinician's interpretation of the MMPI, this
8    is just the computer-generated report that the clinician
9    uses to come up with their own interpretation of the
10   individual's personality and psychological functioning.
11       Q   Let's put that one aside.
12       Are you aware that Dr. Dushenko administered the
13   Millon Clinical Multiaxial Inventory III?
14       A   I administered that.
15       Q   You administered that?
16       A   Yes.
17       Q   Okay.  And let's see if we've got that.
18       Can you tell us what this -- well, let's go
19   ahead and mark this.
20       MR. TENHOFF:  This is 17.
21       (Defendant Exhibit 17 was marked
22       for identification by the reporter.)
23   BY MR. TENHOFF:
24       Q   All right.  The reporter's placed before you
25   what we've marked as Exhibit 17 to this deposition.

Page 134

1        Would you take a moment and tell me whether you
2    recognize this document.
3        A   I do.
4        Q   What is it?
5        A   It's the computer-generated report for the
6    MCMI-III.
7        Q   And what is the MCMI-III?
8        A   It's the Millon Clinical Multiaxial Inventory,
9    third edition.  It's in the same general family as the
10   MMPI, but it's a shorter questionnaire and it's less
11   demanding on the patients.  And it was developed after
12   the MMPI.  And I think it's a little more clinically
13   useful than the MMPI at times, especially for getting at
14   personality issues rather than psychological issues.
15       Q   Was it your decision to have Dr. Jayatilaka take
16   this particular test?
17       A   Yes.
18       Q   Why?
19       A   Well, I thought that personality is an
20   important -- I generally think personality is an
21   important aspect to assess in a neuropsychological
22   evaluation, so it's fairly standard.
23       Q   And I notice there is a section in Exhibit 1 in
24   your report, which is "Personality and Emotional
25   Functioning," but it doesn't mention the MCMI-III.

Page 135

1        A   Right.
2        Q   Why is that?
3        A   I believe Dr. Dushenko had that part removed.  I
4    don't think he -- for whatever reason, he asked that the
5    MCMI results be removed from the report.
6        Q   What were the MCMI results?
7        A   Well, let's look at it now.  There's a
8    significantly elevated index in the validity scales,
9    you're modifying as it's called here, desirability, which
10   is similar to what the finding was on the MMPI, of an
11   attempt to present themselves -- to present themselves in
12   a more favorable light.
13       Q   Uh-huh.
14       A   Other than that, his Axis II or clinical
15   personality patterns are generally subclinical, with the
16   exception of histrionic.  The more severe personality
17   pathologies are all subclinical, clinical syndromes,
18   severe clinical syndromes.  Again, sub syndromic.  One
19   has to consider the fact that his desirability scale is
20   so high, and that the other scales might be somewhat
21   artificially minimized because of that.
22       Q   Well, let me ask you about that.
23       On page SD0453, "Axis II:  Personality
24   Disorders," it says, "Personality configuration composed
25   of the following:  Histrionic Personality Features."

Page 136

1        A   Uh-huh.  Yes.
2        Q   What does that mean?
3        A   Well, someone who's histrionic would generally
4    be described as someone who has a pathological need to be
5    the center of attention and who does things in order to
6    obtain the attention of others or to remain the focus of
7    people's attention.  It's generally what's called an
8    attention-seeking type of personality.
9        Q   Right.  And that's actually a personality
10   disorder in the DSM-IV, correct?
11       A   I believe it's in the DSM.  It's a fairly
12   standard -- I think it's a cluster A, maybe, personality
13   disorder.
14       Q   And could you take a look at Exhibit 8, which is
15   in front of you, which is the DSM-IV excerpt.
16       And if you'll turn the page, it's about the
17   second to last -- the last two pages, actually.  And
18   there's something called "Diagnostic criteria for 301.50
19   Histrionic Personality Disorder."
20       Is that what you've just been referring to?
21       A   Yes.
22       Q   Okay.
23       A   "A pervasive pattern of excessive emotionality
24   and attention seeking"...
25       Q   And as a result of the MCMI-III or any other

34 (Pages 133 to 136)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 137

1  analysis that you did, did you make any clinical
2  conclusions as to whether Dr. Jayatilaka met the
3  diagnostic criteria for that disorder?
4      A  I don't recall.  I know I had written a section
5  on personality in one of my drafts of the report that
6  Dr. Dushenko probably saw at some point, but again, for
7  some reason it was removed from the actual report that
8  went out.  It may have --
9      Q  Regardless of whether it was in the report, did
10 you conclude, at that point, that he met the diagnostic
11 criteria for this histrionic personality disorder?
12     A  I don't think so.  Again, with personality
13 disorders, despite, you know, these questionnaires, one
14 has to take this information in the context of that
15 person's history and presentation.  He didn't present
16 with any history suggestive to me of histrionic
17 personality disorder.
18     He's got some eccentricities.  I could see
19 that -- if you go to the questions here in the back, this
20 is actually kind of -- will be useful to kind of explain
21 this.  Noteworthy responses.  So this is -- these
22 responses are very likely what that diagnostic -- that
23 diagnosis is based on, based on the interpretive report.
24     Q  I'm sorry, which page are you on?
25     A  Page SD0453.

