# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - -

DRUVI JAYATILAKA,           :   CIVIL ACTION
                            :
        Plaintiff,          :
                            :
                            :
    VS.                     :
                            :
                            :
NATIONAL BOARD OF           :
MEDICAL EXAMINERS,          :
                            :
        Defendant.          :   NO.  CV09-2032-PA

- - -

Oral deposition of CATHERINE FARMER, Psy.D., taken at The Rittenhouse, 210 West Rittenhouse Square, Philadelphia, Pennsylvania, on Friday, December 18, 2009, beginning at approximately 10:53 a.m., before Robin Frattali, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

```
1                    - - -
2               CATHERINE FARMER, Psy.D.,
3    having been first duly sworn to tell the
4    truth, was examined and testified as
5    follows:
6                    - - -
7    BY MR. NOWAK:
8         Q.   Would you state your full name, please.
9         A.   Catherine Farmer.
10        Q.   And where do you work?
11        A.   National Board of Medical Examiners.
12        Q.   And what do you do at the National
13   Board?
14        A.   I am manager-disability services, ADA
15   compliance officer, testing programs.
16        Q.   What does that all mean?  Tell me what
17   you do on a day-to-day basis.
18        A.   I oversee the day-to-day operations of
19   the Office of Disability Services at the National
20   Board.
21        Q.   And what does that entail?
22        A.   We receive and review requests for test
23   accommodations.  Review and -- review requests for
24   test accommodations for USMLE, United States
```

CATHERINE FARMER, PSY.D.

1  Medical Licensing Examination.  I supervise a
2  number of direct reports who process those
3  requests.  I'm responsible for making decisions
4  regarding those requests.  Making sure the
5  accommodations are implemented.
6      Q.   Approximately how many requests do you
7  receive annually?
8      A.   It varies from year to year.
9      Q.   Can you ballpark it for me?
10     A.   I would estimate perhaps around 500 a
11 year.
12     Q.   And of those 500 per year, how many
13 are -- ballpark, and I'm not testing, ballpark,
14 how many are granted accommodations?
15     A.   Are granted accommodations?
16     Q.   Yes.  Yes, ma'am.
17     A.   That also would vary from year to year.
18 Gee.  I would estimate more often than not we
19 grant accommodations.
20     Q.   More than 50 percent?
21     A.   More often than not, yes.
22     Q.   What is -- if there is a typical, what
23 is the typical accommodation that's granted?
24     A.   Oh.  I don't know that there's a

```
 1  typical accommodation that's granted.
 2       Q.   Is extra time --
 3       A.   Extra time is the most frequently
 4  requested accommodation.
 5       Q.   How come you denied Dr. Jayatilaka
 6  extra time on his Step 2 exam?
 7       A.   The review of his documentation did not
 8  reveal to us that he demonstrated a substantial
 9  limitation in a major life activity relative to
10  the average person.
11       Q.   What did you review to reach that
12  conclusion?
13       A.   I'm sorry.  Can you repeat that?  I
14  didn't hear.
15       Q.   Yes, ma'am.
16            What -- you said you reviewed
17  his documentation.
18       A.   Uh-huh.
19       Q.   What did you review?
20       A.   I believe he submitted a personal
21  statement, some medical records, a neuropsych eval
22  from --
23       Q.   Dushenko?
24       A.   -- Dushenko and Levine, maybe a 2008
```

```
 1    neuropsych eval.  That's all the documents that I
 2    can recall.
 3         Q.   After your name you have some initials,
 4    P-S-Y-D?
 5         A.   Uh-huh.
 6         Q.   Yes?
 7         A.   Yes.
 8         Q.   What does that stand for?
 9         A.   Doctor of Psychology.
10         Q.   Do you have a practice of your own
11    outside of your work for the National Board?
12         A.   No.
13         Q.   Are you full-time with the Board?
14         A.   I am.
15         Q.   And the reason I ask that is I think
16    the last time we talked -- you talked to my
17    partner, John Mozola -- I don't think you were
18    full time.
19         A.   Do you remember what year that was?
20         Q.   '03?
21         A.   Correct.  I was in training.
22         Q.   Do you diagnose individuals or do you
23    consult with individuals to determine whether or
24    not they have a disability that qualifies under
```

