# Exhibit B

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


DRUVI JAYATILAKA,                    )  No. CV09-2032 PA
                                     )     (CAx)
            Plaintiff,               )
                                     )
      vs.                            )
                                     )
NATIONAL BOARD OF MEDICAL            )
EXAMINERS,                           )
                                     )
            Defendant.               )
_____)




DEPOSITION OF:


                  ANDREW JEREMIAH LEVINE, Ph.D.

                  Wednesday, October 7, 2009

                  9:04 a.m.




Reported by:

                  MONICA T. VOGELBACHER

                  CSR No. 6406

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 11

1     Q    Okay.  At the top of Exhibit 1, there's a series
2  of things about the patient and the date of birth, and
3  one says, "Referral Source:  William Hornstein, M.D."
4     A    Uh-huh.
5     Q    How is it that you first became involved with
6  providing any evaluation for Mr. Jayatilaka?
7     A    Dr. Dushenko had seen Mr. Jayatilaka first and I
8  believe came to the conclusion that he needed a
9  neuropsychological evaluation, so as the
10  neuropsychologist in the practice, he was referred to me
11  by Dr. Dushenko.
12     Q    When was the first time that you got involved
13  with Mr. Jayatilaka and the evaluation?
14     A    I believe it would have been the date 5/8/08,
15  was the first day that we had an evaluation together.
16     Q    Okay.  We'll go into that in just a moment --
17     A    Okay.
18     Q    -- because I want to ask you specifically
19  various dates and tests that were provided.
20     A    Uh-huh.
21     Q    What was your understanding as to the reason for
22  why Mr. Jayatilaka was requesting or being recommended to
23  have an evaluation?
24     A    Well, thinking back to the time, I believe
25  Dr. Dushenko had informed me that -- of his background,

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   that he was in medical school; that he had been assaulted

2   at a certain -- I think it was in 1995, and since that

3   time was having difficulty passing his Boards, and due to

4   that reason, he was seeking evaluation to find out what

5   problems there might be that were preventing him from

6   passing.

7        Q    Okay.  Did you know Dr. Hornstein prior to this

8   time?

9        A    No, I don't think I've ever met Dr. Hornstein.

10       Q    Prior to the first time you met Mr. Jayatilaka,

11   did you have any communications with him -- with his

12   father, rather?

13       A    No.

14       Q    Did Dr. Dushenko provide you with any

15   information about Mr. Jayatilaka prior to the time that

16   you first met him in evaluation?

17       A    Yes.  He provided me with his notes, his

18   progress notes, his evaluation notes.

19       Q    Okay.  And I'll show you those in a bit, too,

20   because there seems to be some notes, I can't quite tell

21   who took those, so I'll probably be asking you about

22   those as well.

23            What, if anything, did he tell you about

24   Mr. Jayatilaka prior to the time that you first met him

25   and began your evaluation?

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 13

1      A   I couldn't tell you what he told me at the time.

2   Whatever he told me was probably -- I was -- probably

3   integrated into the report by me and by him.  We both

4   worked on the report together.

5      Q   Let me ask you, then:  Who actually drafted this

6   report, Exhibit 1?

7      A   In general, Dr. Dushenko worked on the first

8   part, which included the background information, "Reason

9   For Referral, Work History, Developmental/Medical

10  History, Personal Habits," pretty much up until the

11  "Behavioral Observations."  From there on in, it was a

12  neuropsychological evaluation, and I had written the vast

13  majority of that.

14          The end, the "Summary and Impressions," was

15  written by both of us.  Probably -- mostly me, and then

16  Dr. Dushenko went through and added whatever he thought

17  was relevant and pertinent.

18     Q   I see.

19          And the summary of the test results that are

20  shown on pages -- in the charts at the end, pages 14

21  through 16, was that developed by you as well?

22     A   That was me, yes.

23     Q   Okay.  And in terms of the neuropsychological

24  tests that were administered, were you the one who

25  administered them?

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 14

1        A    I administered all of the neuropsychological

2    tests.

3        Q    Okay.  Let me have you refer, Dr. Levine, back

4    to the first page of Exhibit 1.  And if you'll look at

5    the very bottom of that page, and it says, quote:

6              The current referral was requested to

7              obtain neuropsychological and

8              neurobehavioral data to assist in

9              diagnosing the patient's current

10             condition to delineate cognitive and

11             behavioral strengths and challenges

12             and to specify treatment approach to

13             the extent viable, including provision

14             of assistance with meeting

15             educational/professional goals, closed

16             quote.

17             Was that your understanding of the reason for

18    the referral?

19       A    Yes.

20       Q    And did you write this particular sentence?

21       A    I did not write that sentence.

22       Q    Do you have any understanding of what the

23    "provision of assistance with meeting

24    educational/professional goals" refers to?

25       A    I believe that would refer to seeking

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 15

1   concessions or assistance via the ADA.  So, for example,

2   extended testing time.

3       Q    Okay.  At the time that you did your

4   neuropsychological testing of Dr. Jayatilaka, were you

5   aware that he intended to seek an accommodation from the

6   National Board of Medical Examiners to take Step 2 of the

7   USMLE?

8       A    Yes.

9       Q    And how were you aware of that?

10      A    A letter was -- a form or a letter was presented

11  to me indicating what needed to be completed in the

12  evaluation in order for him to apply for that, for those

13  concessions.

14      Q    Okay.  Let's go ahead and mark that, now that

15  you've brought that up.

16          MR. TENHOFF:  Let's mark this as Exhibit 2.

17          (Defendant Exhibit 2 was marked

18          for identification by the reporter.)

19  BY MR. TENHOFF:

20      Q    All right.  The reporter's placed before you

21  what I've marked as Exhibit 2 to this deposition.  And

22  let me just give you a little background here.

23          When we subpoenaed documents from your office,

24  Dr. Levine, we received a couple of hundred pages of

25  documents.  And what we did was, as lawyers, we tend to

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 18

1        Q    Yeah.

2             Let's go -- and we'll take them one at a time as

3   we get to them, Dr. Levine.

4        A    Sure.

5        Q    Before we got a little sidetracked here, I was

6   asking you about your understanding of what

7   Dr. Jayatilaka was looking for in the referral, and you

8   mentioned that you were provided with some information

9   about what needed to be submitted.  And is Exhibit 2 the

10  information that you were provided about the

11  documentation that was needed with regard to

12  disabilities?

13       A    Yes.

14       Q    Okay.  Where did you receive that from?

15       A    I believe this -- I'm trying to remember here.

16  I think that we requested it from Dr. Jayatilaka, and it

17  was given to me through Dr. Dushenko.

18       Q    Okay.  And did you read through this document

19  prior to the time that you conducted the

20  neuropsychological evaluation?

21       A    Yes.

22       Q    Okay.  Let me refer you a couple of places here

23  in Exhibit 2.  If you'll look about -- there's a number 2

24  on the first page of Exhibit 2, where it talks about,

25  "The following characteristics are expected of all

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 19

1    documentation."

2         The use of the term, quote, State a specific

3    diagnosis of the disability, closed quote, what did you

4    understand that to mean when you read it?

5    A    Exactly what it says, "State a specific

6    diagnosis of the disability."

7    Q    And that would be a diagnosis under the DSM-IV

8    diagnostic categories?

9    A    That's a suggestion that's made in this letter.

10   It could be under DSM, it could be ICD.  There's

11   different diagnostic physiologies.

12   Q    What diagnostic tools or mechanisms do you use

13   in your practice?

14   A    Generally, DSM-IV and ICD.  However, sometimes

15   someone's impairments don't fit within a diagnostic

16   category.

17   Q    And when you use DSM, there are a couple

18   different versions of DSM.  There's a DSM-IV and then

19   there's a DSM-IV TR.

20        Is there a particular one that you use?

21   A    The IV.

22   Q    Okay.  It goes on a little further down.  The

23   second to the last paragraph mentions, quote, Describe in

24   detail the individual's limitations due to the diagnosed

25   disability, closed quote.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 20

1        A    Uh-huh.

2        Q    What did you understand that to mean when you

3    read it?

4        A    I believe it's pretty clear there.  Describe

5    their functional limitations as it pertains to day-to-day

6    functioning or academic functioning, occupational

7    functioning due to the disability that's diagnosed

8    through the evaluation.

9        Q    And let me turn you back to the third page of

10   this exhibit, and this is with regard to learning

11   disorders.  Was this section of the document also

12   provided to you by Mr. Jayatilaka?

13       A    To the best of my recollection, yes.

14       Q    And did you have any understanding why you were

15   being provided with information about documentation of

16   learning disorders?

17       A    Well, documentation of a learning disorder

18   probably would qualify one under the ADA for concessions

19   in testing.  And in order to -- in order for them to

20   accept the diagnosis of that, they had some stipulations

21   and criteria here that needed to be met as far as the

22   evaluation went.

23       Q    If you'll look at the bottom of that first page,

24   it says, "Learning disorders" about three bullet points

25   out.  It says, quote:

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 21

1            A diagnosis must be based on the

2            aggregate of test results, history and

3            level of current functioning.  It is

4            not acceptable to base a diagnosis on

5            only one or two subtests, closed

6            quote.

7            Did you understand that when you read it?

8      A    I did.

9      Q    The final sentence on that page says, quote,

10   Test must be appropriately norm for the age of the

11   patient and must be administered in a designated

12   standardized manner, closed quote.

13            Did you understand that when you read it as

14   well?

