Exhibit C

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DRUVI JAYATILAKA, | )  No. CV09-2032 PA |
| | )      (CAx) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| NATIONAL BOARD OF MEDICAL | ) |
| EXAMINERS, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

DEPOSITION OF:

TERRANCE W. DUSHENKO, Ph.D.

Thursday, October 8, 2009

9:05 a.m.

Reported by:

MONICA T. VOGELBACHER

CSR No. 6406

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

1      Q    Okay.  And did you -- let's go -- I want to ask

2  you a couple of questions about this.

3           If you look under -- on the first page of

4  Exhibit 2, where it says, "State a specific diagnosis of

5  the disability," and it says underneath, quote, "A

6  professionally recognized diagnosis for the particular

7  category disability is expected, e.g., the DSM-IV

8  diagnostic categories for learning disorder, closed

9  quote?

10          And did you understand what that meant?

11     A    Uh-huh.  Yeah, that's also part of -- I mean, as

12  you're going over this, part of why it makes sense to me,

13  that this would have been seen after the initial report

14  was written because, as you know, there was no diagnosis

15  in the first report.

16     Q    Okay.  And there was a subsequent diagnosis in

17  the affidavit you submitted in December --

18     A    Correct.

19     Q    -- of 2008, correct?  Okay.

20          And did you also understand that as is shown in

21  the second to the last paragraph, that there was a

22  requirement to describe in detail the limitations due to

23  the diagnosed disability?

24     A    After reading it, yes.

25     Q    All right.  And if you would turn to the third

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 20

1    page, this one is entitled "Learning Disorders."

2         Do you have any understanding as to why the

3    learning disorder information was either downloaded or

4    provided to you?

5    A    I can't testify to that particularly, other than

6    that it would probably be just as a part of the entire

7    process of getting guidelines for what possible

8    disabilities might be provided diagnostically.

9    Q    If you could look on that first page, which is

10   Bates labeled SD0292 towards the bottom, and it says --

11   the third to the last paragraph reads, quote:

12        A diagnosis must be based on the

13        aggregate of test results, history and

14        level of current functioning.  It is

15        not acceptable to base a diagnosis on

16        only one or two subtests, closed

17        quote.

18   A    Right.

19   Q    Did you read that at the time you received this,

20   whenever that was?

21   A    Did I read it?  I probably did, but I doubt that

22   I would have looked at the learning disorders section

23   that thoroughly, to be quite frank with you, because by

24   the time we evaluated Dr. Jayatilaka, I think it was

25   fairly clear to us that he did not have a developmental

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 21

1    learning disorder.  There was no reason to believe that.

2    There's no school, history or evaluation of any sort or

3    any other history that identifies him as having a

4    learning disorder or anything other than acquired

5    disorder.

6        Q   In terms of just learning disorders in general,

7    would you agree with the statements that are made in that

8    particular paragraph?

9        A   The diagnosis must be made on the basis of an

10   aggregate test results?

11       Q   Yes.

12       A   Yes.

13       Q   And you would agree that it's not acceptable to

14   base a diagnosis on only one or two subtests?

15       A   Yes, I would.

16       Q   And would you also agree with the final sentence

17   on that page, quote, Tests must be appropriately normed

18   for the age of the patient and must be administered in a

19   designated standardized manner, closed quote?

20       A   Yes.  Now, again, this is with reference to

21   learning disorders specifically, correct?

22       Q   I understand.

23       A   Which is not -- I don't believe applies in this

24   situation, but -- okay.

25       Q   Also, if you could turn to the final page of

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 23

1          Now, as I understand it from Dr. Levine, that

2     these were the procedures that were administered in terms

3     of the neuropsychological assessment with Dr. Jayatilaka

4     on April 2nd, May 8th and May 15th, 2008, correct?

5          A    Yes, I believe that's correct.

6          Q    And is it also accurate that Dr. Levine is the

7     one who administered and scored those tests?

8          A    Yeah, except for the clinical interview.  And

9     there probably should have been an earlier date here

10    because I did get some history and information from

11    Dr. Jayatilaka's father prior to April 2nd and from

12    Dr. Jayatilaka, basically -- I think some of it was on

13    the phone, and they came into the office briefly to

14    provide some information as well.

15         Q    Okay.  And we're going to go through those in

16    just a minute, because were those reflected on notes that

17    you had --

18         A    Yes.

19         Q    -- in the file?

20         A    Yeah.

21         Q    And we'll talk about those.

22              But apart from those interviews, it was

23    Dr. Levine who was the one who conducted the

24    neuropsychological testing that's --

25         A    That's correct.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 24

 1     Q    -- presented here?

 2     A    Yes.

 3     Q    Remember, the one rule in deposition is you have

 4  to wait till I finish --

 5     A    Sorry.

 6     Q    -- and then you start talking, so that way -- I

 7  know you're an old hand at this, but she can only take

 8  one of us down at a time.

 9          Okay.  Since May 15th of 2008, are you aware of

10  the administration of any other neuropsychological tests

11  to Dr. Dushenko (sic)?

12     A    You mean to Dr. Jayatilaka?

13     Q    Dr. Jayatilaka, yes.  Thanks.

14     A    Am I aware of any additional testing since

15  May 15th?

16     Q    Yes.

17     A    I'm not aware of any, no.

18     Q    Okay.  Let me have you take a look at a couple

19  of these.

20     A    Sure.

21     Q    If you could put Exhibit 3 in front of you,

22  which is something entitled Neuropsychology --

23     A    Questionnaire?

24     Q    -- Questionnaire.

25          Can you tell me, what is this document?

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 25

1      A    It's simply a questionnaire used as a guideline

2    for the examiner in sitting face to face, or in some

3    cases by telephone, with a patient or with a family

4    member of a patient to collect basic information.  It's

5    history taking, basically.

6      Q    And is this your writing on the form?

7      A    Yes, it is.

8      Q    Do you know when you wrote this?  I notice

9    there's no date on this.

10     A    That's a good question.  I'm not certain if this

11   was April the 2nd or if it was prior to that, so I have

12   to apologize for that, because I'm not certain of the

13   exact date.

14     Q    Okay.  But in any event, it was prior to the

15   time that Dr. Levine conducted the neuropsychological

16   tests?

17     A    Yes, it was.

18     Q    Let me ask you about a couple of notations on

19   here --

20     A    Sure.

21     Q    -- on Exhibit 3.

22          There's a notation on page 1, if you could look

23   at that, and it has, "Highest level of formal education

24   completed," and there's a statement underneath that that

25   appears to start saying, "Never" --

TERRANCE W. DUSHENKO, Ph.D.  October 8, 2009

Page 26

1      A   I'm sorry, where are you reading from?

2      Q   I'm sorry.  Yeah, right on page 1 --

3      A   Oh.

4      Q   -- of Exhibit 3.

5      A   Okay.

6      Q   If you could take a look, it's right here.  That

7   sentence that's written underneath the statement,

8   "Highest level of formal education completed," what does

9   that say?

10     A   It says -- well, it's abbreviated.  It says,

11  "Med school," meaning medical school, "internship, then

12  exam.  Never that motivated until recently and hated

13  tests."

14     Q   Was that something that Dr. Jayatilaka related

15  to you?

16     A   Yes.

17     Q   What did he say?

18     A   I think something -- basically, I paraphrased

19  what he said there.

20     Q   Did you have any understanding as to what he

21  meant by "motivated," as to what?

22     A   My understanding was that he was not that

23  motivated when it came to examinations; that it was

24  difficult for him and he did not -- he was just not

25  motivated to do it.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 27

1      Q    Did he explain to you what he meant by "never

2    that motivated"?

