**PLAINTIFF'S APPENDIX TO**

**PLAINTIFF'S JOINT MOTION IN LIMINE NO. 3**

**TO EXCLUDE OPINIONS AND TESTIMONY OF**

**DEFENDANT'S EXPERTS NANCY L. NUSSBAUM,**

**CATHERINE FARMER, AND GEORGE LITCHFORD,**

**AND BRIEF IN SUPPORT**

## Part I: Excerpts from the Deposition of

## Nancy L. Nussbaum

## (Pages 9, 10, 16, 17, & 34)

Statewide Scheduling * Legal Video * Internet Repository

9

```
 1       A.    That he had a blow to the head and had a
 2   depressed right parietal skull fracture, and I think
 3   also had a, maybe a shoulder injury, I'm not sure.
 4       Q.    I've looked at your report, and is your report,
 5   does that give a complete listing of everything you've
 6   reviewed?
 7       A.    No, since that time I received -- let's see.
 8       Q.    DuShenko, Levine, Jayatilaka depositions?
 9       A.    Their depositions, and I also got the data file
10   from Dr. -- is it Dr. -- who is the main person,
11   Dr. Levine or Dr. --
12       Q.    It's hard to tell.  Levine did most of the
13   testing.
14       A.    Testing, right.
15       Q.    DuShenko did the interview and the history, I
16   think Levine did the testing and the clinical
17   observations.
18       A.    So it's probably Dr. Levine's file, then.
19       Q.    Okay.  And while we're on it, would you agree
20   with me that the best way or the most common practice in
21   evaluating a person for a disability is to first take a
22   history from that person?
23       A.    Yes.
24       Q.    And second, administer whatever tests might be
25   indicated?
```

Statewide Scheduling * Legal Video * Internet Repository

10

1  A.  Yes.
2  Q.  Of course evaluate the results of that test,
3  correct?
4  A.  Correct.
5  Q.  And the third, I guess I'd call it a pillar,
6  would be clinical observations?
7  A.  And there's a fourth.
8  Q.  What's the fourth?
9  A.  Review records.
10 Q.  Review records.  Now, you would never presume
11 to make a diagnosis of a person without personally
12 meeting that person, correct?
13 A.  That's correct.
14 Q.  In fact, you consider it unethical to make a
15 diagnosis without hands-on personally meeting the
16 person?
17 A.  Yes.
18 Q.  When were you -- you've been retained by the
19 National Board?
20 A.  Yes.
21 Q.  When were you retained?
22 A.  In January of 2009.
23 Q.  Who called -- were you called or did you get a
24 letter?
25 A.  I was called, I believe I was called initially.

AcuScribe Court Reporters, Inc.
(800) 497-0277

Statewide Scheduling * Legal Video * Internet Repository

16

1   Q.   With?

2   A.   With -- well --

3   Q.   Catherine Farmer?

4   A.   Probably Catherine Farmer, because that's who
5   the letter is to.

6   Q.   How much time did you spend reviewing the
7   information that was given to you prior to drafting your
8   January 22nd, 2009, letter?

9   A.   It looks like I spent a couple of hours doing
10  that.

11  Q.   Two?

12  A.   Two hours, and then an hour and a half of doing
13  the letter, so that would be some of the review while I
14  was doing the letter, so it looks like about three and a
15  half hours.

16  Q.   Generally speaking, would three and a half
17  hours be sufficient to diagnose a person with a
18  disability recognized by the ADA?

19  A.   To do the evaluation --

20  Q.   Yes.

21  A.   -- as you described it earlier?

22  Q.   Yes, ma'am.

23  A.   No.

24  Q.   Do you think that time is sufficient to review
25  the documents to determine whether or not the documents

1  support a disability?
2  A.  Yes.
3  Q.  In your letter on page 2 you note that you
4  found the documentation to be insufficient to document a
5  disability, is that correct?
6  A.  Yes.
7  Q.  What was lacking?
8  A.  That you have a disorder that reaches a level
9  of a disability so that there's a consistent pattern in
10 the evaluation results that indicates that the person
11 has impairment or they're below average in a number of
12 areas that would lead you to say that they have a
13 disability.
14 Q.  And of course, again repeating myself, you know
15 that Dr. DuShenko diagnosed cognitive disorder NOS?
16 A.  Yes.
17 Q.  Did you find any evidence in the documents
18 submitted -- and I know what your opinion is, is that
19 you don't think that the evidence or that the documents
20 support that diagnosis, but did you find any evidence
21 whatsoever that would tend to support that diagnosis?
22 A.  That would tend to support that diagnosis.  He
23 had scores that were below average in a number of areas.
24 Q.  And those below-average scores would tend to
25 support that diagnosis?

