# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - -

DRUVI JAYATILAKA,             :  CIVIL ACTION
                              :
         Plaintiff,           :
                              :
                              :
     VS.                      :
                              :   COPY
                              :
NATIONAL BOARD OF             :
MEDICAL EXAMINERS,            :
                              :
         Defendant.           :  NO.  CV09-2032-PA

- - -

Oral deposition of CATHERINE FARMER, Psy.D., taken at The Rittenhouse, 210 West Rittenhouse Square, Philadelphia, Pennsylvania, on Friday, December 18, 2009, beginning at approximately 10:53 a.m., before Robin Frattali, Registered Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

**CATHERINE FARMER, PSY.D.**

```
                          - - -

                CATHERINE FARMER, Psy.D.,
       having been first duly sworn to tell the
       truth, was examined and testified as
       follows:
                          - - -

BY MR. NOWAK:
          Q.   Would you state your full name, please.
          A.   Catherine Farmer.
          Q.   And where do you work?
          A.   National Board of Medical Examiners.
          Q.   And what do you do at the National
Board?
          A.   I am manager-disability services, ADA
compliance officer, testing programs.
          Q.   What does that all mean?  Tell me what
you do on a day-to-day basis.
          A.   I oversee the day-to-day operations of
the Office of Disability Services at the National
Board.
          Q.   And what does that entail?
          A.   We receive and review requests for test
accommodations.  Review and -- review requests for
test accommodations for USMLE, United States
```

CATHERINE FARMER, PSY.D.

```
 1   the ADA?
 2                   MR. TENHOFF:  Objection.
 3       Compound.  Could you break that down for
 4       her?
 5                      - - -
 6   BY MR. NOWAK:
 7       Q.   Do you understand the question?
 8       A.   I thought I heard a few questions.
 9   Which question would you like me to answer first?
10       Q.   Do you consult with patients?
11       A.   Do I consult with patients?  No.
12       Q.   Have you ever had patients?
13       A.   Have I ever had patients of my own?
14       Q.   As a psychologist.
15       A.   Yes.
16       Q.   Okay.  Have you ever undertaken to
17   evaluate whether a patient has a disability under
18   the ADA?
19                   MR. TENHOFF:  Objection.  Vague
20       as to "evaluate."
21                   THE WITNESS:  I have in my
22       training consulted with patients.  I don't
23       recall that it was for the basis of the --
24       qualifying under the ADA.
```

CATHERINE FARMER, PSY.D.

1  BY MR. NOWAK:
2       Q.   Have you ever diagnosed a patient with
3  a disability?
4       A.   I have diagnosed patients with mental
5  conditions.
6       Q.   A disability?
7       A.   I don't know that I would qualify them
8  as disabilities or not.  They would be DSM
9  diagnoses.
10      Q.   Okay.  Would you agree with me, and not
11 just me, but Dr. Nussbaum and Dr. Litchford, that
12 in order to diagnose a patient with a disability,
13 you need to sit with the patient and take a
14 history?
15      A.   I would agree that a history is
16 important for making a diagnosis.
17      Q.   Well, Dr. Litchford and Dr. Nussbaum
18 said that they would not undertake to make a
19 diagnosis without actually meeting the patient and
20 taking a history.
21                Do you agree with that?
22      A.   That sounds reasonable.
23      Q.   You agree with that?
24      A.   Yes.

CATHERINE FARMER, PSY.D.

