Exhibit B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

DRUVI JAYATILAKA,                )   No. CV09-2032 PA
                                 )        (CAx)
          Plaintiff,             )
                                 )
     vs.                         )
                                 )
NATIONAL BOARD OF MEDICAL        )
EXAMINERS,                       )
                                 )
          Defendant.             )
_____)

## CERTIFIED COPY

DEPOSITION OF:

ANDREW JEREMIAH LEVINE, Ph.D.
Wednesday, October 7, 2009
9:04 a.m.

Reported by:

MONICA T. VOGELBACHER
CSR No. 6406

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

DRUVI JAYATILAKA,           )   No. CV09-2032 PA
                            )       (CAx)
          Plaintiff,        )
                            )
     vs.                    )
                            )
NATIONAL BOARD OF MEDICAL   )
EXAMINERS,                  )
                            )
          Defendant.        )
_____)

DEPOSITION OF:

               ANDREW JEREMIAH LEVINE, Ph.D.

               Wednesday, October 7, 2009

               9:04 a.m.

Reported by:

               MONICA T. VOGELBACHER

               CSR No. 6406

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1      Q   Okay.  At the top of Exhibit 1, there's a series

2  of things about the patient and the date of birth, and

3  one says, "Referral Source:  William Hornstein, M.D."

4      A   Uh-huh.

5      Q   How is it that you first became involved with

6  providing any evaluation for Mr. Jayatilaka?

7      A   Dr. Dushenko had seen Mr. Jayatilaka first and I

8  believe came to the conclusion that he needed a

9  neuropsychological evaluation, so as the

10  neuropsychologist in the practice, he was referred to me

11  by Dr. Dushenko.

12     Q   When was the first time that you got involved

13  with Mr. Jayatilaka and the evaluation?

14     A   I believe it would have been the date 5/8/08,

15  was the first day that we had an evaluation together.

16     Q   Okay.  We'll go into that in just a moment --

17     A   Okay.

18     Q   -- because I want to ask you specifically

19  various dates and tests that were provided.

20     A   Uh-huh.

21     Q   What was your understanding as to the reason for

22  why Mr. Jayatilaka was requesting or being recommended to

23  have an evaluation?

24     A   Well, thinking back to the time, I believe

25  Dr. Dushenko had informed me that -- of his background,

11

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   A   I couldn't tell you what he told me at the time.

2   Whatever he told me was probably -- I was -- probably

3   integrated into the report by me and by him.  We both

4   worked on the report together.

5   Q   Let me ask you, then:  Who actually drafted this

6   report, Exhibit 1?

7   A   In general, Dr. Dushenko worked on the first

8   part, which included the background information, "Reason

9   For Referral, Work History, Developmental/Medical

10  History, Personal Habits," pretty much up until the

11  "Behavioral Observations."  From there on in, it was a

12  neuropsychological evaluation, and I had written the vast

13  majority of that.

14      The end, the "Summary and Impressions," was

15  written by both of us.  Probably -- mostly me, and then

16  Dr. Dushenko went through and added whatever he thought

17  was relevant and pertinent.

18  Q   I see.

19      And the summary of the test results that are

20  shown on pages -- in the charts at the end, pages 14

21  through 16, was that developed by you as well?

22  A   That was me, yes.

23  Q   Okay.  And in terms of the neuropsychological

24  tests that were administered, were you the one who

25  administered them?

13

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    other measures, a great equivalent above the 18th grade,

2    or college, graduate school, he did relatively poorly

3    on those -- poorly than we expected.

4        Q   So relative weakness as opposed to a deficit?

5        A   Yes.

6        Q   And are there particular -- I believe there are

7    some particular subtests when we were talking about

8    auditory and reading comprehension, that would be

9    associated with that; is that correct?

10       A   Yes.

11       Q   So let's go back to the tests here.  And let's

12   go first to the WJ.

13           And there appears to be a subtest entitled

14   "Understanding Directions."  What is that designed to

15   measure?

16       A   In that test, the examinee hears a series of

17   instructions and is -- and then carries out those

18   instructions.  So it assesses auditory comprehension.

