COOLEY GODWARD KRONISH LLP
GREGORY C. TENHOFF (154553)
(tenhoffgc@cooley.com)
WENDY J. BRENNER (198608)
(brennerwj@cooley.com)
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone: (650) 843-5000
Facsimile: (650) 857-0663

Attorneys for Defendant
NATIONAL BOARD OF MEDICAL EXAMINERS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT

WESTERN DIVISION

| | |
|---|---|
| DRUVI JAYATILAKA,<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL BOARD OF MEDICAL EXAMINERS,<br><br>    Defendant. | Case No. CV 09-02932 PA (CWx)<br><br>**DECLARATION OF GEORGE LITCHFORD, PH.D.**<br><br>**(DIRECT TESTIMONY OFFERED BY DEFENDANT NBME FOR 4/6/10 BENCH TRIAL)** |

I, George Litchford, hereby declare:

**1.** I have personal knowledge of the facts set forth herein and could testify competently thereto.

**2. Educational Qualifications.** I obtained a Bachelor's Degree in Mathematics from Syracuse University in 1967. I then obtained a Master's Degree in Psychology, focusing on General Experimental Psychology, from Long Island University in June 1970. Following my Master's degree, I completed a one year internship in Clinical Psychology at the New York University Medical School in New York, New York, and then obtained a Ph.D. in Psychology in 1973 from the State University of New York (SUNY) at Albany. My doctoral specialization was

Clinical Psychology with elective coursework in School Psychology. My postgraduate work has included a Visiting Scholar position at the University of Utah from 1982 to 1983, and a Postdoctoral Fellowship in Medical-Clinical Neuropsychology at the Veteran's Administration Hospital in Salt Lake City, Utah during the same time frame.

**3. Licensure and Certifications.** In addition to being a Licensed Psychologist, I am a Certified School Psychologist; a certified Health Service Provider in Psychology; a diplomate of the American Board of Professional Psychology in Clinical Psychology; an approved examiner for the New York State Office of Vocational and Educational Services for Individuals with Disabilities and the American Board of Professional Psychology; and a Fellow of the Academy of Clinical Psychology.

**4. Professional Qualifications.** I am currently the Director of the Psychological Services Center at SUNY, Albany. I have held this position since January 1987. In my current position, I direct the training clinic for the clinical and counseling psychology programs, and train and supervise doctoral students in clinical psychology and counseling psychology. I was a Senior Staff Clinical Psychologist at the SUNY, Albany University Counseling Center from 1974 to 1987, and have taught classes in the Psychology Department (Clinical Program) and Counseling Psychology Department at SUNY, Albany. My classes have included Psychotherapy Technique; Emergency and Short Term Psychotherapy; and Psychological Development in Young Adulthood. I am also an Assistant Clinical Professor in the Department of Psychiatry at the Albany Medical College, and have had a private Clinical Practice in Albany, New York since 1976. A current curriculum vitae further detailing my educational background and qualifications is before the Court as Exhibit 48.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN         2.         DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)

**5.     Experience with Learning Disabilities and Reading Disorders.**  I have more than thirty years of experience in diagnosing patients with learning disabilities, including reading disorders.  This work has included extensive learning disability assessment and psychological assessment of individuals.  In my private practice and at SUNY, I have conducted psychological assessments, neuropsychological assessments, and learning disability assessments.  I have worked with the Department of Physical Medicine and Rehabilitation at Albany Medical Center to conduct neuropsychological evaluations of hospitalized patients.  As a professor and the Director of the Psychological Services Center at SUNY, Albany, I also train future psychologists in psychological and neuropsychological assessment, including diagnosing learning disabilities.

