# Exhibit A

**Statewide Scheduling * Legal Video * Internet Repository**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

DRUVI JAYATILAKA    )
             )
vs.          ) CASE NO. CV 09-2932 PA
             )    (CWx)
NATIONAL BOARD OF MEDICAL  )
EXAMINERS       )


ORAL DEPOSITION

DR. NANCY L. NUSSBAUM

December 9, 2009


  ORAL DEPOSITION OF DR. NANCY L. NUSSBAUM, produced

as a witness at the instance of the Plaintiff and duly

sworn, was taken in the above-styled and numbered cause

on the 9th day of December, 2009, from 11:15 a.m. to

12:04 p.m., before Staci Williams, Certified Shorthand

Reporter in and for the State of Texas, reported by

computerized stenotype machine at the offices of Austin

Neuropsychology, 711 F-2 West 38th Street, Austin,

Texas, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto.

Statewide Scheduling * Legal Video * Internet Repository

5

```
 1                    DR. NANCY L. NUSSBAUM,

 2      having been first duly sworn, testified as follows:

 3                         EXAMINATION

 4      BY MR. NOWAK:

 5          Q.    Would you state your name, please?

 6          A.    Nancy Nussbaum.

 7          Q.    Can you tell me, Dr. Nussbaum, what the

 8      standards are to qualify for disability under the

 9      Americans with Disabilities Act?

10          A.    I can't tell you in --

11          Q.    There are so many, aren't there?

12          A.    Right, there are so many, so I don't think I

13      can give you in detail the --

14          Q.    Generally, you realize that the act -- and if I

15      speak over, please give me the high sign or at this

16      point throw your phone at me.

17                    In general, you know that there have been

18      amendments that went into effect I think the first of

19      this year?

20          A.    2008, yes.

21          Q.    2009?

22          A.    I think it was -- was it passed in 2008 and

23      maybe went into effect in 2009?

24          Q.    When did Barak take office?  Earlier this year?

25      Bush --
```

AcuScribe Court Reporters, Inc.
(800) 497-0277

Statewide Scheduling * Legal Video * Internet Repository

6

1    A.    January 2009.

2    Q.    Bush signed them in August?

3    A.    Of 2008.

4    Q.    And I think they took effect the 1st?

5    A.    January 1st, 2009.

6    Q.    So generally, and it's really not a quiz, but

7    do you understand that the law defines disability as a

8    physical or mental impairment that substantially limits

9    one or more major life activities of such individual,

10    or, a record of such impairment?

11    A.    Yes.

12    Q.    And that major life activities is defined to

13    include learning, reading, concentrating, and thinking,

14    among other things?

15    A.    Yes.

16    Q.    And you understand that pursuant to the

17    amendments, it was the Act of '08, pursuant to the

18    amendments that are now in effect, that the term

19    "substantially limits" is to be interpreted in favor of

20    broad coverage?

21    A.    Yes.

22    Q.    I think what happened is the courts were

23    getting a little stingy with how they applied the ADA

24    standard, would you agree with that?

25    A.    No, I haven't looked at exactly the cases, I

7

1    don't understand that part.

2        Q.    Okay.  Do you understand that the purpose of

3    the amendments were to return application of the ADA to

4    the original intent of broad coverage?

5        A.    No.

6        Q.    What was the purpose, to your understanding,

7    for the amendments?

8        A.    I didn't really follow what the purpose was, I

9    just followed what the new amendment was.

10        Q.    What is the new amendment, how does that

11    differ --

12        A.    How you just described it.

13        Q.    Broader interpretation, broader coverage?

14        A.    Of what you just said with the substantially

15    limits, yeah.

16        Q.    Gotcha, gotcha.  And you understand of course

17    that reading is a major life activity?

18        A.    Yes.

19        Q.    Okay.  Are you familiar with the criteria for

20    cognitive disorder not otherwise specified?

21        A.    Yes.

22        Q.    Okay.  And what are those criteria?

23        A.    I'm going to pull out my DSM so that --

24        Q.    Anytime you need to look at anything, Doctor,

25    that's fine with me.

