Vincent E. Nowak, Texas State Bar No. 15121550
MULLIN HOARD & BROWN, LLP
P.O. Box 31656
Amarillo, TX   79120-1656
Telephone: (806) 372-5050
Facsimile: (806) 372-5086

Alisa M. Morgenthaler, State Bar No. 146940
GLASER, WEIL, FINK, JACOBS
  HOWARD & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone:  (310) 282-6287
Facsimile:  (310) 556-2920

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DRUVI JAYATILAKA, | Case No. CV 09-2932 PA (CWx) |
| Plaintiff, | **PLAINTIFF'S TRIAL BRIEF** |
| v. | Trial Date: April 6, 2010 |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | Judge:  Hon. Percy Anderson |
| Defendant. | |

To the Honorable United States District Court Judge:

   Plaintiff, Druvi Jayatilaka (Jayatilaka), by the undersigned counsel, files his Trial Brief pursuant to Local Rule 16-10, and respectfully states the following:

### I.  INTRODUCTION

   Plaintiff, Druvi Jayatilaka, takes twice as much time reading given material, "as compared to most people."  Because reading is a major life activity, and because plaintiff is substantially limited in this major life activity, "as compared to most people," he is entitled to

reasonable accommodations pursuant to the Americans with Disabilities Act ("ADA").  The only credible evidence before the Court is that plaintiff is entitled to the reasonable accommodation of twice the normal time on the NBME Step 2 clinical knowledge exam. Defendant's, National Board of Medical Examiners ("NBME") refusal to provide such accommodations resulted in this suit.

In September 2008, then President George W. Bush signed into law "sweeping" amendments to the ADA.  Notwithstanding the hyperbolic adjective, the amendments were only "sweeping" to the extent that they restored the ADA to its initial goal and purpose of inclusiveness.  Prior to the amendments, there was a slew of U.S. Supreme Court and Federal Circuit Court decisions that drastically limited the scope and application of the ADA, favoring instead strict construction and exclusivity.  Of course, these decisions constrained Federal District Courts to deny accommodations to individuals with legitimate disabilities, like the instant plaintiff.  Thankfully, the amendments free the trail courts to broadly apply with ADA, as was always the intent.

However, the NBME continues to function as if its job is to exclude persons from the ADA protections.  Given the evidence of plaintiff's disability, and given the clear mandate from President Bush and Congress that the ADA be liberally applied, this Court should grant the accommodation of twice the normal time on the NBME Step 2 exam.  Such a ruling would test plaintiff's clinical knowledge rather than test his disability.

## II. APPLICABLE AUTHORITY

The ADA amendments expressly rejected the constraints set forth in recent cases, with the instruction that "[t]he definition of disability in [the ADA] shall be construed in

favor of broad coverage of individuals under this Act."[1]  Specifically, the amendments state as their purpose, in part, "to reject the standards enunciated by the Supreme Court in [*Toyota*], that the terms "substantially" and "major" in the definition of disability under the ADA 'need to be interpreted strictly to create a demanding standard for qualifying as disabled,' and that to be substantially limited in performing a major life activity under the ADA 'an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives.'"[2]  Congress found that, as a result of *Toyota,* "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities."[3]

The amendments define disability as, "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; [or] (B) a record of such impairment . . ."[4]  "Major Life Activities" is defined to include, "learning, reading, concentrating, thinking . . ."[5]  "The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008."[6]  In other words, the term is to be interpreted "in favor of broad coverage.  Finally, the amendments provide that "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without regard to the ameliorative effects of mitigating*

---

[1] 42 U.S.C. § 12102(4)(A).
[2] Pub. L. 110-325 § 2(b)(4).
[3] *Id.* at § 2(a)(6).
[4] 42 U.S.C. § 12102(1)(A) & (B).
[5] *Id.* at § 12102(2)(A).
[6] *Id.* at § 12102(4)(B).