Page 138

1      Q  Okay.  Okay.
2      A  Let's see if there are any good ones here.
3  "Emotional dyscontrol.  I often criticize people strongly
4  if they annoy me.  True."  "Interpersonal Alienation.
5  When I have a choice, I prefer to do things alone.
6  True."  These aren't very useful.
7      I guess the point I'm driving at - this doesn't
8  illustrate it very well - is, again, the MCMI was
9  developed, validated with a clinical sample of people
10 with diagnosed personality disorders who answer these
11 questions in a certain way, and all that one has to do,
12 you or me or anyone here, is answer "yes" to a few of
13 those questions or "no" to a few of those questions that
14 they answered "yes" or "no" to, and we would be assigned
15 that diagnosis.  Which is fine, you know, based on this
16 instrument, but then you have to take that and understand
17 that in the context of that person's history.  Does that
18 match what they were reporting to me about their
19 relationships, about their occupational history, their
20 academic history.
21     And for Dr. Jayatilaka - this is based just on
22 what I'm looking at now and my recollection of the
23 information he gave me - I didn't think he actually met
24 criteria for histrionic personality disorder.  He may
25 have some histrionic traits, he may have some

Page 139

1  eccentricities, but definitely, in my opinion, at the
2  time, I don't believe - or at this time - that he would
3  meet criteria for a personality disorder.
4      Q  Do any of the results that you derived from the
5  MCMI-III impact at all your assessment of his performance
6  on the neuropsychological tests that you administered?
7      A  No.
8      Q  Okay.  Would it make any difference to you if
9  you were aware that there was a previous MCMI-III that
10 was conducted by Dr. Pratty in December of 2006?
11     A  That would be interesting, to see for
12 consistency purposes.
13     Q  Okay.  I'll show you that.
14         MR. TENHOFF:  18.  Thank you.
15         (Defendant Exhibit 18 was marked
16         for identification by the reporter.)
17 BY MR. TENHOFF:
18     Q  All right, I've placed before you what I've
19 marked as Exhibit 18 to this deposition, which I can say
20 to you that is -- are test results that we received on
21 the MCMI-III from Dr. Pratty in response to a subpoena.
22     And first of all, I would also look -- if you
23 want to look at page SD0524, if you see on the first part
24 of "Modifying Indices," also a very high ranking in the
25 area of desirability --

Page 140

1      A  Yes.
2      Q  -- as you mentioned previously.
3      A  Yes.
4      Q  And then I'd also say that on SD0523, under --
5  which is under "Possible Diagnoses," if you see that?
6      A  Uh-huh.  Yes.
7      Q  Quote:
8         He appears to fit the following Axis
9         II classifications best:  Depressive
10        personality features and
11        self-defeating personality features.
12        Axis I clinical syndromes are
13        suggested by the client's MCMI-III
14        profile in the areas of generalized
15        anxiety disorder and adjustment
16        disorder with depressed mood.
17     A  Okay.
18     Q  Take a moment to review this, if you need to,
19 because my ultimate question would be:  Knowing -- if you
20 look at this and tell me whether it has any impact on
21 your opinion as to whether this is something that --
22 these personality traits, or what have you, would have
23 any impact upon his performance on the neuropsych testing
24 that you've conducted.
25     A  If this were his profile, Dr. Pratty's profile

35 (Pages 137 to 140)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 141

1  were the one I had when I tested him, I would be more
2  concerned because of the significant anxiety and apparent
3  depression or dysthymia that he had at the time could
4  very likely have affected his testing ability or his
5  ability to do well in testing.  At the time I saw him, I
6  didn't observe significant anxiety and he did not appear
7  depressed.
8      So these are consistent with regards to
9  modifying indices, but sadly inconsistent with regards to
10  what's supposed to be more unchanging personality
11  characteristics.  But the fact that he had anxiety and
12  depression doesn't surprise me.  That could differ, that
13  could change.  That's more of an emotional trait that can
14  change over time.  So, in other words, he looked more
15  emotionally healthy when he saw me.  Based on this.
16      Q  Okay.  Were you aware of any other previous
17  medical records or information from therapists about the
18  level of his anxiety, particular anxiety as it related to
19  the USMLE?
20      A  I don't know if I was aware of it at the time.
21  I can't answer that.  I'm not sure if I was aware of it
22  at the time.
23      Q  And again, the anxiety that -- if he were
24  experiencing anxiety, it could affect his performance on
25  the neuropsych test, correct?