CATHERINE FARMER, PSY.D.

```
 1          Q.   In fact, Dr. Litchford testified that
 2   you really can't say yes or no with respect to a
 3   learning disability unless you personally take the
 4   history, administer a test and make clinical
 5   observations.
 6               And you agree with that, don't
 7   you?
 8               MR. TENHOFF:  Objection.
 9   Misstates his testimony.
10               THE WITNESS:  I don't know what
11   Dr. Litchford testified to.
12                      - - -
13   BY MR. NOWAK:
14          Q.   Well, let me ask you.
15               Can you say yes or no with
16   respect to an ADA disability, specifically a
17   cognitive disorder not otherwise specified, can
18   you say yes, this person has it, or no, this
19   person doesn't without partially taking a history,
20   administering the test and making clinical
21   observations?
22               MR. TENHOFF:  Objection, vague.
23   You mean make a clinical diagnosis?
24               THE WITNESS:  I think the best
```

```
 1            you could do is review the documentation
 2            that was provided and agree or disagree with
 3            the conclusions of the evaluator.
 4                            - - -
 5   BY MR. NOWAK:
 6       Q.   Dr. Nussbaum testified that it would be
 7   unethical to make a diagnosis without actually
 8   meeting a patient.
 9                 Do you agree with her
10   testimony?
11       A.   To make a diagnosis?
12       Q.   Yes.
13       A.   Yes, I agree.
14       Q.   How can you refute a diagnosis without
15   actually meeting with the patient?
16       A.   Well, again, I think reviewing the
17   documentation that the individual provides would
18   either support the diagnosis or not.  If it
19   doesn't, you'd refute the diagnosis or at least
20   question the diagnosis.
21       Q.   And you've never met with
22   Dr. Jayatilaka, have you?
23       A.   I have not.
24       Q.   Have you asked to meet with him?
```

CATHERINE FARMER, PSY.D.

```
 1       A.   Have I?
 2       Q.   Asked to meet with him.
 3       A.   No.
 4       Q.   Have you asked him to meet with either
 5  Dr. Nussbaum or Dr. Litchford?
 6       A.   No.
 7       Q.   Why not?
 8       A.   It's our guidelines for requesting test
 9  accommodations are for individuals to provide
10  documentation from their own treatment or
11  evaluators, treatment providers or evaluators, and
12  then we review that documentation.
13       Q.   But you will agree with Dr. Nussbaum
14  and Dr. Litchford that the best way to evaluate
15  whether someone has a disability that qualifies
16  under the ADA is to meet with them personally,
17  take a history, administer exams, and make
18  clinical observations, correct?
19            MR. TENHOFF:  Objection.  Vague
20       as to "evaluate."
21            THE WITNESS:  I believe that
22       would be appropriate if one was to diagnose
23       or wishing to diagnose.
24                      - - -
```

```
 1   BY MR. NOWAK:
 2       Q.  In fact, Dr. Litchford said that's the
 3   gold standard; that's the way to do it.
 4                   You agree with that, correct?
 5       A.  If one wishes to diagnose.  If one's
 6   goal is to diagnose, yes.
 7       Q.  Why do you qualify that?
 8       A.  I'm sorry?
 9       Q.  Why do you qualify that?
10       A.  I think there's a distinction between
11   reviewing documentation to see if it supports a
12   diagnosis or a request for test accommodations on
13   the basis of disability.
14       Q.  Would you agree --
15                   MR. TENHOFF:  Wait.
16                   Have you finished your answer?
17                   THE WITNESS:  No.
18                   There's a distinction between
19       that and diagnosing someone or evaluating
20       someone for the purpose of making a
21       diagnosis.
22                       - - -
23   BY MR. NOWAK:
24       Q.  Would you agree with me that the best
```

CATHERINE FARMER, PSY.D.