15      A    Yes.

16      Q    Okay.  And finally, I want to turn your

17   attention to the last page of Exhibit Number 2, which is

18   marked SD0294.  And right above the final paragraph it

19   says, quote:

20            Problems such as test anxiety, English

21            as a second language in and of itself,

22            slow reading without an identified

23            underlying cognitive deficit or

24            failure to achieve a desired academic

25            outcome are not learning disabilities

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 22

1              and therefore are not covered under

2              the Americans with Disabilities Act.

3              Did you agree with that at the time you read it?

4        A    I do -- I did and I do, yes.

5        Q    Okay.  All right, let's go ahead and set that

6    one aside.

7        A    Okay.

8        Q    Let's go back to Exhibit 1, just make sure I

9    understand the testing that was conducted.

10             If you'll turn to page 5 of Exhibit 1, there's a

11   category that says "Procedures," and it lists procedures

12   on April 2nd, 2008, May 8th, 2008 and May 15th, 2008.

13             Is this, in fact, a complete summary of all the

14   procedures that were engaged by you or Dr. Dushenko with

15   regard to this evaluation?

16       A    It is.  And if I could just add, I'm seeing now

17   that the first day of all this testing was done on April

18   2nd, and that was the first time I had evaluated him.  It

19   wasn't May 8th.

20       Q    Right.

21            (Recess taken.)

22   BY MR. TENHOFF:

23       Q    And all of the tests that are listed here on

24   page 5 were administered to Mr. Jayatilaka on the dates

25   referenced there?

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 23

1          A    Yes.

2          Q    Were there any other neuropsychological tests

3    that were administered to Mr. Jayatilaka, other than what

4    is listed here on page 5?

5          A    Not to the best of my recollection, no.  Not by

6    me.

7          Q    And since May 15th of 2008, have there been any

8    neuropsychological testing done of Dr. Jayatilaka, to

9    your knowledge?

10         A    Not to my knowledge.

11         Q    All right.  And then we're now in the area of

12   the report that I believe you read most of.

13              If you turn to page 6 through 9 --

14         A    Uh-huh.

15         Q    -- there is a series of different breakdowns

16   and -- up until we get to "Summary and Impressions."

17              Was it your goal in writing this particular

18   portion to characterize the results of the

19   neuropsychological evaluation in terms of various areas

20   of achievement and functioning?

21         A    Yes, as compared to a normative sample.

22         Q    Who actually conducted the clinical interview on

23   April 2nd, 2008?

24         A    The testing?  That would be me.

25         Q    Okay.  Let me see.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 29

1   neuropsychological testing, that Mr. Jayatilaka had

2   suffered a depressed skull fracture in 1995?

3       A   I believe that information was made available to

4   me prior to the evaluation.

5       Q   And did you understand that he had received

6   treatment for that injury at St. Mary's Medical Center in

7   Long Beach the day after the attack occurred?

8       A   I'm not sure when I would have found out about

9   that.

10      Q   Were you aware whether he had traveled back to

11  California the day after it occurred?

12      A   I'm not sure when I would have became aware of

13  that either.

14      Q   Were you aware, prior to conducting the

15  neuropsychological tests, of the result of MRI tests that

16  have been done at various times on Mr. Jayatilaka?

17      A   It's possible, but probably not.

18          MR. TENHOFF:  We'll mark this as -- what are we

19  up to?

20          THE REPORTER:  7.

21          MR. TENHOFF:  7, thanks.

22          (Defendant Exhibit 7 was marked

23          for identification by the reporter.)

24  BY MR. TENHOFF:

25      Q   I've placed before you what I've marked as

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 30

1    Exhibit Number 7 to this deposition, which is a series of

2    documents labeled as SD0314 through 0316, denoting they

3    came from your office's files.

4         Did you ever review -- have you ever seen these

5    documents before?

6         A    Yes, I've seen these before.

7         Q    And did you review these documents prior to the

8    time you conducted neuropsychological testing?

9         A    In all likelihood, no.  In general, I'll look at

10   MRI results after the evaluation.

11        Q    Okay.  And after the evaluation, did you review

12   these particular documents?

13        A    These look familiar to me.  I have these in my

14   files, so, yes, these were probably reviewed by me.

15        Q    Okay.  And on the first page it shows, if I'm

16   reading this correctly, that there was an MRI of the

17   brain without contrast on May 18th of 1996; is that

18   correct?

19        A    Yes.

20        Q    And that the impression at that time was a

21   negative MRI of the brain?

22        A    That's what it says here, yes.

23        Q    And what did you understand, at the time you

24   read this, a negative of the MRI of the brain to mean?

25        A    That there was no neuropathology seen.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 31

1       Q    And if you'll turn to the second page, this
2   appears to be the results of an MRI of the brain without
3   and with contrast on July 28th, 1997, correct?
4       A    Yes.
5       Q    And the impression is, no change since the prior
6   study dated 5/18/96, correct?
7       A    Uh-huh.
8            THE REPORTER:  "Yes"?
9            THE WITNESS:  I'm sorry.  Yes.
10  BY MR. TENHOFF:
11      Q    And so did you understand that to mean that
12  that, again, was a negative MRI of the brain?
13      A    "No abnormality is seen," would indicate to me
14  that it's a negative MRI.
15      Q    And then finally, we'll turn to the last one,
16  which is SD0316, and that appears to be an MRI of
17  June 5th, 2003; is that correct?
18      A    Yes.
19      Q    And the impression there was, "Negative
20  examination, no acute process."  What did you understand
21  that to mean when you read it?
22      A    Again, that the results of the MRI were negative
23  for neuropathological finding; that there's no new
24  processes occurring.
25      Q    There's also a note in this last one,

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 35

1     Q    Sure.

2          MR. TENHOFF:  Could you read that back.

3          (Record read.)

4          THE WITNESS:  Not to the best of my

5     recollection.  There was a letter that Dr. Dushenko had

6     sent on behalf of Dr. Jayatilaka, but I don't believe I

7     saw that letter before it went out.  I don't believe it

8     had my signature on it either.

9     BY MR. TENHOFF:

10    Q    And you mentioned previously, in terms of making

11    certain diagnoses, the tools you used for the DSM-IV and

12    the ICD.

13         What are you referring to when you say the ICD?

14    A    It's more -- it's used more by physicians for

15    medical diagnosis.  The DSM is also used by physicians,

16    psychiatrists, but it's generally the tool for

17    psychologists as well.  We're nonmedical doctors.

18    Q    Okay.  And, to your knowledge, was there ever

19    any diagnosis of Mr. Jayatilaka under ICD standards?

20    A    No.

21    Q    So let's go a little bit longer.

22         Dr. Levine, we can do this in one of two ways.

23    I actually have excerpts from the DSM-IV that we can use

24    and make part of the record, which may be a little easier

25    for everyone, rather than make the whole book part of the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 36

1    record and have to pay for that - no offense - or we can

2    look at the book.  If at any point you want to look at

3    the book, it's right in front of me here.  Feel free to

4    use it.

5          MR. TENHOFF:  So let's go ahead and mark this as

6    8.  Thank you.

7          (Defendant Exhibit 8 was marked

8          for identification by the reporter.)

9    BY MR. TENHOFF:

10    Q    And I want to spend a little time just making

11    sure that you and I have sort of our terminology

12    definitions aligned.

13          What is the DSM-IV used for?

14    A    Diagnostic purposes, generally, for psychiatric

15    disorders.

16    Q    And do you use the term "psychiatric disorders"

17    interchangeably with "mental disorders"?

18    A    Yes.  Psychological, psychiatric, mental and

19    cognitive.

20    Q    If you can turn on Exhibit 8, which again, is an

21    excerpt from the DSM-IV.  If you could turn to the third

22    page of that exhibit, which says, "Definition of Mental

23    Disorder."

24    A    Uh-huh.

25    Q    Okay.  Here, if you look towards the very last

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 42

1   distribution.

2        Q    Okay.  And so let's take a look, for example, on

3   the W-A-I-S.  If you'll look down --

4        A    We call it WAIS.

5        Q    WAIS.  Okay.  Thank you.  Hopefully she gets

6   that.

7             If you look under the "Standard Score," where

8   you're looking at the IQ towards the bottom, there are

9   various standard scores there.

10            Would you agree that when we're using a standard

11  score, there's a mean here of 100 and a standard

12  deviation of 15?

13       A    Uh-huh.

14       Q    Is that --

15       A    Yes.

16       Q    -- correct?

17       A    Yes.

18       Q    Okay.  And if we're using -- if we go above here

19  on the subtest for the WAIS, we actually have a mean of

20  10 and a standard deviation of 3, correct?

21       A    That's correct.

22       Q    All right.  And so, for example, on an IQ test,

23  anyway, plus or minus one standard deviation of the mean

24  represents a score range of, say, 85 to 115 as a standard

25  score, correct?

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 43

1        A    Yes.

2        Q    And 68 percent of the general population in the

3    norm group would fall in that range, correct?

4        A    Within one standard deviation, yes.

5        Q    Thank you.

6             And so then to associate that with the

7    percentiles, plus or minus one standard deviation would

8    be associated with the 16th and the 84th percentile,

9    correct?

10       A    That's correct.

11       Q    So you would expect that the average person in

12   the population would score between the 16th percentile

13   and the 84th percentile, for example, in an administered

14   test of intelligence.

15       A    Yes, with one point that the WAIS-III manual has

16   categories based on their standard scores, and

17   neuropsychologists recognize a score above the

18   75th percentile as being above average and below the

19   25th percentile as being below average.

20       Q    Okay.

21       A    So it doesn't follow the standard deviation

22   distribution exactly.

23       Q    Well, let's -- yeah, let's go back to that in

24   just a minute.

25       A    Uh-huh.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 50

1    on age alone.

2        Q    And again, I'm assuming they're all age alone,

3    unless -- what I'm just looking for is any that were

4    normed differently.