3      A    I don't recall that specific point in time.

4      Q    Let's go ahead and turn to, if you could --

5    there's page SD0299.  And there's a -- one of the items

6    that's checked under the heading, "The following may

7    affect or involve brain functioning.  Please check any

8    you have had."

9           You checked the item "Been a heavy drinker for

10   an extended period of time," parentheses, "years," and

11   then you wrote something after that.  What did you write

12   after that?

13     A    And then it says weekends.  It's an abbreviation

14   for weekends.

15     Q    Then it says, "Current amount of alcohol

16   consumed."  What does that say?

17     A    "Six Jack/Coke."

18     Q    And what is it that Dr. Jayatilaka told you

19   about his drinking patterns?

20     A    That on some weekends, that he did indulge in

21   binge drinking, and that he would -- that was the amount

22   that he would drink when he was drinking heavily.

23     Q    There's a statement on the right that looks like

24   it says, "A lot equals binge (not called that)."

25           What does that refer to?

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 28

1      A    He didn't call it binge drinking, I referred to
2    it that way.   In other words, when he said he drank a
3    lot, I asked him what that meant, and he said it was
4    weekends -- essentially, it was weekends only, and that
5    when he did drink on weekends, that it was Jack and Coke.
6            And then the rest -- do you want me to tell you
7    the rest of that as well?
8      Q    Sure.
9      A    It says it's a Sri Lankan -- basically, when
10   he would drink a lot, meaning what he was referring to
11   was, it's a cultural phenomenon.   He did indicate to me
12   at a later time as well, that especially when he's with
13   relatives or back in Sri Lanka, that he -- is when he
14   drinks the most.
15     Q    Did you draw a conclusion that those were
16   examples of binge drinking?   Is that why you wrote the
17   word "binge"?
18     A    Yeah, I put the word "binge" in there because he
19   did not indicate to me at any point in time during the
20   evaluation that he was a daily drinker or a regular
21   drinker, but that when he did drink, he tended to drink a
22   lot, and the amount that he drank was enough that I would
23   identify it as binge drinking.
24     Q    So let's go to the next page and -- actually, go
25   two pages past that.   I'll ask you about this next

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

1    he's changed, that he's more withdrawn, and that he does

2    not interact as much at all.

3        Q    Okay.  Let me refer you to the next page of

4    notes I'm going to ask you a couple of questions about.

5    That's Exhibit Number 4.

6             Could you take a moment and tell me whether

7    you -- it's right in front of you there.

8        A    Okay.

9        Q    Do you recognize that document?

10       A    Yes.

11       Q    What is that?

12       A    It's a page of written notes that I took during

13   the same interviews.  It's actually part of the same --

14   the back sheet of this.

15       Q    So you're not sure when you actually took that?

16       A    Well, no, it was taken at the same time as

17   this -- as Exhibit 3.

18       Q    Right.

19       A    And, yes, it was taken either at the end of

20   March or the 1st -- 2nd of April.

21       Q    Okay.  And I won't go through every part of

22   this, but can you tell me what he recanted to you about

23   the incident in Guadalajara.

24       A    Sure.  What he said is that he initially did not

25   remember it, but that he eventually did remember pretty

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 32

1   much all of the details of what occurred, and that when

2   he left a club in Guadalajara with a friend of his that

3   was drunk, that somebody jumped him from behind,

4   apparently hit him in the back of the head with a gun,

5   which resulted in the depressed skull fracture.  He also

6   believed that he was shot at, and that a bullet grazed

7   his skull.  He was apparently was hit by, he believes,

8   two cars, and flew over the hood of one and was run over

9   by another.

10          When he was able to return to Long Beach the

11   next day, he was fairly certain that his shoulder had

12   been severely damaged as well, but apparently, that was

13   not the case.  He was accurate about the depressed skull

14   fracture, and unfortunately, underwent surgery at

15   St. Mary's.

16      Q    And a couple of notes on that.

17          Did he recount to you that he flew home on a

18   commercial airline the following day after this occurred?

19      A    Correct.  He had a roommate with him that

20   accompanied him back to Long Beach because he did not

21   want to undergo the medical intervention they were

22   proposing in Guadalajara.

23      Q    Okay.  And he was in the hospital -- he told you

24   he was in the hospital for five to seven days, although

25   he couldn't recall?

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 33

1        A    That's right.

2        Q    And what is this reference to the next day

3    playing basketball?

4        A    It was part of what I think Dr. Jayatilaka would

5    acknowledge himself is his own bravado; that he was proud

6    of the fact that right after he got out of the hospital,

7    he was able to play basketball the next day, even though

8    he still had staples in his head.

9        Q    Okay.  And that's what he recounted to you?

10       A    Yes.

11       Q    Okay.  Let me have you take a look at Exhibit 5

12   as well, which is also in front of you there.

13            All right.  Could you take a look at this and

14   tell me if you recognize this document.

15       A    Yes.

16       Q    This exhibit.

17            What is this?

18       A    These are also notes that I took, and this was

19   in conversation with Druvi directly before the evaluation

20   process.

21       Q    Do you know if these were -- in terms of time,

22   were these taken before or after the notes we just looked

23   at?

24       A    They were either taken at the same time or they

25   were taken before.  I'm not certain.  I would believe --

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 47

1            (Defendant Exhibit 22 was marked

2            for identification by the reporter.)

3            (Defendant Exhibit 23 was marked

4            for identification by the reporter.)

5            THE WITNESS:  Is this in any way substantively

6    different from the other 5/21 report?

7    BY MR. TENHOFF:

8        Q   I don't believe it is, but I was going to ask

9    you that question.  So let me ask you --

10       A   What I don't see here is the 5/30 report.

11       Q   Right, and I'll show you the 5/30 report in a

12   minute.

13       A   Okay.

14       Q   I'm just trying, at this point, to understand

15   what was actually submitted to the NBME as opposed to a

16   separate report.

17       A   Okay.

18       Q   If you could take a look at Exhibit 22 first,

19   which is the affidavit.

20           And do you recognize this document?

21       A   Yes.

22       Q   And is this your signature on the second page of

23   it?

24       A   Yes, it is.

25       Q   Okay.  And, to your knowledge, was this sent to

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

1   Dr. -- from Dr. -- I'm sorry, from Mr. Nowak's office.

2   And he asked us to review it and take a look at what we

3   agreed, disagreed with and what we needed or wanted to do

4   to make it read more accurately, so it went from the

5   original copy that he had sent to us to our revision,

6   then went back to him and then went on.

7        Q   And do you have any copies of the original

8   versions of this document?

9        A   I probably do.

10       Q   While you're looking for that, Dr. Dushenko, I

11  also want to ask you, what was the purpose of submitting

12  an affidavit at that point in time?

13       A   To be quite frank with you, I think you're going

14  to have to refer to Mr. Nowak because I don't recall what

15  the purpose of it was at that point.

16           Here it is, I think.  Yeah.

17       Q   Okay.  And do the notes here reflect your

18  changes?

19       A   Yes.

20       Q   Okay.  And if I'm reading this correctly, the

21  diagnosis of -- the DSM-IV diagnosis of cognitive

22  disorder NOS was in the original draft that was proposed

23  to you by Mr. Nowak?

24       A   I don't recall --

25       Q   I can show you --

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 50

1        A    -- but it could be.

2        Q    I don't want to take this out of your file, but

3   I do want to get --

4        A    It probably is --

5        Q    -- a copy of that.

6        A    -- because we had already -- prior to this, we

7   had already given -- submitted this diagnosis, I believe,

8   to Dr. Farmer.  So that's probably accurate.