Statewide Scheduling * Legal Video * Internet Repository

34

```
 1      Q.   One and a half to two times -- if it takes him
 2  twice as long, would two times be an appropriate
 3  accommodation?
 4           MS. BRENNER:  Objection.
 5      A.   100 percent more time, yes.
 6      Q.   (BY MR. NOWAK) Which is my way of saying double
 7  time.
 8      A.   Mm-hmm.
 9      Q.   And just to be clear, you didn't take Dru's
10  history, correct?
11      A.   Correct.
12      Q.   Did not test him, correct?
13      A.   Correct.
14      Q.   Did not make any clinical observations,
15  correct?
16      A.   Correct.
17      Q.   You did review the documents, though?
18      A.   Yes.
19      Q.   Okay.  In your -- in counsel's disclosures it
20  shows that you were an expert witness at trial or
21  deposition in the following cases, Gabriel Zeifman.
22  Without revealing anything protected by HIPAA, generally
23  what was that case about?
24      A.   Some of these I remember and some I don't.
25      Q.   Okay, that's fair enough.
```

# PART II: EXCERPTS FROM THE DEPOSITION OF

# CATHERINE FARMER

# (PAGES 4, 9, 11, 42, & 51)

**CATHERINE FARMER, PSY.D.**

```
 1                    - - -
 2                    CATHERINE FARMER, Psy.D.,
 3   having been first duly sworn to tell the
 4   truth, was examined and testified as
 5   follows:
 6                    - - -
 7   BY MR. NOWAK:
 8        Q.   Would you state your full name, please.
 9        A.   Catherine Farmer.
10        Q.   And where do you work?
11        A.   National Board of Medical Examiners.
12        Q.   And what do you do at the National
13   Board?
14        A.   I am manager-disability services, ADA
15   compliance officer, testing programs.
16        Q.   What does that all mean?  Tell me what
17   you do on a day-to-day basis.
18        A.   I oversee the day-to-day operations of
19   the Office of Disability Services at the National
20   Board.
21        Q.   And what does that entail?
22        A.   We receive and review requests for test
23   accommodations.  Review and -- review requests for
24   test accommodations for USMLE, United States
```

CATHERINE FARMER, PSY.D.

```
 1   BY MR. NOWAK:
 2        Q.   Have you ever diagnosed a patient with
 3   a disability?
 4        A.   I have diagnosed patients with mental
 5   conditions.
 6        Q.   A disability?
 7        A.   I don't know that I would qualify them
 8   as disabilities or not.  They would be DSM
 9   diagnoses.
10        Q.   Okay.  Would you agree with me, and not
11   just me, but Dr. Nussbaum and Dr. Litchford, that
12   in order to diagnose a patient with a disability,
13   you need to sit with the patient and take a
14   history?
15        A.   I would agree that a history is
16   important for making a diagnosis.
17        Q.   Well, Dr. Litchford and Dr. Nussbaum
18   said that they would not undertake to make a
19   diagnosis without actually meeting the patient and
20   taking a history.
21              Do you agree with that?
22        A.   That sounds reasonable.
23        Q.   You agree with that?
24        A.   Yes.
```

CATHERINE FARMER, PSY.D.

1   disabilities or a cognitive disorder not otherwise
2   specified. Let's limit it to that.
3       A.   Okay.
4       Q.   Can you make such a diagnosis without
5   taking a history and administering tests?
6       A.   I suppose it's possible.
7       Q.   Would you do it?
8       A.   Probably not.
9       Q.   Because the best practice is to take
10  the history and administer whatever tests are
11  indicated, correct?
12      A.   Correct. I think you just hit it,
13  based on the history. That would lead you to the
14  next steps.
15      Q.   Sure.
16           And then another important
17  component to making a diagnosis in such an
18  individual is clinical observations, correct?
19      A.   Yes, that's -- that's very important.
20      Q.   History, testing, clinical
21  observations, those are the three pillars that are
22  most important in making a diagnosis of an
23  individual for a learning disorder, correct?
24      A.   Okay. Yes.