1  Q. And Dr. Nussbaum and Dr. Litchford also
2  said that in addition to personally meeting with
3  the patient and taking a history, that a
4  psychologist would need to administer tests.
5  You agree with that, correct,
6  to -- to determine whether or not the person has a
7  disability.
8  A. Not necessarily. I think it would
9  depend on what the individual's symptoms were,
10 whether you needed to administer a test.
11 Q. Okay. Tell me the situations where you
12 would not need to administer a test when
13 evaluating a client or a patient for a disability.
14 A. Again --
15     MR. TENHOFF: Go ahead.
16     THE WITNESS: -- I think I
17 would be evaluating or a psychologist would
18 be evaluating for any number of things.
19 Again, it's usually to make a diagnosis. A
20 diagnosis of anxiety disorders, depression,
21 they don't generally require a test.
22         - - -
23 BY MR. NOWAK:
24 Q. Okay. Let's talk about learning

1  disabilities or a cognitive disorder not otherwise
2  specified.  Let's limit it to that.
3       A.   Okay.
4       Q.   Can you make such a diagnosis without
5  taking a history and administering tests?
6       A.   I suppose it's possible.
7       Q.   Would you do it?
8       A.   Probably not.
9       Q.   Because the best practice is to take
10 the history and administer whatever tests are
11 indicated, correct?
12      A.   Correct.  I think you just hit it,
13 based on the history.  That would lead you to the
14 next steps.
15      Q.   Sure.
16           And then another important
17 component to making a diagnosis in such an
18 individual is clinical observations, correct?
19      A.   Yes, that's -- that's very important.
20      Q.   History, testing, clinical
21 observations, those are the three pillars that are
22 most important in making a diagnosis of an
23 individual for a learning disorder, correct?
24      A.   Okay.  Yes.

```
 1              you could do is review the documentation
 2              that was provided and agree or disagree with
 3              the conclusions of the evaluator.
 4                          - - -
 5   BY MR. NOWAK:
 6         Q.    Dr. Nussbaum testified that it would be
 7   unethical to make a diagnosis without actually
 8   meeting a patient.
 9                Do you agree with her
10   testimony?
11         A.    To make a diagnosis?
12         Q.    Yes.
13         A.    Yes, I agree.
14         Q.    How can you refute a diagnosis without
15   actually meeting with the patient?
16         A.    Well, again, I think reviewing the
17   documentation that the individual provides would
18   either support the diagnosis or not.  If it
19   doesn't, you'd refute the diagnosis or at least
20   question the diagnosis.
21         Q.    And you've never met with
22   Dr. Jayatilaka, have you?
23         A.    I have not.
24         Q.    Have you asked to meet with him?
```

CATHERINE FARMER, PSY.D.

1   A.   Have I?

2   Q.   Asked to meet with him.

3   A.   No.

4   Q.   Have you asked him to meet with either
5   Dr. Nussbaum or Dr. Litchford?

6   A.   No.

7   Q.   Why not?

8   A.   It's our guidelines for requesting test
9   accommodations are for individuals to provide
10  documentation from their own treatment or
11  evaluators, treatment providers or evaluators, and
12  then we review that documentation.

13  Q.   But you will agree with Dr. Nussbaum
14  and Dr. Litchford that the best way to evaluate
15  whether someone has a disability that qualifies
16  under the ADA is to meet with them personally,
17  take a history, administer exams, and make
18  clinical observations, correct?

19           MR. TENHOFF:   Objection. Vague
20      as to "evaluate."

21           THE WITNESS:   I believe that
22      would be appropriate if one was to diagnose
23      or wishing to diagnose.

24              - - -

CATHERINE FARMER, PSY.D.

```
 1   BY MR. NOWAK:
 2       Q.   In fact, Dr. Litchford said that's the
 3   gold standard; that's the way to do it.
 4            You agree with that, correct?
 5       A.   If one wishes to diagnose.  If one's
 6   goal is to diagnose, yes.
 7       Q.   Why do you qualify that?
 8       A.   I'm sorry?
 9       Q.   Why do you qualify that?
10       A.   I think there's a distinction between
11   reviewing documentation to see if it supports a
12   diagnosis or a request for test accommodations on
13   the basis of disability.
14       Q.   Would you agree --
15            MR. TENHOFF:  Wait.
16            Have you finished your answer?
17            THE WITNESS:  No.
18            There's a distinction between
19       that and diagnosing someone or evaluating
20       someone for the purpose of making a
21       diagnosis.
22                    - - -
23   BY MR. NOWAK:
24       Q.   Would you agree with me that the best
```

CATHERINE FARMER, PSY.D.