19       Q   Okay.  And on that particular test, he was in

20   the 49th percentile, correct?

21       A   Yes.

22       Q   All right.  And then the other one on the

23   Watkins-Johnson (sic) was, there's one called "Passage

24   Reading Comprehension."  What is that intended to

25   measure?

66

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1        A    That is just as it says, reading comprehension.

2   One reads a passage and then answers a question with

3   regards to the content of that passage.

4        Q    And that was a 42 -- 42nd percentile; is that

5   correct?

6        A    Yes.

7        Q    All right.  So that was also in the average

8   range.

9        A    Yes.

10       Q    All right.  Are you familiar with the diagnosis

11  of a mixed expressive-receptive language disorder --

12       A    Yes.

13       Q    -- under the DSM-IV?

14       A    Yes.

15       Q    Let's go back to the DSM-IV.  It should be,

16  actually, a couple of pages in.  That's on -- this is,

17  again, Exhibit 8, pages 60 to 61.  Do you see that?

18       A    Uh-huh.  Yes.

19       Q    And are you familiar with those diagnostic

20  criteria for mixed receptive-expressive language

21  disorder?

22       A    Yes.

23       Q    And again, one of the things, as I understand

24  it, is that the first criteria here is, quote:

25            The scores obtained from a battery of

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   criteria out there for diagnosing a learning disability

2   than what's in the DSM-IV, that I didn't use for this

3   particular evaluation and, in fact, probably would not

4   have applied to Dr. Jayatilaka.  Based on my evaluation

5   of him, I found him to have some weaknesses in some

6   areas, but I didn't feel that he met diagnostic criteria

7   for any of the DSM-IV disorders.

8       Q   Do you understand that Dr. Dushenko, in December

9   of 2008, submitted an affidavit in which he diagnosed

10  Mr. Jayatilaka with a cognitive disorder not otherwise

11  specified?

12      A   I have become aware of that, yes.

13      Q   Do you agree with that?

14      A   It's not what I would have diagnosed, but it's

15  arguable that it could have been diagnosed.

16      Q   You don't agree with that diagnosis?

17      A   Cognitive disorder NOS is kind of a wastebasket

18  term for somebody who doesn't meet diagnostic criteria

19  for, say, amnestic disorder or dementia or delirium or

20  any other disorders, but that they have some form of

21  impairment that limits them in some substantial way.  So

22  one could argue that these deficits are limiting

23  Dr. Jayatilaka in a substantial way.  At the time of my

24  evaluation, that wasn't my impression.

25      Q   Is it your impression today?

69

Merrill Legal Solutions
(800) 869-9132

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    A   I could be swayed probably either way.  Because

2    my understanding is that Dr. Jayatilaka was doing fairly

3    well in school, fairly well in school.  He wasn't a

4    stellar student, but he made it through college and he

5    made it into medical school, until he was injured in this

6    assault, and following that assault, he had had

7    tremendous difficulty -- I'm assuming he had difficulty

8    in medical school if it took him so long to take his

9    first Board and tries to take his first Board and pass

10   it.  So one could attribute that to deficits incurred in

11   that assault, which, in that case, one could assign a

12   diagnosis of cognitive disorder NOS.

13   Q    Okay.  Let's take a look at the -- which, by the

14   way, did you have any involvement with any submissions by

15   Mr. Jayatilaka to the NBME, where he identified DSM-IV

16   diagnoses?

17   A    I'm not sure what you mean by "any submissions"

18   by Dr. Jayatilaka.

19   Q    Okay.  Were you aware that in submitting an

20   application for accommodations to the National Board of

21   Medical Examiners, Dr. Jayatilaka stated that he had a

22   reading disorder?

23   A    I'm not aware of that.

24   Q    Were you aware that in submitting information to

25   the National Board of Medical Examiners, Mr. Jayatilaka

70

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    this.