**6.     The Americans with Disabilities Act.**  Approximately fifteen percent (15%) of my professional time is devoted to advising various testing organizations (including the National Board of Medical Examiners, the New York Board of Law Examiners, the Association of American Medical Colleges and, previously, the Massachusetts and Connecticut Bar Examiners) concerning accommodation requests based upon learning disabilities.  In this capacity, I have reviewed more than 1,500 case files, and have been doing so for approximately fifteen years.  As set forth in my CV, I have been qualified to provide testimony as an expert witness in four ADA cases in federal court.  Because of this work, I attend regular trainings related to the requirements of the Americans with Disabilities Act ("ADA"), and through such training, I stay current on changes to the statutory framework and legal requirements.  When advising testing entities, I consider the nature of the individual's mental impairment, the functional limitations imposed by the impairment, and what reasonable modifications would allow the individual to access the test material so as to overcome the effects of their functional limitations.  I regularly make recommendations to various testing entities to grant

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN         3.         DECLARATION OF GEORGE LITCHFORD
                                CV 09-02932 PA (CWx)

accommodations to individuals with a variety of learning disabilities, including reading disorders.

**7.     Average Person Standard.**  When forming my opinions concerning whether an individual is impaired, I compare the individual's functional capabilities against the average person in the general population.  It is my understanding that this standard is required under the ADA.  For purposes of neuropsychological tests, the term "Average" is defined as a score that falls within one standard deviation of the mean.  Most neuropsychological tests have a mean of 100, and a standard deviation of 15.  This means that a score is within the average range if it falls between 85 and 115.  This translates into a percentile range of 16 to 84, meaning that any score between the 16th and 84th percentiles, inclusive, is within the average range.

**8.     Materials and Information Relied Upon in Forming My Opinions.**  In formulating the opinions set forth in this Declaration, I have reviewed and relied upon the following materials:

  **(a)**  The materials submitted by Mr. Jayatilaka to the NBME on or around July 17, 2008 in support of his request for an accommodation on the USMLE, which included the following:

   **(i)**  Mr. Jayatilaka's completed application form for a testing accommodation submitted to the NBME;

   **(ii)**  A personal statement written by Mr. Jayatilaka;

   **(iii)**  A Neuropsychological Evaluation dated May 21, 2008 by Drs. Terrance Dushenko and Andrew Levine (the "Evaluation");

   **(iv)**  A December 17, 1996 letter from Dr. William Gorbunoff;

   **(v)**  Reports dated December 7, 1995 and August 2, 1996 from Dr. David Morgan; and

   **(vi)**  A June 12, 2006 letter from Allan Aksamit.

**(b)**  The raw test data from the neuropsychological tests administered by Drs. Dushenko and Levine;

**(c)**  The deposition transcript and the exhibits thereto of Dr. Levine's deposition on October 7, 2009;

**(d)**  The deposition transcript and the exhibits thereto of Dr. Dushenko's deposition on October 8, 2009; and

**(e)**  The deposition transcript and the exhibits thereto of Mr. Jayatilaka's deposition on October 8 and 9, 2009.

I also relied upon my own personal knowledge of learning disabilities based upon my thirty years of clinical, teaching, assessment, and supervisory experience in the field of psychology.

**9.  Overall Opinion.**  I have not been requested to clinically diagnose or medically examine Mr. Jayatilaka, nor have I done so.  Instead, I have reviewed all of the documentation specified above to determine if Mr. Jayatilaka has shown a mental impairment that substantially limits his cognitive functioning and therefore justifies the accommodation he seeks on the USMLE (which I understand to be double the standard testing time).  It is my opinion that Mr. Jayatilaka does **not** have a mental impairment that substantially limits his cognitive functioning.

**10.  Reading Disorder and Mixed Receptive/Expressive Language Disorder.**  I understand that when Mr. Jayatilaka initially applied for an accommodation on the USMLE in July 2008, he did so on the basis of two alleged mental impairments:  a Reading Disorder and a Mixed Receptive/Expressive Language Disorder.  I do not believe that the information I have reviewed supports either such diagnosis for the following reasons:

**(a)  Opinions of Drs. Dushenko and Levine.**  Mr. Jayatilaka's two treating psychologists, Drs. Dushenko and Levine, did not diagnose Mr. Jayatilaka with either a Reading Disorder or a Mixed Receptive/Expressive Language Disorder in their Evaluation.  They also have both subsequently testified in their

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN

5.

DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)

deposition that they do not believe that Mr. Jayatilaka meets the diagnostic criteria for either condition. I agree with Drs. Dushenko and Levine that the information that I've reviewed does **not** support a finding of either a Reading Disorder or a Mixed Receptive/Expressive Language Disorder.

      **(b)** **Reading Disorder.**

      **(i)** The Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV") is used by physicians, psychiatrists and psychologists for the diagnosis of psychiatric and mental disorders. Under the DSM-IV, a diagnosis of a Reading Disorder requires a significant discrepancy between an individual's cognitive ability, measured by their IQ, and their performance on tests of achievement. In other words, there must be statistically significant evidence that the individual's achievement level is not consistent with their IQ.

      **(ii)** Mr. Jayatilaka's reading achievement, however, is consistent with his IQ as shown by the neuropsychological test results reported in the Evaluation prepared by Drs. Dushenko and Levine. As set forth in the Evaluation, Mr. Jayatilaka's full scale IQ on the Weschler Adult Intelligence Scale ("WAIS-III") was 103 (58th percentile), and his reading scores on the Woodcock Johnson Achievement Tests ("WJR-III") were as follows: Letter-word Identification (Reading) was 52nd percentile; Reading Fluency was 78th percentile; and Passage (Reading) Comprehension was 42nd percentile. These achievement test scores are all within the average range, and all are consistent with his overall IQ. In addition, his WJR-III broad reading index was between 101 and 106 which is in the average range. In other words, there is no significant discrepancy between Mr. Jayatilaka's IQ and his achievement test scores for reading.

      **(c)** **Mixed Receptive/Expressive Language Disorder.**

      **(i)** According to the DSM-IV, a Mixed Receptive/Expressive Language Disorder requires that an individual's scores on standardized individually administered measures of both receptive and expressive language development are

substantially below those obtained from standardized measures of nonverbal intellectual capacity.

**(ii)** Mr. Jayatilaka did not exhibit such a discrepancy in the neuropsychological test scores reported in the Evaluation. The best measure of nonverbal intelligence is the WAIS Perceptual Organization Index, on which Mr. Jayatilaka scored a 109 (73rd percentile, average range). The best measure of expressive/receptive language ability is the WAIS Verbal Comprehension Index, on which he scored a 100 (50th percentile, average range). This nine point gap is not a significant discrepancy as required by the DSM-IV. A nine point gap is less than one standard deviation, which is not statistically significant for diagnostic purposes.

**(iii)** To the extent this alleged impairment purportedly stems from a "speed of processing" issue (as stated by Mr. Jayatilaka on his initial application to the NBME for an accommodation), Mr. Jayatilaka's neuropsychological test measures of processing speed reported in the Evaluation reflect average performance: his WAIS Processing Speed Index score was 58th percentile; his WJR-III Reading Fluency was the 78th percentile; and his WJR-III Writing Fluency score was 94th percentile. These three tests measure processing speed relevant to academic applications (reading and writing), and Mr. Jayatilaka's scores do **not** reflect any impaired performance.

**(iv)** I also note that Mr. Jayatilaka performed in the average range on other measures of receptive language functions. For example, Mr. Jayatilaka scored in the 49th percentile on the WJ-III test of Understanding Directions. This score would typically be lower for an individual with a Mixed Receptive/Expressive Language Disorder.

**11. Overall Academic Functioning.** It is my opinion that Mr. Jayatilaka's academic abilities are unimpaired as compared to the average person in the general population, especially in regard to his reading and writing abilities. As previously mentioned, Mr. Jayatilaka's cognitive abilities, as measured by the

COOLEY GODWARD KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN

7.

DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)

WAIS-III tests reported in the Evaluation, are in the average range with a full scale IQ of 103, a verbal IQ of 100, and a performance IQ of 107. His performance on the WJ-III Achievement Tests (as reported in the Evaluation) is consistent with these IQ scores. His broad reading ability was an average range standard score of 101 to 106; his broad math score was in the average to high average range with a score between 109 and 114; his academic fluency was in the high average to superior range with a score of 116 to 120. His subtests scores relating to language fluency and processing were within the high average range – his Reading Fluency was 110 to 114 and his Writing Fluency was 117 to 129. These scores demonstrate that at the time of the Evaluation, Mr. Jayatilaka's reading, writing and mathematic abilities were unimpaired and all were in the average to high average range depending on the specific measure given.

**12. Other Cognitive Functioning.** The neuropsychological test results set forth in the Evaluation also show that Mr. Jayatilaka's other measures of cognitive functioning are within the average range:

**(a) Attention and Working Memory.** Mr. Jayatilaka was given a number of neuropsychological tests of attention and working memory, including measures of the WAIS-III, the Weschler Memory Scale, 3rd Edition (WMS-III) and the Delis-Kaplan Executive Functioning Systems Battery ("DKEFS"). As set forth in the Evaluation, Mr. Jayatilaka's performance on these neuropsychological tests in the area of attention and working memory were within the average to superior range of functioning.

**(b) Visual-Spatial Functioning.** Mr. Jayatilaka was given a number of tests of visual-spatial functioning including the WAIS-III Block Design and Perceptual Organization Index, the DKEFS Visual Scanning, and the Hooper Visual Organization Test ("HVOT"). As set forth in the Evaluation, Mr. Jayatilaka's performance on these neuropsychological tests were within the average to above average range of functioning.

**(c) Memory.** Mr. Jayatilaka was given a number of tests of verbal/auditory memory and non-verbal memory within the WMS-III test battery. As set forth in the Evaluation, his memory index scores from the WMS-III were within the average to high average range of functioning and consistent with his IQ.

**(d) Executive Functioning.** Mr. Jayatilaka was given a number of tests of executive functioning including the WAIS-III, the DKEFS, and the Wisconsin Card Sorting Test ("WCST"). As set forth in the Evaluation, he also scored in the normal range of expectations on all tests of executive functioning, except for the WCST, which I discuss below in Section 13(c).

**13. Neuropsychological Test Scores Relied Upon By Mr. Jayatilaka's Experts.** Out of the approximately 71 neuropsychological tests (in nine functional areas) reported in the Evaluation of Drs. Dushenko and Levine, Mr. Jayatilaka scored below the average range on only four of them. A chart showing Mr. Jayatilaka's performance on each of the neuropsychological tests reported in the Evaluation of Drs. Dushenko and Levine is set forth as **Exhibit A** hereto. In forming his opinions about Mr. Jayatilaka's alleged impairments, Dr. Dushenko relies upon Mr. Jayatilaka's performance on three such tests: the Boston Naming Test, the WCST, and one administration of the Verbal Fluency Subtest of the DKEFS. It is my opinion that Mr. Jayatilaka's performance on these three tests do not reflect an impairment.

**(a) Boston Naming Test.** There are four reasons why I do not believe Mr. Jayatilaka's performance on the BNT demonstrates an impairment:

**(i)** His score (18th percentile) is within the average range. It is at the low end of the average range, but it is still within the range.

**(ii)** An individual's performance on this test can be affected if they are not a native English speaker. Mr. Jayatilaka's first language is Singhalese, not English. He did not learn to speak English until he was age 4 or 5. English as a second language is an important issue as it can influence one's performances on

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN

9.

DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)

verbal tests, especially test of verbal fluency like the Controlled Oral Fluency test and word naming tests like the BNT. Accordingly, his performance on the BNT may well have been influenced by the fact that English is his second language.