Statewide Scheduling * Legal Video * Internet Repository

9

1    A.    That he had a blow to the head and had a

2  depressed right parietal skull fracture, and I think

3  also had a, maybe a shoulder injury, I'm not sure.

4    Q.    I've looked at your report, and is your report,

5  does that give a complete listing of everything you've

6  reviewed?

7    A.    No, since that time I received -- let's see.

8    Q.    DuShenko, Levine, Jayatilaka depositions?

9    A.    Their depositions, and I also got the data file

10  from Dr. -- is it Dr. -- who is the main person,

11  Dr. Levine or Dr. --

12    Q.    It's hard to tell.  Levine did most of the

13  testing.

14    A.    Testing, right.

15    Q.    DuShenko did the interview and the history, I

16  think Levine did the testing and the clinical

17  observations.

18    A.    So it's probably Dr. Levine's file, then.

19    Q.    Okay.  And while we're on it, would you agree

20  with me that the best way or the most common practice in

21  evaluating a person for a disability is to first take a

22  history from that person?

23    A.    Yes.

24    Q.    And second, administer whatever tests might be

25  indicated?

Statewide Scheduling * Legal Video * Internet Repository

1    A.   Yes.

2    Q.   Of course evaluate the results of that test,

3  correct?

4    A.   Correct.

5    Q.   And the third, I guess I'd call it a pillar,

6  would be clinical observations?

7    A.   And there's a fourth.

8    Q.   What's the fourth?

9    A.   Review records.

10    Q.   Review records.  Now, you would never presume

11  to make a diagnosis of a person without personally

12  meeting that person, correct?

13    A.   That's correct.

14    Q.   In fact, you consider it unethical to make a

15  diagnosis without hands-on personally meeting the

16  person?

17    A.   Yes.

18    Q.   When were you -- you've been retained by the

19  National Board?

20    A.   Yes.

21    Q.   When were you retained?

22    A.   In January of 2009.

23    Q.   Who called -- were you called or did you get a

24  letter?

25    A.   I was called, I believe I was called initially.

1   Q.   With?

2   A.   With -- well --

3   Q.   Catherine Farmer?

4   A.   Probably Catherine Farmer, because that's who

5   the letter is to.

6   Q.   How much time did you spend reviewing the

7   information that was given to you prior to drafting your

8   January 22nd, 2009, letter?

9   A.   It looks like I spent a couple of hours doing

10   that.

11   Q.   Two?

12   A.   Two hours, and then an hour and a half of doing

13   the letter, so that would be some of the review while I

14   was doing the letter, so it looks like about three and a

15   half hours.

16   Q.   Generally speaking, would three and a half

17   hours be sufficient to diagnose a person with a

18   disability recognized by the ADA?

19   A.   To do the evaluation --

20   Q.   Yes.

21   A.   -- as you described it earlier?

22   Q.   Yes, ma'am.

23   A.   No.

24   Q.   Do you think that time is sufficient to review

25   the documents to determine whether or not the documents

Statewide Scheduling * Legal Video * Internet Repository

17

1    support a disability?

2        A.    Yes.

3        Q.    In your letter on page 2 you note that you

4    found the documentation to be insufficient to document a

5    disability, is that correct?

6        A.    Yes.

7        Q.    What was lacking?

8        A.    That you have a disorder that reaches a level

9    of a disability so that there's a consistent pattern in

10   the evaluation results that indicates that the person

11   has impairment or they're below average in a number of

12   areas that would lead you to say that they have a

13   disability.

14       Q.    And of course, again repeating myself, you know

15   that Dr. DuShenko diagnosed cognitive disorder NOS?

16       A.    Yes.

17       Q.    Did you find any evidence in the documents

18   submitted -- and I know what your opinion is, is that

19   you don't think that the evidence or that the documents

20   support that diagnosis, but did you find any evidence

21   whatsoever that would tend to support that diagnosis?

22       A.    That would tend to support that diagnosis.  He

23   had scores that were below average in a number of areas.

24       Q.    And those below-average scores would tend to

25   support that diagnosis?