*measures* such as . . . ***reasonable accommodations . . .or . . . learned behavioral or adaptive neurological modifications.*[7]**

Title II of the ADA prohibits discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability. 42 U.S.C. § 12132. Title III of the ADA requires, *inter alia*, entities offering licensing examinations to provide reasonable accommodations to disabled individuals. 42 U.S.C. § 12189. *See also* 29 C.F.R. § 1630.2(j)(3)(i) (extra time accommodations on timed examinations).

In order to find that Plaintiff has a disability, he must be substantially limited in a major life activity in comparison to "most people." 28 C.F.R. Pt. 35, App. A § 35.104.

> "[A]n impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity..."

29 C.F.R. pt. 1630, App. A § 1630.2(j).

On the totality of evidence, including Plaintiff's current neuropsychological examination scores (required by the NBME to document Plaintiff's diagnosis and disability) and his DSM diagnosis, Plaintiff has shown that he is an individual with a disability under the ADA because he is substantially limited in the major life activities of reading and comprehending what is read to use it in functional way when compared to most people.

The USMLE Step II examination involves and requires extensive reading, and scoring well and/or passage of the exam requires extensive subject-matter knowledge. Plaintiff has shown a sufficient causal connection between his cognitive impairment and his substantial limitation to read and comprehend the written word as compared to most people. Plaintiff

---

[7] *Id.* § 12102(4)(E)(i)(emphasis added).

has shown that if he is accommodated he will be effectively tested not on his disability but rather on his subject matter knowledge.  Plaintiff has shown that his cognitive impairment seriously decreases the rate at which he reads with comprehension.  Plaintiff will suffer irreparable injury if the requested injunction is denied.

With the requested reasonable accommodation of double time to take the Step II exam, Plaintiff will have time to either display his mastery of the subject matter, or show that he has not sufficiently mastered the tested materials.  In either event, granting the injunction will allow Plaintiff to be tested on his medical and science knowledge and not his disability.

The threatened injury to Plaintiff outweighs any damage that granting the injunction might cause at this time to the Defendant or to the public.

The injunction will not disserve the public interest but will further the public interest in prohibiting discrimination by public entities, such as the National Board of Medical Examiners, on the basis of disability by fulfilling the ADA's requirement that entities offering licensing examinations provide reasonable accommodations to disabled individuals.

### III.  TRIAL EVIDENCE

**Dr. Dushenko testified as follows:**

It is my understanding that the parties dispute whether Plaintiff has a disability as defined under the Americans with Disabilities Act and what reasonable accommodations would be in light of any disability.

For the reasons set forth below, it is my opinion, based upon my research, experience, and personal knowledge of Plaintiff that he has a disability which is classified by the DSM-IV on Axis I of 294.9: Cognitive Disorder NOS.  It is also my opinion, based upon my

experience and research, that twice or double the standard time is a reasonable accommodation on an examination to grant an individual with such a disability.

I am the president and CEO of Health Psychology Associates in Long Beach, California.  I am a member of the American Psychological Association, as well as other societies and foundations for psychology.  I have attached my Curriculum Vitae to this declaration.  (Trial Exhibit # 26).  I am affiliated with three separate hospital systems in the Long Beach area.  My current practice consists of neuropsychology and psychological evaluations, post trauma stress treatment, adult psychotherapy, geropsychology, and integrative medicine.

I received my Ph.D. in 1983 from the University of Manitoba, in Winnipeg, Canada. Following my Ph.D. degree, I received post-doctoral training at the Rosenberg-Rand Institute from January 1986 through June 1988.  I am also officially licensed in Psychology by the state of California as of January 1984.

As of 2004, I have a Level 3 certification in Intuition in Psychotherapy (NICABM). For a more detailed review of my certifications, experience, and publications please refer to my Curriculum Vitae, which I have attached here to and hereby incorporate as if set out fully herein.

On April 2, 2008, after my clinical interview, the following procedures were administered by my colleague Dr. Andrew Levine:  Beck Depression Inventory, Second Edition; Boston Naming Test; Delis-Kaplan Executive Functioning System (including Trail Making Test, Verbal Fluency Test, and Color Word Interference Test); Finger Tapping Test; Grooved Pegboard; Hooper Visual Organization Test; Millon Clinical Multiaxial Inventory –

III; Wechsler Adult Intelligence Scales – Third Edition; Wechsler Memory Scale – Third Edition; Wechsler Test of Adult Reading; and Wisconsin Card Sorthing Test – 64.