Page 142

1      A  Yes.
2      Q  And would you assume from that it would affect
3  his ability on other tests, such as the USMLE?
4      A  I think that would logically follow, yes.
5      Q  Okay.  Were you aware of any information from a
6  Dr. Higgins, who he had previously seen, in connection
7  with anxiety?
8      A  That does not sound familiar.
9      Q  Were you aware that he sought out Dr. Higgins
10  for the purpose of combatting anxiety about taking the
11  USMLE?
12      A  I was not aware of that.
13      Q  Were you aware of any statements he made,
14  Dr. Jayatilaka made to Dr. Higgins, about how his anxiety
15  interfered with his motivation to actually take the exam?
16      A  I was not aware of that.
17      Q  Would it affect your opinion in any way if you
18  were to see Dr. Higgins' notes about anxiety relative to
19  the test, the USMLE Step 2?
20      A  My opinion about what?
21      Q  His performance and his -- his performance on
22  the neuropsych test and your ultimate conclusions derived
23  from those.
24      A  It could, I suppose, perhaps influence my
25  interpretation of the results, but what's more important

Page 143

1  to me is my behavioral observations at the time.  And
2  from what I recall - I'd like to have my notes in front
3  of me - he didn't appear to be particularly anxious about
4  testing.
5      Q  Uh-huh.
6      A  Which doesn't mean he wasn't.  It's an internal
7  state.  But I didn't observe him to be particularly
8  anxious during the neuropsychological testing.
9      One reason, if I could add, for repeating the
10  verbal fluency test is, due to the potential confounds of
11  poor concentration or anxiety, just to see if the test
12  findings are consistent.  And he did do a little bit
13  better the second time around, which, as I mentioned, was
14  very likely due to practice effects, but also conceivably
15  could have been due to lower anxiety at the second
16  testing.  It's conceivable.
17      Q  Uh-huh.
18      A  But that's an example of one thing we do to
19  address those confounds.
20      Q  Let me go back to another confound that you
21  mentioned - I may have learned a new word today - and
22  that is the level of effort that were -- that was put in
23  by Dr. Jayatilaka on the neuropsych test.
24      Are there any tests to measure how much effort
25  somebody's putting in, or is it simply an observation?

Page 144

1      A  It's both.  There's observation across testing
2  in general and there's also tests specifically designed
3  to assess effort or, more accurately, detect people who
4  are feigning disability or feigning impairment.
5      Q  There's a couple of things in Exhibit 1 in your
6  report, and again -- let me first direct you to page 5.
7  This was something you mentioned earlier, Dr. Levine,
8  under -- this is under "Behavioral Observations."
9      A  Yes.
10      Q  Quote, The patient was cooperative with the
11  examiner, although he made it clear that he was only
12  undergoing the procedure at the behest of his parents,
13  closed quote.
14      That is something he told you?
15      A  I don't remember him saying it, but if it's in
16  here, it very likely is something he told me.
17      Q  Okay.  And then it goes on to say, quote, He
18  frequently laughed during the testing, at times appearing
19  humored by the task requirements, closed quote.
20      A  Yes.
21      Q  That was an observation as well?
22      A  That was an observation, yes.
23      Q  Okay.  And then if you'll turn to page 9 of the
24  report.  If you look under "Summary and Impressions,"
25  there in the second paragraph, the fourth sentence says,

36 (Pages 141 to 144)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 145

1    quote, This may have been due to varying effort level,
2    closed quote.
3         What did you mean by that?
4         A   "A notable finding was that his performance on
5    reverse span tests was better than that of forward span
6    tests.  This may have been due to varying effort level."
7         It's somewhat atypical to find someone -- to
8    observe someone have a better performance when repeating
9    a span of digits backwards than forward, and there could
10   be a few reasons for that.  One is just practice; that
11   they learn quickly how to maintain the digits in their
12   mind.  Another can be anxiety with the test as it begins,
13   and then they get more comfortable with it.  And another
14   can be that when the test begins and they're in their
15   forward span, they're just not trying their hardest, and
16   when the test gets more difficult, they start to put more
17   effort in.  That's really not that uncommon and one of
18   the difficulties in interpreting the types of these
19   tests.
20        My -- yeah.
21        Q   I'm sorry, I didn't mean to cut you off.
22        A   My observation -- I believe this is based on my
23   observation, and it ties in to the behavioral observation
24   that he was somewhat humored by the test, not taking them
25   seriously at first, but that when they became difficult,