1   person to diagnose a disability would be the
2   psychologist who is actually personally taking the
3   history, administering the test, and making
4   clinical observations?  That's the best person to
5   diagnose a disability, correct?
6        A.   That sounds like the best person, yes.
7        Q.   And the National Board has done none of
8   that with respect to Dr. Jayatilaka, correct?
9        A.   We have not diagnosed Dr. Jayatilaka,
10  correct.
11       Q.   Tell me about Step 2 CK.  What is that?
12       A.   It's an examination called a Step 2
13  Clinical Knowledge Examination.  It's one of three
14  step exams for the United States Medical Licensing
15  Examination.  It assesses clinical knowledge.
16       Q.   Tell me about how it's administered,
17  how much time is given, what breaks there are in
18  between.
19       A.   It's a computer-based multiple-choice
20  examination administered over a single day.  There
21  are nine test blocks of one hour each and 45
22  minutes of break time.
23       Q.   Just one break?
24       A.   It's used at the examinee's discretion

```
 1       duties are, and they don't involve
 2       determining effect on tests or psychometrics
 3       or anything like that.
 4              Your request for the deposition
 5       was the person who made the decisions
 6       whether to grant the accommodations and
 7       Dr. Farmer's that person.  She's here to
 8       answer those questions, but she's not the
 9       person who develops the test, determines
10       whether the test -- how it would be affected
11       by extra time or not extra time.
12              She's not a psychometrician.
13                    - - -
14  BY MR. NOWAK:
15       Q.    You just don't know?
16       A.    Correct.
17       Q.    How did you determine that
18  Dr. Jayatilaka would not be given the
19  accommodation of extra time on Step 2?
20       A.    Reviewing his documentation, sending it
21  out for external review, and that would have been
22  to Dr. Litchford, and based on the documentation
23  that was provided did not demonstrate that he was
24  substantially limited in a major life activity
```

```
 1   compared to most or the average person in the
 2   general population.
 3       Q.  When did y'all consult with
 4   Dr. Nussbaum?
 5       A.  I don't recall the dates exactly, but
 6   it was when we received Dr. Jayatilaka's request
 7   for reconsideration, I think, through your letter.
 8       Q.  Why did y'all consult with
 9   Dr. Nussbaum?
10       A.  I don't recall offhand.
11               I believe that no additional
12   substantive documentation was provided other than
13   I think it was Dr. Dushenko's Affidavit that had a
14   diagnosis.  Dr. Litchford had already reviewed the
15   documentation, rendered a recommendation to us.
16   In view of the request for reconsideration, we
17   thought we would send it out to someone different.
18       Q.  How many requests for accommodations
19   have you sent to Dr. Nussbaum?
20       A.  I don't know offhand.  I can think of
21   maybe a couple this year.
22       Q.  That's this year.  I mean, over your
23   history with her.
24       A.  That's all that I can -- that's all
```

CATHERINE FARMER, PSY.D.

```
 1    that I can recall offhand.
 2         Q.   Are you critical of the testing
 3    administered by Dr. Levine?
 4         A.   I'm not sure I understand what you
 5    mean.  Am I critical?
 6         Q.   Yeah.  Are you critical?
 7         A.   Can you -- can you say more?  Can you
 8    explain that?
 9         Q.   Do you have a problem with the way he
10    tested Druvi?
11         A.   With the way he tested?
12         Q.   Uh-huh.
13         A.   I'm not sure that I know the way he
14    tested other than the report that he provided.
15         Q.   And that report contained the diagnosis
16    of cognitive disorder not otherwise specified,
17    correct?
18         A.   No.
19              MR. TENHOFF:  Objection.
20    Misstates the evidence.
21              Go ahead.
22              THE WITNESS:  No.  No.  His
23    report didn't include any diagnosis.
24                        - - -
```

```
 1   BY MR. NOWAK:
 2        Q.   The Dushenko Affidavit did, though,
 3   didn't it?
 4        A.   After, yes, we got the --
 5        Q.   And what was --
 6             MR. TENHOFF:  Wait.  Wait.
 7   Let's make sure we get a clear record.
 8             Can you finish your answer,
 9   Cathy.
10             THE WITNESS:  Yeah.
11             After we had reviewed the
12   neuropsychological evaluation and denied the
13   request, subsequent to that, we received the
14   Affidavit with the diagnosis.
15                    - - -
16   BY MR. NOWAK:
17        Q.   What was the diagnosis?
18        A.   Cognitive disorder NOS.
19        Q.   Not otherwise specified.
20             And are you critical of that
21   diagnosis?
22        A.   Are you asking do I agree with it?
23        Q.   We'll start with that, and then you can
24   heap on your criticism after that.
```