5        A    Okay.

6        Q    Differently or had an additional stratification.

7    Age and education, age, education, gender.

8        A    The Wisconsin Card Sorting Test, the WCST --

9        Q    Yeah.

10       A    -- I believe that might have education in it.

11   Let me just check.  I have the printout here for that.  I

12   might not have that in here.  That may be age and

13   education.

14           The Grooved Pegboard and Finger Tapping Test are

15   ethnicity, age and education based.

16       Q    Okay.

17       A    And that's it.

18       Q    Could you, one more time, tell me below average,

19   average and above average, and then we'll take a break,

20   in terms of your percentiles, the percentiles that you

21   use.

22       A    So I use -- out of my average range is 25 to

23   75 percentile.  My low average is 9th to 24th percentile.

24       Q    And you use that as low average; is that --

25       A    Low average.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1      Q    Okay.

2      A    My -- what's called borderline impaired would be

3    5th to 8th percentile, and impaired would be below the

4    5th percentile.  Above average would be 76th through 91.

5    And above that it's, I think, superior.

6      Q    91 and above?  Or 92 and above?

7      A    Ninety -- oh, boy.  I'm sorry.  I'm having a

8    little recollection difficulty right here myself.

9          I think what we call 92 to 95 would be very

10   high, and then above 95 would be superior.  It's somewhat

11   arbitrary.  Ask six neuropsychologists what they use and

12   there'll be some variation in there.

13         They're just categories based -- again, to

14   express, you know, how this person's functioning to the

15   lay person.  Some use somewhat more strict ranges, others

16   use more lax ranges, so...

17     Q    It sounds like the ranges that you're using,

18   there's just more gradation and there's more categories.

19     A    There's more categories, yes.

20     Q    Okay.  Why don't we go ahead and take a quick

21   break.  This is a good breaking point.

22         MR. TENHOFF:  We can go off the record.

23         (Recess taken.)

24         MR. TENHOFF:  Let's go back on the record.

25     Q    Okay, back on the record.  I'd like to start

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 62

1    discrepancy between intellectual ability on the one hand

2    and scores on achievement testing on the other hand?

3         A    Yes.

4         Q    And let's go to page 10 of your report.  If

5    you'll look at the very last paragraph here, it says,

6    quote:

7                   Diagnostically, a significant

8                   discrepancy must exist between his

9                   intellectual ability as measured by

10                  the WAIS-III and his scores on

11                  achievement testing as measured by the

12                  WJ-III.  Such a discrepancy was not

13                  found, closed quote.

14                  Are you referring, at that point, when you say

15   "diagnostically," relative to the diagnostic standards in

16   the DSM-IV?

17        A    Yes.

18        Q    Okay.  And so you weren't -- or you didn't

19   diagnose Mr. Jayatilaka with a learning disability under

20   the DSM-IV standards, did you?

21        A    That's correct.

22        Q    And it was also your conclusion that

23   Mr. Jayatilaka is a man of average intellectual ability;

24   is that correct?

25        A    Yes.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 63

1        Q    Okay.  And if you could turn to that, I just

2   want to make sure -- that's on page 9.  It's right

3   underneath "Summary and Impressions."

4        A    Uh-huh.

5        Q    It says, quote, Psychometric estimates of

6   premorbid functioning indicate that Dr. Jayatilaka is a

7   man of average intellectual ability, closed quote.

8            You capitalized the word "average."  Were you

9   using that in a particular way?

10       A    You know, sometimes I just capitalize the range

11  that it falls within to kind of emphasize that and to let

12  the reader know that that's an actual category rather

13  than just, he did average.  It's actually -- when I put

14  it in capital, I'm trying to convey that it's an actual

15  category that we use.

16       Q    And that is, again, according to the definitions

17  that you and I talked about earlier in terms of your

18  scale in terms of what's average, below average and above

19  average?

20       A    It would be on both of our scales.

21       Q    Yeah.

22            And this also refers to "premorbid functioning."

23  Is it, in fact, the case that your conclusion is that

24  Mr. Jayatilaka was a man of average intellectual ability

25  before the injury in 1995?

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 64

1        A    That would be my estimate, yeah.

2        Q    Are you familiar with the DSM-IV definition of a

3   reading disability?

4        A    Yes.

5        Q    Let's go back and take a look as long as we have

6   the excerpt.

7             Do you have Exhibit 8 in front of you there?  If

8   you'll turn, there's actually on -- it says page 50 at

9   the top.  It has the diagnostic criteria for 315.00.  And

10  again, I'm referring to Exhibit 8, for the record.

11            Are you familiar with these criteria for a

12  reading disorder?

13       A    Yes.

14       Q    And did you ever conclude that Mr. Jayatilaka

15  met the diagnostic criteria for such a reading disorder?

16       A    No, not according to the DSM.

17       Q    Would you agree that he scored, actually, very

18  high on measures of reading on the neuropsychological

19  tests?

20       A    Yes.  Average or better.

21       Q    Okay.  Well, let's go to page 6, actually, of

22  Exhibit 1, because I'm just trying to use your exact

23  words.

24       A    Uh-huh.

25       Q    All right.  It says -- and this is right under

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 67

1        A    That is just as it says, reading comprehension.

2   One reads a passage and then answers a question with

3   regards to the content of that passage.

4        Q    And that was a 42 -- 42nd percentile; is that

5   correct?

6        A    Yes.

7        Q    All right.  So that was also in the average

8   range.

9        A    Yes.

10       Q    All right.  Are you familiar with the diagnosis

11  of a mixed expressive-receptive language disorder --

12       A    Yes.

13       Q    -- under the DSM-IV?

14       A    Yes.

15       Q    Let's go back to the DSM-IV.  It should be,

16  actually, a couple of pages in.  That's on -- this is,

17  again, Exhibit 8, pages 60 to 61.  Do you see that?

18       A    Uh-huh.  Yes.

19       Q    And are you familiar with those diagnostic

20  criteria for mixed receptive-expressive language

21  disorder?

22       A    Yes.

23       Q    And again, one of the things, as I understand

24  it, is that the first criteria here is, quote:

25            The scores obtained from a battery of

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 68

1          standardized individually administered

2          measures of both receptive and

3          expressive language development are

4          substantially below those obtained

5          from standardized measures of

6          nonverbal intellectual capacity,

7          closed quote.

8          And do you understand what the term

9   "substantially below" in this context refers to?

10       A   Not necessarily.  It's not defined here, but I

11   would generally use a 1.5 to 2 standard deviations.

12       Q   And would you agree that Mr. Jayatilaka does not

13   meet the criteria for a mixed receptive-expressive

14   language disorder?

15       A   I do.

16       Q   Was there ever a point in time where you

17   concluded that there was a DSM-IV diagnosis that was

18   applicable to Mr. Jayatilaka?

19       A   Not at the time of my evaluation of writing this

20   report.

21       Q   Did you come to that conclusion at some later

22   point?

23       A   Well, it's arguable.  The DSM is not the best

24   reference guide for diagnosing cognitive and

25   neuropsychological disorders.  There's better diagnostic

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

1   criteria out there for diagnosing a learning disability

2   than what's in the DSM-IV, that I didn't use for this

3   particular evaluation and, in fact, probably would not

4   have applied to Dr. Jayatilaka.  Based on my evaluation

5   of him, I found him to have some weaknesses in some

6   areas, but I didn't feel that he met diagnostic criteria

7   for any of the DSM-IV disorders.

8        Q   Do you understand that Dr. Dushenko, in December

9   of 2008, submitted an affidavit in which he diagnosed

10  Mr. Jayatilaka with a cognitive disorder not otherwise

11  specified?

12       A   I have become aware of that, yes.

13       Q   Do you agree with that?

14       A   It's not what I would have diagnosed, but it's

15  arguable that it could have been diagnosed.

16       Q   You don't agree with that diagnosis?

17       A   Cognitive disorder NOS is kind of a wastebasket

18  term for somebody who doesn't meet diagnostic criteria

19  for, say, amnestic disorder or dementia or delirium or

20  any other disorders, but that they have some form of

21  impairment that limits them in some substantial way.  So

22  one could argue that these deficits are limiting

23  Dr. Jayatilaka in a substantial way.  At the time of my

24  evaluation, that wasn't my impression.

25       Q   Is it your impression today?

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1      A    I could be swayed probably either way.  Because

2   my understanding is that Dr. Jayatilaka was doing fairly

3   well in school, fairly well in school.  He wasn't a

4   stellar student, but he made it through college and he

5   made it into medical school, until he was injured in this

6   assault, and following that assault, he had had

7   tremendous difficulty -- I'm assuming he had difficulty

8   in medical school if it took him so long to take his

9   first Board and tries to take his first Board and pass

10  it.  So one could attribute that to deficits incurred in

11  that assault, which, in that case, one could assign a

12  diagnosis of cognitive disorder NOS.

13     Q    Okay.  Let's take a look at the -- which, by the

14  way, did you have any involvement with any submissions by

15  Mr. Jayatilaka to the NBME, where he identified DSM-IV

16  diagnoses?

17     A    I'm not sure what you mean by "any submissions"

18  by Dr. Jayatilaka.

19     Q    Okay.  Were you aware that in submitting an

20  application for accommodations to the National Board of

21  Medical Examiners, Dr. Jayatilaka stated that he had a

22  reading disorder?

23     A    I'm not aware of that.

24     Q    Were you aware that in submitting information to

25  the National Board of Medical Examiners, Mr. Jayatilaka

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 71

1    stated that he had a learning disability?

2         A    I'm not aware of that.

3         Q    And were you aware that in submitting

4    information to the National Board of Medical Examiners,

5    Mr. Jayatilaka stated that he also had the mixed

6    receptive-expressive language disorder?