9        Q    Okay.  And would you agree with me that the

10  affidavit that was ultimately submitted, which is

11  Exhibit 22 in front of you, was the first submission to

12  the NBME that there was a DSM-IV diagnosis?

13       A    I don't know that that's accurate because I

14  don't know whether the information we sent back to

15  Dr. Farmer went to anyone else in the NBME or not.

16       Q    What did you send to Dr. Farmer?

17            I'm going to hand this back to you --

18       A    Sure.

19       Q    -- for your file, Doctor, which is --

20       A    Sure.

21       Q    -- the draft declaration -- or affidavit,

22  rather.

23       A    I believe this is a draft version of it.  The

24  final -- here we are.  This is the same thing on the

25  letterhead, if you want.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 53

1   front of you Exhibit 14.

2        A    Can I ask you a question, if you don't mind?

3        Q    Absolutely.

4        A    The copy you gave me here, Exhibit 23?

5        Q    Yes.

6        A    This was submitted to the board in December of

7   2008; is that correct?

8        Q    That is correct?

9        A    Okay.  So -- all right.

10        Q    In other words --

11        A    What I'm wondering is whether or not they

12   requested an additional copy of the report and my office

13   manager sent them a draft copy rather than the final

14   copy.

15        Q    Yeah.  The essence of it -- and I'm not trying

16   to be tricky here, but --

17        A    No, I understand.

18        Q    -- the fact is that along with your affidavit in

19   December of 2008, the same May 21st report was submitted

20   to the National Board.  And we're aware that after we

21   received the subpoenaed documents from your files, that

22   there was a subsequent report dated May 30th of 2008,

23   which we hadn't seen until we received documents from

24   your office.

25             And do you have any idea why it is that the May

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 54

1    30th report -- and I'll have you take a look at

2    Exhibit 14, which is in front of you.

3         A    Sure.

4         Q    And my question to you there is:  Do you have

5    any idea why the May 30th report was not submitted?

6         A    I do not.  In fact, the only answer I can give

7    you to that is that if the -- if only the May 21st report

8    was sent, not the May 30th one, that there was a mistake,

9    because the May 30th one is, obviously, the revised

10   report.  And, no, so I don't know why the May 21st one

11   was sent and not the May 30th report.

12        Q    Okay.  So let me ask you to put Exhibit 1 and

13   Exhibit 14 side by side.

14        A    Sure.

15        Q    Exhibit 1 being the original report, May 21st of

16   2008, and then Exhibit 14, which is the one dated May

17   30th of 2008.  And if you'll turn with me to page 4 of

18   each document.

19             And as I compare these -- okay, are you with me

20   there?

21        A    Uh-huh.

22        Q    All right.  If you take a look at SD0263, which

23   is on -- should be -- let's see, you should have that on

24   Exhibit 14.  Let's make sure you've got --

25        A    Okay.

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 55

1        Q    Okay?

2        A    Uh-huh.

3        Q    Now, if you look, the following statements are

4    contained on Exhibit 14 and they're not on Exhibit 1.

5        A    Right.

6        Q    And so here are the statements that I understand

7    are different.

8             First of all, on Exhibit 14, five lines up,

9    quote, He states that he notices the apnea now primarily

10   after episodes of heavy alcohol use, closed quote.

11            The last sentence of that paragraph, quote,

12   While he does not call himself alcoholic, he describes

13   extended periods of heavy drinking, with very poor and

14   restless sleep accompanying many drinking bouts, closed

15   quote.

16            And then under "Personal Habits," the second

17   full sentence, quote, He identifies periods of heavy

18   alcohol use as above, but feels he is able to control

19   when and how to indulge, and attributes much of the

20   heavier usage to cultural factors, closed quote?

21            First, do you know why this language is included

22   in Exhibit 14, but not Exhibit 1?

23       A    I don't know why it was not included in the

24   first one.  I know it was included in the second one

25   simply to address that issue because it was one that he

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 56

1    brought up a fair amount in the actual interview, and I

2    felt it was important to address it and identify that

3    while he's got issues of heavy drinking, he's not

4    alcoholic, which the rest of that paragraph you were just

5    reading, of course, elucidates.  So that was the purpose

6    of having it in there.

7           It was refining and, obviously, revising the

8    initial report.  Typically, when we do that, what's going

9    on, of course, is correcting everything from

10   typographical errors to anything that may be substantive.

11   I don't know if there's anything else substantively

12   changed in that report or not.

13       Q   Yeah, let's take a look at page 6.  And this is

14   a slightly different change --

15       A   Okay.

16       Q   -- where something that was in the first version

17   was taken out of the second version.

18       A   Okay.

19       Q   And in particular, take a look first at Exhibit

20   Number 1, which is the one that was submitted.

21       A   Uh-huh.

22       Q   And if you'll look under "Achievement Testing,"

23   the second full paragraph states that, quote:

24           Although his scores still fell within

25           the average range when compared to

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 57

1              individuals from his age group, it is

2              quite possible that they reflect

3              sequelae of his traumatic head injury,

4              closed quote.

5         Now, if you look at Exhibit 14, that sentence is

6    not included in the subsequent May 30th report.  Why is

7    that?

8         A    That's a good question.  Let me take a look and

9    see.

10             That's a good question.  This is -- this part

11   was written by Dr. Levine, so I don't know what the

12   intent was of taking that out and I don't recall

13   discussion between us.  In this case, obviously, it isn't

14   to his benefit, to Dr. Jayatilaka's benefit, for us to

15   take that information out in any observable way that I

16   can ascertain right now.

17             It may have been -- and all I can do is

18   speculate.  It may have been that Dr. Levine did not want

19   to be appearing to overstate the case, but I -- that's

20   pure speculation.  I don't know.

21        Q    So you don't know.

22        A    I don't know.

23        Q    Okay.  Let me ask you about one more here, and

24   then we'll go ahead and take a break.

25             If you'll look at the -- turn to the final --

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 58

1    I'm sorry page 12 of --

2         A    Of the original document?

3         Q    Of both of them, yeah.

4         A    Page 12, okay.

5         Q    All right.  And if you'll turn to, also, page 12

6    of Exhibit 14.

7              Now, first of all, I notice that while Exhibit

8    1, which was submitted to the National Board, is signed

9    by both you and Dr. Levine, that Exhibit 14 is signed

10   only by you.  Do you know why that is?

11        A    No, I don't.  That's a good question.

12        Q    I'd also note that Exhibit 14 has two additional

13   recommendations.  And I understand from Dr. Levine that

14   you wrote these recommendations 1 through 7 or 1 through

15   9?

16        A    Well, we reviewed them together and went over

17   them with him, and he provided some input.  And I drafted

18   the final copy, I believe, yes.

19        Q    And if you'll look, items 8 and 9 are in the

20   May 30th report, but they are not included in the --

21   Exhibit 1, the report submitted to the NBME.  Do you know

22   why that is?

23        A    No, I do not.  And this is information that, if

24   anything, would be helpful to Dr. Jayatilaka.  So, no, I

25   can't specify for you why it isn't there.

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 59

1      Q    Do you know what was actually done with the

2    May 30th report?  Was it provided to anybody?

3      A    My understanding, as I said, was that it was

4    submitted to the Board.  But apparently, if you don't

5    have a copy of it or did not before this, then that's not

6    the case.

7      Q    Do you know whether your office made two

8    submissions?  Well, let me back up a bit.

9           For the report that was submitted to the Board,

10   who actually did the submission, your office or somebody

11   else?

12     A    My office manager did, yeah.

13     Q    And so you don't know whether Exhibit 14 was

14   ever submitted to the Board.

15     A    No, I -- apparently not.  I thought I did, but

16   apparently not.