CATHERINE FARMER, PSY.D.

```
 1        Q.   Okay.  Who made the decision on
 2   Dr. Rush's case?
 3        A.   I don't recall.
 4                  What year was it?
 5        Q.   '93.
 6                  2003.  Sorry.
 7                  MR. TENHOFF:  Again, if you
 8   know.  Don't speculate.
 9                  THE WITNESS:  I don't know for
10   sure.
11                    - - -
12   BY MR. NOWAK:
13        Q.   And who is the ultimate decision maker
14   in Dr. Jayatilaka's request?
15        A.   I am.
16        Q.   Tell me every reason you, on behalf of
17   the Board, refused to grant the accommodation of
18   extra time to Dr. Jayatilaka?
19                  MR. TENHOFF:  Objection.  Asked
20   and answered.
21                  You can answer again.
22                  THE WITNESS:  The documentation
23   submitted by Dr. Jayatilaka upon review, the
24   initial and subsequent reconsideration
```

**CATHERINE FARMER, PSY.D.**

1  Incomplete hypothetical.

2         THE WITNESS:  I'm sorry.  I

3  really don't know.

4              - - -

5  BY MR. NOWAK:

6     Q.   You'd have to meet with the patient,

7  correct?

8         MR. TENHOFF:  Objection.  Asked

9  and answered.

10        THE WITNESS:  The amount of

11 time it would take to diagnose would depend

12 on the presentation of the individual.

13             - - -

14 BY MR. NOWAK:

15    Q.   So that's a yes?

16    A.   That's a yes.

17        MR. NOWAK:  Pass the witness.

18        MR. TENHOFF:  Okay.  I have no

19 questions.

20             - - -

21        (Whereupon, at 11:15 a.m., the

22 witness was excused and the deposition was

23 concluded.)

24             - - -

## PART III: EXCERPTS FROM THE DEPOSITION OF

## GEORGE LITCHFORD, JR.

## (PAGES 9 & 13)

GEORGE LITCHFORD, JR., PH.D.

```
 1      Q.   So I guess what I'm hearing is that the
 2  standard is meet the patient, take the history,
 3  administer the testing, make clinical
 4  observations, review the documents and as part of
 5  the testing, rule out other conditions.
 6      A.   Yeah, that would be a general standard.
 7      Q.   Well, that's pretty much the gold
 8  standard, right?
 9      A.   Yeah, that would be good.
10      Q.   Okay.  Have you ever met Druvi
11  Jayatilaka?
12      A.   No, I have never met him.
13      Q.   What have you done -- first of all, let
14  me ask you this:  Who contacted you from the
15  National Board to seek your involvement in this
16  case?
17      A.   I was contacted by the secretary, who
18  sent me an e-mail notifying me that she was
19  sending me a file to review.
20      Q.   Do you remember her name?
21      A.   She changed, and I don't remember
22  exactly who it was, but it was just the office
23  secretary at that time.
24      Q.   I got you.
```

1   Q.  How much time did you spend reviewing
2   the information before you made that
3   recommendation?
4   A.  On the original file?
5   Q.  Yes, sir.
6   A.  It would have been -- I can just add it
7   up for you here.  It would have been, it looks
8   like, an hour and a half, hour and 45 minutes.
9   Q.  And if I understood your testimony
10  earlier, in order to say yes, someone has a
11  disability, or no, someone does not have a
12  disability, it's important to personally take the
13  history, administer testing, make clinical
14  observations, review documents and rule out other
15  conditions, correct?
16           MR. TENHOFF:  Objection.
17  Misstates his testimony.  That's not what he
18  said.
19           THE WITNESS:  Could you restate
20  the question?
21           - - -
22  BY MR. NOWAK:
23  Q.  Yes, sir.
24           If I understand your testimony