1  person to diagnose a disability would be the
2  psychologist who is actually personally taking the
3  history, administering the test, and making
4  clinical observations?  That's the best person to
5  diagnose a disability, correct?
6       A.   That sounds like the best person, yes.
7       Q.   And the National Board has done none of
8  that with respect to Dr. Jayatilaka, correct?
9       A.   We have not diagnosed Dr. Jayatilaka,
10 correct.
11      Q.   Tell me about Step 2 CK.  What is that?
12      A.   It's an examination called a Step 2
13 Clinical Knowledge Examination.  It's one of three
14 step exams for the United States Medical Licensing
15 Examination.  It assesses clinical knowledge.
16      Q.   Tell me about how it's administered,
17 how much time is given, what breaks there are in
18 between.
19      A.   It's a computer-based multiple-choice
20 examination administered over a single day.  There
21 are nine test blocks of one hour each and 45
22 minutes of break time.
23      Q.   Just one break?
24      A.   It's used at the examinee's discretion

CATHERINE FARMER, PSY.D.

1       Jerry Dillon.
2       Q.  Is it the Board's contention that
3  giving Druvi extra time on Step 2 CK would allow
4  him an unfair advantage?
5              MR. TENHOFF:  Objection.  Calls
6     for speculation.  Lacks foundation.
7              THE WITNESS:  I don't know.
8                     - - -
9  BY MR. NOWAK:
10      Q.  Well, who could I ask that question of?
11             MR. TENHOFF:  If you know.
12             THE WITNESS:  Yeah.  I don't --
13   I don't know.
14                    - - -
15  BY MR. NOWAK:
16      Q.  Are you aware of any facts that
17  allowing Druvi extra time on Step 2 CK would give
18  him an unfair advantage?
19      A.  I don't know.
20      Q.  Would you agree with me that an
21  appropriate accommodation for an individual who
22  takes double the amount of time to process the
23  written word would be double time on an exam?
24             MR. TENHOFF:  Objection.  Lacks

1   We're just about done.
2              MR. TENHOFF:  Sure.
3                     - - -
4              (Whereupon, a discussion was
5   held off the record.)
6                     - - -
7   BY MR. NOWAK:
8       Q.   Is it the National Board's contention
9   that Dr. Jayatilaka is not qualified to be a
10  medical doctor?
11      A.   I don't know that.  Nobody's ever made
12  that statement.
13      Q.   So that's a no?
14      A.   That's a no.
15      Q.   Is the Step 2 CK exam designed to test
16  reading comprehension?
17             MR. TENHOFF:  Objection.  Lacks
18  foundation.  Calls for speculation.
19             THE WITNESS:  Our website
20  doesn't indicate that it's a reading
21  comprehension test, no.
22                    - - -
23  BY MR. NOWAK:
24      Q.   So that's a no?

1    A.    No.
2    Q.    In the last five years, if you could, please, ballpark for me the number of people who were granted the accommodation of extra time on Step 2 CK.
6    A.    Sorry.  I have absolutely no idea how many people in the last five years were granted.
8    Q.    I think you told me earlier it was more than 50 percent?
            MR. TENHOFF:  Objection. Misstates her testimony.
                - - -
BY MR. NOWAK:
14   Q.    Is that accurate?
15   A.    I believe I -- my statement was to a question about how many accommodations on average, and I believe I said we granted an accommodation more often than not.
19   Q.    Which would be 51 percent or better, right?
21   A.    Yeah.  That would mean across all steps, any kind of accommodation.
23   Q.    Do y'all have records in your office that would tell me precisely how many people in

CATHERINE FARMER, PSY.D.