2        Q    Okay.  So if I were to tell you that a 9 on the

3    verbal reasoning test is, roughly, 55th to 77.9

4    percentile, and a 7 on physical sciences 36 to 53

5    percentile, and a 7 on the biological is 30 to 44.9

6    percentile, would that have any impact on your opinion as

7    to how he scored overall on the MCATs prior to the

8    injury?

9        A    I would say he obtained an average or better

10   score on the MCATs.

11       Q    Okay.  All right.  And were you aware that based

12   upon these MCAT scores, he was not accepted to any

13   medical schools the first year that he applied, in 1991?

14       A    Yes, but I'm also aware that schools don't base

15   admissions strictly on MCAT scores.

16       Q    In terms of a -- we can set that aside.

17            In terms of a potential diagnosis of cognitive

18   disorder not otherwise specified, would you attribute any

19   significance to the fact that the MRI reports that we

20   looked at earlier were negative and showing no brain

21   abnormality?

22       A    Well, if one were to, say, for example, assign

23   this diagnosis of cognitive disorder based on post

24   concussive syndrome, one would not necessarily expect to

25   see any changes on an MRI.

80

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    Q   Okay.  Did you review any medical records that

2  indicated that there was any injury to the brain as

3  opposed to a fracture to just the skull?

4    A   I don't recall, but if I didn't put anything in

5  my report mentioning specific brain injury, chances are I

6  did not review any medical records that mentioned it,

7  because that would be very relevant to my interpretation.

8    Q   Are you aware of any medical records that show

9  that there was actually a brain injury to Mr. Jayatilaka

10  as opposed to a skull injury?

11    A   None that show actual neuronal damage, tissue

12  damage itself.  Which isn't to say that a skull fracture

13  wouldn't cause imbalance of neural function.  It causes a

14  reaction of the organ, but not necessarily one that you

15  can see.  For example, a concussion, one doesn't

16  necessarily see a giant bleed in the brain or atrophy or

17  any changes on MRI.  The changes are actually more on a

18  microscopic level, but they're very real.

19      So in the case of an injury or impact to the

20  head that was strong enough to cause a fracture, I would

21  expect him to at least have a concussion and very

22  potentially post concussive symptoms.

23    Q   And again, you're not a medical doctor, right?

24    A   That's right.

25    Q   Is it possible, if you know - I know you're out

81

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    expect it.

2        Q   Okay.  And you didn't write the words "a lot

3    equals binge" on the right-hand side?

4        A   No.  That's Dr. Dushenko's writing, I believe.

5        Q   Okay.  And again, is there anything about the

6    use of alcohol, or now seeing those things and the use of

7    alcohol, that would change your opinions in any way?

8        A   No.

9        Q   Okay.

10           MR. TENHOFF:  Are you ready for a break?

11           (Recess taken.)

12           MR. TENHOFF:  Let's go back on the record.

13       Q   Let's go back to Exhibit 1, which is the report

14   that was submitted.  And I'd like to go to page 9, if we

15   could.

16       A   I'm sorry, was it 1 that was submitted or 14

17   that was submitted?

18       Q   1 that was submitted, yes.

19           And if you'd go to page 9 with me there.

20       A   Okay.

21       Q   All right.  And I want to first talk about the

22   area of speech and language functioning.  And under

23   "Summary and Impressions," the third paragraph of the

24   first sentence says, quote, Language functioning was

25   characterized by deficits - I take it it's supposed to be

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    "in" - expressive and receptive functions.

2        A   Uh-huh.

3        Q   Did you write that?

4        A   I'd imagine, yeah.  I think that this "Summary

5    and Impressions" looks very much like mine or sounds very

6    much like my language.

7        Q   Okay.  And in terms of those particular

8    functions, expressive and receptive functions, what of

9    the neuropsych tests were you relying upon to conclude

10   that there was deficits in those areas?

11       A   BNT.

12       Q   Uh-huh.

13       A   The D-KEFS verbal fluency.

14       Q   Uh-huh.

15       A   The auditory and reading comprehension subtests

16   of the Woodcock-Johnson.