        **(iii)** It is not clear whether the BNT was administered according to standard procedures. The test protocol requires that certain stimulus cues be given, and Dr. Levine testified that he could not remember whether or not he actually administered the stimulus cues for all the test items. Mr. Jayatilaka also cannot recall whether they were administered. The written test protocols which show Mr. Jayatilaka's actual responses on this test suggest that the stimulus cues may *not* have been administered on certain items, suggesting that Mr. Jayatilaka's score may well have been higher if standard procedures were used.

        **(iv)** Even if Mr. Jayatilaka has some limitation with verbal fluency, that is not impacting his reading. Mr. Jayatilaka scored in the 78th percentile on the WJR-III test of Reading Fluency. This shows that to the extent Mr. Jayatilaka struggles with verbal fluency, if at all, it is not causing any functional limitations with respect to his reading.

        **(b) DKEFS – Letter Subtest.** There are three reasons why I do not believe that Mr. Jayatilaka's score on the DKEFS Letter Subtest reflect an impairment:

        **(i)** The test was administered twice, and on the second administration, Mr. Jayatilaka scored in the 16th percentile, which is in the average range.

        **(ii)** Fluency tests can be affected if English is the second language of the examinee. Mr. Jayatilaka is not a native English speaker.

        **(iii)** To the extent Mr. Jayatilaka has any weakness in processing, such weakness is not translating into a reading problem, as shown by his high scores on reading achievement tests as set forth in Paragraph 10(b)(ii) above.

**(c)   Wisconsin Card Sorting Test ("WCST").** I also do not believe that Dr. Jayatilaka's score on the WCST reflects an impairment for the following four reasons:

**(i)** Although the score was below average, other measures of executive functioning from the WAIS-III and the DKEFS battery were generally in the average to above average range (except for one administration of the Letter Subtest of the DKEFS, discussed above in subsection (b)).

**(ii)** It is possible that his score was affected based on the fact that he was given the abbreviated version of the test. There are two versions of the test – the full test (consisting of 128 items) and the abbreviated test consisting of 64 items). The individual being tested has more of an opportunity to learn and master the test on the full version of the test. In their Evaluation, Mr. Jayatilaka's evaluators noted that Mr. Jayatilaka quickly found a good strategy once he understood the test, and that once he understood the test, he performed well. This suggests that if Mr. Jayatilaka had been given the full test, he would have scored substantially higher.

**(iii)** Problems on the WCST typically tend to suggest problems with rigidity and perseveration. However, Mr. Jayatilaka's evaluators noted that he did not exhibit any such problems.

**(iv)** Any problem with executive functioning is not manifesting in overall academic functions – Mr. Jayatilaka's reading ability and writing ability are within average range and above the expected range given his IQ.

**14.   Malingering.** In reviewing the Evaluation and other documentation provided by Drs. Dushenko and Levine, it does not appear that they administered any tests of malingering, motivation and/or effort. There are a number of commonly used instruments available which typically are used in neuropsychological evaluations to provide information about whether or not the examinee responded with a sufficient amount of effort and/or whether or not there

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN

11.

DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)

were any signs of malingering. In my opinion, it would have been helpful to have tests of malingering and motivation administered to Dr. Jayatilaka as it would have provided more information about whether or not he was making a good effort on the neuropsychological tests administered to him.

15. **Other Possible Effects on Neuropsychological Test Scores.** It appears that there may have been some factors relating to effort and/or motivation and anxiety that could have influenced Mr. Jayatilaka's test scores. Dr. Levine noted that there were variations in motivation during the testing and, in addition, anxiety may have played a role. Mr. Jayatilaka also reports that he sought out treatment for test anxiety and learned techniques to cope with test anxiety. These factors could have resulted in Mr. Jayatilaka's neuropsychological scores being lower than expected.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 23 day of March, 2010.

_/s/ George B. Litchford, Jr._
George B. Litchford, Jr., Ph.D.

COOLEY GODWARD
KRONISH LLP
ATTORNEYS AT LAW
PALO ALTO

839046 v3/HN

12.

DECLARATION OF GEORGE LITCHFORD
CV 09-02932 PA (CWx)