**Statewide Scheduling * Legal Video * Internet Repository**

18

1       A.   Would be one thing that you'd look at for that

2   diagnosis.

3       Q.   In what areas did he score below average?

4       A.   I think -- look at my notes.  On the DKEFS,

5   D-K-E-F-S, verbal fluency subtest, one subtest of verbal

6   fluency from that measure, and there's three subtests,

7   and he only was below average in one of those.

8       Q.   Okay.

9       A.   Logical memory from the Wechsler Memory Scale,

10  the Wisconsin Card Sorting Test, the 64-item version of

11  that.

12      Q.   Let me ask you, is the 64 standard --

13           MS. BRENNER:  Wait.  Do you want to finish

14  your answer before --

15      Q.   (BY MR. NOWAK) I was going to forget 64 versus

16  128.  I'll remember that we're on the 64 deal.  Is 64

17  standard or is 128 standard on that deal?

18      A.   Well, I think that it's a better test to give

19  128.

20           MS. BRENNER:  Did you finish your answer

21  to the earlier question?

22      Q.   (BY MR. NOWAK) No, I apologize for

23  interrupting, but I swear I would have forgot to ask

24  that.  Go on, please.

25      A.   Sure.  And pegboard and finger tapping.  Can we

Statewide Scheduling * Legal Video * Internet Repository

20

1    A.    About two and a half hours, I think.

2    Q.    Ouch.  With a lawyer?  Wendy's nice.

3           MS. BRENNER:  I'm very charming.

4           THE WITNESS:  Right.

5    Q.    (BY MR. NOWAK) What did y'all talk about in

6  that two and a half hours?

7    A.    We went through the files, I think, and talked

8  about the standards, again refreshed me on the

9  standards.

10   Q.    The ADA standards?

11   A.    Yes, uh-huh.  And mainly went through the file.

12   Q.    Are the ADA standards different from the

13  National Board standards?

14   A.    Not that I'm aware of.

15   Q.    Tell me more about what y'all -- other than the

16  standards and the file, I mean --

17   A.    Well, okay, so we went through the letter that

18  I had written and kind of how I'd come to those

19  opinions.  We went through my notes that talked about --

20  I mean, I can go through those with you if you want.

21   Q.    That would be great.

22   A.    Okay, so --

23          MS. BRENNER:  I think we need a question.

24   Q.    (BY MR. NOWAK) Okay, first of all, you'd agree

25  with me that different psychologists can differ on

1    whether or not to reach a diagnosis, correct?

2        A.   Yes.

3        Q.   Okay.  In fact, that's what happened in the

4    Rush case, we had I want to say six or seven

5    psychologists, let's call it eight, and it was four and

6    four.  And that's not uncommon, is it?

7        A.   I think it is uncommon to have that degree of

8    difference, to have four line up on one side and four

9    line up on the other side.

10       Q.   Right.

11       A.   Yeah.

12       Q.   And would you agree with me that the best

13   person to assign a diagnosis would be the clinician that

14   actually administered the tests -- took the history,

15   administered the tests, made clinical observations, and

16   reviewed documents?

17       A.   That's the person who should diagnose the

18   person.

19       Q.   Now, you were going to tell me about your

20   notes, so here's my question.  If you would go through

21   your notes and explain them to me, describe them to me,

22   tell me what you're doing there on that paper.

23       A.   Sure, and then if you can ask me how much

24   detail you want --

25       Q.   Yes, ma'am.

Statewide Scheduling * Legal Video * Internet Repository

22

1    A.    -- please, that would be great.

2    Q.    Yes, ma'am.

3    A.    Unless you want me to go through line by line.

4    Q.    No, just give me the gist, and if we want to go

5    any deeper, we will.

6    A.    Okay, sure.  So I have notes on -- that I took

7    on Mr. Jayatilaka's deposition, it's about one page of

8    notes.

9    Q.    Okay.  Anything that jumps out at you?

10   A.    Statements about that he doesn't feel that he

11   currently has significant cognitive problems jumped out

12   at me.

13   Q.    Without disclosing any names, obviously we

14   don't want to violate HIPAA, you've had patients that

15   don't believe they have a disability and you've

16   diagnosed them with disabilities, correct?