Plaintiff returned for the following procedures on May 8, 2008:   Delis-Kaplan Executive Function System – Verbal Fluency (Alternative Form) and Conners' Continuous Performance Test, Second Edition.

Finally, Jayatilaka took the Woodcock Johnson Psychoeducational Battery – Third Edition on May 15, 2008.

My opinions of Jayatilaka are based on my training, experience, personal contact with plaintiff, and a detailed review of his medical records and the results of the above procedures.

His scores in these areas show more than just a "weakness" in relation to the population overall, or most people.   His cognitive disorder is significant enough to be classified a deficit or impairment, when compared to most people.

Jayatilaka's disability does not directly affect his reading ability.   It affects his ability to make sense of what he has read and the ability to use it in a functional way.   The disability manifests itself in certain aspects of verbal processing, difficulty in speed-of-information processing, and extended mental tracking and control.

It was my opinion at the time, and still is today, that his cognitive disability would be directly reflected in test performance, if provisions such as extra time, were not made.

Jayatilaka's disability substantially limits his ability to process verbal and written information, as compared to most people.   Because of his reduced ability and reduced speed in understanding what he has read, he is not functioning at a level that is consistent with

either his premorbid functioning or with functioning that is sufficient for him to complete the Step II examination without accommodation.   Specifically, this inability to process information efficiently results in significantly reduced test scores on timed exams because he is not able to complete the examination.   In general, Jayatilaka does poorly on timed tasks because of is slow performance and processing speed.   This can be seen in his difficulty with tasks such as confrontation naming and phonemic fluency.   The test results demonstrate that Jayatilaka's low reading efficiency is caused by a very low reading processing and decision speed.   Processing speed is the ability to perform automatic cognitive tasks, particularly when measured under time pressure to maintain focused attention.   Decision speed is an aspect of cognitive efficiency and provides an index of a person's ability to make correct conceptual decisions quickly.

Allowing Jayatilaka twice or double the standard time on the examination is a reasonable accommodation.   It would equalize the test demands and ensure that he has a fair chance to display his mastery, or lack thereof, of the tested material.   The cognitive disorder, while effecting Jayatilaka's processing speed, does not affect his knowledge of the medical material that may or may not be tested on the examination.   The reasonable accommodation of double time would allow him the needed time to comprehend and process what the questions are asking.   During the extra time, Jayatilaka will either show his mastery of the subject matter, or his lack of knowledge.   Thus allowing him to be tested on the material at issue and not his cognitive disability.

**Plaintiff testified as follows:**

My disability stems back to 1995, when I was brutally attacked in Guadalajara, Mexico. On December 5, 1995, I was preparing to travel back to the United States when my friends invited me go out with them to celebrate their upcoming graduation. I did not really want to go, but did anyway. I did not drink while I was out with them.

One of my friends had left the club where we were and I was getting hungry, so I walked out to find him. When I stepped outside, I saw my friend sitting on the curb. As I was walking up to him, someone jumped on me from behind. At first I thought it was one of my friends, but then he hit me in the head with the butt of a handgun. After being hit, I have trouble remembering what happened. The next thing I clearly remember is waking up on the ground with a gun pointed at my head. The person standing over me fired the gun. Then a car came speeding up the street and ran over my shoulder. I did my best to crawl between two parked cars to prevent being hit or run over again.

Red Cross set up a staging area, but I felt I needed to go to a hospital. At the hospital, they wanted to explore the wound to find pieces of my skull and lift it back up. I told them that I did not want them to do that and I would go back to the United States for treatment. I had them just clean the wound and I went home.

I flew back to Los Angeles, California the next day and was taken to St. Mary's Medical Center in Long Beach. I had a depressed skull fracture and after surgery stayed in the ICU for several days, then in a regular room for continued observation for at least another three days before finally being sent home.

Since my accident I have noticed several changes in my mental abilities and function.