Page 146

1    he rose to the challenge and wanted to do well or wanted
2    to complete the test.
3         Q   You went on to say in that paragraph, quote,
4    This is reflective of his overall approach during
5    testing.  In most instances, when he realized that he had
6    to put additional effort to do well, he did, closed
7    quote.
8         A   Yes, that's basically what I was saying.
9         Q   Okay.  So that sort of varying levels of effort
10   was observed by you at various times during the
11   neuropsychological testing.
12        A   Yes.
13        Q   And was it also sort of a pattern that you were
14   observing that the more difficult the test, the harder he
15   worked at it?
16        A   It seemed that when the test became more
17   difficult, he kind of perked up and would put more effort
18   in.  That's to the best of my recollection.  This is,
19   again, not such an uncommon thing with some people that
20   are resistant to testing.
21        Q   Uh-huh.  Were there any -- we've talked about
22   sort of efforts and motivation and anxiety and
23   personality factors.  You listed a number of other
24   confounds.
25        Was there any evidence in -- that came to your

Page 147

1    attention, prior to coming to your conclusions here of
2    other confounds, that may or may not have had an impact
3    on Dr. Jayatilaka's performance on the neuropsychological
4    tests?
5         A   No, not at the time.  Although I was looking at
6    the records recently and saw mention in a medical record
7    about apnea, which, if someone is not sleeping well, can
8    certainly affect their performance on tests.  Maybe I did
9    know it at the time and this pattern of relative deficits
10   didn't really suggest that it was due to lack of sleep.
11        For example, if one were suffering from a lack
12   of sleep, most often we'd see difficulties with, I think,
13   attention, concentration, being able to focus, and he did
14   fairly well on those tests.  Actually, those were among
15   his strengths.
16        So I'm not sure if that information was
17   available to me at the time and I just didn't think that
18   it was relevant or if the information was not available
19   to me at the time and I just didn't put it in.
20        Q   Okay.  On page 12, which is the final page right
21   above your signature in Exhibit 1, it states that, quote,
22   It is quite likely that, if he was to -- open to
23   addressing underlying issues, both cognitive-behavioral
24   and psychodynamic approaches to individual psychotherapy
25   would be of benefit, closed quote.

Page 148

1         What did you mean by that?
2         A   I believe Dr. Dushenko wrote many of the
3    recommendations in here, including that one.
4         Yeah, I believe that was written by
5    Dr. Dushenko, so he might be better able to answer that.
6         Q   Do you have any idea what was meant by that?
7         A   I could speculate, but I don't want to.  I
8    don't -- you're going to see Dr. Dushenko tomorrow; he
9    can answer that one direct.
10        Q   Okay.  You mentioned the migraine headaches, and
11   it is noted on the first page of Exhibit 1, quote, He
12   notes that he has not had a substantial headache in over
13   a year, closed quote.
14        Was that your understanding at the time that you
15   rendered the report?
16        A   I don't know if I knew that at the time of
17   the -- that I wrote the -- my section of the report.
18   Again, that's information that Dr. Dushenko would have
19   obtained.  We consulted at various times while writing
20   the report, so it may have become known to me at that
21   time, but I don't recall.  If it's not in my
22   interpretation of the results, chances are that either it
23   wasn't relevant, as far as I was concerned, or I did not
24   know about it at the time.
25        Q   Was there any evidence during the neuropsych

37 (Pages 145 to 148)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 149

1  testing of any headaches or any other medical conditions
2  that were affecting Dr. Jayatilaka?
3      A  No.
4      Q  There's another recommendation -- the
5  recommendation you have on the page prior to that, on
6  Exhibit 1, which is the recommendation for extended time
7  for completion of current and future written medical
8  examinations, was that your recommendation?  Did you
9  write that?
10     A  I believe, again, this was written by
11  Dr. Dushenko.  I'm not necessarily in disagreement with
12  it, but the recommendations, I believe, were generally
13  written by Dr. Dushenko, looking at the language and the
14  actual recommendations themselves, yes.
15     Q  Did you do any analysis as to whether there was
16  a correlation between what's requested here, the extended
17  time for completion of testing, and the results of your
18  neuropsychological tests?
19     A  I'm not sure what you mean by that question.
20     Q  Yeah, let me back up a little bit.
21         In terms of functional limitation, do you
22  believe that Dr. Jayatilaka has deficits that limit his
23  ability to read, as compared to most people?
24     A  Can you define "reading" for me?  I know it
25  sounds like a very difficult -- well, let me answer it in