CATHERINE FARMER, PSY.D.

```
 1                MR. TENHOFF:  So the question
 2       to you, Dr. Farmer, is do you agree with
 3       that diagnosis.
 4                THE WITNESS:  No, we don't.  I
 5       don't believe -- I'm sorry.  No, I don't
 6       agree with the diagnosis.
 7                        - - -
 8  BY MR. NOWAK:
 9       Q.   Why not?
10       A.   Again, I don't think the documentation
11  that was provided in the entire record from
12  Dr. Jayatilaka supported a diagnosis of cognitive
13  disorder NOS.
14       Q.   Other than Dr. Litchford and
15  Dr. Nussbaum, who have you consulted with with
16  respect to Dr. Jayatilaka's request for
17  accommodations?
18       A.   I'm trying to think.
19                No one outside of the Board.  I
20  have staff in-house that may have reviewed it at
21  that time.
22       Q.   Who would that be?  Would it be
23  Suzanne?
24       A.   Suzanne may have certainly after --
```

```
 1   after the fact, not when the decision was made
 2   after either your reconsideration request or after
 3   the suit was filed.
 4        Q.   Right.
 5        A.   I've had some staff turnover, so I
 6   can't recall exactly if I had another psychologist
 7   in the office reviewing with me.  I don't believe
 8   so.
 9        Q.   Step 2 CK is nine hours?
10        A.   It is.
11        Q.   Has the Board ever considered
12   increasing the amount of time?
13        A.   On Step 2 CK?
14        Q.   Yes.
15        A.   I don't know.
16        Q.   What's a passing score on Step 2 CK?
17        A.   It is a score of 75 on a two-digit
18   scale, and I don't recall exactly on the
19   three-digit scale.
20        Q.   What's a passing score on Step 1?
21        A.   A 75 on the two-digit score.
22        Q.   Why did I think it was 185?
23        A.   It could be.  There's a three-digit
24   score --
```

```
 1                    C E R T I F I C A T E
 2
 3   COMMONWEALTH OF PENNSYLVANIA    :
 4                                   :    SS
 5   COUNTY OF PHILADELPHIA          :
 6
 7
 8                    I, ROBIN FRATTALI, Registered
 9   Professional Reporter - Notary Public, within and
10   for the Commonwealth of Pennsylvania, do hereby
11   certify that the proceedings, evidence, and
12   objections noted are contained fully and
13   accurately in the notes taken by me of the
14   preceding deposition, and that this copy is a
15   correct transcript of the same.
16
17
18                         [signature: Robin Frattali]
19                         _____
20                         ROBIN FRATTALI
21                         Registered Professional
22                         Reporter - Notary Public
23
24
```

**CATHERINE FARMER, PSY.D.**

|  |  |
|---|---|
| 1 | ERRATA SHEET |
| 2 | Attach to Deposition of: Catherine Farmer, Psy.D.<br>Taken on: December 18, 2009 |
| 3 | In the matter of: Jayatilaka vs. National Board |
| 4 | PAGE          LINE NO.          CHANGE                REASON |
| 5 | _____ |
| 6 | _____ |
| 7 | _____ |
| 8 | _____ |
| 9 | _____ |
| 10 | _____ |
| 11 | _____ |
| 12 | _____ |
| 13 | _____ |
| 14 | _____ |
| 15 | _____ |
| 16 | _____ |
| 17 | _____ |
| 18 | _____ |
| 19 | _____ |
| 20 | _____ |
| 21 | _____ |
| 22 | _____ |
| 23 | _____ |
| 24 | _____ |

CATHERINE FARMER, PSY.D.

```
 1                    SIGNATURE PAGE
 2
 3                         - - -
 4
 5              I hereby acknowledge that I have
 6    read the aforegoing transcript, dated December 18,
 7    2009, and the same is a true and correct
 8    transcription of the answers given by me to the
 9    questions propounded, except for the changes, if
10    any, noted on the Errata Sheet.
11
12                         - - -
13
14
15
16
17    SIGNATURE:        _____
18                      Catherine Farmer, Psy.D.
19
20    WITNESSED BY:     _____
21
22
23
24
```