7         A    No, I'm not aware of that.

8         Q    Let's go -- if you'll take a look at Exhibit

9    Number 8 here.  And turn to -- there should be an excerpt

10   here, and jump all the way to page 163 for "Cognitive

11   Disorder Not Otherwise Specified."

12             Are you there with me?

13        A    Yes.

14        Q    At 294.9, do you see that?

15        A    Yes.

16        Q    All right.  And again, this states, quote:

17             This category is for disorders that

18             are characterized by cognitive

19             dysfunction presumed to be due to the

20             direct physiological effect of a

21             general medical condition that do not

22             meet criteria for any of the specific

23             deliriums, dementias or amnesic

24             disorders listed in this section.

25             Now, is it your understanding based upon that

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    criteria that for such a diagnosis, there would have to

2    be a medical -- general medical condition that actually

3    causes cognitive dysfunction?

4        A    Yes, that is my understanding.

5        Q    Okay.  And so in terms of a general medical

6    condition, apart from the skull fracture in 1995, are you

7    aware of any other general medical condition of

8    Mr. Jayatilaka that could potentially be causing him

9    cognitive disfunction?

10       A    No.  You know, he had sleep apnea, but that's

11   not enough to -- any criteria for cognitive disorder NOS.

12       Q    Okay.  And it seems that in terms of going

13   either way on that kind of a diagnosis, it would be

14   important to you to understand the level of intellectual

15   achievement by Mr. Jayatilaka prior to the 1995 injury;

16   is that right?

17       A    Yes.

18       Q    Okay.  Let me see if I can give you some

19   information on that.

20            So you were aware that Dr. Jayatilaka attended

21   high school at Chadwick School in Palos Verdes?

22       A    Yes.

23       Q    Okay.

24            MR. TENHOFF:  Let's go ahead and mark this as 9.

25            (Defendant Exhibit 9 was marked

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 73

1           for identification by the reporter.)

2    BY MR. TENHOFF:

3        Q    I've placed before you what I've marked as

4    Exhibit 9 to this deposition.

5             Have you ever seen this document before?

6        A    No.

7        Q    All right.  If you'd turn to the second page

8    here, there is shown at the bottom, right above that last

9    chart, it says "Cum GPA grades 10 through 12 of 3.13."

10            Do you see that?

11       A    I do.

12       Q    And a class rank of 33 out of 60.  Would you

13   agree that, generally speaking, that's average

14   performance in high school?

15       A    Yes.

16       Q    Are you aware of how Mr. Jayatilaka performed in

17   college?

18       A    From my recollection, he had told us that he had

19   average or better grades in high school and college.

20       Q    Okay.

21            MR. TENHOFF:  Let's mark that, please.

22            (Defendant Exhibit 10 was marked

23            for identification by the reporter.)

24   BY MR. TENHOFF:

25       Q    All right, I've placed before you what I've

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 74

1    marked as Exhibit 10 to this deposition.

2            Will you take a moment and tell me whether you

3    recognize this document.

4        A   I have not seen this document.

5        Q   All right.  And if you'll look -- you understood

6    that Dr. Jayatilaka attended college prior to the 1995

7    injury, correct?

8        A   Yes.

9        Q   All right.  And if you'll look at the bottom

10   here, it appears that he received a bachelor of arts

11   degree in May of 1991, correct?  It's at the very bottom.

12       A   Yes.

13       Q   And that there was a cumulative grade point

14   average of 2.69.  Do you see that?

15       A   I do.

16       Q   And his final rank in the class was 318 out of

17   431.  Correct?

18       A   Yes.

19       Q   All right.  Would you consider those to be

20   average grades or slightly below average grades?

21       A   I'd say average.  Except for that F in organic

22   chemistry.

23       Q   Well, I was going to ask you about that.  There

24   seems to be that in some of the courses which appear to

25   be more science oriented or premedical, that there are a

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    number of lower-ranking grades.  So, for example, if you

2    look -- the second entry on the left-hand side,

3    organismic biology was a C.  Go slightly down:  Organic

4    chemistry I, C; macroeconomics, C; organic chemistry II,

5    F; genetics, C.  On the right-hand side:  General

6    physiology, C; and pathology is C; and population biology

7    is C minus.

8          Would that have any impact on your opinion of

9    his academic performance prior to the injury?

10    A    Again, I'd say it's pretty average.  I mean,

11    there's other instances where he did well in organic

12    chemistry.  Later on, he had a B plus.  There's lots of

13    factors here.

14          I don't know what he was doing in college, if he

15    was taking it seriously or not.  But all of the things

16    being equal, these wouldn't be considered by me to be

17    particularly great grades.  I think they'd be average or

18    below.

19    Q    Okay.  Were you aware of his scores in medical

20    school, both before and after the injuries?

21    A    No.

22    Q    Okay.

23          MR. TENHOFF:  Let's go ahead and -- 11.

24          (Defendant Exhibit 11 was marked

25          for identification by the reporter.)

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 77

1   after the 1995 injury?

2        A    I'm not sure exactly where the injury would have

3   occurred in this list, if it was before the first or --

4   before or after the first period of '95.  But there's not

5   really that many grades after the injury here to base any

6   conclusions on.

7        Q    In terms of an opinion or potential opinion on

8   the diagnosis of cognitive disability not otherwise

9   specified, would it be important to determine how

10  Mr. Jayatilaka performed on standardized testing prior to

11  the injury?

12       A    I'm sorry, could you repeat that.

13       Q    Sure.  I bet she can better than I can.

14            (Record read.)

15            THE WITNESS:  It would be helpful, yes.

16  BY MR. TENHOFF:

17       Q    Okay.  Did you ever have a chance to see how he

18  had scored on his SATs prior to the injury?

19       A    I did not.

20       Q    Okay.

21            MR. TENHOFF:  Let's go ahead, and we're up to

22  12.

23            (Defendant Exhibit 12 was marked

24            for identification by the reporter.)

25  BY MR. TENHOFF:

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 81

1     Q    Okay.  Did you review any medical records that

2  indicated that there was any injury to the brain as

3  opposed to a fracture to just the skull?

4     A    I don't recall, but if I didn't put anything in

5  my report mentioning specific brain injury, chances are I

6  did not review any medical records that mentioned it,

7  because that would be very relevant to my interpretation.

8     Q    Are you aware of any medical records that show

9  that there was actually a brain injury to Mr. Jayatilaka

10  as opposed to a skull injury?

11     A    None that show actual neuronal damage, tissue

12  damage itself.  Which isn't to say that a skull fracture

13  wouldn't cause imbalance of neural function.  It causes a

14  reaction of the organ, but not necessarily one that you

15  can see.  For example, a concussion, one doesn't

16  necessarily see a giant bleed in the brain or atrophy or

17  any changes on MRI.  The changes are actually more on a

18  microscopic level, but they're very real.

19          So in the case of an injury or impact to the

20  head that was strong enough to cause a fracture, I would

21  expect him to at least have a concussion and very

22  potentially post concussive symptoms.

23     Q    And again, you're not a medical doctor, right?

24     A    That's right.

25     Q    Is it possible, if you know - I know you're out

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 82

1    of your area of expertise here - to have a skull fracture

2    without injury to the brain?

3         A    Define "injury to the brain."  I'm not really

4    sure what you mean by that.

5         Q    Injury that causes cognitive dysfunction.

6         A    Is it possible to have a skull fracture without

7    an injury that causes cognitive dysfunction.  I'd imagine

8    there are many instances where people have fractured

9    their skulls and not had any cognitive sequela from that.

10        Q    Wasn't it, in fact, your conclusion that

11   Mr. Jayatilaka had been functioning within the average

12   range of intellectual ability for some time?

13        A    Based on my premorbid estimates, yes.

14        Q    So average functioning both before and after the

15   injury, correct?

16        A    Yes.

17        Q    Were you aware of any change in the report that

18   was submitted to the NBME after the May 21st report?

19        A    I'm not aware of anything.  After I signed it,

20   it went into the file.  Although the date on the report

21   that I have is 5/30/08, so -- the date on the one you

22   gave me is 5/21/08.  I'm not sure which actual draft went

23   out.  But my signature is on the one that you have, so --

24        Q    Right.

25        A    -- very likely that's the one that went out.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 84

1        Q   And did you sign this one?

2        A   It's not signed on here.  It's not signed on

3    this copy.

4        Q   Okay.  Are you aware of any differences between

5    the May 21st and the May 30th report?

6        A   I'll just quickly look over it.  Aside from the

7    missing information...

8        Q   Well, let me point you out to a couple of them,

9    because I want to ask you specifically about a couple.

10       A   Okay.

11       Q   If you'll look, first of all, on Exhibit 1 at

12   page 6.  Take a look under -- all right.

13           So first of all, take a look at Exhibit 1, and

14   under "Achievement Testing," the second full paragraph,

15   there's -- the second sentence says, quote:

16               Although his scores still fell within

17               the average range when compared to

18               individuals from his age group, it's

19               quite possible that they reflect

20               sequelae of his traumatic head injury,

21               THI, closed quote.

22               Do you see that?

23       A   Yes.

24       Q   All right.  Now, did you write that portion?

25       A   I don't recall.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 85

1        Q    Now, if you'll take a look in Exhibit Number 14,

2    and you'll look under "Achievement Testing," that

3    statement is deleted.  Do you know why that is?

4        A    That I don't know.

5        Q    Do you have any conclusion as to whether the

6    scores on the academic testing reflect sequelae of his

7    traumatic head injury or not?

8        A    Do I have any opinion of that?

9        Q    Yes, sitting here today.  I've got two reports

10   and one says it does and one says it doesn't.