17     Q    Okay.  Let's go ahead and take a quick break.

18     A    Okay.

19     Q    This is a good breaking spot.  Thanks.

20          (Recess taken.)

21          MR. TENHOFF:  Let's go ahead and go back on the

22   record.

23     Q    Dr. Dushenko, are you familiar with the DSM-IV?

24     A    Yes, I am.

25     Q    What is it?

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 60

 1      A    It's the diagnostic manual put together by the

 2   American Psychiatric & Psychological Association to

 3   provide for presumed diagnostic categorization of pretty

 4   much any emotional disorder.

 5      Q    And I think the DSM-IV uses the term "mental

 6   disorder," correct?

 7      A    In many places I think it does, yes.

 8      Q    Yes, okay.

 9           And if you would turn to Exhibit 8 with me,

10   which is -- we're using just a portion of the DSM-IV that

11   we did with Dr. Levine.

12           And if you can take a look here, there's a page

13   that is the third page in and it is under "Definition of

14   Mental Disorder."  Do you see that?

15      A    Okay.  Uh-huh.  Yes, I do.  Sorry.

16      Q    Okay.  And it says, quote:

17           In DSM-IV, each of the mental

18           disorders is conceptualized as a

19           clinically significant behavioral or

20           psychological syndrome or pattern that

21           occurs in an individual and that is

22           associated with present distress,

23           e.g., a painful symptom or disability,

24           i.e., impairment in one or more

25           important areas of functioning or with

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 61

1          a significantly increased risk of

2          suffering death, pain, disability or

3          important loss of freedom, closed

4          quote.

5          Would you agree with me that that's a pretty

6     standard definition of a mental disorder?

7     A    Well, no, it's the DSM's definition.  It's their

8     standard definition, yes.

9     Q    Okay.  And so at least as they use the term

10    "disability," again just as the way DSM-IV uses it, is

11    that it requires an impairment in one or more important

12    areas of functioning, correct?

13    A    Correct.

14    Q    Okay.  We also talked yesterday with Dr. Levine

15    about the difference between a relative area of weakness

16    and a deficit or an impairment.  Are you familiar with

17    the use of those terms?

18    A    Yes.

19    Q    And how do you draw the distinction between

20    those?

21    A    Well, "relative" is, with each individual,

22    relative to what their capability was, in general, or

23    with the population -- relative to the population

24    overall.  And the reality in this particular circumstance

25    is that it certainly appears that for Dr. Jayatilaka,

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 62

1   that there are certain areas of functioning that,

2   relative to his premorbid functioning, are not at the

3   place that they were previously, and they are, in fact,

4   at a level that is below the general standard for the

5   population as well.

6         Q   Okay.  In terms of the neuropsychological

7   testing that was conducted -- and this would be back in

8   Exhibit Number 1.  Let's take a look at these, see if I

9   understand these correctly.

10            And again, I want to look at sort of functional

11   areas.  Do you have that in hand?

12        A   I do.

13        Q   Are you looking at something else in your file?

14        A   Yeah.  If you don't mind, what I'm going to do

15   is haul out a copy of the same report.

16        Q   And yesterday, just so you know, Dr. Levine had

17   testified that -- we were trying to get our definitions

18   straight between what is considered average when we're

19   talking about neuropsychological test results and below

20   average and above average, and in his view, that when

21   you're looking at percentiles in particular, the

22   percentiles from 9 to 24 are in the low average range,

23   the average range is 25 to 75th percentile, and above

24   average is 76 to the 91st percentile.

25            Would you agree with that characterization?

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 63

1      A    Well, that's the characterization that's given

2  to us by the statistical format that's used for making

3  actuarial data, meaning that -- needless to say, somebody

4  who's operating at the 24th percentile is probably not

5  doing as well as somebody at the 74th percentile, but

6  theoretically, they're both still in the average range.

7      Q    Okay.  But you would agree with those numerical

8  cutoffs for those particular --

9      A    Yeah, it's not a matter of --

10     Q    Hang on.

11          You would agree with those numerical cutoffs for

12  those descriptors, at least as they relate to

13  neuropsychological tests?

14     A    I would agree that those are the standards that

15  are given to us, yes.

16     Q    Okay.  So let's take a look at Exhibit 1, and in

17  particular let's look first at the IQ test here.  And

18  this is -- if you'll look, there's a chart at the back

19  I'm going to ask you some questions about.

20     A    Sure.

21     Q    It begins on page 14.

22     A    Okay.

23     Q    And I won't go through these in a lot of detail

24  because we covered these in significant detail with

25  Dr. Levine yesterday.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 66

1     Q   Right.  And again, I'm not going to ask you

2   about every score in the test because we spent a long

3   time with Dr. Levine on those yesterday.

4     A   Okay.  Some of those are not in the standard

5   range.

6     Q   I understand.

7     A   Okay.

8     Q   And we had --

9     A   I'm sorry.

10    Q   -- a long discussion with Dr. Levine about each

11  one of those --

12    A   Okay.

13    Q   -- in intimate, gory detail yesterday.

14    A   All right.

15    Q   So I'm sparing you a little bit of that.

16    A   Thank you.

17    Q   In terms of DSM-IV diagnoses, Dr. Levine

18  testified yesterday that in his opinion, that

19  Dr. Jayatilaka did not meet the diagnostic criteria for a

20  learning disability as set forth in the DSM-IV.  Would

21  you agree with that?

22    A   For a learning disability?

23    Q   Yes.

24    A   I would agree with that, yes.

25    Q   Dr. Levine also testified that in his opinion,

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 67

1  that Dr. Jayatilaka did not meet the diagnostic criteria

2  for a reading disorder as set forth in DSM-IV.  Would you

3  agree with that?

4       A   Yes, I would.

5       Q   Dr. Levine also testified yesterday that in his

6  opinion, that Dr. Jayatilaka did not meet the diagnostic

7  criteria for mixed receptive-expressive language disorder

8  as set forth in the DSM-IV.  Would you agree with that

9  opinion?

10      A   Yes, I would.

11      Q   And I know we have the affidavit for cognitive

12  disorder not otherwise specified, and we'll get to it in

13  just a minute, but have you ever reached an other -- or

14  an opinion that Dr. Jayatilaka has any other disability

15  as that term is defined or those conditions are defined

16  in the DSM-IV?

17      A   Reword the question.  I'm not sure what you're

18  asking.

19      Q   Sure.

20          Apart from the diagnosis set forth in your

21  affidavit of cognitive disorder not otherwise specified,

22  have you ever diagnosed Dr. Jayatilaka with any other

23  disorder pursuant to the DSM-IV?

24      A   No.  We do not have diagnostic criteria that

25  effectively address what is going on with him.  It's, I

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 68

1    think, not only viable but likely that at some point in

2    the future that will be the case.  It doesn't exist right

3    now.

4         Q    Okay.  Let's take a look at the DSM-IV criteria

5    for cognitive disorder not otherwise specified, and for

6    that one -- actually, let me ask you one question before

7    we get to that.

8              Were you aware at any point in time prior to

9    today that in submitting his application for

10   accommodation to the National Board of Medical Examiners,

11   Dr. Jayatilaka represented that he had a reading

12   disorder?

13        A    No, I was not.

14        Q    Were you aware that in connection with his

15   application for accommodation to the NBME, that he

16   represented that he had a learning disability?

17        A    That he represented that?  Not anybody else

18   submitting information of that sort?

19        Q    Right.

20        A    No, I'm not aware of that.

21        Q    And were you aware, prior to today, that in

22   connection with his application to the National Board of

23   Medical Examiners, that Dr. Jayatilaka represented that

24   he had mixed receptive-expressive language disorder?