1    Q.    If I brought my 16-year-old son to you
2    and told you that he was having trouble keeping up
3    with the rest of his class, how long would you
4    spend with him to determine whether or not he had
5    a learning disability?
6                MR. TENHOFF:  Objection.  Calls
7    for speculation.  Incomplete hypothetical.
8                THE WITNESS:  I don't know.  It
9    would depend.
10                       - - -
11   BY MR. NOWAK:
12   Q.    Well, have you ever diagnosed anyone
13   with a learning disability?
14   A.    I have.
15   Q.    And generally, how long does it take to
16   visit with a person and take a history, administer
17   tests and make clinical observations?
18                It takes more than an hour and
19   45 minutes, doesn't it?
20   A.    To evaluate an individual to render a
21   diagnosis?
22   Q.    Yes.
23   A.    It could.
24   Q.    Well, it does.

```
 1      A.   It could.
 2      Q.   Well, would -- have you ever made a
 3   diagnosis in less than two hours?
 4      A.   I don't recall.
 5      Q.   Well, think.
 6      A.   I really don't recall.
 7      Q.   Would you ever make a diagnosis in less
 8   than two hours of a learning disability?
 9      A.   Again, I don't know.  I can't speculate
10   on what I would or wouldn't do.  It would be based
11   on the individual who presented.
12      Q.   Sure, but you're the doctor, I'm not.
13           You agree with me that it would
14   take more than two hours to diagnose a learning
15   disability, wouldn't it?
16           MR. TENHOFF:  Objection.  Calls
17      for speculation.  Incomplete hypothetical.
18                    - - -
19   BY MR. NOWAK:
20      Q.   It is a hypothetical because you're the
21   doctor.  You're the expert.
22           MR. TENHOFF:  No, she's not
23      testifying as an expert, Vince.
24           MR. NOWAK:  She's a doctor.
```

CATHERINE FARMER, PSY.D.

```
 1        Incomplete hypothetical.
 2              THE WITNESS:  I'm sorry.  I
 3        really don't know.
 4                    - - -
 5   BY MR. NOWAK:
 6        Q.   You'd have to meet with the patient,
 7   correct?
 8              MR. TENHOFF:  Objection.  Asked
 9        and answered.
10              THE WITNESS:  The amount of
11        time it would take to diagnose would depend
12        on the presentation of the individual.
13                    - - -
14   BY MR. NOWAK:
15        Q.   So that's a yes?
16        A.   That's a yes.
17              MR. NOWAK:  Pass the witness.
18              MR. TENHOFF:  Okay.  I have no
19        questions.
20                    - - -
21              (Whereupon, at 11:15 a.m., the
22        witness was excused and the deposition was
23        concluded.)
24                    - - -
```

Page 52

CATHERINE FARMER, PSY.D.

```
               C E R T I F I C A T E


COMMONWEALTH OF PENNSYLVANIA    :
                                :    SS
COUNTY OF PHILADELPHIA          :
```

         I, ROBIN FRATTALI, Registered Professional Reporter - Notary Public, within and for the Commonwealth of Pennsylvania, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.

*Robin Frattali*

———————————————

ROBIN FRATTALI
Registered Professional
Reporter - Notary Public

**CATHERINE FARMER, PSY.D.**

```
                    ERRATA SHEET

Attach to Deposition of: Catherine Farmer, Psy.D.
Taken on:  December 18, 2009
In the matter of: Jayatilaka vs. National Board

PAGE          LINE NO.         CHANGE              REASON
```

Page 55

CATHERINE FARMER, PSY.D.

```
 1              SIGNATURE PAGE
 2
 3                  - - -
 4
 5              I hereby acknowledge that I have
 6   read the aforegoing transcript, dated December 18,
 7   2009, and the same is a true and correct
 8   transcription of the answers given by me to the
 9   questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12                  - - -
13
14
15
16
17   SIGNATURE:      _____
18                   Catherine Farmer, Psy.D.
19
20   WITNESSED BY:   _____
21
22
23
24
```

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com