17       Q   Okay.  Any others?

18       A   I believe that's it.  I'm looking through here.

19           Yeah.  Yeah, I think that's it.

20       Q   Okay.  And, I'm sorry, which one on the

21   Woodcock-Johnson are you referring to?

22       A   Passage comprehension, also called reading

23   comprehension.

24       Q   Okay.

25       A   And then the auditory comprehension would be

91

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    called "Understanding Directions."

2         Q    And again, the "Understanding Directions" is

3    49 percentile, which is in the average range --

4         A    Uh-huh.

5         Q    -- correct?

6         A    That's right.

7         Q    And the passage reading comprehension, again, is

8    at the 42nd percentile, which is, again, in the average

9    range.

10        A    Right.

11        Q    Okay.

12        A    Also spelling, I believe, is probably included

13    in that conclusion.

14        Q    Okay.

15        A    Which was at the 57th percentile.

16        Q    Again, in the average range.

17        A    Yes.

18        Q    All right.  So let's take the Boston Naming

19    Test, and we've got that as a -- that was in the

20    18th percentile, correct?

21        A    Yes.

22        Q    All right.  So in your classifications, that

23    would be in the lower average range, correct?

24        A    Yes.

25        Q    All right.  And were you the one who

                                                        92

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    administered that test?

2        A   Yes.

3        Q   All right.  And the -- I think that one was one

4    that you referred to before that was normed both from an

5    age perspective and an educational perspective, correct?

6        A   It's possible.  I don't remember the normative

7    set I used, and that's my fault to not include that in

8    the results here.  Oftentimes neuropsychologists will put

9    the normative sample that they used to arrive at their

10   percentile.  So it may have been based on age alone, it

11   may have been based on age and education.

12       Q   Okay.  And if it was education, given

13   Dr. Jayatilaka's level of educational attainment, that, I

14   assume, would be a norm group of greater intellectual

15   ability, correct?

16       A   Yes.  The range of grades differ across

17   normative samples.  It may have been 13 to 21, it may

18   have been 16 to 21 years of education.  It may have been

19   20 to 21 years of education.  I don't recall the specific

20   stratification of it.

21       Q   And under the "Raw Score" of 52, do you have any

22   idea how that would correlate to a percentile if we only

23   used age-based numbers?

24       A   It would probably still be below average.

25       Q   You think it would still be below the

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    25th percentile?

2        A    I believe it would be below the 25th percentile,

3    yes.

4        Q    Okay.  Let me ask you about the administration

5    of the Boston Naming Test, because there was a document

6    given to us.

7            MR. TENHOFF:  Go ahead -- what are we up to, 15?

8    Thanks.

9            (Defendant Exhibit 15 was marked

10           for identification by the reporter.)

11   BY MR. TENHOFF:

12       Q    The reporter's placed before you what I've

13   marked as Exhibit 15 to this deposition, and it's marked

14   at the bottom right-hand corner SD0480 and 0481.  Have

15   you ever seen this document -- which, by the way, denotes

16   it came from your office's files.

17           Have you ever seen this before?

18       A    Yes.

19       Q    What is it?

20       A    This is the protocol for the Boston Naming Test.

21       Q    All right.  So if you start on the second page,

22   it seems like we start on item 30, correct?

23       A    Uh-huh.

24       Q    "Yes"?

25       A    Yes.

94

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1       A    Can I point it?

2       Q    Absolutely.  I got these three.

3       A    This one here, this one.

4       Q    This one here?

5       A    Yes.

6       Q    Okay.  And on those scores, the WMS-III list

7    learning immediate, those scores range in percentiles

8    from 37 to 84 percent.  What is it about those scores

9    that indicates to you that supports the conclusion that

10   he's prone to being overwhelmed when presented with too

11   much information at once?

12       A    That comes from a logical memory score, which

13   was at the 16th percentile.

14       Q    Got it.

15       A    So one -- for the logical memory, he was read a

16   story which contained a fair amount of information and

17   had to remember it.  For the list learning, he was read a

18   list of 12 words, which some would consider a lot of

19   information, but one can also use strategies in order to

20   remember those words.  Some people learn better through

21   rote, some people through contextual learning like a

22   story.