17   A.    Yes.

18   Q.    It's not uncommon to see a patient who is in,

19   quote-unquote, "denial," that doesn't want to believe

20   they have some sort of disability, correct?

21   A.    That's correct.

22   Q.    I think Dr. DuShenko in his definition called

23   it machismo, and I'm paraphrasing, or bravado on behalf

24   of Dru that he doesn't want to acknowledge that he has a

25   disability, you recall that from his deposition,

Statewide Scheduling * Legal Video * Internet Repository

23

1    correct?

2        A.    Yes.

3        Q.    And I interrupted you, you were going through,

4    and I think you first said on your first note of your

5    notes on Dru's deposition that he had indicated he did

6    not believe he has a disability?

7        A.    Or cognitive problems.

8        Q.    Okay.

9        A.    Is what he said, yeah.

10       Q.    Okay.

11       A.    Okay.  And then Dr. Levine's deposition, I took

12   notes on that, so I have about, well, one page of notes

13   on that.

14       Q.    And Dr. Levine disagrees with the diagnosis of

15   cognitive disorder NOS, right?

16       A.    That's correct.

17       Q.    That would be the -- probably one of the

18   biggest things that jumped out at you, right?

19       A.    Right, and talking about relative deficits I

20   think is another thing that jumped out.

21       Q.    Why is that?

22       A.    Well, there's a difference between absolute

23   deficits or -- absolute deficits and relative deficits.

24       Q.    And what is that difference?

25       A.    So absolute deficits would be statistically

Statewide Scheduling * Legal Video * Internet Repository

33

1      A.   The -- from the DKEFs.

2      Q.   Okay.  Okay, keep going, I'm sorry.

3      A.   Okay.  So then I just have notes that I took,

4    and I don't have them dated so I don't know exactly when

5    I took these.  I think that these were probably taken

6    after I had read the depositions in the last say six

7    weeks or so.  And they're just notes about what my

8    observations were.

9      Q.   Could I take just like a minute?  We don't have

10   to go off the record.

11     A.   Sure (indicating).

12     Q.   Thank you so much.  (Mr. Nowak examines

13   records) What does TBI stand for?

14     A.   Traumatic brain injury.

15     Q.   If a given -- if it takes a given person twice

16   as long to process the written word, in other words to

17   get it in and be able to work with what they're reading,

18   what would an appropriate accommodation be?

19          MS. BRENNER:  Objection, calls for

20   speculation.

21     Q.   (BY MR. NOWAK) Or what are the appropriate

22   accommodations?

23     A.   If they are -- take twice as long and they have

24   other evidence that they have a reading disorder, then

25   the appropriate accommodation would be extended time.

Statewide Scheduling * Legal Video * Internet Repository

34

```
1        Q.    One and a half to two times -- if it takes him

2   twice as long, would two times be an appropriate

3   accommodation?

4             MS. BRENNER:   Objection.

5        A.    100 percent more time, yes.

6        Q.    (BY MR. NOWAK) Which is my way of saying double

7   time.

8        A.    Mm-hmm.

9        Q.    And just to be clear, you didn't take Dru's

10  history, correct?

11       A.    Correct.

12       Q.    Did not test him, correct?

13       A.    Correct.

14       Q.    Did not make any clinical observations,

15  correct?

16       A.    Correct.

17       Q.    You did review the documents, though?

18       A.    Yes.

19       Q.    Okay.   In your -- in counsel's disclosures it

20  shows that you were an expert witness at trial or

21  deposition in the following cases, Gabriel Zeifman.

22  Without revealing anything protected by HIPAA, generally

23  what was that case about?

24       A.    Some of these I remember and some I don't.

25       Q.    Okay, that's fair enough.
```

Statewide Scheduling * Legal Video * Internet Repository

38

```
1                    CHANGES AND SIGNATURE

2     WITNESS NAME:  DR. NANCY L. NUSSBAUM

3     DATE OF DEPOSITION:  December 9, 2009

4     PAGE LINE  CHANGE                    REASON

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

**Statewide Scheduling * Legal Video * Internet Repository**

39

```
 1        I, DR. NANCY L. NUSSBAUM, have read the foregoing

 2   deposition and hereby affix my signature that same is

 3   true and correct, except as noted above.