The most noticeable since the accident are the migraines I have. I have been diagnosed with post-traumatic disorder migraines. The migraines come and go. I have years when they are a mild hindrance, and other years where they are absolutely debilitating. They were worst immediately following the accident. I would have to stay home for days on end because the migraines were so bad with no relief.

I have also noticed that I have trouble comprehending and understanding what I read at the speed and ability I did before the accident. Normally, I must now read something at least twice to understand what it says or in the situation of an exam question, what it is asking. I have noticed it helps if I write something out myself, but that is not an option in many situations where much reading is required.

### Defendant's Experts Testified as follows:

The NBME hired two experts, Litchford and Nussbaum. Neither of these experts met with, examined, tested, made clinical observations, nor scored the battery of tests. Importantly, both of these experts admit that it is impossible to make a disability diagnosis without having done any of the foregoing. Moreover, both admit that it would be unable to assign a diagnosis without performing any of the foregoing. Notwithstanding, they both nakedly assert that plaintiff is not disabled. The Court should ignore the "opinions" of both of these experts because neither follow the very standard of diagnosis to which they admit.

### IV. CONCLUSION

Because plaintiff has met his burden in showing that he is substantially limited, as compared to most people, with respect to a major life activity (reading), and because the

NBME has refused reasonable accommodations, the Court should grant plaintiff's request that the NBME be enjoined from allowing plaintiff the reasonable accommodation of twice the normal amount of time on the NBME Step 2 exam.  Plaintiff prays for whatever additional relief the Court deems appropriate.

Dated: March 30, 2010.

Vincent E. Nowak, Esq.
MULLIN HOARD & BROWN, LLP
P.O. Box 31656
Amarillo, TX  79120-1656
E-mail: venowak@mhba.com

Alisa M. Morgenthaler, Esq.
GLASER, WEIL, FINK, JACOBS
 HOWARD & SHAPIRO, LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
E-mail: amorgenthaler@glaserweil.com

MULLIN HOARD & BROWN, LLP

By: /s/ Vincent e. Nowak
        Vincent E. Nowak
Attorneys for Plaintiff
Druvi Jayatilaka

1

## **PROOF OF SERVICE**

2   STATE OF CALIFORNIA
    COUNTY OF LOS ANGELES
3

4        I am employed in the County of Los Angeles, State of California; I am over the
5   age of 18 and not a party to the within action; my business address is 10250
    Constellation Boulevard, 19th Floor, Los Angeles, California 90067.
6

7        On March 30, 2010, at the direction of a member of the Bar of this Court, I
    served the document described below:
8

9   PLAINTIFF'S TRIAL BRIEF

10  on the interested parties to this action by delivering a copy thereof in a sealed
11  envelope addressed to each of said interested parties at the following address(es):

12  Gregory C. Tenhoff, Esq.
13  Cooley, Godward, Kronish, LLP
    5 Palo Alto Square
14  3000 El Camino Real
15  Palo Alto, CA  94306-2155
    gtenhoff@cooley.com
16  (650) 843-5000
17  (650) 857-0663 (fax)

18  ☒       (BY MAIL)  I am readily familiar with the business practice for collection
19          and processing of correspondence for mailing with the United States
20          Postal Service.  This correspondence shall be deposited with the United
            States Postal Service this same day in the ordinary course of business at
21          our Firm's office address in Amarillo, Texas.  Service made pursuant to
22          this paragraph, upon motion of a party served, shall be presumed invalid
            if the postal cancellation date of postage meter date on the envelope is
23          more than one day after the date of deposit for mailing contained in this
24          affidavit.

25

26

27

28

{8070\00\00168347.DOC / 1}
PLAINTIFF'S TRIAL BRIEF

Page 12

☐ (BY OVERNIGHT DELIVERY SERVICE) I served the foregoing document by Federal Express, an express service carrier which provides overnight delivery, as follows. I placed true copies of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed to each interested party as set forth above, with fees for overnight delivery paid or provided for.

☐ (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the above named addressee(s).

☒ (BY E-MAIL) I caused such documents to be delivered via facsimile to the offices of the addressee(s) at the e-mail address listed above.

Executed this 30th day of March, 2010, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____

ERIKA BARBOUR