Page 150

1  my convoluted way.
2         Reading, per se, he doesn't have difficulty in
3  reading a word.  He doesn't have difficulty reading
4  things quickly.  But according to these results, he has a
5  relative difficulty in digesting what he reads, which
6  would mean that he would have to go back and reread in
7  order to understand what -- in order to digest what it is
8  in the passage he's reading.
9      Q  And do you believe that he has deficits that
10  limit his ability to write compared to most people?
11     A  His spelling was relatively low, a weakness.
12     Q  A relative weakness.
13     A  A relative weakness, yes.
14     Q  How about as compared to most people in the
15  population?
16     A  To the average person?
17     Q  Yes.
18     A  It would be within the average range.  It would
19  be comparable.
20     Q  And his ability to read, is that within the
21  average range?
22     A  It was, according to the percentiles presented
23  here, in the average range.
24     Q  In the area of executive functioning that we
25  talked about before, is there any major life activity

Page 151

1  with Dr. Jayatilaka that is affected by any relative
2  weaknesses or deficits in executive functioning?
3      A  Is there any area of general functioning.
4      Q  Do you want me to read that back?
5      A  Yeah.
6      Q  That was kind of a mouthful there.
7      A  Yeah, please, would you please read that back.
8         (Record read.)
9         THE WITNESS:  Based on the results of the
10  Wisconsin Card Sort, one could argue that he has a more
11  difficult time kind of understanding what's being --
12  figuring things out, problem solving.  So one could argue
13  that that is a deficit, and compared to the general
14  population, you know, based on his test scores, it's an
15  impairment.  So one could argue that that is a bona fide
16  deficit within executive functioning.  You could argue
17  that.
18         Now, whether or not that impacts an activity of
19  daily life, you'd have to define what an activity of
20  daily life is.  Does that include driving?  Probably not.
21  Does that include grocery shopping?  Probably not.  Would
22  that include taking an advance graduate test?  Possibly.
23  It really depends on how you're interpreting what's
24  stated by the ADA.
25  BY MR. TENHOFF:

Page 152

1      Q  Yeah.  And again, one of the hard parts of these
2  tests -- and I'm not trying to confuse you here at all --
3  is that there's a difference between what you do and what
4  Vince and I do in terms of there are legal standards --
5      A  Yes.
6      Q  -- and there are medical standards.
7      A  Yes.
8      Q  And we've been spending a lot of time on medical
9  standards and the DSM-IV standards, but eventually, we've
10  got to try to translate that into the legal jargon, which
11  is not necessarily the same.
12     A  I understand.
13     Q  Okay.  So, anyway, I appreciate you giving it a
14  good shot with us.
15         There was a statement that says -- and this was
16  on the recommendations, I don't know if this came from
17  Dr. Dushenko, which says -- and this was -- if you look
18  at number 2 on the "Recommendations and Plan."
19     A  Yes.
20     Q  It says, "the latter," and he's referring to a
21  certain type of tools or programs, but it says, "The
22  latter is only rarely available with individuals who are
23  as highly functioning as Dr. Jayatilaka."
24     A  Yes.
25     Q  Closed quote.  I take it he -- Dr. Dushenko

38 (Pages 149 to 152)

Page 153

1  wrote that?
2      A  Yes.
3      Q  And do you have any idea what he meant by that?
4  Or what did you understand it to mean?
5      A  Well, it looks like he's referring to cognitive
6  rehabilitation, face-to-face programs such as Orange
7  County -- or, rather, Orange Coast College, which those
8  programs are meant for people with traumatic head injury
9  who are essentially rehabilitating cognitive function,
10  and they're not necessarily designed for people who are
11  still independently functioning and going to school and
12  working and able to function independently in most
13  areas -- in all areas of daily life, which Dr. Jayatilaka
14  is.
15      Q  In terms of executive functioning - going back
16  again and sort of comparing it to standardized tests -
17  are you aware that Dr. Jayatilaka passed the USMLE Step 1
18  examination without any accommodation?
19      A  After ten tries.
20      Q  But you're aware that he did?
21      A  I am aware of that, yes.
22      Q  And does that affect your opinion at all with
23  regard to his executive functioning?
24      A  I don't know why that would affect my opinion
25  about executive functioning, no.