11       A    It would be hard for me to make that conclusion

12   because of the site of the injury.  If there were any

13   underlying damage to the brain, it would not necessarily

14   affect the abilities which were below expectation on the

15   achievement testing.  It's conceivable.  Anything's

16   possible.  One could make the argument, but that's not a

17   conclusion I believe that I would have made.

18       Q    Okay.  Is that a conclusion that you make

19   sitting here today?

20       A    No, I wouldn't make that conclusion sitting here

21   today.

22       Q    Okay.  Another one I wanted to ask you about

23   was, if you go back -- let's take a look at, first of

24   all, on page 4 -- oh, let me -- let's go back to page 4

25   of both documents, Exhibit 14 and Exhibit 1.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 92

1    called "Understanding Directions."

2         Q    And again, the "Understanding Directions" is

3    49 percentile, which is in the average range --

4         A    Uh-huh.

5         Q    -- correct?

6         A    That's right.

7         Q    And the passage reading comprehension, again, is

8    at the 42nd percentile, which is, again, in the average

9    range.

10        A    Right.

11        Q    Okay.

12        A    Also spelling, I believe, is probably included

13   in that conclusion.

14        Q    Okay.

15        A    Which was at the 57th percentile.

16        Q    Again, in the average range.

17        A    Yes.

18        Q    All right.  So let's take the Boston Naming

19   Test, and we've got that as a -- that was in the

20   18th percentile, correct?

21        A    Yes.

22        Q    All right.  So in your classifications, that

23   would be in the lower average range, correct?

24        A    Yes.

25        Q    All right.  And were you the one who

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 93

1   administered that test?

2       A   Yes.

3       Q   All right.  And the -- I think that one was one

4   that you referred to before that was normed both from an

5   age perspective and an educational perspective, correct?

6       A   It's possible.  I don't remember the normative

7   set I used, and that's my fault to not include that in

8   the results here.  Oftentimes neuropsychologists will put

9   the normative sample that they used to arrive at their

10  percentile.  So it may have been based on age alone, it

11  may have been based on age and education.

12      Q   Okay.  And if it was education, given

13  Dr. Jayatilaka's level of educational attainment, that, I

14  assume, would be a norm group of greater intellectual

15  ability, correct?

16      A   Yes.  The range of grades differ across

17  normative samples.  It may have been 13 to 21, it may

18  have been 16 to 21 years of education.  It may have been

19  20 to 21 years of education.  I don't recall the specific

20  stratification of it.

21      Q   And under the "Raw Score" of 52, do you have any

22  idea how that would correlate to a percentile if we only

23  used age-based numbers?

24      A   It would probably still be below average.

25      Q   You think it would still be below the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 94

1    25th percentile?

2         A    I believe it would be below the 25th percentile,

3    yes.

4         Q    Okay.  Let me ask you about the administration

5    of the Boston Naming Test, because there was a document

6    given to us.

7              MR. TENHOFF:  Go ahead -- what are we up to, 15?

8    Thanks.

9              (Defendant Exhibit 15 was marked

10             for identification by the reporter.)

11   BY MR. TENHOFF:

12        Q    The reporter's placed before you what I've

13   marked as Exhibit 15 to this deposition, and it's marked

14   at the bottom right-hand corner SD0480 and 0481.  Have

15   you ever seen this document -- which, by the way, denotes

16   it came from your office's files.

17             Have you ever seen this before?

18        A    Yes.

19        Q    What is it?

20        A    This is the protocol for the Boston Naming Test.

21        Q    All right.  So if you start on the second page,

22   it seems like we start on item 30, correct?

23        A    Uh-huh.

24        Q    "Yes"?

25        A    Yes.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 95

1        Q    All right.  So what's the protocol for this
2    test?  How do you give this test?
3        A    Well, generally, you show the examinee a
4    picture - it's more of a drawing - of a relatively common
5    object, and they then attempt to name what that object
6    is.  If they can't name it, you give them a stimulus cue.
7    So, for example, if I were showing you a picture of a
8    harmonica, I would say it's a musical instrument.  And if
9    that doesn't jog your memory, I would give you a phonemic
10   cue, which would be starts with the sound "har".
11       Q    And again -- and so the stimulus cue is what's
12   in the parentheses after the actual item, correct?
13       A    Yes.
14       Q    And the phonemic clue is the one that's the --
15   underlined at the beginning of the item, correct?
16       A    Yes.
17       Q    All right.  And the reason I'm asking you about
18   this is, I don't see any marks or notations that indicate
19   that stimulus cues were given when this test was
20   administered.
21       A    I don't mark everything I do on these.  It
22   becomes kind of -- I just have a standard way of giving
23   it.  And if it's clear to me that someone recognizes what
24   the object is, but they can't come up with the name, I'll
25   skip the stimulus cue altogether.  The reason for this is

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 96

1    that you want to understand what the language deficit is.

2          We have a condition, for example, called

3    agnosia, where someone will look at a cup, for example,

4    and not really understand what it is at all, but if you

5    explain to them what category it falls within, they may

6    be able to come up with the word.  That's a different

7    type of deficit than having difficulty retrieving the

8    word, even though you know what the object is and you can

9    recognize it and describe what it's used for.

10    Q   And isn't that the purpose of giving a stimulus

11    clue first and a phonemic clue second, so that you can

12    identify which particular potential deficiency you're

13    dealing with?

14    A   Yes, one would give the stimulus cue first if

15    they thought that there was some kind of agnosia going

16    on.  If it's clear to me that the patient understands and

17    recognizes what the object is and is already struggling

18    with coming up with the word, then sometimes I may skip

19    the stimulus cue.

20    Q   And of the ones that were given here, do you

21    have any recollection of how many times you did skip

22    giving the stimulus cue?

23    A   I don't have any recollection of that.

24    Q   And is there anything in the Boston Naming Test

25    testing protocol that provides that you can skip the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 97

1    stimulus cue step?

2        A    I believe if you look into the protocol for the

3    Boston Naming Test, there's a lot of ambiguous areas,

4    such as how many seconds one can give a person to come up

5    with the stimulus cue, how many seconds they have to come

6    up once the phonemic cue is given.  So I felt in always

7    administering the BNT, there's some latitude in the

8    protocol for administering it.

9            For example, starting on item 30, I believe, is

10   fairly commonplace.  But we also have the reversal rule,

11   so if they have an error within the first, I believe

12   eight or so items, one starts to work backwards until

13   there's a basal of eight items.

14       Q    Is there a -- if you're looking at the numbers

15   here, at the bottom it says -- first of all, it's "Total

16   correct without cue," which is 52, correct?

17       A    Uh-huh.

18       Q    "Yes"?

19       A    Yes.

20       Q    Okay.  And then it's "Total correct with or

21   without stimulus cues" as 52, correct?

22       A    Yes.

23       Q    All right.  And then "Total correct with or

24   without stimulus or phonemic clues" is 57, correct?

25       A    Yes.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 98

1      Q   All right.  So the raw score that you reported

2   is a 52 on the report, correct?

3      A   That's right.

4      Q   All right.  So where did that come from?  Which

5   one is that?

6      A   Total correct without giving a cue -- without --

7   stimulus cue counts.  If you give a stimulus cue, that

8   also counts.  If they get it right after, say, for

9   example, it's something you drink out of, that also gets

10   counted as correct in the raw score.

11      Q   Right.  So if you had given the stimulus cues

12   and you, for instance, got one because of the stimulus

13   clue --

14      A   I would have marked that in the column.

15      Q   Right.  And then his scores would have been

16   reported on the raw score would have been higher than 52.

17      A   That's right.  No, no.

18      Q   Okay.

19      A   Oh, that's right, that's right.  Yes.

20      Q   So in giving this test, in looking at your

21   results, you can't tell which ones he would have gotten

22   correctly if he had been given a stimulus clue.

23      A   That's not necessarily true.  If somebody is

24   struggling, let's say, for example -- here's a good

25   example.  The word "accordion."  He sees the accordion

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 99

1    and he says it's a xylophone.  Based on that answer, he

2    knows it's a musical answer, so I don't give the stimulus

3    cue, it's a musical instrument.  For stilts, if he's

4    looking at that and struggling with it, I'll say, They're

5    used to making you taller.  If it's clear to me that they

6    know what category or what type of item it is, I'll skip

7    the stimulus cue, as in, for example, number 47,

8    accordion.

9        Q    Uh-huh.

10       A    Right.

11       Q    And again, you don't know which ones you did or

12   did not skip a stimulus cue on?

13       A    Chances are if they -- it's pretty standard to

14   give all stimulus cues, again, unless for some reason

15   they indicate that they don't -- it's indicated that they

16   don't recognize -- I'm sorry, it's indicated that they

17   recognize what the item is, so, for example, 47.  So --

18   but you're right, from the absence of the checks here in

19   the center column, I can't identify specifically which

20   ones I didn't give as stimulus cues.

21       Q    Is there a difference in performance on the

22   Boston Naming Test for individuals who speak English as a

23   second language?

24       A    It's possible.  It probably depends upon the age

25   at which English became -- they started learning English.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 105

1            "Receptive language was notable for

2            auditory and reading comprehension

3            that is below expectation considering

4            educational attainment, albeit average

5            for his age."

6            Would you agree that he does not have an

7       impairment or deficit in receptive language functioning?

8       A    Not relative to the normative sampling, yes.

9       Q    Okay.  And there are, again, measures of that in

10      the neuropsychological tests that you conducted, correct?

11      A    Yes.

12      Q    So, for example, on the Woodcock-Johnson test on

13      page 14, that would be the -- I think we mentioned this

14      before, but that would be the understanding directions

15      subtest?