25        A    No, I was not aware of that.

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 69

1        Q    He submitted an application in July of 2008 to

2    the National Board of Medical Examiners.  I assume you

3    haven't seen that?

4        A    No.

5        Q    Okay.  So let's go back to Exhibit 8, which is

6    the DSM-IV.  And here I'd like to turn to page 163.

7        A    Okay, I've got it.

8        Q    Okay.  And so this is 294.9, "Cognitive Disorder

9    Not Otherwise Specified."  That was, in fact, the

10   diagnosis that you set forth in your affidavit?

11       A    That's correct.

12       Q    Okay.  And so it says, quote:

13            This category is for disorders that

14            are characterized by cognitive

15            dysfunction presumed to be due to the

16            direct physiological effect of a

17            general medical condition but do not

18            meet criteria for any of the specific

19            deliriums, dementias or amnestic

20            disorders listed in this section and

21            that are not better classified,

22            essentially, elsewhere, closed quote.

23            Would you agree that that's the diagnostic

24   criteria for this particular disorder?

25       A    Yes.

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 70

1        Q    All right.  And would you agree with me that

2    the -- in order to meet the diagnostic criteria for this

3    disorder, that the cognitive dysfunction is caused by a

4    general medical condition?

5        A    Yes.

6        Q    All right.  So let's talk first about the

7    medical condition, in your opinion, for Dr. Jayatilaka.

8             I assume the medical condition you're referring

9    to is the 1995 skull fracture that he suffered?

10       A    That's correct.

11       Q    And you're aware that the various MRIs that have

12   been done through the years since 1995 on Dr. Jayatilaka

13   do not reveal any brain injury; is that correct?

14       A    I am.  And, in fact, that's one of the major

15   challenges in neurology, in general, these days,

16   especially with post-concussive injuries.  As you know,

17   Dr. Jayatilaka suffered two or possibly three prior

18   concussions, and virtually all the data that's

19   accumulating on concussions these days indicates that

20   their effects tend to be cumulative.

21            It's -- I think the one thing that's not in

22   dispute here is that he suffered a head injury in that

23   incident in Guadalajara, and it did require surgical

24   intervention.  I'm not aware of there being a

25   post-concussion diagnosis given at that time.  At the

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 71

1  same time, I don't think you'd likely find anyone who

2  would argue that that didn't occur.  The reality is, I

3  think that some of his functioning has changed since that

4  time, and it's difficult to attribute it to anything

5  other than that, frankly.

6      Q   And we'll get to that part in a minute --

7      A   Sure.

8      Q   -- in terms of the cause and effect.  But I want

9  to just know, in terms of the injury, does it concern you

10 at all that the -- well, let me back up.

11         Have you ever seen any medical records that show

12 that - or delineate - that there was an injury to his

13 brain as opposed to his skull?

14     A   Any medical records that specify that?

15     Q   Yes.

16     A   Not that I recall.

17     Q   Okay.

18     A   No.

19     Q   And I know you're not a medical doctor --

20     A   Right.

21     Q   -- and I won't ask you a medical opinion, but is

22 it possible that a skull can be fractured without

23 damaging the brain?

24     A   I have never heard of such a thing happening.  I

25 think you would be hard pressed to find somebody who

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 74

1   set of scores when it comes to the processing speed of

2   verbal information specifically as compared to everything

3   else, it doesn't make sense it's anything other than

4   related to an injury.  And you can have -- we all have

5   strengths and weaknesses, but there's such a huge

6   discrepancy between that and the rest of his test data.

7       Q   Let me ask you to turn to report Exhibit 1 and

8   have you turn to page 11.

9           And if you'll look, the third sentence at the

10  top of the page says, quote, It is unclear if his

11  deficits have been present throughout his life or were

12  acquired in the 1995 assault, closed quote.

13          Did you write that?

14      A   I don't know whether I wrote it or whether it

15  was written with Dr. Levine and I in conjunction, but

16  obviously, I'm ultimately responsible for it, as is he.

17      Q   And did you agree with that statement at the

18  time that you submitted the report and signed it?

19      A   Uh-huh.

20          THE REPORTER:  "Yes"?

21          THE WITNESS:  Yes.  Sorry.

22  BY MR. TENHOFF:

23      Q   And so, has your opinion changed since that

24  time?

25      A   No.  I think what I've been doing in this case

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 75

1   is making a statement that it's not clear overall that he

2   is -- what his capabilities have been overall, but, no, I

3   believe that the problems that he's got are a consequence

4   of the injury.

5       Q   Okay.  Because there's a difference here, you

6   understand, that in May of 2008 your words are, it's

7   unclear whether they were present throughout his life or

8   they were acquired in the 1995 assault.  And is your

9   testimony here today, under oath, that you now believe

10  that his deficits were, in fact, acquired in the 1995

11  assault?

12      A   What I believe is that in going over the data

13  and going over the data and looking at the overall -- his

14  overall functioning in general now, that by -- there's no

15  way you can say specifically with any of these things,

16  with 100 percent certainty, as you know.  This is an

17  opinion.  So my opinion is more strongly now than before

18  that I do believe that this is a consequence of what

19  happened to him, because it doesn't make sense to me.

20          That's why I'm saying, anything is possible.  I

21  mean, there may be -- there may have been something that

22  occurred prior to this and it may have been a

23  consequence.  For example, the concussions that he

24  suffered prior to the actual injury in 1995.  It may have

25  been a consequence of any number of other things in his

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 76

1   life.  But the reality is, is his functional capabilities

2   are impaired and...

3        Q    But my question is one of causation.

4             Sitting here today, is it your opinion that the

5   deficits that you're mentioning in the report were

6   acquired as a result of the 1995 assault?

7        A    I believe that that's the case.  I mean, as I

8   said, I cannot tell you that with certainty.  I believe

9   that that is why they occurred.  They may have occurred

10  previously and simply went undetected over that period of

11  time as well.

12       Q    And when did you go from being unclear about

13  whether that was the case to having an opinion that, in

14  fact, that was the case?

15       A    Well, I'm still stating that I don't think

16  anybody can make a statement of this sort with a hundred

17  percent certainty because the issue of examining what's

18  going in the brain is too complex an issue in the first

19  place.  What I'm saying is that as I examined the data

20  further and looked more at the pattern of results that

21  were there, it seems to me more and more unlikely that

22  there's any other reasonable explanation for what's going

23  on than it's from an acquired head injury.

24       Q    Let me show you, also, another statement on

25  page 10 of your report.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 77

1            By the way, you just used the phrase "contrecoup

2     type injury."

3        A    Correct.

4        Q    What does that mean?

5        A    It means that, not uncommonly, when an injury to

6     the skull or the brain is a consequence of, typically,

7     blunt force or trauma in one area, the one part of the

8     brain that is as much or sometimes more affected is an

9     area that is, essentially, opposite to what was hit.  So

10    if you're hit in the back of the head, for example, the

11    front of the head may be where you see some of the

12    greatest deficits because of the movement of the brain in

13    the skull casing.

14       Q    And if you'll look at the top of page 10 on

15    Exhibit 1, it says, quote, Dr. Jayatilaka's most

16    prominent injury was inflicted by focal impact,

17    parentheses, pistol butt, that was unlikely to result in

18    a contrecoup type injury, closed quote.

19            Did you write those words?

20       A    No, I don't believe that I did.  That's, I

21    believe, Dr. Levine's opinion, and it may be one of the

22    few places where we have some point of disagreement.  I'm

23    not sure how he came to the conclusion that a pistol butt

24    could not result in a contrecoup injury.

25       Q    Did you agree with that statement at the time

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 78

1   that the report was submitted?

2        A   I don't recall how much discussion here I had

3   about that at the time, but, obviously, I left it in the

4   report, so I was deferring to him at that point.  It

5   would be a disagreement I have at this point.