23       Q    Uh-huh.

24       A    Yeah.

25       Q    Okay.  And again, that was -- as I understand

                                                            108

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1     it, it was, again, the comparison between the two that

2     you have a word list learned at a high rate, an above

3     average rate --

4          A   Yes.

5          Q   -- you know, from a percentile perspective,

6     84 percent --

7          A   Yes.

8          Q   -- and you've got a learning of short stories

9     unexpectedly poor at 16 percent.

10         A   Yes.

11         Q   And can you think of any reason why there would

12    be such a disparity between the two?

13         A   Well, as mentioned in the report, again, it

14    might be because of the amount of information required in

15    the story.  It could also be that he just lost

16    concentration or focus during that particular time of

17    testing, which is why we like to administer more than one

18    test on this.

19         Q   Uh-huh.

20         A   So when I draw my conclusions, I often soften

21    them with suggesting "perhaps," terms like that, rather

22    than, in this case, making a strong conclusion, because

23    as compared to, for example, his other scores, verbal

24    paired associates, which was average, list learning,

25    which was above average, the logical memory was pretty

109

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   correct.

2          I believe you said at the time you wrote the

3   report, Exhibit 1, it wasn't your impression that that

4   was a diagnosis, and then I asked you about sitting here

5   today, and you said you could go either way on it.  The

6   reality of this process is, I only get one chance, to

7   everyone's advantage, to ask you questions before we try

8   this case next April.

9          So let me ask you:  Sitting here today, have you

10  concluded that he does or does not have, or you would

11  diagnose him, with cognitive disability not otherwise

12  specified?

13     A   Well, let me give you somewhat of a long-winded

14  answer to that, because it's not a yes or no answer.

15         I, based on my understanding of the diagnosis,

16  would not have assigned that, based on the findings.  I

17  feel that Dr. Jayatilaka has some weaknesses; that many

18  of them may be attributable to the brain injury or the

19  head injury from 1995.  It's difficult to say, but I

20  would not assign that diagnosis.

21         Now, I am a clinician who is usually resistant

22  to assigning diagnosis, in general.  I can, however,

23  understand why somebody could assign that diagnosis,

24  because it is somewhat of a vague, ill-defined diagnosis

25  and one could interpret the findings as cognitive

122

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    disorder NOS if they believed that these deficits were --

2    began at the time of the head injury and are due to some

3    sort of kind of now chronic or - what's the word? -

4    persisting post-concussive symptoms.

5        Q    Okay.   But to you, the difficulty you have is,

6    it's unclear to you whether the deficits that you've

7    identified have been present throughout his life or were

8    acquired as a result of the assault in 1995; isn't that

9    right?

10       A    Yes, it's hard to make that determination.

11   Again, based on the area of the injury, if there were

12   some underlying pathology that occurred just in the area

13   of impact, the findings here are -- don't corroborate

14   that, they don't -- they're not consistent with that.

15       Q    Okay.   Take a look at page 11, Dr. Levine, in

16   your report here.   And there's a statement, which is the

17   second full sentence there, which says, quote, It is

18   unclear if his deficits have been present throughout his

19   life or were acquired in the 1995 assault, closed quote.

20            I understand that was your opinion at the time

21   you wrote the report.   Is that your opinion today?

22       A    Yes.

23       Q    On the Boston Naming Test and the other test we

24   mentioned this morning, which was the D-KEFS verbal

25   fluency for letters, are deficits that are identified by

123

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1    testing of any headaches or any other medical conditions

2    that were affecting Dr. Jayatilaka?

3        A    No.

4        Q    There's another recommendation -- the

5    recommendation you have on the page prior to that, on

6    Exhibit 1, which is the recommendation for extended time

7    for completion of current and future written medical

8    examinations, was that your recommendation?  Did you

9    write that?

10       A    I believe, again, this was written by

11   Dr. Dushenko.  I'm not necessarily in disagreement with

12   it, but the recommendations, I believe, were generally

13   written by Dr. Dushenko, looking at the language and the

14   actual recommendations themselves, yes.