 4                              _____

 5                              DR. NANCY L. NUSSBAUM

 6   THE STATE OF _____)

 7   COUNTY OF _____)

 8        Before me, _____, on this day

 9   personally appeared DR. NANCY L. NUSSBAUM, known to me

10   or proved to me on the oath of _____ or

11   through _____ (description of

12   identity card or other document) to be the person whose

13   name is subscribed to the foregoing instrument and

14   acknowledged to me that he/she executed the same for the

15   purpose and consideration therein expressed.

16

17        Given under my hand and seal of office on this _____

18   day of _____, _____.

19

20                              _____

21                              NOTARY PUBLIC IN AND FOR

22                              THE STATE OF _____

23   My Commission Expires: _____

24   ___No Changes Made ___Amendment Sheet(s) Attached

25   JAYATILAKA VS. NATIONAL BOARD OF MEDICAL EXAMINERS
```

**Statewide Scheduling * Legal Video * Internet Repository**

40

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
 2
     DRUVI JAYATILAKA             )
 3                               )
     vs.                         ) CASE NO. CV 09-2932 PA
 4                               )          (CWx)
     NATIONAL BOARD OF MEDICAL   )
 5   EXAMINERS                   )

 6                      REPORTER'S CERTIFICATE

 7           ORAL DEPOSITION OF DR. NANCY L. NUSSBAUM

 8                       December 9, 2009

 9

10       I, Staci Williams, Certified Shorthand Reporter in

11   and for the State of Texas, hereby certify to the

12   following:

13       That the witness, DR. NANCY L. NUSSBAUM, was duly

14   sworn and that the transcript of the deposition is a

15   true record of the testimony given by the witness;

16       That the deposition transcript was duly submitted on

17   December 17, 2009   to the witness or to the attorney for

18   the witness for examination, signature, and return to me

19   by January 18, 2010          .

20       That a copy of this certificate was served on all

21   parties shown herein on _____.

22       I further certify that pursuant to FRCP Rule

23   30(f)(1) that the signature of the deponent:

24       __X__was requested by the deponent or a party before

25   the completion of the deposition and that the signature
```

**AcuScribe Court Reporters, Inc.**
**(800) 497-0277**

Statewide Scheduling * Legal Video * Internet Repository

41

1   is to be before any notary public and returned within 30

2   days from date of receipt of the transcript.   If

3   returned, the attached Changes and Signature Page

4   contains any changes and the reasons therefore:

5        ____was not requested by the deponent or a party

6   before the completion of the deposition.

7        I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties in the

9   action in which this proceeding was taken, and further

10  that I am not financially or otherwise interested in the

11  outcome of this action.

12       Certified to by me on this 11th day of

13  December, 2009.

14

15

16       _____

17       STACI WILLIAMS, TEXAS CSR 8306
         Expiration:  12/31/2010
         Firm Registration No. 241
18       1601 Rio Grande, Suite 443
         Austin, Texas  78701
19       (512) 499-0277

20

21

22

23

24

25

Statewide Scheduling * Legal Video * Internet Repository

42

1    COUNTY OF TRAVIS )

2    STATE OF TEXAS    )

3        I hereby certify that the witness was notified on

4    _____ that the witness has 30 days (or _____days

5    per agreement of counsel) after being notified by the

6    officer that the transcript is available for review by

7    the witness and if there are changes in the form or

8    substance to be made, then the witness shall sign a

9    statement reciting such changes and the reasons given by

10    the witness for making them;

11        That the witness' signature was/was not returned as

12    of_____.

13        Subscribed and sworn to on this _____ day of

14    _____, _____.

15

16

17        _____

18    STACI WILLIAMS, TEXAS CSR 8306
         Expiration:  12/31/2010
19    Firm Registration No. 241
         1601 Rio Grande, Suite 443
20    Austin, Texas  78701
         (512) 499-0277

21

22

23

24

25