Page 154

1      Q  Okay.  Were you aware that he's taken the Step 2
2  exam on a couple of occasions, and narrowly missed
3  passing without accommodation?
4      A  I know he's taken it and failed.  I'm not sure
5  what the margin of -- margin was.
6          MR. TENHOFF:  Actually, why don't we take a
7  quick break.
8          (Recess taken.)
9          (Defendant Exhibit 19 was marked
10          for identification by the reporter.)
11          MR. TENHOFF:  Let's go back on the record.
12      Q  Dr. Levine, I've placed before you what I've
13  marked as Exhibit 19 to this deposition.  Can you take a
14  moment and tell me whether you recognize this document.
15          And I will note for the record that it is
16  document SD0331 through SD0348, denoting that it did come
17  from your files?
18          Can you tell me what this is.
19      A  This is the results of the Continuous
20  Performance Test.  It's a test of sustained attention and
21  vigilance.
22      Q  And what's the purpose of administering this
23  test?
24      A  It's just another aspect of attention that I
25  like to evaluate and -- or assess in my evaluations, what

Page 155

1  I -- what's called sustained attention; ability to kind
2  of engage in an activity for an extended period of time
3  and maintain a certain level of performance over that
4  time.  These tests are often useful in detecting
5  attention deficit disorder, for example, or used in
6  evaluation of attention deficit disorder.
7      Q  Got it.
8          And were there any significant results from this
9  testing that led to any of your opinions regarding
10  Dr. Jayatilaka?
11      A  I don't recall.  If I refer back to the report,
12  I can tell you.
13      Q  Sure.  And by "the report," you mean Exhibit 1,
14  correct?
15      A  Exhibit 1, yes.
16          There's no mention of it in -- well, it mentions
17  the scores in the report.  But as far as I can tell, this
18  is a fairly good performance on the CPT.
19      Q  Okay.  Could you turn to -- there's a -- one
20  notation I wanted to ask you about, which is -- it's on
21  page SD0341, which is page 11.
22      A  Yes.
23      Q  And under "Profile Analysis," what is this
24  section about?
25      A  This looks like the program uses some sort of

Page 156

1  algorithm to determine some overall performance scores or
2  interpretations.  I generally don't use this text.  I
3  just look at the scores themselves and the graphs.
4      Q  Okay.  Let me direct your attention, there's a
5  second paragraph under "Profile Analysis" that says,
6  quote, Druvi's responses were very fast and he also made
7  relatively few errors.  Therefore, the fast speed
8  probably represents fast processing ability, closed
9  quote.
10          What does that refer to?
11      A  The, in this case, fast visual motor processing
12  is what I would call it.  You see a visual stimulus and
13  you respond with a motor -- very quick motor response.
14      Q  And did you write that portion?
15      A  No.  This is generated by the computer.
16      Q  Okay.
17      A  So the examinee takes the test on the computer
18  and then the computer coughs out this report based on the
19  norms included in the program.
20      Q  Would you agree with the statements that are in
21  that paragraph, the ones I just read to you?
22      A  His reaction time was above average, according
23  to the normative data.  And his error rate was also --
24  was average, his commission error rate.  Response style
25  was average.

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 157

1      Basically what it's saying is, some people will
2  sacrifice accuracy for speed, other people will sacrifice
3  speed for accuracy. He had very fast responses but was
4  also very accurate, so he did very well on this test.
5      Q  And on Exhibit 1, where are you looking at?  Are
6  you looking at the --
7      A  Page --
8      Q  -- final page?
9      A  Page 7 on the report, or for you, it would be
10  SD0337.
11      Q  Okay.
12      A  "Summary of Overall Measures."
13      Q  Okay.  And is this the one CP-II, hit reaction
14  time?
15      A  Yes.  And you'll see that the percentiles are
16  low when, in fact, for this particular test you have to
17  reverse that.  So he didn't have the 23rd percentile on
18  this, he actually had the 77th percentile.  It's just
19  reverse score.
20      Q  Got it.  Okay.  I asked you about that.
21      Now, this morning, you had identified some other
22  medical records that you had in your file that you
23  brought with you.  And let me go ahead and mark this one,
24  because I think this is one of them that you identified,
25  and then I'm going to ask to see the other ones just to

Page 158

1  make sure that we've got those.
2      MR. TENHOFF:  So let's mark this as 20, if you
3  would, please.
4      (Defendant Exhibit 20 was marked
5      for identification by the reporter.)
6  BY MR. TENHOFF:
7      Q  All right.  I've placed before you what I've
8  marked as Exhibit Number 20 to this deposition.  Would
9  you take a moment and tell me -- by the way, I'll note
10  for the record it's 0308 through 0313, denoting that it
11  came from your office's files.
12      Have you seen this before?
13      A  I believe I have this in my folder.
14      Q  And again, I think you had mentioned that you
15  had records from Dr. Aksamit at the Mayo Clinic.  Is this
16  consistent with what you have in your file folder?
17      A  Yes.
18      Q  Okay.  And you mentioned two sets of records
19  from Dr. Aksamit.  Could I see the other one, or is that
20  what's included in what I've marked as Exhibit 20?
21      A  This one is not included in the one --
22      Q  Okay.
23      A  -- you gave me.  This is --
24      MR. TENHOFF:  For the record, I'm looking at a
25  four-page document called Clinical Document Copy, which