16      A    Yes.

17      Q    All right.  And that was at the 49th percentile.

18      A    Yes, but the grade estimate was 10.4.  Again,

19      it's relative to his other performances.

20      Q    And then the other one is the WAIS verbal

21      comprehension index as well, which is also a measure of

22      receptive language function, correct?

23      A    Not necessarily, no.

24      Q    No?

25      A    It's a composite of various WAIS verbal

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1        A    Can I point it?

2        Q    Absolutely.  I got these three.

3        A    This one here, this one.

4        Q    This one here?

5        A    Yes.

6        Q    Okay.  And on those scores, the WMS-III list

7   learning immediate, those scores range in percentiles

8   from 37 to 84 percent.  What is it about those scores

9   that indicates to you that supports the conclusion that

10   he's prone to being overwhelmed when presented with too

11   much information at once?

12        A    That comes from a logical memory score, which

13   was at the 16th percentile.

14        Q    Got it.

15        A    So one -- for the logical memory, he was read a

16   story which contained a fair amount of information and

17   had to remember it.  For the list learning, he was read a

18   list of 12 words, which some would consider a lot of

19   information, but one can also use strategies in order to

20   remember those words.  Some people learn better through

21   rote, some people through contextual learning like a

22   story.

23        Q    Uh-huh.

24        A    Yeah.

25        Q    Okay.  And again, that was -- as I understand

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   it, it was, again, the comparison between the two that

2   you have a word list learned at a high rate, an above

3   average rate --

4       A   Yes.

5       Q   -- you know, from a percentile perspective,

6   84 percent --

7       A   Yes.

8       Q   -- and you've got a learning of short stories

9   unexpectedly poor at 16 percent.

10      A   Yes.

11      Q   And can you think of any reason why there would

12  be such a disparity between the two?

13      A   Well, as mentioned in the report, again, it

14  might be because of the amount of information required in

15  the story.  It could also be that he just lost

16  concentration or focus during that particular time of

17  testing, which is why we like to administer more than one

18  test on this.

19      Q   Uh-huh.

20      A   So when I draw my conclusions, I often soften

21  them with suggesting "perhaps," terms like that, rather

22  than, in this case, making a strong conclusion, because

23  as compared to, for example, his other scores, verbal

24  paired associates, which was average, list learning,

25  which was above average, the logical memory was pretty

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 110

1   low.  So it might be indicative of something or it might

2   just have been one of those kind of low scores which just

3   happens.  Generally everybody at some point --

4        Q    Uh-huh.

5        A    -- a large number of people at some point have a

6   neuropsychological testing.

7        Q    Well, let me ask you, maybe the bigger question,

8   then, is:  Based upon all the scores you have, are you of

9   the opinion that he has any particular deficit in the

10  learning and memory area?

11       A    I don't know if I made that conclusion.  Let's

12  see.  Well, I'm reading what I wrote here as far as that

13  goes.  Okay.

14            And your question again, please?

15       Q    Sure.

16            MR. TENHOFF:  Could you read it back to him.

17            (Record read.)

18            THE WITNESS:  I'd say that he -- based on this,

19  one could say that he learns better through, for example,

20  rote than through just having a lot of information told

21  to him at once and having to digest that information.  I

22  would say it's a weakness.  I wouldn't say that it's some

23  sort of syndromic impairment or syndromic level of

24  impairment.  I wouldn't say it's indicative of a learning

25  disability or a memory impairment per se, but --

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 111

1   BY MR. TENHOFF:

2        Q    You would or you wouldn't?

3        A    I wouldn't.

4        Q    Okay.

5        A    But I would say that he does have difficulty in

6   this area.  Recall that the neuropsychological evaluation

7   in this case is also used for coming up with a profile of

8   strengths and weaknesses, without necessarily always

9   assigning, you know, some sort of diagnostic category.

10  This would probably be an instance of where this was an

11  area of weakness for him.  And you can -- and on page 10,

12  the second paragraph, I mention a couple of reasons why

13  this may have occurred.

14       Q    Okay.  So let's go to one final area and then we

15  can take a break for lunch, which is on the "Executive

16  Functioning area," and you want to go to page 10, if you

17  could.

18            And if you look -- are you with me there?

19       A    I'm sorry.  Is this 1 or 14 we're on?

20       Q    Let's just stick with 1.

21       A    Okay.

22       Q    I think I'm done with 14 for a while.

23       A    Okay.  Page?

24       Q    10, please.

25       A    Okay.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 112

1      Q    Are you there with me?

2      A    I'm there.

3      Q    All right.   Thank you.

4           If you'll look right above the paragraph that

5      says, "To summarize," it talks about executive abilities,

6      and it says, quote, Executive abilities are generally

7      intact, with the exception of conceptual thinking and

8      flexibility of thought, as assessed with the WCST, closed

9      quote.

10          Is that the area of executive functioning we're

11     talking about?  Is that the same as executive abilities?

12     A    Yes.  I believe they're interchangeable.

13     Q    Okay.  And would you agree with me that,

14     generally speaking, that his scores on executive

15     functioning tests were in the average or above average

16     range, with the exception of this test?

17     A    Yes.

18     Q    All right.

19     A    Actually, there were a couple of low average

20     scores on there.

21     Q    But the basis of your opinion was the Wisconsin

22     Card Sorting Test, right?

23     A    Yes.

24     Q    All right.

25     A    But looking at it now, he did also -- well, I

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 113

1    can't say that.  Yeah, that's based on the Wisconsin Card

2    Sorting Test, yes.

3        Q    All right.  And then this goes on, on page 10,

4    to say, quote:

5                On this test, Dr. Jayatilaka took an

6                unusually long time to figure out the

7                purpose of the test.  Once he

8                discovered the purpose of the task, he

9                quickly developed a successful

10               strategy, however, it was too late to

11               obtain a score that was outside of the

12               impaired range, closed quote.

13       A    Yes.

14       Q    What did you mean by that?

15       A    I don't know how else to say it besides the way

16   it says it there.  It's pretty clear that he -- there's a

17   catch to the test, and once you figure out what the test

18   is asking of you and you figure that out, you can do well

19   on it.  It took him a while, longer than usual, to figure

20   out what the test was asking of him.

21       Q    And once he did figure it out, his performance

22   improved?

23       A    His -- once he figured it out, he was able to

24   stick with it and not make a significant number of

25   errors.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1      Q    Okay.

2      A    But it took a while for him to figure it out.

3      Q    And are there two different tests for the

4  Wisconsin Card Sorting Test, one which has 64 items, one

5  which has 128 items?

6      A    That's correct.

7      Q    And did you administer the 64-item test?

8      A    The computerized 64, yes.

9      Q    I'm sorry?

10     A    Yes, the computerized version of the 64.

11     Q    Okay.  And is there any professional reason why

12  you selected the 64-item test as opposed to the 128-item

13  test?

14     A    Because it's on my computer and it's infinitely

15  easier to administer.

16     Q    Is it more the general practice in your

17  community to administer a 128-item test?

18     A    That I'm not sure.  I'm not sure how many

19  neuropsychologists use the 128 versus the 64.

20     Q    Are there any guidelines in the testing

21  protocols as to which one should be used and when?

22     A    Not that I'm aware of.

23     Q    If you had administered the 128-item test, would

24  you expect that the score that he would have achieved to

25  be much higher?

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 115

1       A   I think it would have been higher because he

2   would have had more opportunity to make up for the

3   initial poor performance.

4       Q   And the Wisconsin Card Sorting Test, does it

5   typically indicate problems in functioning with

6   over-rigidity in thinking or severation?

7       A   Yes.

8       Q   But you concluded that he actually didn't

9   demonstrate either of those problems, correct?

10      A   That's right.  If one were to just look at the

11  scores, one could make that conclusion, but having

12  administered it to him and seeing how -- why he made the

13  errors he did or why he got the scores he did, I didn't

14  come to that conclusion.

15      Q   Okay.  And the norms that you used on the

16  Wisconsin Card Sorting Test, what norms are -- did you

17  utilize on those?

18      A   They're actually built into the program, and I

19  believe they're age -- I believe they're age and

20  education stratified, but I'm not absolutely sure.

21      Q   Are those known as the Heaton norms?

22      A   Again, they're built into the program.  Bob

23  Heaton's norms, who actually developed the 64 test, I'm

24  assuming those are the ones that are used in the program.

25  I didn't actually look up any of the norms myself in the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 116

1    computer.  When the administration is finished, the

2    computer gives you a table of the normative data.

3         Q    And do you know whether it's normed not only for

4    age and education, but also for gender?

5         A    I don't recall if it's stratified based on

6    gender.

7         Q    Are those the only norms that are available for

8    the Wisconsin Card Sorting Test?

9         A    As far as I'm aware.

10            MR. TENHOFF:  Okay.  Let's go ahead and take a

11   break now.

12            (Recess taken.)

13            MR. TENHOFF:  Let's go ahead and go back on the

14   record.

15        Q    Dr. Levine, you understand you're still under

16   oath?

17        A    Yes.

18        Q    Okay, I wanted to finish with one final area in

19   your report that you mentioned, which was manual motor

20   ability.

21            If you could turn to Exhibit 1 and look at

22   page 10 with me, please.  And the second paragraph says,

23   quote:

24            Manual motor ability was impaired.

25            This was especially true for the left

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 117

1           nondominant hand.  These findings are

2           of uncertain significance as

3           Dr. Jayatilaka did not report

4           difficulty with manual activities and

5           his cognitive profile is not

6           indicative of right hemisphere

7           pathology, closed quote.