6        Q   Okay.  And before we took a break, we took a

7   look at the May 30th report and the May 21st report, and

8   one of the provisions that was taken out of the May 21st

9   report -- or it was either taken out of or it was put

10  into the --

11       A   You mean the May 30th report?

12       Q   Yeah, I'm sorry, the other way around.

13           So on that one, the May 30th report does not

14  have the statement that it's quite possible that the

15  deficits reflect sequelae of the traumatic head injury.

16  In other words, you had a May 21st report that said this

17  is what we think is the causation, then you have a

18  May 30th report that took that phrase out.

19           Does that reflect a change in your opinion or

20  Dr. Levine's opinion?

21       A   It may have -- as I said earlier, it may have

22  reflected him not wanting to overstate the case, but I

23  don't -- I don't have any reason to believe that it

24  reflected a change in his opinion that the head injury is

25  not something relating to his deficits.  He did not

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 79

1   relate to me at any point in time, nor has he since then,

2   that he doesn't believe that the head injury could have

3   been the cause of these deficits.

4        Q   Well, let me ask you:  The one neuropsych test

5   that was administered was the WTAR, which is the only

6   measure, as I understand it, that could be of premorbid

7   functioning, correct?

8        A   Well, it's the only thing that was administered

9   here that is a guesstimate of premorbid functioning, and

10   that is -- as you know, what it is, it's a very rough

11   estimate.

12       Q   And it estimated -- at that point, that would

13   have been an estimated IQ of 109, correct?

14       A   I believe that's correct, if I recall.

15       Q   All right, which would put him in the 73rd

16   percentile, correct?  Is that right?

17       A   It may be the case.  I'm not sure.

18       Q   All right.  In terms of -- in terms of any

19   neuropsych test, was there any other neuropsychological

20   testing done to try to determine the premorbid

21   functioning of Dr. Jayatilaka prior to the 1995 incident?

22       A   Not that I'm aware of.

23       Q   And would it have any impact on your opinion as

24   to whether the 1995 assault caused any deficits if you

25   were to review his academic performance or performance on

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 80

1    standardized tests prior to the 1995 incident?

2        A    It might, yes.  If there was evidence prior to

3    that indicating that he was having specific difficulty

4    with processing information and doing the very kinds of

5    things that these test results indicate, then, yes.

6        Q    Let me ask you, there's a statement in

7    Exhibit 1, and if you'd turn to page 9 of Exhibit 1.  The

8    very first sentence says, quote, Psychometric estimates

9    of premorbid functioning indicate that Dr. Jayatilaka is

10   a man of average intellectual ability, closed quote.

11            Did you write that?

12       A    No, I don't believe I did.

13       Q    Did you agree with that at the time that this

14   was written?

15       A    I believe so; otherwise, I wouldn't have let it

16   be in the report.

17       Q    Okay.  And sitting here today, do you agree that

18   from a premorbid standpoint, that he was, prior to 1995,

19   a man of average intellectual ability?

20       A    To the best of my knowledge and the best of the

21   information we have available, yes.

22       Q    And after 1995, do you believe him to be a man

23   of average intellectual ability?

24       A    Overall, yes.  With specific deficits related to

25   that, yes.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 81

1      Q   Have you done any comparison of his performance,

2   both in terms of grades and performance on standardized

3   tests, before and after 1995?

4      A   No, we did not have that data available

5   whatsoever.

6      Q   Okay.  Would it have any impact on your opinion

7   if - and I can show you the transcript if you'd like -

8   that in high school, his high school grades, his GPA for

9   grades 10 through 12 was 3.13, and he graduated 33 out of

10  60 in his high school class?

11     A   Would that do what?

12     Q   Would it change your opinion in any way in terms

13  of causation as to whether -- again, what I'm focusing on

14  now is:  Did the 1995 assault cause what you believe to

15  be cognitive deficits, okay?  And if he -- certainly, if

16  he's of average intellectual ability before and he's

17  average intellectually afterwards --

18     A   What I'd have -- I mean, it certainly raises a

19  question.  That's completely valid.  What I'd have to

20  know is what that's comprised of, meaning how his grade

21  point average is at that level.  Is it a consequence of

22  him having difficulty in those areas of comprehension of

23  reading and being able to apply that as it exists now or

24  not.  If that were the case, if that existed then, then

25  it's possible that they may -- those issues may have been

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 82

1   related to the concussions he had in high school.

2        Q    Okay.  How about if I ask you to assume the

3   following.

4        A    Okay.

5        Q    That Dr. Jayatilaka never asked for, nor

6   received any, accommodations of any kind for any deficits

7   or disabilities in high school, college, medical school,

8   on the SATs or the MCAT.

9        A    That he never asked for any accommodation.

10       Q    Nor received any.

11       A    Right.  Okay.

12       Q    Nor, to our knowledge, any complaints of any

13   cognitive deficits.

14       A    Well, as far as complaints of cognitive deficits

15   go, I think, as you know yourself, Dr. Jayatilaka has

16   never acknowledged cognitive deficits.

17            THE WITNESS:  So no offense, Druvi, but I'm not

18   sure you're the best judge of that.

19            So I don't think that he's recognized that he's

20   had those difficulties at any point in time.

21   BY MR. TENHOFF:

22       Q    Let me give you some additional data --

23       A    Okay.

24       Q    -- in terms of his academic performance prior to

25   1995.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

 1        A    Okay.

 2        Q    And assume that he graduated from college

 3    without asking for or receiving any accommodations; that

 4    he graduated with a 2.69 GPA, which put him at a rank of

 5    318 out of 431; that on some of the medical science tests

 6    that he -- or classes that he took in college he received

 7    Cs; that in medical school, he graduated medical school

 8    without requesting or receiving any accommodations; that

 9    the essence of the grades he received in medical school

10    were average; and that he received a minimum passing

11    score of six on four different occasions.

12        A    I'm not sure what that means.

13        Q    There was a scale of 1 to 10, and on at least

14    four of the occasions he received a score of six, which

15    is the lowest passing score.

16        A    Okay.

17        Q    Let me also have you assume that his performance

18    on the SAT was taken prior to 1995 without

19    accommodations, and that he took it on three different

20    occasions.  The highest score he received on the verbal

21    was 510, which is a 76 percentile, and the highest score

22    on the math section was 600, which would be in the 83rd

23    percentile.  And then the MCAT was taken by him on five

24    separate occasions without requesting or receiving any

25    accommodation, and his highest score was 23 out of a

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 84

1   possible 45 points.

2         So given that history, that academic history,

3   which I would characterize as average --

4   A   Uh-huh.

5   Q   -- prior to the injury in 1995, would that alter

6   your opinion as to causation in any way?

7   A   What it raises a question of - for me,

8   particularly - is what his scores might have been like

9   all the way through that with accommodation, because

10  given that what the test results now suggest is his

11  greatest area of difficulty, if he's going to be able to

12  perform better, the only way he would be able to perform

13  better would be with additional time, and the reality is,

14  if the problems that are there are something of a much

15  more ingrained nature that have simply been with him all

16  along, if he's given a thousand hours to complete a test,

17  it wouldn't make any difference.

18        So what it suggests is, you know, he's pretty

19  much always been underplaying any of the issues or

20  difficulties that he's had.  And I don't know whether

21  he's been aware of the challenges or not, frankly.

22  Q   But in that answer, Doctor, are you assuming

23  that he had cognitive deficits prior to 1995?

24  A   No, I'm not assuming it.  I am suggesting,

25  though, that the possibility is certainly there.  And

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 85

1   given that he's had concussions in high school as well,

2   they may have begun at that point in time.  It's even

3   possible it may have occurred from something earlier than

4   that.