15       Q    Did you do any analysis as to whether there was

16   a correlation between what's requested here, the extended

17   time for completion of testing, and the results of your

18   neuropsychological tests?

19       A    I'm not sure what you mean by that question.

20       Q    Yeah, let me back up a little bit.

21            In terms of functional limitation, do you

22   believe that Dr. Jayatilaka has deficits that limit his

23   ability to read, as compared to most people?

24       A    Can you define "reading" for me?  I know it

25   sounds like a very difficult -- well, let me answer it in

149

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

1    my convoluted way.

2         Reading, per se, he doesn't have difficulty in

3    reading a word.  He doesn't have difficulty reading

4    things quickly.  But according to these results, he has a

5    relative difficulty in digesting what he reads, which

6    would mean that he would have to go back and reread in

7    order to understand what -- in order to digest what it is

8    in the passage he's reading.

9         Q    And do you believe that he has deficits that

10   limit his ability to write compared to most people?

11        A    His spelling was relatively low, a weakness.

12        Q    A relative weakness.

13        A    A relative weakness, yes.

14        Q    How about as compared to most people in the

15   population?

16        A    To the average person?

17        Q    Yes.

18        A    It would be within the average range.  It would

19   be comparable.

20        Q    And his ability to read, is that within the

21   average range?

22        A    It was, according to the percentiles presented

23   here, in the average range.

24        Q    In the area of executive functioning that we

25   talked about before, is there any major life activity

ANDREW JEREMIAH LEVINE, Ph.D.   October 7, 2009

1   with Dr. Jayatilaka that is affected by any relative

2   weaknesses or deficits in executive functioning?

3       A   Is there any area of general functioning.

4       Q   Do you want me to read that back?

5       A   Yeah.

6       Q   That was kind of a mouthful there.

7       A   Yeah, please, would you please read that back.

8           (Record read.)

9           THE WITNESS:  Based on the results of the

10  Wisconsin Card Sort, one could argue that he has a more

11  difficult time kind of understanding what's being --

12  figuring things out, problem solving.  So one could argue

13  that that is a deficit, and compared to the general

14  population, you know, based on his test scores, it's an

15  impairment.  So one could argue that that is a bona fide

16  deficit within executive functioning.  You could argue

17  that.

18          Now, whether or not that impacts an activity of

19  daily life, you'd have to define what an activity of

20  daily life is.  Does that include driving?  Probably not.

21  Does that include grocery shopping?  Probably not.  Would

22  that include taking an advance graduate test?  Possibly.

23  It really depends on how you're interpreting what's

24  stated by the ADA.

25  BY MR. TENHOFF:

151

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

1

2

3

4

5

6

7           I, ANDREW JEREMIAH LEVINE, Ph.D., do hereby

8    declare under penalty of perjury, under the laws of the

9    United States, that I have read the foregoing transcript;

10   that I have made such corrections as noted herein, in

11   ink, initialed by me, or attached hereto; that my

12   testimony as contained herein, as corrected, is true and

13   correct.

14           EXECUTED this _____ day of _____,

15   20____, at _____, _____.
                        (City)                    (State)

16

17

18   _____
             ANDREW JEREMIAH LEVINE, Ph.D.

19

20

21

22

23

24

25

ANDREW JEREMIAH LEVINE, Ph.D.    October 7, 2009

Page 168

1    STATE OF CALIFORNIA          )
                                  : ss
2    COUNTY OF LOS ANGELES        )

3

4            I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6            That the foregoing deposition was taken before

7    me at the time and place herein set forth; that any

8    witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is a true record

13   of the testimony given.

14           Before completion of the deposition, review of

15   the transcript [X] was [ ] was not requested.  If

16   requested, any changes made by the deponent (and provided

17   to the reporter) during the period allowed are appended

18   hereto.

19           I further certify that I am not interested in

20   the outcome of the action.

21           WITNESS my hand this date

22   _____.

23

24       _____

25       MONICA T. VOGELBACHER, CSR No. 6406