Page 159

1  appears to be, as I believe Dr. Levine previously
2  mentioned, one page of demographic information,
3  impressions and report, which actually looks like it's
4  identical to the very first section of Exhibit 20 on the
5  second page, and then a series of different laboratory
6  reports.
7      Q  I'm going to hand that back to you, Dr. Levine.
8  We don't need to mark that as an exhibit.
9      A  Okay.
10      Q  And were there any other medical records in your
11  file that I -- we haven't already marked?
12      A  Yes.  Here.
13      Q  Okay.
14      MR. TENHOFF:  Dr. Levine handed me a two-page
15  document, again, dated September 25th, 2006, a one-page
16  letter from Dr. Aksamit, and then also with an impression
17  report plan about a return phone call to Mr. Jayatilaka
18  regarding the use of Topamax.
19      Q  Okay, let me hand that back to you, Dr. Levine.
20  Any other medical records in your file that we
21  haven't marked or looked at?
22      A  The one from St. Mary's.
23      Q  Thank you.
24      MR. TENHOFF:  And this is a -- looks like about
25  a one, two, three, four, five, six-page document of

Page 160

1  laboratory reports as well from St. Mary's.
2      Q  And I'll hand that back to you, Dr. Levine.
3      Okay.
4      MR. TENHOFF:  Let's go ahead and mark this,
5  then, as 21, please, which is the CV that he brought with
6  him.
7      Q  I'm just going to have you authenticate this.
8      (Defendant Exhibit 21 was marked
9      for identification by the reporter.)
10  BY MR. TENHOFF:
11      Q  Dr. Levine, I've placed before you what's been
12  marked as Exhibit Number 21 to this deposition.
13      Can you take a moment and tell me whether you
14  recognize that document?
15      A  Yes.
16      Q  What is it?
17      A  It's my CV.
18      Q  And is that the CV that you brought in response
19  to the subpoena that was directed to you today?
20      A  Yes.
21      Q  Is that current and up to date?
22      A  I believe so, yes.
23      Q  Is it accurate in all -- every way?
24      A  Some of my professional memberships may have
25  expired.  Other than that, all the jobs, publications,

40 (Pages 157 to 160)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 161

1   education, address, everything else should be accurate.
2   Yeah.
3      Q   We've gone through in some significant detail
4   Exhibit 1, which is the report that you and Dr. Dushenko
5   prepared.
6         Other than the opinions that are expressed in
7   that report and what you've expressed here today in your
8   testimony, do you intend to offer any other opinions at
9   the trial of this matter?
10     A   I didn't catch the last part of what you said.
11     Q   Sure.
12        MR. TENHOFF: Do you want to read that back,
13   please?
14        (Record read.)
15        THE WITNESS: Do I intend to offer any other
16   opinions.
17   BY MR. TENHOFF:
18     Q   Yeah.  And again, I'm not trying to trick you,
19   but again, one of the points here is that I only have one
20   chance to depose you, most likely.
21     A   Okay.
22     Q   So I'm trying to make sure I have all your
23   opinions and the basis of those opinions, so that if you
24   were to come in next April in the courtroom and say, I'm
25   offering three more opinions, I'd like to find out now if

Page 162

1   you anticipate doing that or not.
2      A   Okay.  I've given opinions for all the questions
3   that I was asked, and I can't think of anything else I
4   would give an opinion for.  I don't know if I'll give
5   another opinion for another question that's asked of me
6   in the court.
7      Q   Okay.  But in terms of -- maybe I'll put it to
8   you this way:  Have you been asked by Mr. Jayatilaka or
9   Mr. Nowak to develop and provide any other opinions at
10   the trial of this matter?
11     A   No.
12     Q   Have you been asked to do any additional work on
13   this case between now and next April?
14     A   I have not.
15     Q   Do you have any plans to do any additional work
16   in this case between now and next April?
17     A   If I'm asked as a clinician, I may.  Or -- yeah.
18     Q   Is Mr. Jayatilaka an ongoing patient with you at
19   this point?
20     A   Not with me, no.
21     Q   Is he with Dr. Dushenko?
22     A   I don't know.
23     Q   Is he with anyone else in your office?
24     A   I don't know.
25     Q   Have you previously testified in a case similar