8           What does that last sentence mean?

9      A    Well, essentially, the findings just kind of

10   stand by themselves, without any sort of congruent

11   findings anywhere else.  His -- the test that that's

12   based on -- ah, it's two tests.  One is a pegboard test,

13   in which they're required to place pegs in a pegboard,

14   and the other is a -- called the finger tapping test,

15   which they press down on a -- kind of a little lever with

16   their finger as quickly as they can within ten -- in a

17   ten-second time limit.  And his scores were actually

18   quite low, but they didn't really seem to correlate with

19   any other findings.  They just kind of stood by

20   themselves.

21     Q    Was that motor ability or impaired motor ability

22   any basis for your recommendation that he be given double

23   the amount of time on the USMLE?

24     A    I don't think that played in.  Let's see.

25           No.  You know, motor tests, in general, in a

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 118

1   neuropsychological evaluation are meant to look for

2   asymmetric findings which might be indicative of

3   pathology in one hemisphere or the other.  So, for

4   instance, Dr. Jayatilaka, he had 40 some odd percentile

5   with his -- excuse me, 46 percentile with his right

6   dominant hand on the group pegboard and then an impaired

7   2nd percentile on the nondominant left hand, which is a

8   rather significant discrepancy.  A discrepancy like that,

9   we'd expect some rather significant -- we'd expect some

10  sort of findings, you know, neuropathology as the basis

11  for that.  But there were no other test findings or no

12  neuroimaging findings that would corroborate that.

13       Q   Well, in terms of the USMLE - again, just to be

14  clear - was that any basis for any double time

15  accommodation on the --

16       A   I don't think motor functioning necessarily in

17  this instance would be an issue with his capacity to

18  complete the test in a timely fashion.

19       Q   Right.  And the reason I ask that is because if

20  you look, his Woodcock-Johnson III writing fluency scores

21  are in the 94th percentile.

22       A   Right.

23       Q   So that's actually a measure of writing fluency,

24  correct?

25       A   Right.  Not necessarily the same thing.  You

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 119

1   know, putting a peg in a hole versus writing as many very

2   short sentences as you can within a time limit aren't

3   necessarily assessing the same ability, which is why

4   they're not really kind of mentioned together, I believe.

5        Q    Now, as I understand it, an injury to the right

6   side of the brain could affect motor skills on the

7   left-hand side of the body, like the left hand motor

8   skills and visa versa, correct?

9        A    That's correct, yes.

10       Q    All right.  But if there were that kind of

11  neuropsychological injury, you would assume that it would

12  be, you know, consistent, in other words, if it was to

13  the right hemisphere, that those motor skills on the left

14  side would be impaired in different measures, correct?

15       A    Well, it really depends where the injury was.

16  The left hemisphere -- or, rather, the right hemisphere

17  is kind of a large place with regards to the number of

18  functions it subserves.

19       Q    Uh-huh.

20       A    So if one were to have, for example, an injury

21  towards the front of the brain on the right side, one

22  would expect motor deficits on the left.

23       Q    Okay.  And the reason I ask is because the two

24  tests -- if you look on the motor/psychomotor processing

25  speed, you have two tests of the right hand, one the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   group pegboard, one the finger tapping test.  The group

2   pegboard is showing a 46 percentile and the finger

3   tapping test is showing a 3rd percentile.

4        A    Uh-huh.

5        Q    Do you have any understanding as to why there

6   would be such a discrepancy there?

7        A    It's just odd.  These discrepancies happen on a

8   neuropsychological evaluation, and one has to make a

9   decision about how clinically relevant they are.  I don't

10  necessarily, based again on all the other information I

11  had, think that that was necessarily a significant

12  finding.  Overall, I mean, it's curious, but it doesn't

13  seem to be supported -- it doesn't -- it just kind of

14  stands alone, I guess, is what I'm saying there.

15       Q    Does it cause you to question the integrity of

16  the test or the test procedure in terms of having results

17  that are inconsistent, at least with the right hand?

18       A    Not necessarily.  You know, you give all of

19  these tests across -- we saw Dr. Jayatilaka over three

20  days.  There's going to be some instances where there's

21  going to be a poor performance for -- just based on

22  becoming tired or losing concentration, and the

23  neuropsychologist has to determine whether or not that's

24  clinically relevant.

25            So sitting there in the room with him for all of

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 121

1    those hours and observing him taking these tests, I can

2    make a judgement on whether or not I felt he was putting

3    effort into a particular test or he got distracted by a

4    siren going off outside or was lost in thought.  So the

5    reason why he did poorly on a test is often left up to my

6    interpretation.

7         Q    Uh-huh.  And do you have any interpretation as

8    to why he did poorly on these tests?

9         A    These, I don't think I do.  I think I mentioned

10   that -- I just thought it was a curious finding.  Let me

11   look at what I wrote about it.  Excuse me a moment,

12   please.

13        Q    Uh-huh.

14        A    Yeah, it's curious.  I mean, it could be that

15   he's, you know, a body builder and he's got slower motor

16   skills based on overusing his hands, it could be he

17   was -- lacked motivation during that test.  It could be a

18   number of things.  But because it stood alone and there

19   was no sort of either physiological or other cognitive

20   correlations with it, I felt it was difficult to make any

21   solid interpretation of that.

22        Q    Let me go back to one thing we did cover this

23   morning, which is the DSM-IV diagnosis of cognitive

24   disability not otherwise specified.  And I went back and

25   looked at your testimony just to make sure I had it

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 122

1   correct.

2          I believe you said at the time you wrote the

3   report, Exhibit 1, it wasn't your impression that that

4   was a diagnosis, and then I asked you about sitting here

5   today, and you said you could go either way on it.  The

6   reality of this process is, I only get one chance, to

7   everyone's advantage, to ask you questions before we try

8   this case next April.

9          So let me ask you:  Sitting here today, have you

10  concluded that he does or does not have, or you would

11  diagnose him, with cognitive disability not otherwise

12  specified?

13      A   Well, let me give you somewhat of a long-winded

14  answer to that, because it's not a yes or no answer.

15          I, based on my understanding of the diagnosis,

16  would not have assigned that, based on the findings.  I

17  feel that Dr. Jayatilaka has some weaknesses; that many

18  of them may be attributable to the brain injury or the

19  head injury from 1995.  It's difficult to say, but I

20  would not assign that diagnosis.

21          Now, I am a clinician who is usually resistant

22  to assigning diagnosis, in general.  I can, however,

23  understand why somebody could assign that diagnosis,

24  because it is somewhat of a vague, ill-defined diagnosis

25  and one could interpret the findings as cognitive

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 123

1   disorder NOS if they believed that these deficits were --

2   began at the time of the head injury and are due to some

3   sort of kind of now chronic or - what's the word? -

4   persisting post-concussive symptoms.

5       Q   Okay.  But to you, the difficulty you have is,

6   it's unclear to you whether the deficits that you've

7   identified have been present throughout his life or were

8   acquired as a result of the assault in 1995; isn't that

9   right?

10      A   Yes, it's hard to make that determination.

11  Again, based on the area of the injury, if there were

12  some underlying pathology that occurred just in the area

13  of impact, the findings here are -- don't corroborate

14  that, they don't -- they're not consistent with that.

15      Q   Okay.  Take a look at page 11, Dr. Levine, in

16  your report here.  And there's a statement, which is the

17  second full sentence there, which says, quote, It is

18  unclear if his deficits have been present throughout his

19  life or were acquired in the 1995 assault, closed quote.

20          I understand that was your opinion at the time

21  you wrote the report.  Is that your opinion today?

22      A   Yes.

23      Q   On the Boston Naming Test and the other test we

24  mentioned this morning, which was the D-KEFS verbal

25  fluency for letters, are deficits that are identified by

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 124

1    those particular tests associated with or mostly

2    associated with an injury to a particular hemisphere of

3    the brain?

4         A    I would say, in general, the left hemisphere.

5         Q    And --

6         A    Depending on -- some people have language

7    dominance on the right, but they're far and few in

8    between.

9         Q    And are you aware that the injury to plaintiff's

10   skull -- or to Mr. Jayatilaka's skull, rather, was on the

11   right side of his skull?

12        A    Yes.

13        Q    And do you know what region that was?

14        A    I believe it was in the right parietal region.

15        Q    And how would you describe the right parietal

16   region?  Where is it?

17        A    It's on the right.  It's towards the rear of the

18   brain or the top dorsal surface of the brain.

19        Q    And that would be different from frontal lobe --

20        A    Yes.

21        Q    -- area of the brain, correct?

22        A    It borders the frontal lobe, but it's not --

23   yeah, they're clearly demarcated.

24        Q    Okay.  What was your -- let's go to one part of

25   your report here, which is at the very back, which is on

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 125

1    recommendations and plan.  Now, before we get to that,

2    let me ask you a couple of other questions about the

3    neuropsychological tests that you administered.

4            Is there any possibility that other

5    psychological factors have an effect on an individual's

6    scores on those particular tests?

7        A    Sure.  Absolutely.

8        Q    What other factors would contribute to that?

9        A    Lack of sleep the night before.  Anxiety.  Some

10   people might make an effort to do poorly on tests to

11   portray themselves as being impaired.  Sensory deficits,

12   poor hearing, poor sight.  Personality factors.  There

13   might be oppositional -- they might be resistant to

14   testing.  They might just lack motivation.  They might

15   not be taking the process seriously.  Effects of

16   medications might make them drowsy or maybe too aroused

17   or hyper to focus.

18       Q    Uh-huh.

19       A    Those are the best ones I can think of now.

20       Q    Okay.  And let's take personality factors.

21           And by the way, did you do any analysis of

22   whether Dr. Jayatilaka's scores on any of the neuropsych

23   tests were affected by any of these particular factors,

24   these other psychological factors?