5        Q    And if the deficits were prior to 1995, then

6   they weren't caused by the 1995 assault, correct?

7        A    Well, they may have -- what they -- what likely

8   would have occurred, especially given that he had

9   concussions beforehand, is that whatever deficits he had

10  would have been exacerbated and extended further by an

11  additional injury.

12       Q    Right.

13            To your knowledge, is there any evidence of any

14  kind that came to your attention that he had cognitive

15  deficits of any kind prior to 1995?

16       A    That anyone evaluated him for that, you mean, or

17  that he was aware --

18       Q    Any evidence at all.

19       A    Not that I'm aware of, no.

20       Q    Okay.  Would you also agree with me that if

21  there is any cognitive dysfunction under the diagnosis of

22  cognitive disorder not otherwise specified, that that has

23  to be due to a medical condition as opposed to an issue

24  with substance abuse?

25       A    No.  DSM is filled with diagnostic

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 93

1   that Dr. Jayatilaka had consulted with other

2   psychologists.  I was not aware of who they were, other

3   than Dr. Pratty, who is actually a psychiatrist.

4        Q   If you could do me a favor - I won't read these

5   out loud - if you would look at pages SD0590 and 0591.

6   And if you'll take a look and read through the clinical

7   notes that are listed there, to the extent you can - I

8   know some of them are a little hard to read - and take a

9   moment and read through those and tell me when you're

10  done, and I'll have some specific questions for you about

11  those.

12       A   The top line is cut off on the second page.

13       Q   Right.  I understand.  It is on my copy, too.  I

14  wasn't going to ask you about that one.

15       A   Okay.  There's some parts that I can't quite

16  make out, but I get the gist of it.

17       Q   Okay.  And is there anything in the notes of

18  Dr. Higgins that would lead you to believe that there is

19  any issue with regard to confounds in terms of test

20  performance?

21       A   Challenges to test performance, certainly, yes.

22       Q   What do you mean by that?

23       A   The issues that she's identifying, I think, are

24  unquestionably ones that Dr. Jayatilaka himself would

25  acknowledge, that he has been conflicted about the

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 94

1   process of becoming a physician and what it entails and

2   whether it really is exactly what's right for him.  I

3   think that he has felt that he needed to become a

4   physician, probably even more than wanted to actively.

5   So I think there have been emotional challenges for him

6   in making a decision, of course, as there are for many

7   people with their career choice.  I don't think it would

8   be appropriate to say that he absolutely knew from early

9   in his life that he definitively wanted to be a doctor.

10       Q   Is there any element of family pressure, to your

11   knowledge?

12       A   I think, if anything, there is an attempt for

13   family support to have him be successful in general, and

14   I think that -- and I'm speculating here, simply, but I

15   believe that Dr. Jayatilaka's father certainly wants the

16   best for him in every way.  I think that there is very

17   likely, on Dr. Jayatilaka's part himself, not necessarily

18   presumed pressure, but pressure he's putting on himself

19   believing that it is what he needs to do for his family.

20       Q   In your Exhibit 14, you -- I'll just read it for

21   you.

22       A   Sure.

23       Q   One of your recommendations was, quote:

24            It is also likely that his parents

25            might benefit from several sessions of

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 98

1   certainly doesn't surprise me, that having the

2   frustration level that has occurred with this, that he

3   would, at times, be doing things that don't support that.

4   Whether there's an overall pattern of sabotage and that's

5   been going on indefinitely, I can't address it.  I know

6   that's Dr. Higgins' opinion, apparently, but I know I --

7   I'm not aware of that.

8        Q   Do you believe that pressure from his family

9   could be a significant factor contributing to his anxiety

10  or ambivalence about any of the testing?

11       A   This is pure speculation, but in my interaction

12  with his father, particularly, my guess would be more

13  that it is Druvi's pressure on himself about trying to

14  please and impress his family than his family's need for

15  him to do anything other than what he most wants to do.

16       Q   Wherever the pressure comes from, do you believe

17  that it causes anxiety for Dr. Jayatilaka, particularly

18  in testing situations, whether it be neuropsychological

19  tests or whether it's testing under USMLE?

20       A   I would actually characterize him as someone who

21  is more -- has got a high level of baseline anxiety that

22  is well masked.

23            MR. TENHOFF:  Would you read the question back

24  one more time.

25            (Record read.)

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 99

1          THE WITNESS:  Do you want another answer?

2   BY MR. TENHOFF:

3      Q    I'm not sure I got an answer to that question.

4   That's why I had her read it back.

5      A    Okay.  Well, what I was trying to address there

6   is to say that I would characterize him more somebody who

7   has a high level of general anxiety rather than somebody

8   who has specific test-taking anxiety or anxiety in very

9   specific situations.  I think that it's there at a

10  baseline level period, and probably has been for - and,

11  again, completely speculating - the majority of his life.

12     Q    Were you aware that the MCMI administered by --

13  in December 2006 listed as a possible diagnosis an

14  anxiety disorder?

15     A    As I think I indicated to you, I wasn't aware

16  the MCMI was administered in December of 2006.

17     Q    Okay.  So let's take a look at that.  That's

18  Exhibit Number 18.

19          And take a look -- this is -- by the way, this

20  is what we received, and -- again, from one of his

21  treating therapists, and it was administered in December

22  of 2006.  And under "Possible Diagnoses," it lists

23  depressive personality features and self-defeating

24  personality features and a generalized anxiety disorder

25  and adjustment disorder with depressed mood.

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 101

1   challenges with the diagnostic picture, period.

2          In terms of what it means for his performance, I

3   don't even know how to speculate about that.  There's not

4   a clear picture of anything from this diagnosis alone

5   that would say this is going to have X, Y or Z effect or

6   likely effect on the testing process.

7       Q   Let me ask you about personality traits or

8   personality characteristics and whether those could

9   possibly be a confound in this particular situation.

10          Was there anything in the information that you

11   reviewed or that was available to you that would suggest

12   that personality traits or personality characteristics in

13   any way were -- could be a potential confound as to

14   testing performance?

15      A   I wouldn't call his underlying personality a

16   confound as much as a challenge for him to be able to do

17   well in different testing situations, because his

18   tendency to minimize and underplay means that his overall

19   judgement in those situations is not going to be stellar;

20   that his -- what he recognizes as his abilities or lack

21   of abilities I think is, in those situations, somewhat

22   lacking.  He needs guidance to be able to recognize where

23   his strengths and weaknesses lie if he's going to develop

24   them in a positive fashion.

25      Q   And what particular personality traits or

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 102

1   characteristics were you referring to in your last

2   answer?

3       A   The tendency to very much minimalize virtually

4   anything that's going on and to put on a front that

5   everything is okay, and that there aren't any problems

6   and that I can handle this, and that no matter what the

7   circumstances are, I'll get through it.  That kind of --

8   I wouldn't call it stiff upper lip as much as an attempt

9   to appear cavalier when there's much more going on under

10  the surface.

11      Q   Were you aware of the MMPI that was administered

12  by Dr. Pratty in December of 2006?

13      A   I was aware that there was one administered.  I

14  think I indicated to you we had attempted to get a copy

15  of that from Dr. Pratty, and I know that we faxed a

16  release over to him, but we did not ever receive the

17  data.

18      Q   Okay.  Have you seen that to date?

19      A   No, I have not.

20      Q   I think it's one of the exhibits in front of

21  you.  Let me see if I can find which one.