Page 163

1   to this?
2      A   Never.
3      Q   Have you testified in any court trials
4   previously?
5      A   Never.
6      Q   In connection with the reports that you've done
7   in this case or thereafter, have you had any direct
8   communications with Mr. Jayatilaka's father?
9      A   No.
10     Q   And again, the only conversations you would have
11   would have been recounted to you by Dr. Dushenko, or that
12   you're aware of, would have been recounted by
13   Dr. Dushenko?
14     A   Yes.
15     Q   How many times have you been in communications
16   with Mr. Nowak?
17     A   Never.  I've never spoken to him before today.
18     Q   Have you ever spoken to anyone in his office or
19   anyone working on his behalf?
20     A   No.
21     Q   And do you have any idea why -- well, let me ask
22   you this:  Your office is located at 1045 Atlantic
23   Avenue, Suite 806; is that correct?
24     A   Yes.
25     Q   And is Dr. Jayatilaka in the same building as

Page 164

1   you are, in Suite 818?
2      A   I don't know what suite he's in, but I'm aware
3   he's in the same building.
4      Q   And prior to the time you first met his son and
5   began your neuropsych evaluation, did you have any
6   interactions with Dr. Jayatilaka at all?
7      A   I've never met him, never spoken with him.
8      Q   And do you know if he has any sort of personal
9   or professional connection with Dr. Dushenko?
10     A   I don't know.
11     Q   Do you know how it was that Dr. Hornstein had
12   recommended your practice as a mechanism for evaluating
13   Mr. Jayatilaka?
14     A   I don't know.
15     Q   Have you been paid for your analysis of
16   Dr. Jayatilaka?
17     A   I was paid as a clinician to see him and write
18   this report for an evaluation, yes.
19     Q   And who paid for that?
20     A   I -- that's a good question.  I get paid -- my
21   check comes from Dr. Dushenko, so whether it was paid for
22   through Medicare or Dr. Jayatilaka's insurance carrier or
23   out of pocket, I'm not aware.
24     Q   And are you being paid for your time here today?
25     A   Yes.

41 (Pages 161 to 164)

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 165

1    Q  How much are you being paid?
2    A  80 percent of whatever our rate is.
3    Q  Do you know what your rate is?
4    A  For depositions?
5    Q  Yes.
6    A  Dr. Dushenko's office sets the rate.  I think it
7    might be 4- or $500 an hour.
8    Q  Okay.
9    A  I'm not sure.
10   Q  And do you know who's paying for that?
11   A  My understanding is, it's Dr. Jayatilaka's side.
12   I'm not sure if it's his father or the law firm.
13   Q  Okay.  And do you anticipate being paid in a
14   similar manner for any testimony you were to offer at
15   trial in this matter?
16   A  My understanding is that if I'm called as a
17   professional witness or expert witness, then I would be
18   paid for deposition time.  But again, this is relatively
19   new to me, so...
20   Q  Okay.  Do you anticipate you'd be paid for
21   testifying at trial as opposed to being here in a
22   deposition?
23   A  I don't know.
24   Q  And do you know if your firm has different rates
25   for trial testimony and deposition testimony?

Page 166

1    A  I don't know.
2    Q  I have no further questions for Dr. Levine.
3    Thank you.
4    A  Thanks.
5         MR. NOWAK:  I'll reserve.
6    //
7    //
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 167

1
2
3
4
5
6
7         I, ANDREW JEREMIAH LEVINE, Ph.D., do hereby
8    declare under penalty of perjury, under the laws of the
9    United States, that I have read the foregoing transcript;
10   that I have made such corrections as noted herein, in
11   ink, initialed by me, or attached hereto; that my
12   testimony as contained herein, as corrected, is true and
13   correct.
14        EXECUTED this _____ day of _____,
15   20____, at _____, _____.
                (City)          (State)
16
17
                _____
18              ANDREW JEREMIAH LEVINE, Ph.D.
19
20
21
22
23
24
25

Page 168

1    STATE OF CALIFORNIA        )
                                : ss
2    COUNTY OF LOS ANGELES      )
3
4         I, the undersigned, a Certified Shorthand
5    Reporter of the State of California, do hereby certify:
6         That the foregoing deposition was taken before
7    me at the time and place herein set forth; that any
8    witnesses in the foregoing proceedings, prior to
9    testifying, were placed under oath; that a verbatim
10   record of the proceedings was made by me using machine
11   shorthand which was thereafter transcribed under my
12   direction; further, that the foregoing is a true record
13   of the testimony given.
14        Before completion of the deposition, review of
15   the transcript [X] was [ ] was not requested.  If
16   requested, any changes made by the deponent (and provided
17   to the reporter) during the period allowed are appended
18   hereto.
19        I further certify that I am not interested in
20   the outcome of the action.
21        WITNESS my hand this date
22        _____.
23
24
25   MONICA T. VOGELBACHER, CSR No. 6406

42  (Pages 165 to 168)