25       A    I'm not aware of any analysis.  I'm not sure

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 126

1    what you mean by "analysis."

2         Q    Well, did you -- let me go at it another way.

3              Did you make any conclusions as to whether other

4    psychological factors could have impacted his abilities

5    or his achievements on the neuropsych test that you gave

6    to him?

7         A    I don't know.  Let's see.  I don't recall

8    reading anything in here in which I mention possibly --

9    we call them "confounds."

10        Q    You call it, I'm sorry?

11        A    Confounds.  Confounds in the testing.  I don't

12   believe I mention any in here, which in all likelihood

13   indicates that I didn't think there were any at the time.

14             In my notes, I know that it was somewhat --

15   there was somewhat of a -- his approach to the testing

16   was somewhat flippant.  Is that the right word?  It

17   wasn't sometimes taking it too seriously at first, but

18   then kind of rose to the challenge.

19             I believe that I also mention at some point in

20   my notes, in the report, that he was doing it at the

21   behest of his father; that he didn't really want to do it

22   himself, which isn't to say that he didn't put good

23   effort in.  My impression of effort, I believe, was that

24   he did put adequate effort in across tests.

25        Q    Okay.  And we'll get to that one specifically,

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 144

1        A    It's both.   There's observation across testing

2    in general and there's also tests specifically designed

3    to assess effort or, more accurately, detect people who

4    are feigning disability or feigning impairment.

5        Q    There's a couple of things in Exhibit 1 in your

6    report, and again -- let me first direct you to page 5.

7    This was something you mentioned earlier, Dr. Levine,

8    under -- this is under "Behavioral Observations."

9        A    Yes.

10       Q    Quote, The patient was cooperative with the

11   examiner, although he made it clear that he was only

12   undergoing the procedure at the behest of his parents,

13   closed quote.

14            That is something he told you?

15       A    I don't remember him saying it, but if it's in

16   here, it very likely is something he told me.

17       Q    Okay.  And then it goes on to say, quote, He

18   frequently laughed during the testing, at times appearing

19   humored by the task requirements, closed quote.

20       A    Yes.

21       Q    That was an observation as well?

22       A    That was an observation, yes.

23       Q    Okay.  And then if you'll turn to page 9 of the

24   report.  If you look under "Summary and Impressions,"

25   there in the second paragraph, the fourth sentence says,

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 145

1    quote, This may have been due to varying effort level,

2    closed quote.

3              What did you mean by that?

4         A    "A notable finding was that his performance on

5    reverse span tests was better than that of forward span

6    tests.  This may have been due to varying effort level."

7              It's somewhat atypical to find someone -- to

8    observe someone have a better performance when repeating

9    a span of digits backwards than forward, and there could

10   be a few reasons for that.  One is just practice; that

11   they learn quickly how to maintain the digits in their

12   mind.  Another can be anxiety with the test as it begins,

13   and then they get more comfortable with it.  And another

14   can be that when the test begins and they're in their

15   forward span, they're just not trying their hardest, and

16   when the test gets more difficult, they start to put more

17   effort in.  That's really not that uncommon and one of

18   the difficulties in interpreting the types of these

19   tests.

20             My -- yeah.

21        Q    I'm sorry, I didn't mean to cut you off.

22        A    My observation -- I believe this is based on my

23   observation, and it ties in to the behavioral observation

24   that he was somewhat humored by the test, not taking them

25   seriously at first, but that when they became difficult,

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 146

1    he rose to the challenge and wanted to do well or wanted

2    to complete the test.

3        Q    You went on to say in that paragraph, quote,

4    This is reflective of his overall approach during

5    testing.  In most instances, when he realized that he had

6    to put additional effort to do well, he did, closed

7    quote.

8        A    Yes, that's basically what I was saying.

9        Q    Okay.  So that sort of varying levels of effort

10   was observed by you at various times during the

11   neuropsychological testing.

12       A    Yes.

13       Q    And was it also sort of a pattern that you were

14   observing that the more difficult the test, the harder he

15   worked at it?

16       A    It seemed that when the test became more

17   difficult, he kind of perked up and would put more effort

18   in.  That's to the best of my recollection.  This is,

19   again, not such an uncommon thing with some people that

20   are resistant to testing.

21       Q    Uh-huh.  Were there any -- we've talked about

22   sort of efforts and motivation and anxiety and

23   personality factors.  You listed a number of other

24   confounds.

25            Was there any evidence in -- that came to your

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 149

1    testing of any headaches or any other medical conditions

2    that were affecting Dr. Jayatilaka?

3         A    No.

4         Q    There's another recommendation -- the

5    recommendation you have on the page prior to that, on

6    Exhibit 1, which is the recommendation for extended time

7    for completion of current and future written medical

8    examinations, was that your recommendation?  Did you

9    write that?

10        A    I believe, again, this was written by

11   Dr. Dushenko.  I'm not necessarily in disagreement with

12   it, but the recommendations, I believe, were generally

13   written by Dr. Dushenko, looking at the language and the

14   actual recommendations themselves, yes.

15        Q    Did you do any analysis as to whether there was

16   a correlation between what's requested here, the extended

17   time for completion of testing, and the results of your

18   neuropsychological tests?

19        A    I'm not sure what you mean by that question.

20        Q    Yeah, let me back up a little bit.

21             In terms of functional limitation, do you

22   believe that Dr. Jayatilaka has deficits that limit his

23   ability to read, as compared to most people?

24        A    Can you define "reading" for me?  I know it

25   sounds like a very difficult -- well, let me answer it in

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 150

1   my convoluted way.

2            Reading, per se, he doesn't have difficulty in

3   reading a word.  He doesn't have difficulty reading

4   things quickly.  But according to these results, he has a

5   relative difficulty in digesting what he reads, which

6   would mean that he would have to go back and reread in

7   order to understand what -- in order to digest what it is

8   in the passage he's reading.

9       Q   And do you believe that he has deficits that

10  limit his ability to write compared to most people?

11      A   His spelling was relatively low, a weakness.

12      Q   A relative weakness.

13      A   A relative weakness, yes.

14      Q   How about as compared to most people in the

15  population?

16      A   To the average person?

17      Q   Yes.

18      A   It would be within the average range.  It would

19  be comparable.

20      Q   And his ability to read, is that within the

21  average range?

22      A   It was, according to the percentiles presented

23  here, in the average range.

24      Q   In the area of executive functioning that we

25  talked about before, is there any major life activity

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 152

1      Q    Yeah.  And again, one of the hard parts of these
2  tests - and I'm not trying to confuse you here at all -
3  is that there's a difference between what you do and what
4  Vince and I do in terms of there are legal standards --
5      A    Yes.
6      Q    -- and there are medical standards.
7      A    Yes.
8      Q    And we've been spending a lot of time on medical
9  standards and the DSM-IV standards, but eventually, we've
10  got to try to translate that into the legal jargon, which
11  is not necessarily the same.
12      A    I understand.
13      Q    Okay.  So, anyway, I appreciate you giving it a
14  good shot with us.
15          There was a statement that says -- and this was
16  on the recommendations, I don't know if this came from
17  Dr. Dushenko, which says -- and this was -- if you look
18  at number 2 on the "Recommendations and Plan."
19      A    Yes.
20      Q    It says, "the latter," and he's referring to a
21  certain type of tools or programs, but it says, "The
22  latter is only rarely available with individuals who are
23  as highly functioning as Dr. Jayatilaka."
24      A    Yes.
25      Q    Closed quote.  I take it he -- Dr. Dushenko

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 153

1   wrote that?

2       A   Yes.

3       Q   And do you have any idea what he meant by that?

4   Or what did you understand it to mean?

5       A   Well, it looks like he's referring to cognitive

6   rehabilitation, face-to-face programs such as Orange

7   County -- or, rather, Orange Coast College, which those

8   programs are meant for people with traumatic head injury

9   who are essentially rehabilitating cognitive function,

10  and they're not necessarily designed for people who are

11  still independently functioning and going to school and

12  working and able to function independently in most

13  areas -- in all areas of daily life, which Dr. Jayatilaka

14  is.

15      Q   In terms of executive functioning - going back

16  again and sort of comparing it to standardized tests -

17  are you aware that Dr. Jayatilaka passed the USMLE Step 1

18  examination without any accommodation?

19      A   After ten tries.

20      Q   But you're aware that he did?

21      A   I am aware of that, yes.

22      Q   And does that affect your opinion at all with

23  regard to his executive functioning?

24      A   I don't know why that would affect my opinion

25  about executive functioning, no.

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 167

7        I, ANDREW JEREMIAH LEVINE, Ph.D., do hereby

8   declare under penalty of perjury, under the laws of the

9   United States, that I have read the foregoing transcript;

10   that I have made such corrections as noted herein, in

11   ink, initialed by me, or attached hereto; that my

12   testimony as contained herein, as corrected, is true and

13   correct.

14        EXECUTED this _____ day of _____,

15   20_____, at _____, _____.
                    (City)                    (State)

16

17

18   _____
              ANDREW JEREMIAH LEVINE, Ph.D.

19

20

21

22

23

24

25

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 168

1   STATE OF CALIFORNIA        )
                               : ss
2   COUNTY OF LOS ANGELES      )

3

4            I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6            That the foregoing deposition was taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is a true record

13  of the testimony given.

14           Before completion of the deposition, review of

15  the transcript [X] was [ ] was not requested.  If

16  requested, any changes made by the deponent (and provided

17  to the reporter) during the period allowed are appended

18  hereto.

19           I further certify that I am not interested in

20  the outcome of the action.

21           WITNESS my hand this date

22  _____.

23

24       _____

25       MONICA T. VOGELBACHER, CSR No. 6406