22      A   It is one in front of me?

23      Q   Yeah, I believe so.  Let me check.

24          DRUVI JAYATILAKA:  SD0122.

25  BY MR. TENHOFF:

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 115

1  here are predominantly when information is given to him
2  orally.
3       Q   Okay, right.  But my question is the opposite of
4  that.
5           There's two ways we get information:  We either
6  hear it verbally or we read it.
7       A   Right.
8       Q   Are there any neuropsych test scores on here
9  that indicate that there is a problem with processing
10  speed when he receives the information via reading?
11      A   Well, let me take a look and see if there's
12  anything else.  I don't believe there is, though.
13      Q   All right.
14      A   No, it's apparently through -- predominantly
15  through oral presentation of information that he has the
16  difficulty.
17      Q   Okay.  Do you have any understanding of the
18  USMLE Step 2 and how --
19      A   Actually --
20      Q   -- it's administered?
21      A   Actually, yeah.  Let me just backtrack a little
22  bit on this again with you.  If you look on page 14 under
23  Achievement Testing --
24      Q   Yes.
25      A   -- the way that you would infer that - and

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 116

1    that's all you can do here because it's not a direct

2    measure - is if you look at -- if you go down the list

3    here, he, on the letter word identification or reading,

4    performs above the 18th grade level.  On reading fluency,

5    he performs above the 18th level.  At understanding

6    directions, he's down to the tenth grade level, which is

7    a dramatic decline.

8             Similarly, calculation of fluency, he's at the

9    average level or above the 18th grade level.  And with

10   spelling fluency, he's at the 13.9 grade level.  Again, a

11   significant decline.  And then lastly, with writing

12   fluency or passage in reading comprehension, which is in

13   written form, he's down at the 12 and a half grade level.

14            So those do reflect the same issue, that he is

15   having difficulty with processing information, and these

16   do suggest that it's in a written form as well as in oral

17   form.

18       Q    How can you say that he has a problem with

19   reading information and processing it when every one of

20   these scores is in the average percentile, if not higher,

21   including reading fluency is at the 78th percentile,

22   writing fluency is at the 49th percentile?  How do you

23   conclude from those test scores that he has any

24   deficiency of any kind in processing speed when

25   information is provided to him by reading?

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

Page 117

1        A    I didn't make it based upon the tests that you

2    just presented.  What I'm identifying is that -- if

3    you're going to take a look at this overall profile, the

4    achievement testing, then it makes sense that you want to

5    take a look at why you have test scores at one level in

6    one area and a very different level in another area, and

7    the areas where his test scores are different are all the

8    ones that have to do with making sense of the situation

9    and being able to apply that information effectively.

10       Q    Diagnostically, what does statistically

11   significant mean for discrepancy in test scores?

12       A    Well, as you know, these tests, in general, the

13   difference between one score and another can be sometimes

14   as little as one or two questions.  So the reality of

15   this is that in order to have any real certainty, you

16   have to readminister these tests over and over again.

17       Q    No, my question was different than that, which

18   is:  Diagnostically speaking, what is a statistically

19   significant disparity between test scores that would lead

20   you to do a diagnostic conclusion?  Plus or minus two

21   standard deviations, correct?

22       A    That -- if you are looking at absolute actuarial

23   data, yes, of course.  But, again, I mean -- I guess I

24   shouldn't say "yes, of course."  It is the standard that

25   we've adopted, but that standard itself is something that

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

1    is not only open to question and is a matter of opinion,

2    it's something that's based upon the closest guesstimate

3    that people can make when using what are, clearly, very

4    imprecise and very imperfect ways of gathering data.

5        Q    What is the standard deviation between a 49 and

6    a 52nd percentile?

7        A    Obviously, there's not.  Considerably less than

8    one.

9        Q    Okay.

10       A    However, you're -- again, you're making

11   comparison here with grade levels that really suggests

12   that there is -- if you look at a grade estimate, the

13   reason for taking not just the percentile scores, but

14   also the grade estimate, is so that you get more data,

15   that you have a bigger picture so that you can look at

16   more what's there and not simply pigeonhole in one area

17   and say everything is okay, because, as you well know, on

18   any test, if we have two measures and one is high and one

19   is low, you have an overall average score.

20       Q    Are you aware of any literature that supports

21   the notion that in determining a significant disparity

22   between test scores, that one uses the grade estimates as

23   opposed to the percentiles?

24       A    No, I'm not.

25       Q    In terms of the USMLE Step 2, are you aware of

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 119

1    the type of test it is?

2        A    No, I am not familiar with that.

3        Q    Do you know whether it's administered verbally

4    or in writing?

5        A    My presumption is that it's in writing, but

6    that's from input I got from people talking to me about

7    it, not from any personal experience.

8        Q    Okay.  You don't know.

9        A    No.

10           MR. TENHOFF:  Why don't we take five minutes.  I

11   may be done.  I have a few questions left, and we can go

12   from there.

13           (Recess taken.)

14           MR. TENHOFF:  Let's go back on the record.

15       Q    Could I have you take a look at Exhibit 1 at

16   page 6?

17       A    Okay.

18       Q    And if you could look -- so under "Achievement

19   Testing," it says, quote, He obtained very high scores on

20   measures of reading, arithmetic and mathematical

21   reasoning consistent with reported level of education,

22   closed quote.

23           Were those your words or Dr. Levine's words?

24       A    Dr. Levine's.

25       Q    And did you agree with that at the time it was

TERRANCE W. DUSHENKO, Ph.D.    October 8, 2009

1      A    Not that I'm aware of.  You'd have to check with

2   my office manager on that.  She takes care of all of

3   those issues for us.

4      Q    Okay.  And do you have a set rate that you have

5   for testifying in deposition and trial?

6      A    I believe that we do.  We have a standard form

7   that we send out.  We don't use it very often because we

8   don't do a lot of forensic work, but I believe we do have

9   standard rates, yes.

10      Q    Do you know what those are?

11      A    If my recollection is correct, for the

12   deposition -- I don't know for trial, I can't even speak

13   to that, but I believe that Angela said it was 2 and a

14   half thousand for a half day for deposition.

15      Q    Okay.  Is Dr. Jayatilaka, Druvi Jayatilaka, a

16   current patient of yours?

17      A    No, he is not.

18      Q    Apart from the evaluation and discussions you

19   may have had in connection with the evaluation, have you

20   treated him at any other time prior or after that?

21      A    No, I have not.  Other than the recommendations

22   that I made for him.

23      Q    How many times have you testified previously,

24   either in deposition or trial?

25      A    Either in deposition or trial?  I think, as I

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 129

7        I, TERRANCE W. DUSHENKO, Ph.D., do hereby

8   declare under penalty of perjury, under the laws of the

9   United States, that I have read the foregoing transcript;

10   that I have made such corrections as noted herein, in

11   ink, initialed by me, or attached hereto; that my

12   testimony as contained herein, as corrected, is true and

13   correct.

14        EXECUTED this _____ day of _____,

15   20_____, at _____, _____.
                        (City)                    (State)

16

17

18   _____
                  TERRANCE W. DUSHENKO, Ph.D.

19

20

21

22

23

24

25

TERRANCE W. DUSHENKO, Ph.D.   October 8, 2009

Page 130

1   STATE OF CALIFORNIA        )
                              : ss
2   COUNTY OF LOS ANGELES      )

3

4         I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6         That the foregoing deposition was taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is a true record

13  of the testimony given.

14        Before completion of the deposition, review of

15  the transcript [X] was [ ] was not requested.  If

16  requested, any changes made by the deponent (and provided

17  to the reporter) during the period allowed are appended

18  hereto.

19        I further certify that I am not interested in

20  the outcome of the action.

21        WITNESS my hand this date

22  _____.

23

24        _____

25        MONICA T. VOGELBACHER, CSR No. 6406